UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| ENERGY TRANSFER EQUITY, L.P., and ENERGY TRANSFER PARTNERS, L.P.,<br><br>Plaintiffs,<br><br>vs.<br><br>GREENPEACE INTERNATIONAL (aka "STICHTING GREENPEACE COUNCIL"); GREENPEACE, INC.; GREENPEACE FUND, INC.;  BANKTRACK (aka "STICHTING BANKTRACK"); EARTH FIRST!; and JOHN AND JANE DOES 1-20,<br><br>Defendants. | Case No.: _____<br>Judge: _____<br><br>**COMPLAINT<br>JURY TRIAL DEMANDED** |

Plaintiffs Energy Transfer Equity, L.P., Energy Transfer Partners, L.P.  (collectively "Energy Transfer" or "Plaintiffs"), as and for their complaint against Greenpeace International (aka "Stichting Greenpeace Council"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund") (collectively, the "Greenpeace Defendants"), BankTrack (aka "Stichting BankTrack"), Earth First!, and John and Jane Does 1-20, allege as follows:

<u>PRELIMINARY STATEMENT</u>

1.      This case involves a network of putative not-for-profits and rogue eco-terrorist groups who employ patterns of criminal activity and campaigns of misinformation to target legitimate companies and industries with fabricated environmental claims and other purported misconduct, inflicting billions of dollars in damage.  The network's pattern of criminal and other misconduct includes (i) defrauding charitable donors and cheating federal and state tax authorities with claims that they are legitimate tax-free charitable organizations; (ii) cyber-attacks; (ii) intentional and malicious interference with their targeted victim's business

relationships; and (iv) physical violence, threats of violence and the purposeful destruction of private and federal property.  Energy Transfer is the latest legitimate business targeted by this network.

2.      Over several decades, certain once legitimate not-for-profit groups have been corrupted by money raised from individuals and a network of foundations and special interests willing to "contribute" to advance their own political or business agendas.  More recently, many smaller, more violent eco-terrorist organizations and radicalized individuals have begun exploiting the same lucrative business model using the proliferation of web-based fundraising tools to make money, much of which is diverted for personal gain and not used to further any environmental cause.

3.      In its simplest form, this model has two components: (1) manufacturing a media spectacle based upon phony but emotionally charged hot-button issues, sensational lies, and intentionally incited physical violence, property destruction, and other criminal conduct; and (2) relentlessly publicizing these sensational lies, manufactured conflict and conflagration, and misrepresented "causes" to generate funding from individual donors, foundations, and corporate sponsors.  These putative "environmental" groups accept grants and other consideration from foundations and special business interests who use the groups' environmental mantle to advance their own ulterior agendas.

4.      The market leader among purported international not-for-profits is a network called "Greenpeace."  The Greenpeace network has fraudulently induced people throughout the United States and the world into donating millions of dollars based on materially false and misleading claims about its misrepresented environmental purpose and the sham "campaigns" it mounts against targeted companies, projects, or causes.

5.      Under the "Greenpeace Model," raising money and the network's profile is the primary objective, not saving the environment.  "Issues" are selected according to which ones will generate maximum publicity and donations, irrespective of the environmental merits.  As a matter of course, the campaigns are based upon fabricated evidence and witness accounts. Greenpeace has staged phony photo-ops, and fabricated false GPS coordinates representing locations and events that never occurred to support its campaigns, deceive the public, and elicit donations.

6.      Greenpeace's most senior leaders have admitted that their goal is not to present accurate facts, but to "emotionalize" issues and thereby "pressure" (i.e. manipulate) their donor audiences into parting with their money.  When caught red-handed spreading patently false misinformation, Greenpeace has conceded that to "emotionalize" targeted donors and other victims, it uses what it calls internally, "ALARMIST ARMAGEDDONIST FACTOIDS," that it intentionally and expressly markets to its donors as "facts" based on "research," and "science." Indeed, in a recent effort to escape legal liability for its widespread dissemination of emotionally charged, but wholly untrue statements made in the course of a fundraising campaign, Greenpeace admitted that its claims against another targeted company were not based on "research," "facts," or "science" as donors were told, but were "hyperbole" and "overheated rhetoric" that did not reflect "scientific precision" and should not be taken "literally."

7.      For decades, Greenpeace has executed its fraudulent, slanderous campaigns against hundreds of companies and industries with virtual impunity, and its tactics have become increasingly aggressive as a result.  The great success of the model has led to an explosion of groups and individuals attempting to likewise profit from exploiting the sincere environmental

interests of the public.  These groups include Earth First!, Bold Alliance, BankTrack, and others.
Together with Greenpeace, these groups form a predatory pack preying on legitimate businesses.

8.      In June 2014, Plaintiffs and their partners announced the development and
construction of the Dakota Access Pipeline ("DAPL" or the "Project") to provide much needed
safe and efficient crude oil transport in the wake of exploding North American production.  For
more than two years, Energy Transfer and its partners, together with federal and state regulatory
agencies, meticulously designed, planned, and constructed the pipeline.  The company went to
extraordinary lengths to plan for the project to cross, almost exclusively, private land.  In
addition, wherever possible the route was designed to traverse already-disturbed property that
was the site of other decades-old public works projects, including gas and power lines, to avoid
environmentally or culturally sensitive areas.  Plaintiffs' representatives also engaged in
exceptional efforts to confer with all interested stakeholders potentially affected by the pipeline's
construction, and to accommodate any genuine or legitimate concerns and objections raised by
them.  DAPL's extensive and well-documented community outreach was in addition to tribal and
other consultation undertaken by the U.S. Army Corps of Engineers (the "Corps" or "USACE")
related to the Project's crossing at Lake Oahe, which a federal court found, on its own, went
above and beyond what was legally required.

9.      Among those approached repeatedly by Plaintiffs' representatives and the Corps
for input, were the Native American tribes with property near or potentially affected by the
proposed pipeline route, including the Standing Rock Sioux Tribe ("Standing Rock" or "SRST"
or the "Tribe") in North Dakota.  During the planning and construction of the pipeline, DAPL
attempted to directly engage relevant tribes even though the project does not pass over any
sovereign Native American territory at any point along its route.   Nevertheless, for two years,

4

Plaintiffs' representatives sought to inform and listen to these critical constituents and to respond to the concerns they raised.  Some tribes elected to engage with DAPL and the Corps, and, as a result, the pipeline was rerouted repeatedly to avoid areas deemed culturally important, even though not on sovereign land, and various other steps also were implemented to further this goal. Other tribes, including specifically SRST, refused to work with DAPL and declined offers to participate in cultural surveys of aspects of the route that were not subject to review by the Corps.

10.     On July 25, 2016, years after DAPL began its outreach and the Corps engaged in its consultation, the Corps granted the permit to proceed with one of the final pieces of the pipeline under Lake Oahe.  The very next day, enterprise member Earthjustice commenced a highly publicized lawsuit on behalf of the Tribe challenging the permit.  The filing was accompanied by a press release right out of the "Greenpeace Model" -- making the grossly untrue and factually unfounded claims, among others, that the pipeline "Threatens Livelihoods, Sacred Sites, and Water"; and that the permitting process was "fast-tracked," "wrote off the Tribe's concerns," "ignored the pipeline's impacts to sacred sites and culturally important landscapes," and created an "existential threat" of an "inevitable" spill that would poison the Tribe's water supply.   The press release also misrepresented that:  "There have been shopping malls that have received more environmental review and Tribal consultation than this massive crude oil pipeline.  Pipelines spill and leak – it's not a matter of if, but when.  Construction will destroy sacred and historically significant sites."  Employing the "Greenpeace Model," the press release concluded with a solicitation for money, imploring readers to "Join Our Fight" and providing a link to donate with a suggested minimum donation of $100.  Tellingly,

understanding the weakness of the legal claims it had filed on behalf of the Tribe, Earthjustice's press release focused on a number of sensational statements that were not included in the lawsuit.

11.     The reason the Tribe had not previously alleged the objections trumpeted by the press release accompanying the new lawsuit was simple.  The claims were false.  They were asserted at the eleventh hour by Earthjustice to the press with the express purpose of attaching itself, like a parasite, to the Tribe's cause, and using it to incite an international outcry designed to serve the agenda of the Enterprise.

12.      The Enterprise exploited the impoverished Tribe's cause for its own end. Promising legal and financial support, the Enterprise urged SRST and other peaceful protesters to establish protest camps on private and Corps property north of the Cannonball River and SRST's reservation.  The Enterprise then cynically planted radical, violent eco-terrorists on the ground amongst the protestors, and directly funded their operations and publicly urged their supporters to do the same.

13.     Defendant Earth First! provided $500,000 of seed money to a core group of violent eco-terrorist infiltrators, who then formed what would be known as Red Warrior Camp. Red Warrior Camp operated as a rogue group at the protest site, refusing to work collaboratively with the Tribe or the protestors' various ad hoc governing bodies.  Greenpeace also organized donation drives to fund, feed, and house the militant group in ten cities across the country.  Red Warrior Camp advertised their violent confrontations to secure additional funding, and used other illegal means, including selling drugs bought with donated money to other protestors at the camps to finance their operations and line their own pockets.

14.     Red Warrior Camp initiated direct action training for its own members and other protestors interested in engaging in violent conflict and incited and perpetrated acts of terrorism

6

and destruction of private and federal lands.   The violence at the camps escalated in tandem with the establishment of Red Warrior Camp and the Enterprise's misinformation campaign.  The Enterprise maliciously disseminated misinformation and prompted on-site violence for its own financial purposes and not because it was in the Tribe's interest.  Indeed, ultimately, the Tribe sought to evict Red Warrior Camp from the protest site in November 2016 because it had become apparent that the Red Warrior Camp was advancing their own and the Enterprise's sensational and violent agenda irrespective and contrary to the interests of the Tribe that they falsely claimed to be supporting.

15.     For the next six months, the Defendants and Enterprise members used this manufactured crisis to relentlessly campaign against DAPL based on a series of demonstrably false lies and illegal activity designed to publicize those lies.  First, the Enterprise falsely claimed that the pipeline was intentionally constructed over sacred and culturally important sites, when, in fact, Plaintiffs' representatives have gone to extraordinary lengths to avoid such sites.

16.      Second, the Enterprise falsely claimed that the pipeline was constructed on tribal lands without permission, when, in fact, the pipeline was constructed almost exclusively on private land, with the remaining land comprised entirely of federal, not tribal lands.

17.     Third, the Enterprise falsely claimed the pipeline was approved and constructed without tribal consultation when, in fact, both Plaintiffs' representatives and USACE, the U.S. federal agency responsible for reviewing the project before issuing permits, consulted extensively with the tribes.

18.     Fourth, the Enterprise misrepresented that the pipeline created a materially increased and substantial risk of an oil spill that would poison (or was already poisoning) the Tribe's drinking water, when, in fact, the route where the pipeline travels already contained an

existing pipeline which has operated without incident or objection for decades, and DAPL's materials, design, and construction were far safer than, and superior to, that existing pipeline, and, most important, crude oil was being transported regularly through tribal land and water -- without objection -- by truck and rail, both of which are exponentially more dangerous and environmentally harmful means of transport.

19.     Fifth, the Enterprise misrepresented that Plaintiffs and DAPL have engaged in abusive treatment of so-called protestors in North Dakota, including allegedly beating, firing at, and directing dogs to attack what the Enterprise misrepresented were peaceful protestors.  In fact, it was the Enterprise members and mobs they intentionally incited who engaged in criminal and civil trespass, rioting, assaults and menacing, attacking police and innocent workers, chasing police and construction staff with vehicles, horses, and dogs, and causing widespread destruction of public (including federal) and private property.  Yet, the Enterprise claimed its protestors were peaceful and fabricated evidence that Plaintiffs attacked those peaceful protestors by publishing a photograph purporting to show a dog bite received by a child at the DAPL site in North Dakota, when, in fact, the picture was of a young girl bitten years before in an entirely different location under entirely different circumstances having nothing to do with DAPL.

20.     The Enterprise, through Earth First! and Red Warrior Camp, knowingly funded, controlled, directed, and incited acts of terrorism in violation of the U.S. Patriot Act, including attempted and actual destruction of an energy facility and arson on government property and aimed at interstate commerce.  These acts of physical sabotage of the pipeline were serious terrorist threats that -- had oil been flowing in the pipeline when the attacks were perpetrated -- would have caused the pipeline to explode, endangering human lives and resulting in

environmental disaster.   The attacks further undermine the authenticity of the Enterprise's "environmental" cause.

21.     In addition to utilizing these lies and the spectacle in North Dakota to dupe donors into contributing money and incite riots and property destruction, the Enterprise directly manufactured and disseminated these lies as part of a campaign to cut off Plaintiffs' access to the capital markets and other critical business relationships.  Specifically, through a highly coordinated and sophisticated effort, the Enterprise spread its false claims throughout the marketplace, targeting Plaintiffs' banks, investors, research analysts, and other critical business constituents with threats that if they continued to do business with Plaintiffs they would be subjected to the same disruptive attacks, lies, boycotts, and harassment, based on the same utterly false claims the Enterprise had disseminated widely into the public square.

22.     The Enterprise also launched cyber-attacks against Plaintiffs, and intentionally incited the most violent and unstable actors at their disposal to target company executives, inundating them with death threats, physically menacing the Company's directors and officers, and publishing personal information about them that put them at imminent risk of harm.  It also threatened and carried out acts of cyberterrorism against Plaintiffs, putting their business operations and the livelihood of their employees at risk.

23.     Remarkably, there was virtually no indication of this coming onslaught even the day before DAPL received its permit despite the over two-year public permitting process that had just been completed and in which none of the Defendants or Enterprise members sought to participate.  Yet, the very next day Plaintiffs were besieged with an attack from numerous, highly aggressive and organized groups, all singing from the same hymnal.  It was as if the entire campaign came in a box.  And of course it did, and its objective was not to protect the

environment or Native Americans but to produce as sensational and public a dispute as possible, and to use that publicity and emotion to drive fundraising while at the same time inflicting harm on Plaintiffs.

24.    Ultimately, the pipeline was completed and is operational.  But the toll from the attack was high.  The damage to Plaintiffs' relationships with the capital markets has been substantial, impairing access to financing and increasing their cost of capital and ability to fund future projects at economical rates.  Moreover, Plaintiffs incurred substantial expenditures to mitigate the direct impact of the opposition's slander campaign and the violent protests.

25.    These damages -- which the Enterprise has widely and proudly reported has cost Plaintiffs "many hundreds of millions of dollars" -- were intentionally and maliciously inflicted based upon a relentless campaign of lies and outright mob thuggery.  Defendants must be held accountable for these damages, and for substantial punitive damages to deter this illegal means of doing business.

## JURISDICTION AND VENUE

26.    This action arises under The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968, and state statutes and common law.

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

28.    This Court has personal jurisdiction over the defendants pursuant to, inter alia, 18 U.S.C. § 1965 because each defendant resides in the United States, transacts business on a systematic and continuous basis in the United States, and/or has engaged in tortious misconduct here in violation of U.S. law, and under North Dakota's long-arm statute, N.D.R. Civ. P. 4; because each defendant directly and through agents transacts business within the state;

committed tortious acts and omissions within the state; committed tortious injury in the state

caused by an act or omission outside the state; regularly does business, engages in a persistent

course of conduct, and derives substantial revenue within the state; or is registered to do business

in and has consented to personal jurisdiction in this state.

29.     Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events giving rise to Plaintiffs' claims occurred in this forum and

defendants are subject to personal jurisdiction in this judicial district.  Numerous defendants are

registered to do business in the State of North Dakota and, with respect to Energy Transfer,

traveled to the state to perform significant campaign-furthering acts, including but not limited to

physically disrupting Plaintiffs' lawful activity at construction sites, harassing construction

workers and law enforcement, setting fire to and otherwise damaging private, federal, and state

property, including federal and state lands, and disseminating false information to incite such

activity.  In addition, as set forth herein, defendants' wrongful conduct and related activities

caused substantial effects in this jurisdiction and in this district based on their tortious conduct

outside of the State, including but not limited to directing their campaign of disinformation

toward disrupting lawful activity in North Dakota and sending money and supplies to the state

for protestors to engage in illegal activity such as criminal trespass, property destruction, and

arson, which together with the activities in the state, has caused nearly $33 million in damages to

North Dakota taxpayers to pay for state and local responses to the protests and related illegal

activities.

## THE PARTIES

30.     Plaintiff Energy Transfer Equity, L.P., is a master limited partnership organized

under the laws of Delaware and headquartered in Dallas, Texas.  Energy Transfer Equity is the

parent company of the other Plaintiff entities herein.  Together with its subsidiaries, Energy Transfer owns and operates a diverse portfolio of natural gas midstream, intrastate, and interstate transportation and storage assets, as well as crude oil, natural gas liquids, and refined product transportation and terminalling assets, and in recent years has annual revenues of approximately $40 billion.  Energy Transfer owns the largest liquid petroleum and natural gas pipeline system by volume in the United States, spanning nearly 72,000 miles, including a 38.25% interest in the Dakota Access Pipeline ("DAPL").

31.   Plaintiff Energy Transfer Partners, L.P. ("Energy Transfer Partners") is a master limited partnership organized under the laws of Delaware with its headquarters and principal place of business in Dallas, Texas, and is a wholly owned subsidiary of Energy Transfer Equity. It holds a 51 % interest in Dakota Access, LLC ("Dakota Access"), a limited liability company organized under the laws of Delaware with its headquarters and principal place of business in Dallas, Texas, which owns and operates DAPL.

32.   Defendant Greenpeace International, aka Stichting Greenpeace Council ("GP-International" or "GPI"), is a putative Dutch not-for-profit foundation based in Amsterdam, the Netherlands.

33.   Defendant Greenpeace, Inc. ("GP-Inc.") is a putative nonprofit corporation organized under the laws of California and headquartered in Washington, D.C. and is licensed to do business and raises funds in the form of donations in many states throughout the United States, including North Dakota.  GP-Inc. is registered for tax-exempt status as a Section 501(c)(4) "social welfare" organization with the Internal Revenue Service.

34.   Defendant Greenpeace Fund, Inc. ("GP-Fund") is a putative nonprofit charitable corporation organized under the laws of California and headquartered in Washington, D.C. and is

licensed to do business and raises funds in the form of donations in many states throughout the United States, including North Dakota.  GP-Fund is registered for tax-exempt status as a Section 501(c)(3) "charitable organization" with the Internal Revenue Service.

35.     Defendant BankTrack Foundation ("BankTrack"), aka Stichting BankTrack, is a putative Dutch not-for-profit foundation based in Nijmegen, the Netherlands.

36.     Defendant Earth First! is a putative nonprofit corporation organized under the laws of Florida with headquarters in Lake Worth, Florida.

37.     John and Jane Does 1 through 20, whose identities are presently unknown to Plaintiffs, include other participants in the network of environmental groups' fraudulent campaigns, including its campaign against Energy Transfer, as well as co-conspirators and/or aiders and abettors of the named Defendants in the scheme, enterprise, and misconduct alleged in this complaint, including, among others, cyber-hacktivists, environmental activists, and certain foundations directing funds to the Defendants.

## STATEMENT OF FACTS

### A.  The Criminal Enterprise

38.     The campaign against Energy Transfer alleged herein was conducted by an illegal Enterprise comprised of various legally distinct but associated-in-fact environmental organizations, individuals, and others who worked in concert with one another for the purpose of carrying out the pattern of racketeering activity alleged herein, including, but not limited to: (i) violating or otherwise funding, directing, controlling, and intentionally inciting acts of terrorism that violate the U.S. Patriot Act, including damaging or attempting to damage an energy facility and committing arson on federal property and on private property used for interstate commerce; (ii) using the mails and wires as part of a scheme to defraud donors, supporters, state and federal treasuries, and others; (iii) tax fraud; (iv) interstate drug trafficking; (v) transporting and

transmitting misappropriated funds and property through interstate commerce; and (vi) conspiracies to do the same.  The Enterprise associated for the purpose of carrying out these racketeering acts was comprised of, among others, the following members:

a) **Greenpeace International** - Defendant GP-International is a putative Dutch charitable foundation ("Stitching") organized under the laws of the Netherlands.  GP-International holds the Greenpeace trademark and serves as the international coordinating body for a network of more than twenty-six legally distinct national and regional associations under the common Greenpeace name, including GP-Inc., GP-Fund, GP-Switzerland, GP-Japan, and GP-Netherlands.  These distinct, but associated in fact organizations operating under the Greenpeace banner provide grants, loans, and other financial remuneration to GP-International, and GP-International also provides grants and disbursements back to select organizations to support its international campaigns.  As such, GP-International is directly involved in the creation, management, control, and implementation of the associations' coordinated campaigns and associated fundraising.

b) **Greenpeace Fund, Inc.** – Defendant GP-Fund is a Section 501(c)(3) nonprofit foundation which falsely purports to be exclusively operated for a charitable purpose. GP-Fund collects 501(c)(3) tax exempt donations throughout the United States, including in North Dakota, and distributes those monies to GP-International in the Netherlands and GP-Inc. in the United States.  In 2015, GP-Fund collected approximately $16.8 million and distributed approximately $6.8 million of that to GP-International and $6.5 million to GP-Inc. in the United States.  The rest of the revenue -- over 60% of the monies raised -- is consumed by organizational salaries, expenses, and the costs of raising further funds. Although GP-Fund and GP-Inc. are separate and distinct legal entities with no corporate relationship in and between them (as required for their

14

respective U.S. tax statuses) they associate in fact by publicly identifying themselves as "Greenpeace USA," and by jointly planning, approving, directing, controlling, and funding GP-Inc.'s activities in the United States, and by jointly funding and participating in GP-International's worldwide activities.   Like GP-International, GP-Fund authorized, underwrote, and facilitated  GP-Inc.'s campaign against Plaintiffs, published and republished the disinformation on its own webpages, and, along with GP-International, was actively involved in the operation, control, and planning of the campaign with GP-Inc. and other enterprise members. GP-Fund exercised its operation and control through its executive director Annie Leonard, who directed and controlled the activities of GP-Inc., and Perry Wheeler and Mary Sweeters.  GP-Fund benefited from this participation by fraudulently inducing donations to itself directly that it used to sustain its continued operations, pay the salary of Annie Leonard and others, and fund even more fundraising for itself and GP-Inc.

c)       **Greenpeace, Inc.** – Defendant GP-Inc. is a nonprofit corporation organized pursuant to the laws of California and headquartered in Washington D.C.  GP-Inc. falsely purports to be operated "exclusively to promote social welfare" and describes its social welfare mission as "promot[ing] the protection and preservation of the environment."  Funded by direct donations as well as grants and loans from GP-Fund, GP-Inc. takes substantial direction from, and is under the control of, GP-International and GP-Fund and those private organizations, including earmarking donations for particular actions.   GP-Inc. receives substantial support from both GP-International and GP-Fund, including the use of the Greenpeace name and the funding necessary to pay its substantial operating expenses and salaries and fund its execution of the disinformation campaign.   With respect to the campaign against Energy Transfer, GP-Inc. and Leonard, Wheeler, and Sweeters aggressively prosecuted the disinformation campaign to

fraudulently induce donations that were then used to fund GP-Inc.'s operations and enrich GP-Fund and GP-International.  It also coordinates closely with other entities in the Greenpeace association, including particularly Enterprise members GP-Switzerland, GP-Japan, and GP-Netherlands, in executing the campaign directed at Energy Transfer set forth herein.

d)     **Greenpeace Netherlands** – Enterprise member Greenpeace Netherlands ("GP-Netherlands") is a putative Dutch nonprofit foundation based in Amsterdam, the Netherlands and is the Dutch licensee of the Greenpeace name.  Funded by direct donations, as well as grants and loans from GP-International, GP-Netherlands receives substantial direction from GP-International and works closely with GP-International and other Greenpeace organizations in executing Greenpeace's global campaigns, including GP-Fund and GP-Inc. in the United States.  GP-Netherlands also works directly with Defendant BankTrack in furthering campaigns directed at the capital market relationships of targeted companies, including Plaintiffs here.  GP-Netherlands participated in and directed the Enterprise's campaign against Plaintiffs by, among other things, disseminating materially false, misleading, and defamatory disinformation about DAPL and Energy Transfer, targeting Plaintiffs' banks, investors, and other sources of capital through direct letters, in-person meetings, and staged protests.

e)     **Greenpeace Japan** – Enterprise Member GP-Japan is a putative nonprofit organization organized under the laws of Japan based in Tokyo, Japan and is the Japanese presence of the Greenpeace associations.  Funded by direct donation as well as grants and loans from GP-International, GP Japan receives substantial direction and control from GP-International. GP-Japan works closely with GP-International in executing Greenpeace's global campaigns and also coordinates closely with other entities in the Greenpeace association, and other Enterprise members, including 350.org Japan.  Greenpeace Japan coordinated the

Enterprise's campaign and activities by, among other things, targeting the banks funding DAPL and other Energy Transfer infrastructure projects through direct letters, in-person meetings, and staged protests, including working with 350.org Japan to pressure Japanese banks funding DAPL to defund the Project based on the Enterprise's false and defamatory lies about the Project's putative environmental and cultural impacts.

   f)  **Greenpeace Switzerland** – Enterprise member GP-Switzerland is a putative nonprofit organization organized under the laws of Switzerland based in Zurich, Switzerland and is the Swiss presence of the Greenpeace associations.  Funded by direct donation as well as grants and loans from GP-International, GP Switzerland takes substantial direction from GP-International.  GP-Switzerland collaborates closely with GP-International in executing Greenpeace's global campaigns and also coordinates closely with other entities in the Greenpeace association and other Enterprise members.  Greenpeace Switzerland coordinated the Enterprise's campaign and activities by, among other things, targeting the banks funding the DAPL and other Energy Transfer infrastructure projects through direct letters, in-person meetings, and staged protests.  Specifically, GP-Switzerland furthered the Enterprise's scheme against Plaintiffs by disseminating the Enterprise's materially false, misleading, and defamatory disinformation and spearheading the Enterprise's efforts to block Plaintiffs' access to the capital markets participants in Switzerland.  In furtherance of this objective, GP-Switzerland launched the #ASKCREDITSUISSE campaign which was intended to extort Credit Suisse to terminate its relationship with Energy Transfer or become the target of the Enterprise's campaign.  Consistent with the Enterprise's playbook, GP-Switzerland disseminated the Enterprise's lies to Credit Suisse personnel in direct letters and in-person meetings and organized and carried out protests at Credit Suisse's headquarters and local branches, including a demonstration at the bank's annual

general meeting in Zurich on April 28, 2017 during which GP-Switzerland protesters rolled a 10 meter, 900 kilogram section of pipeline bearing the Credit Suisse logo and "Dirty Pipeline Deals" into the convention center, and protesters repelled from the rafters of the convention hall while the CEO was speaking to unveil a gigantic banner with the words "Credit Suisse: No Dirty Pipeline Deals."  Most recently, in April of this year, GP-Switzerland distributed pamphlets and bottles of what was labeled as "Credit Suisse Sponsored and Certified Pure Dakota Spring Water" at various Credit Suisse branches in Zurich, Berne, and Basel.  The water bottles contained brown water, and were accompanied by "literature" contained the Enterprise's false and defamatory claims about DAPL and Energy Transfer.

g)     **Annie Leonard** – Enterprise member Annie Leonard is the Executive Director of GP-Fund and GP-Inc. with responsibility for directing, operating, and managing the coordinated activities of these two organizations with each other, GP-International, and the other regional Greenpeace organizations.

h)     **Perry Wheeler** – Enterprise member Perry Wheeler is global communications and outreach manager with direct responsibility for GP-Inc.'s illegal activities directed against Plaintiffs, as alleged herein.

i)     **Mary Sweeters** – Enterprise member Mary Sweeters is a Climate and Energy Campaigner with direct responsibility for GP-Inc.'s illegal activities directed against Plaintiffs, as alleged herein.

j)     **BankTrack** – Defendant BankTrack is a putative Dutch not-for-profit foundation based in the Netherlands whose express stated purpose is to support NGOs, like the worldwide Greenpeace associations, in their campaigns to target financial institutions with extortionate and otherwise illegal threats.  Indeed, BankTrack's stated goal is "[t]o campaign using engagement

18

and public pressure and in cooperation with partners, in order to stop banks from financing specific projects, companies, and high impact sectors."  Consistent with this objective, BankTrack, working in concert with and at the direction of NGOs, participates in the disinformation and extortive schemes used to intimidate financial institutions from doing business with targeted companies or risk becoming the subject of "brand damaging campaigns." With respect to Energy Transfer, BankTrack, under the direction of its director Johan Frijns, identified -- often through illegal means -- firms providing financial backing to the Plaintiffs, provided that information to the Enterprise members directing action against those institutions, and actively and aggressively participated in that direct action by disseminating to those institutions extortive threats based on the Enterprise's materially false, misleading,  and defamatory disinformation.  Thus, for example, joined by, among others, defendants and enterprise members GP-Inc., GP-Fund, Leonard, GP-International, GP-Netherlands, RAN, 350.org, Sierra Club, Bold, BankTrack sent letters to each of the seventeen banks financing DAPL, demanding that the banks immediately withdraw funding for the Project or face crippling boycotts, divestment campaigns and reputational damage, and immediately published each letter on their website to galvanize the public to exert further pressure on the banks through on-site protests, boycotts, and divestment campaigns.   BankTrack benefited from their participation in the Enterprise by fraudulently inducing donations to BankTrack that were used to sustain its continued operations.

   k)  **Johan Frijns** – Enterprise member Johan Frijns is the Director of Defendant BankTrack with responsibility for BankTrack's participation in the illegal campaign directed at Energy Transfer as alleged herein.

l)      **Earth First!** – Defendant Earth First! is a radical eco-terrorist group that funds,

trains, and organizes acts of civil disobedience and "monkeywrenching," i.e., property

destruction.  Founded in 1980 by Mike Roselle, a veteran of Enterprise member Sierra Club, the

organization has deep ties to other enterprise members, including Enterprise member RAN

which Roselle subsequently co-founded in 1985, and Defendant Greenpeace which Roselle

joined in 1986.   At Greenpeace, Roselle employed Earth First!'s militant tactics to organize

Greenpeace's first "action teams" and trained and prepared these teams to execute unlawful acts.

As a result of his role in implementing these tactics, Roselle was subsequently appointed to the

board of directors of Greenpeace.  With its long history of collaboration, consistent with past

campaigns, Earth First!, along with Greenpeace and other members, funded and supported the

eco-terrorist militant group Red Warrior Camp with $500,000 in seed money to fund its violent

campaigns against DAPL.  Additionally, Earth First! distributed its "Direct Action Manual," a

playbook laying out techniques for vandalism and property destruction to stop energy

infrastructure development, including tactics such as slashing tires, pouring sand into the gas

tanks of construction equipment, and locking down construction equipment, at the protest camps.

As the Enterprise intended, Mississippi Stand and other eco-terrorist groups employed Earth

First!'s playbook in opposition to DAPL, including, by way of example only, the use of

"sleeping dragons" to chain themselves to equipment and lock down construction.

m)      **Red Warrior Camp** –Red Warrior Camp purports to be a coalition of water

protectors representing 27 tribal nations dedicated to direct action to interfere with the

construction of DAPL.  In fact, Red Warrior Camp is an eco-terrorist group funded by the

Enterprise and formed to execute the Enterprise's illegal campaign against Energy Transfer

under the false guise of being a Native American organization.  Using seed money from

Defendant Earth First! and funds and supplies provided by Defendant Greenpeace, Red Warrior sought to infiltrate and radicalize the indigenous protest movement by coordinating and employing militant tactics to disrupt DAPL construction.  Red Warrior widely disseminated recruitment videos of militant footage to encourage the public to travel to protest camps, where Red Warrior members trained new members on how to conduct attacks on construction sites and personnel.  Red Warrior then coordinated large-scale attacks on construction sites that concluded with bombing and arson of federal and state lands, property destruction, and arrests.  To raise funds, Red Warrior recorded attacks, announced arrests, and set up funds for bail and legal representation.  Red Warrior also engaged in an illegal drug trade by using donation money to buy drugs out of state and sell them at the Camps at enormous profits.  Red Warrior's militant tactics eventually resulted in their ouster from the camps by unanimous vote of the SRST Tribal council.  Rather than leave as asked, Red Warrior continued to engage in and incite violent and terrorist actions definitively demonstrating that their agenda had nothing to do with support and protecting SRST.

n)  **Bold Alliance** – Enterprise member Bold Alliance ("Bold") is a putative nonprofit environmental activist organization incorporated under the laws of Nebraska and based in Hastings, Nebraska.  Bold is registered for tax-exempt status as a Section 501(c)(4) "social welfare organization" with the Internal Revenue Service.  Bold is comprised of four affiliates: Bold Nebraska, Bold Iowa, Bold Oklahoma, and Bold Louisiana.  Bold played a critical role in the Enterprise's campaign against Plaintiffs by widely disseminating the Enterprise's materially false, misleading, and defamatory disinformation in order to generate public outrage about the Project, allow the Enterprise members to raise monies based on those false claims, and use those false claims to incite illegal and extortive protests at the Standing Rock camps in North Dakota,

as well as in Iowa, Louisiana and Washington, D.C.  Bold played a critical role in the operation

of the Enterprise's fundraising campaign against Energy Transfer, spreading malicious and

sensational lies about Energy Transfer and DAPL through the publication of alarmist articles on

its website.  Moreover, Bold closely collaborated with RAN, 350.org, Greenpeace, and others

including, for example, carrying out illegal on-the-ground protest, such as during September

2016 when 40 protesters, including members of Bold and RAN, illegally occupied the

Department of the Interior's headquarters in Washington, D.C., resulting in 13 arrests.  Members

of the leadership of Bold and RAN were among those arrested for their illegal conduct.

Additionally, Bold activists organized and participated in illegal protests at the Standing Rock

camps in North Dakota and in Louisiana.  Bold benefited from its participation in the Enterprise

by fraudulently inducing donations to Bold that were used to sustain its continued operations.

o)  **Rainforest Action Network** – Enterprise member RAN is a putative nonprofit

corporation organized under the laws of California with headquarters in San Francisco,

California.  Enterprise member RAN has directed and controlled the Enterprise through the

dissemination of materially false and defamatory claims about Energy Transfer and DAPL,

issuing extortive threats to the banks financing Energy Transfer and DAPL to divest their

interests in and support for DAPL and other Energy Transfer infrastructure projects, and

advocating and organizing self-described "mass acts of civil disobedience to stop the

construction and financing of dangerous, polluting pipeline projects" by "showing up to disrupt

pipeline construction and challenge the banks that are bankrolling climate chaos and human

rights abuses."  In furtherance of the Enterprise's campaign, and in collaboration with Bold and

other Enterprise members, RAN actively recruited protestors on its website to take the "pipeline

pledge of resistance," including "showing up to disrupt pipeline construction"; offering "training

and training materials on organizing your community and organizing effective direct action"; and touted its organization of holding more than 150 civil disobedience trainings in 38 states.  RAN members also participated in these illegal protests in coordination with members of Enterprise member Bold.  For example, in September 2016, members of RAN and Bold organized and participated in the occupation of the Department of Interior in Washington, D.C. in protest of DAPL, which resulted in Bold and RAN and Bold leaders being arrested for their illegal conduct.  RAN benefited from its participation in the Enterprise by fraudulently inducing donations to RAN that were used to sustain its continued operations.

p)    **350.org** – Enterprise member 350.org is a putative nonprofit corporation organized under the laws of the District of Columbia with headquarters in Brooklyn, New York. 350.org's purported charitable purpose is building a global association of organizations targeting, among other things, companies involved in the fossil fuel industry.  With a global network active in over 188 countries, 350.org purports to operate through "online campaigns, grassroots organizing and mass public action."  Friends and allies listed on 350.org's website include Enterprise members Greenpeace, Sierra Club, and RAN.   In furtherance of the Enterprise's illegal campaign and in collaboration with other Enterprise members, including Bold, RAN, Greenpeace USA, GP-Japan, Sierra Club and BankTrack, 350.org has aggressively disseminated the Enterprise's materially false, misleading, and defamatory disinformation about Energy Transfer and DAPL including in posts on its website, made extortionate threats against banks financing DAPL and other business constituents critical to the Project, and organized manufactured protests and publicity campaigns based on those lies.   350.org benefited from its participation in the Enterprise by fraudulently inducing donations to 350.org that were used to sustain its continued operations.

q)      **Earthjustice** – Enterprise Member Earthjustice purports to be "the nation's original and largest nonprofit environmental law organization," and claims to "fight for justice and advance the promise of a healthy world."  Founded in 1971 to serve as the legal arm of the Sierra Club, Earthjustice (formerly known as the Sierra Club Legal Defense Fund) credits "generous investments of individual donors and foundations" with allowing it to "choose cases strategically" and represent its clients free of charge.   In fact, Earthjustice is funded by a cadre of billionaires that use purportedly legitimate legal actions to further their business, political, and social objectives.  Under the guise of serving as pro bono counsel, Earthjustice acts as a parasite on the causes of sympathetic plaintiffs and incentivizes them to commence litigation with promises of their ability to raise funds for the plaintiffs' cause once Earthjustice has elevated it to national and international attention.  Earthjustice in turn uses its prey's cause as a pretext to launch highly sensational, high profile media campaigns to coordinate opposition and advance the objectives of their donors.  In furtherance of this fraudulent scheme, Earthjustice commissions sham expert reports and otherwise fabricates evidence to support its cause, and ubiquitously publicizes this evidence and other putative developments in the litigation through false and misleading press releases, op-eds, and on social media.  Earthjustice works in concert with other putatively independent ENGO groups that likewise disseminate the same false, misleading, and unfounded allegations and engage in protests and other misconduct to generate attention and support for the opposition movement and foster legitimacy for their campaigns.

r)      **Sierra Club** – With its long history of collaborating closely with its former legal arm, Earthjustice, Enterprise member Sierra Club directed and controlled the Enterprise through the dissemination of materially false, misleading, and defamatory allegations about Energy Transfer, executing the Enterprise's extortive scheme against Energy Transfer's critical business

relationships, and advocating, organizing, and participating in illegal activities which directly interfered with Energy Transfer's ability to pursue their business.  Sierra Club collaborated closely with BankTrack, RAN, 350.org, Greenpeace, and others to threaten the banks financing DAPL and other Energy Transfer infrastructure projects to defund from the Energy Transfer companies; disseminated false and defamatory letters, articles, and press releases about DAPL and Energy Transfer which served as an echo chamber for the Enterprise's lies; and fostered putative legitimacy for the Enterprise's campaign.

s)        **Jessica Reznicek, Ruby Montoya, and Mississippi Stand –** Enterprise members Jessica Reznicek and Ruby Montoya are members of Enterprise Member Mississippi Stand, one of the militant eco-terrorist groups that participated in the Enterprise's campaign.  Reznicek and Montoya were incited by the Enterprise's misinformation campaign and have admitted to engaging in illegal terrorist attacks against DAPL, including, specifically, burning heavy construction equipment and using blowtorches to cut holes in segments of the interstate pipeline.  Regurgitating many of the Enterprise's misrepresentations about DAPL, Reznicek and Montoya have issued a call to action for others to follow in their violent and terrorist actions, and have provided a blue print for arson and property destruction.  Mississippi Stand prominently featured Reznicek's and Montoya's statements on its homepage and openly advocates property destruction and terrorism, while fundraising for legal support to finance such action.

t)        Other individuals and militant environmental groups, including Climate Direct Action, Veterans Stands, Michael Wood, Wesley Clark, Jr., and Democracy Now coordinated and participated in the Enterprise's campaign by, among other things, prosecuting the disinformation campaign and engaging in illegal conduct including violent attacks, trespass, and property destruction, including, specifically, of the interstate pipeline, and arson, including in

North Dakota and theft of donations intended to support peaceful protests and support Native American rights.

u) **John and Jane Does** – On a frequent and long-term basis, the Defendants and Enterprise members work with third-parties currently unknown to Plaintiffs to illegally misappropriate proprietary and other confidential information from Energy Transfer through, among other things, hacking and other illegal cyber-activity.  The John and Jane Doe Defendants have also organized and participated in violent, criminal protests against Energy Transfer in furtherance the Enterprise's campaign.  This is part of a broader Enterprise practice of engaging in various illegal activities to misappropriate trade and other secrets from, or interfere with, targets of the Enterprise's campaigns.  Although these persons and entities are distinct and independent of each other, and free and incentivized to act in and advance their own interests independently, they have associated in fact with a common purpose, identifiable relationships, and sufficient longevity to pursue their common purpose.  Specifically, beginning no later than April 2016 through to the present, they have been engaged in a mutually understood, agreed upon, and coordinated campaign of racketeering activity directed at Energy Transfer.

39.     The common purpose of the Enterprise was to act as a parasite on the primarily local, indigenous objections to DAPL, and use those concerns to manufacture an international media frenzy based on sensational lies that could be used to raise funds, advance the ulterior motives of the Enterprise member's major financial supporters, pressure Plaintiffs' business partners and investors to sever ties with the Company, and incite illegal and violent attacks.

40.     For approximately fourteen months this group and the others comprising the Enterprise have been pursuing the Enterprise's purposes, and they continue to do so today.

B.  **The Fraudulent Scheme**

1.  **The ENGO's Pattern and Practice Of Fraud And Other Illegality**

41.     Over the past several decades, numerous environmental non-governmental

organizations ("ENGO's") putatively focused on the environment have been corrupted and

coopted by money and special interests.  As a result of that corruption, these putative

environmental organizations have abandoned legitimate environmental action and instead

regularly manufacture sensational and grossly misrepresented causes designed exclusively to

perpetuate and enrich those organizations and their executives, and serve the interests of a

shadowy network of foundations and business special interests who funnel monies to these

organizations to serve their own undisclosed agendas.  The central element of the business plans

for these corrupted charitable organizations is to aggressively disseminate sensational, phony,

and unsupportable claims to manufacture sham causes on topical hot-button issues, and then use

those sham causes to raise funds from donors and special interests who might otherwise benefit

from those causes.

42.     One of the ways the corrupt organizations conceal their true operations is to create

the illusion that their "campaigns" and high-profile "events" are grassroots actions by volunteers

and local "victims" who are spontaneously rallying together for the promoted cause.  In fact,

these events are organized, funded, and produced by these corrupt ENGOs to create sensational

media attention and drive traffic and donors to their websites.  Wolfpacks of corrupt ENGOs

regularly collaborate on these manufactured attacks, including "old-line" ENGOs like

Greenpeace and radical and fringe eco-terrorists who engage in disguised direct actions

involving violence, property, and business destruction, and fabricated claims and "evidence" of

misconduct by those targeted by the campaigns.  These radical fringe groups create public

spectacles and generate fodder for putatively legitimate environmental organizations to trumpet

via-press releases and use as the basis to disseminate a parade of falsehoods deployed as part of a plea to the general public to "get involved" by donating or taking their own, more benign, direct action such as placing calls, or writing letters.  Thus, at the heart of this fraudulent scheme are fundamental lies as to what these ENGOs do, their substantial funding, well-organized structures, powerful influences, and purposefully coordinated activities designed to create the appearance of an independent "grassroots" uprising by the people.  These lies are perpetuated on donors, tax authorities, targets and their critical market constituencies, and the public at large.

43.     If these corrupted environmental groups were genuinely focused on the environment, they would be focused on facts and science.  Instead, they focus solely on situations conducive to sensational headlines that will induce strong emotions, and thereby "pressure" (i.e. manipulate) the public at-large.   To "emotionalize" and manipulate the public, these organizations utilize what Greenpeace's worldwide association internally refer to as "ALARMIST ARMAGEDDONIST FACTOIDS" that are presented as scientific facts but which the Greenpeace worldwide associations has admitted are really not facts,  "do not hew to strict literalism or scientific precision," and are instead only "hyperbole" and "heated rhetoric" that cannot be taken "literally."  Of course, were such disclaimers shared with the public bombarded by the untruths these corrupt organizations use to "emotionalize" donors and induce contributions, few if any would make such contributions.

44.     For years, the Greenpeace Enterprise members as well as Enterprise members BankTrack, 350.org, Sierra Club, Bold Alliance, Earthjustice, and the other putative "green groups" have regularly worked in concert to execute dozens of these fraudulent schemes.  When the extortion succeeds, these putative environmental groups insist that their target publicly endorse their campaign and lies, which they then use to drive further donations and attacks.  For

example, Enterprise members Greenpeace, 350.org, RAN, Sierra Club, and BankTrack pursued a concerted campaign against companies extracting oil from the Canadian Tar Sands, and, in doing so, relied on the relentless dissemination of false but "ALARMIST SENSATIONAL FACTOIDS," publishing the production of putatively spontaneous protests, violence, and other criminal activity.  Indeed, Jane Kleeb, the founder of the extremist group and Enterprise member Bold Nebraska, identified a sensational campaign against the Tar Sands as business opportunity for Bold to become the face of a high-profile campaign against fossil fuel development. Consistent with their playbook, the ENGOs ubiquitously disseminated baseless and alarmist allegations of catastrophic impacts of extraction of tar sand oil, including in a September 2011 Greenpeace publication "The World's Largest Carbon Bomb," which threatened, among other things, that "carbon contained in the tar sands is enough to send Earth's atmosphere into runaway heating, releasing ancient methane and killing sea life and forests, so that humanity could not reverse the heating regardless of what we do."  350.org echoed these same falsehoods, falsely representing that the tar sands are "one of the world's largest and most dangerous pools of carbon," which, if extracted, "will . . . mean more asthma and respiratory diseases, more cancer, and more cardiovascular problems."  Likewise, Sierra Club published a video in June 2012 entitled "The Tar Sands Pipelines: The Dirtiest Oil on Earth," which accused the tar sands of "generating massive greenhouse gas pollution and dumping cancer-causing chemicals into the air and water."  And BankTrack claimed that the logging necessary to extract oil from the tar sands "is fatal for the climate."  These claims were completely untethered to fact but sufficiently sensational to generate high publicity and emotion and drive visitors and donors to the website of the tar sands pack.  Based on these sensational and alarmist statements, the Enterprise staged protests and encouraged activists to get arrested to pressure politicians and the media.

45.     That none of these corrupt organizations were driven by genuine environmental concerns, but solely by their desire for donation-driven publicity is demonstrated by their endorsement of and encouragement for the reckless, criminal acts of Direct Climate Action activists who illegally and dangerously stopped the flow of five oil pipelines carrying Canadian oil sands in October 2016 by shutting valves at pumping stations, despite the substantial risk that the pipelines would rupture or explode.  In response, Greenpeace USA stated: "Greenpeace supports the brave activists" who engaged in these extremely reckless acts and created a substantial and immediate risk of a major environmental disaster.

46.     Similar tactics were employed against Shell Oil's exploration of potential oil extraction in the Arctic.  In 2011, Earthjustice recruited a coalition of environmental and native groups to commence legal action to enjoin Shell from drilling in the arctic.  The false and unfounded claims of calamity that would result from Shell's drilling were ubiquitously disseminated by Earthjustice through an accompanying media campaign, and echoed by other putatively independent, but in fact coordinated ENGOs, including in a propaganda video created by Greenpeace and disseminated in June 2012 which falsely purported to show a Shell launch party ostensibly celebrating the company's entry into Arctic drilling.  The fake video, titled "#ShellFAIL: Private Arctic Launch Party Goes Wrong," depicted a person attempting to pour a drink from a model oil rig, which suddenly malfunctioned and began uncontrollably spewing brown liquid.  The video concluded with a purported Shell employee attempting to take the phone of the person recording the incident.  The video was viewed over 500,000 times within one day of being posted online.  As part of this "hoax," the ENGOs created a fake Shell website, ArcticReady.com, which contained fake Shell marketing copy, including, by way of example, the statement on the website's homepage that "That's why we at Shell are committed to not only

recognize the challenges that climate change brings, but to take advantage of its tremendous opportunities. And what's the biggest opportunity we've got today? The melting Arctic." The hoax even included fake legal threats from Shell threatening legal action against journalists and bloggers who reported on the story.

47.     Consistent with other campaigns, BankTrack, Greenpeace, Sierra Club and 350.org targeted Shell and its critical market constituents with reputational damage, and summoned the radical ENGO contingency for militant protests to generate publicity for their coordinated opposition. For example, in May 2015, 350.org organized "kayaktivists" in Puget Sound for a three day protest during which protesters surrounded a shell oil rig in kayaks and canoes. Likewise, on June 15, 2015, as Shell's Polar Pioneer drilling rig was attempting to depart for the Arctic, "kayaktivists" blocked its path and delayed its departure, resulting in the arrest of numerous protesters for their criminal activity. In the days that followed 350.org collaborated closely with Sierra Club to organize over 30 events in 15 days, culminating in a massive July 25, 2015 demonstration to protest the arrival of a Shell icebreaking vessel carrying a critical piece of drilling equipment scheduled to arrive in Portland, Oregon that day. On July 30, 2015, thirteen Greenpeace activists blocked that same vessel from leaving port in Portland by repelling from the St. John's Bridge and creating an aerial blockade and preventing the ship from departing for the Arctic. The U.S. Coast Guard had to remove "kayaktivists" from blocking the ship's path and, after two days, authorities had to remove the protesters hanging from the bridge. A federal judge in Alaska found Greenpeace to be in civil contempt of a preliminary injunction, and ordered the group to pay fines beginning at $2,500 per hour, and increasing to $10,000 per hour if the protesters did not cease their illegal activity by August 2, 2015. The next day, Sierra Club praised Greenpeace's illegal activity, publishing a Facebook post, "Thanks to all the

#kayaktivists and the 13 brave Greenpeace USA activists for saying #sHellNo to Arctic drilling and fighting to protect the arctic!"

48.     After Earthjustice's initial lawsuit to halt Arctic drilling was unsuccessful, in June 2015, it commenced a second action, on behalf of Sierra Club and others, challenging the Bureau of Ocean Energy Management's approval of Shell's arctic oil exploration plan.  Earthjustice's press release accompanying the lawsuit warned, without citation to any factual or scientific support, that Shell's plan "will devastate some of our most iconic wildlife" and "sets us on a path toward climate catastrophe as the latest science says Arctic oil must be kept in the ground in order to have a chance at keeping the planet safe," and concluded by accusing Shell of having an "extensive eco-crimes rap sheet."

49.     The sustained campaign of unlawful behavior finally succeeded when Shell abandoned its Arctic initiatives in September 2015, after it had already expended over $6 billion in the endeavor.  It was reported that Shell's decision was, at least in part, made in response to the serious threats to Shell's reputation due to the public protests.  Among the protester's heavy reporting of Shell's decision, 350.org posted on Facebook that "Shell's decision to abandon Arctic drilling is a HUGE win for grassroots resistance to fossil fuels.  Shell had to take billions of dollars in losses, and set back any plans to drill by decades.  That makes it very likely that Shell will *never* be able to drill in the Arctic -- which is just one step we must take to avert catastrophe."

50.     The ENGOs' opposition to genetically modified organisms ("GMOs") provides another example of their illegal and coordinated campaigns.  For years Greenpeace and other "green" groups, including Earthjustice and Sierra Club, have campaigned against GMOs, claiming that GMOs are unnatural, will produce unanticipated mutations that will devastate the

planet, and are not safe to consume.  Their campaign, however, ignores the science, and is based

on knowing falsehoods and their familiar scaremongering tactics to promote their cause and

fraudulently manufacture donations.

51.     For example, Greenpeace is stubbornly opposed to "Golden Rice," which is

genetically enhanced to address the vitamin A deficiency suffered by millions of rice-dependent

people in poor countries, a deficiency that causes preventable blindness and death on a massive

scale.  Indeed, the World Health Organization notes that there are more than 100 million vitamin

A deficient children around the world, and that 250,000 to 500,000 children become blind every

year, with 50 percent of them dying from their deficiency.  Despite the fact that there is no

research suggesting that Golden Rice is unhealthy, and a four-year human study revealed no

health problems resulting, Greenpeace attacked the study by issuing a press release claiming that

"24 children used as guinea pigs in genetically engineered 'Golden Rice' trial."  Because

Greenpeace had no science-based arguments to support its opposition to Golden Rice,

Greenpeace's press release demonized the life-saving rice as "another example of big business

hustling in of one (sic) the world's most sacred things: our food supply," and, incredibly, claimed

that Golden Rice is not necessary to solve vitamin A deficiency in millions of children because

the problem can be solved by "overcoming poverty and accessing a more diverse diet."

Greenpeace claimed that Golden Rice is a "con" because:  (i) increasing access to the many

vitamin-rich food plants would address more than just vitamin A deficiency; (ii) we don't know

if Golden Rice is safe, and there is the potential to cause allergenic reactions; and (iii) a few

multinational companies would benefit financially from "get[ting] us hooked on their seed."

52.     In furtherance of their campaign, following the illegal playbook of the extremist

militant group Earth First!, Greenpeace activists destroyed GMO crops, causing significant

damage to both property and research in progress.  As an example, in 2011, Greenpeace activists broke into an experimental farm in Australia and destroyed a plot of genetically-modified wheat engineered to benefit diabetics, causing $400,000 in damage and setting back the research by a year.  Greenpeace proudly published a video of the break-in.  The criminal activists were convicted of crimes for their actions and ordered to pay for the damage caused.  Greenpeace paid the fine and did not rule out undertaking similar actions in the future.

53.     Earthjustice has likewise been actively fighting GMOs for years through the commencement of lawsuits and the publication of alarmist statements on their website. Earthjustice claims that there is "no scientific basis" for finding that GMOs are safe to eat, and that GMOs "wreak havoc on the environment."  In addition to other alarmist publications, Earthjustice repeatedly characterizes GMOs as "Engineering an Environmental Disaster" on its website.  Opposing the FDA's approval of genetically engineered salmon for human consumption, Earthjustice warns that they "undermine the sustainability of our food supply," "highlight the ways we have devastated many of our wild fish populations," and will result in "an increase in exotic diseases and parasites."

54.     Consistent with the Enterprise's playbook, Sierra Club has lent putative legitimacy to the Enterprise's false claims by echoing Earthjustice's, Greenpeace's, and others' false lies in highly sensational blog posts and on social media, and calling for a complete ban on the planting of all genetically engineered crops and the release of all [GMOs] into the environment, including those now approved, pending improved regulatory procedures and safety testing" based on the false allegation that "a growing body of scientific evidence demonstrates that GMO crops contribute to a host of environmental and human health problems."  Working

34

alongside Greenpeace, Sierra Club aggressively campaigned against Golden Rice, thereby restricting access to Golden Rice to address blindness and Vitamin A deficiency.

55.     Despite the ENGO's blanket opposition to GMOs, Stephen Tindale, who spent six years as an executive director of Greenpeace UK, revealed in 2015 that while he was in charge of anti-GMO campaigns, he never believed that a blanket ban on GMOs was appropriate, believing instead that they should be "assessed on a case-by-case basis," underscoring the fact that Greenpeace was no basis to believe that GMOs were universally unsafe and would lead globally to disease and other health risks.

56.     In 2015, Greenpeace and other ENGOs manufactured baseless claims about Professor Anne Glover, the chief scientific adviser to the European Commission, to procure her termination because she recognizes the benefits and safety of GMOs.  The ENGOs accused her of giving one-sided opinions on genetically modified crops and that she falsely claims that there is a scientific consensus about their safety, and succeeded in eliminating her position, prompting her resignation.

57.     In June 2016, 107 Nobel Laureates signed a letter stating, "Organizations opposed to modern plant breeding, with Greenpeace at their lead, have . . . . misrepresented [GMOs'] risks, benefits and impacts, and supported the criminal destruction of approved field trials and research projects."  The letter urged Greenpeace to "re-examine the experience of farmers and consumers worldwide with crops and foods improved through biotechnology, recognize the findings of authoritative scientific bodies and regulatory agencies, and abandon their campaign against 'GMOs' in general and Golden Rice in particular."  Likewise, a 2014 study estimated that the Greenpeace-led opposition resulted in delays to the approval of the technology and the delay in India alone has cost 1.4 million life years since 2002.

58.     Recognizing the ENGOs' true motivation for their baseless campaign, in January 2017 Nobel Laureate Sir Richard Roberts expressly stated that Greenpeace and other environmental groups spread lies about GMOs because opposing GMOs is extremely lucrative:

> Every single major science academy in the world has come out and said GMOs are safe.  But Greenpeace and other green parties continue to deny it because this is the very best fundraising they have ever had.  They have made huge amounts of money in funding as a result of being anti-GMO. . . . We now have 30 years of experience, we now know that it's perfectly safe.  There has not been one documented case of any problem, and there have been thousands upon thousands upon thousands of hectares of these crops.  Not one incident.

59.     This pattern of fraud, deceit, extortive threats, and other illegal activities has been carried on for decades.  As a result, among other things, Canadian authorities long ago revoked Greenpeace's charitable status because its sensational claims "served no public purpose," and authorities in India are also attempting to do the same and investigating it for fraudulent accounting and tax evasion.  Indeed, Greenpeace's founder, Dr. Patrick Moore, recently labelled Greenpeace a "monster" engaged in "extremism," "RICO," "wire-fraud," "witness tampering" and "obstruction of justice."

## 2.  The Illegal Campaign Against The Dakota Access Pipeline

60.     Since no later than August 2016, Energy Transfer has been the target of a malicious and increasingly hostile campaign arising from its development, construction, and operation of DAPL -- a 1,172 mile underground pipeline -- which extends from the Bakken region of North Dakota to Patoka, Illinois, passing through South Dakota and Iowa, the specifics of which are as follows:

### a.  The Dakota Access Pipeline - The Target Of The Illegal Campaign

61.     For nearly a century, pipelines have powered America, delivering energy and natural resources from production areas or ports of entry to consumers, airports, military bases,

population centers, and industry every day.  Without pipelines, America could not function. The

energy delivered through pipelines allow Americans to commute to work, power the industries

that make goods and supply services, and are used as raw materials in manufacturing.  In the

U.S. alone, a network of more than 207,800 miles of liquid pipelines, over 300,000 miles of gas

transmission pipelines, and more than 2.1 million miles of gas distribution pipelines safely,

efficiently, and cost effectively move energy and raw materials to fuel our nation's economic

engine.

62.     Energy Transfer, a Texas-based pipeline operator engaged in liquid petroleum and

natural gas transportation in North America, owns the largest liquid petroleum and natural gas

pipeline system by volume in the United States, spanning nearly 72,000 miles.  Energy Transfer

has operated such pipelines successfully and safely since 1995 without serious environmental

incident.

63.     By 2012, U.S. production of oil and gas resources had skyrocketed due to

improvements in technologies, particularly in North Dakota.  Previously available technologies

could not economically access crude from North Dakota's Bakken shale formation.  However,

new hydraulic fracturing ("fracking") techniques made production of Bakken crude and similar

reserves elsewhere economically viable.   The resulting rapid and substantial expansion of oil

and gas production, particularly from Bakken, vastly outpaced the existing pipeline capacity.  As

a result, transportation by the far more dangerous and environmentally unfriendly options of rail,

truck, and barge increased over 2,300% from 2008 to 2012.

64.     On July 6, 2013, the dramatically increased threat to the environment manifested

itself in a crude oil train derailment in Lac Megantie, Quebec, Canada.  The derailment caused a

fire and explosion, killing forty-seven people, destroying over thirty buildings in the town's

center, and requiring the evacuation of a third of the town's population.   In the U.S. alone,

between July 2013 and June 2014, there were ten additional crude oil train derailments, each

with catastrophic oil spills, explosions, evacuations, and injuries, including a November 8, 2013

derailment and explosion involving a 90-car train carrying North Dakota Bakken crude oil.

65.     This series of catastrophic crude oil rail incidents confirmed the already long-

standing environmental and safety concerns associated with rail transport of oil and gas.  In

October 2013, the Fraser Institute -- an independent non-partisan research and educational

organization -- studied all publicly available information from the Department of

Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), and

published a report entitled "Intermodal Safety In the Transport of Oil," concluding that "pipeline

transportation is safer than transportation by rail, road or barge, as measured by incidents,

injuries and fatalities."  Likewise, the U.S. Department of Transportation statistics demonstrate

that "pipelines are between 3.6 to 4.5 times safer than rail and 34 times safer than truck

transportation of crude oil."  The U.S. Government Accountability Office ("GAO") also

confirmed that pipelines were a materially safer mode of transporting oil and gas than truck and

rail, and that the lack of sufficient pipeline capacity to meet increased oil and gas production

posed significant environmental and other risks.

66.     In response to this serious environmental risk, on June 25, 2014, Energy Transfer

announced the development and construction of DAPL to safely move nearly a half-million

barrels of domestically produced crude oil across four states daily.  In addition to protecting the

environment, DAPL would provide a permanent cost-effective means for producers to transport

Bakken crude oil to market even in soft markets, and thereby allow domestic crude production to

permanently displace imported crude oil from Mexico, Venezuela, Africa, and the Middle East, which arrives through even more environmentally dangerous means.

> ### i.   DAPL Tracks Existing Pipelines And Avoids Culturally And Environmentally Sensitive Areas

67.   Plaintiffs' representatives conducted extensive analysis and planning to identify a pipeline route that would have the least impact on the maximum group of stakeholders and resources.  For more than two years, Energy Transfer engaged in design, permitting, consultation, and environmental survey work analyzing, among other factors, constructability, population centers, cost, and minimization of potential public, cultural, and environmental impacts.  The result of this exhaustive process was a route that would track privately-held land and pre-existing utility lines, roadways, and infrastructure to ensure minimal environmental, cultural and tribal impacts.

68.   In North Dakota alone, there were already 7,000 miles of pipeline running underground before DAPL was planned, including eight-decades-old pipelines that cross under the Missouri River.  As planned and constructed, DAPL crosses under the Missouri River in two locations: (i) under the man-made Lake Oahe; and (ii) near Willinston, North Dakota.  In both locations, DAPL is located 100% adjacent to and within 22 to 300 feet from the Northern Border Pipeline, a 1,249 mile, 42-inch natural gas pipeline, built in 1982 by the Northern Border Pipeline Company ("NBL Co."), which for four decades has safely transported natural gas from the Western Canadian Sedimentary Basin and Williston and Powder River Basins in North Dakota and Montana, respectively, to natural gas shippers in the Chicago area and North Hayden, Indiana.  DAPL is also co-located parallel to an existing overhead power line operated by Basin Electric that crosses Lake Oahe.  Energy Transfer specifically selected these crossing

locations, like the rest of the DAPL route, because they would, by definition, traverse areas that had already been disturbed by other infrastructure projects.

69. Significantly, neither the original construction of the Northern Border Pipeline under Lake Oahe in 1982, nor the subsequent expansion of the Northern Border Pipeline (the "Northern Border Addition") prompted any opposition from SRST or the Enterprise members. Specifically, in connection with the construction of the upgraded compressor stations for the Northern Border Addition, Northern Border directly solicited feedback from Native tribes in the region concerning whether the Northern Border Pipeline would affect any places of historic, cultural, or religious significance. When SRST responded to Northern Border's request for comment it never raised an issue with or objection based on the possibility that any potential archeological sites, much less sacred burial ground, might exist along the exact same route as DAPL under Lake Oahe. The Federal Energy Regulatory Commission subsequently approved construction of the Northern Border Pipeline and has regulated its operation ever since, without subsequent incident or objection from SRST.

70. For DAPL, Energy Transfer commissioned multiple detailed cultural surveys by professional archeologists and ethnographic specialists. These surveys confirmed that there were no remaining intact cultural or tribal resources at DAPL's Lake Oahe crossing. USACE likewise came to the same finding after its own exhaustive surveys conducted multiple times over many years for various projects, and then again specifically for DAPL.

### ii.    DAPL Was Routed In Response To Tribal Concerns

71. Despite the fact that DAPL used private land and previously existing pipeline and industrial routes and does not traverse any tribal treaty land, over a period of 25 months Energy Transfer attempted to consult with all federally recognized tribes in the pipeline region to ensure each had an opportunity to express any concerns they had about areas of cultural and spiritual

significance or otherwise.   In addition, the Corps separately held dozens of meetings with tribes regarding DAPL.

72.     As early as June 2014, Energy Transfer reached out to various tribes to solicit input on DAPL's route.  The Company hosted and funded three tribal consultation meetings to disseminate information and address the concerns of the tribes and offered to fund pre-construction tribal surveys.  In addition to these meetings, the Company individually met with various tribes, including multiple meetings with representatives of SRST, beginning as early as September 30, 2014.

73.     Beyond hosting tribal consultation meetings, the Company shared the results of all cultural surveys -- which cover 76.5% of the project route -- with each tribe, including SRST, in both electronic and hard copy.  Significantly, where these surveys revealed previously unidentified historic or cultural resources that might be affected by construction and operation of the pipeline, the Company rerouted the pipeline.  In North Dakota, for example, pre-construction cultural surveys found 149 potentially eligible sites, 91 of which had stone features.  The pipeline route and workspace was modified to avoid all 91 of these stone features and all but 9 of the other potentially eligible sites.  Ultimately, the Company rerouted the pipeline 140 times in North Dakota alone to avoid potential cultural resources.  Plans were also put in place to mitigate the other nine sites through coordination with the North Dakota State Historic Preservation Office ("SHPO").

74.     The Company also invited the tribes to participate in tribal surveys along the proposed route, including for all federal jurisdictional areas subject to the Clean Water Act and the National Historic Preservation Act and all areas that could reasonably be identified as having intact tribal features, including undisturbed land, locations considered to have a high probability

of containing cultural sites, and areas identified by the various authorities, including tribal authorities, as having the possibility of containing cultural sites.  Lake Oahe was one of the areas investigated, studied, and evaluated for cultural and tribal resources.

75.     Beyond these extensive efforts to ensure that the Project would not knowingly impact any unknown sites, Energy Transfer developed and deployed a comprehensive Unanticipated Discoveries Plan for each state that spells out the procedures to stop work, notify the proper authorities (which include tribal authorities), and implement guidelines for how to mitigate the discovery of unanticipated cultural resources during construction.  The plan was provided to the tribes for comments.  Tribal comments were incorporated, and the Unanticipated Discoveries Plan was subsequently submitted to state and federal permitting authorities for their review and approval, which was granted.   Moreover, the Company voluntarily agreed to allow tribal monitoring during construction at sensitive locations identified by USACE, various states, and certain tribes, including at the Missouri River crossing at Lake Oahe.

76.     Over the course of construction, the plan was utilized multiple times to handle the discovery of unanticipated cultural resources.

### iii.    DAPL Was Constructed With The Safest, Most Advanced Technology

77.     DAPL's design utilizes the latest operational, safety, and environmentally protective technologies, far in excess of those used for pre-existing pipelines that have been in place at those very locations for years without objection or incident.

78.     The design, construction, inspection, and maintenance of DAPL were subject to stringent federal safety requirements that PHMSA monitors and enforces.

79.     In addition to federal pipeline and safety regulations, the design and construction of DAPL adheres to and exceeds safety codes and industry best practices promulgated by, among

others, the American Society of Mechanical Engineers, the National Association of Corrosion Engineers, and the American Petroleum Institute.  Implemented safety specifications and best management practices that exceed those required by PHMSA include, but are not limited to: (i) additional drain tile and topsoil protection measures; (ii) pipe mill inspections with on-site quality control measures including enhanced testing and record retention and additional pipe wall thickness (45% greater) at all public road, railroad, and waterway crossings; (iii) installation of valves with motorized actuators to supplement local monitoring with remote monitoring; (iv) enhanced hydrostatic and other testing, including an inspection of the entire pipeline length by an internal deformation tool prior to startup; and (v) a cathodic protection system activated earlier than required.

80.     Moreover, while DAPL is generally buried 4 feet below the surface, at the Lake Oahe crossings, the pipeline was installed at a depth of 140 to 210 feet beneath the surface of the federal land it traverses and approximately 90 to 115 feet deep beneath the lakebed.  The crossing of Lake Oahe was constructed utilizing horizontal directional drilling ("HDD") technology so that the pipe may be installed several feet beneath the body of water without disturbing the body of water under which the pipeline is being constructed.  Among other benefits, the HDD technique makes it highly improbable that, in the unlikely event of an oil-spill or leak, drinking water will be affected.

81.     Like other major water body crossings, the crossing at Lake Oahe was engineered with heavier wall thickness than standard pipe, making that segment of the pipeline stronger and better able to withstand higher operating pressure.

### iv.     DAPL's Benefits

82.     The safety and economic benefits of DAPL are indisputable.  DAPL makes access transporting and accessing energy cheaper, easier, more reliable, and most important, far safer.

In addition to these benefits, the much-needed infrastructure reduces the burdens on rail and roads.  Increased transportation of oil by rail in recent years has had negative impacts on the oil industry as well as other industries, such as delays disrupting the agricultural sector.  Reports from 2014 show that one railway had a backlog of 1,336 rail cars waiting to ship grain and other products.

83.   Moreover, shipping costs for oil delivered by DAPL is approximately $3-$7 lower per barrel than by rail.  The cheaper, safer means of transporting oil will boost national security by decreasing dependence on foreign energy, especially on oil-producing countries in unstable regions.

84.   DAPL will also provide tax benefits to the local economies of four states.  North Dakota stands to gain more than $110 million annually in tax revenue upon operation.  In addition to oil tax revenue, the pipeline is estimated to generate $55 million from property taxes annually in North Dakota, South Dakota, Iowa, and Illinois, including more than $10 million per year in North Dakota.

85.   Construction of DAPL also boosted the local economy in North Dakota, South Dakota, Iowa, and Illinois, creating 8,000 to 12,000 new construction jobs.  Local businesses benefited too, as workers spent money locally for lodging, food, recreation, supplies, and other items.  An estimated $655.9 million worth of goods and services were directly purchased in North Dakota, $485.6 million in South Dakota, $628.4 million in Iowa, and $366.6 million in Illinois.  Increased spending led to increased sales tax revenue for each of the four states.

### b.  The Enterprise Launches The #NODAPL Campaign

86.   Following twenty-five months of planning, design, permitting, consultation, environmental and cultural surveys, and mitigation measures, on July 25, 2016, USACE issued its Final Environmental Assessment ("EA") for DAPL with a Mitigated Finding Of No

44

Significant Impact ("FONSI").  That same day, the Corps issued Nationwide Permit ("NWP")

verification and other authorizations for construction of the limited portions of DAPL that

traverse federally regulated waters, paving the way for Energy Transfer to complete construction

of the pipeline which had been underway on private property since May 2016.

87.     Inexplicably, after more than two years of silence while DAPL was being

meticulously and carefully designed, reviewed, and approved, and while Energy Transfer was

engaged in outreach to all interested stakeholders, the Enterprise burst to the surface immediately

upon the Corp's approval.  Two days later, the Enterprise filed suit challenging it, ostensibly on

behalf of SRST in a 48-page complaint.   The bases for the suit were fabrications about the

environmental review and tribal consultation conducted, sacred sites, and water safety.  When

Earthjustice, the Tribe's putative lawyers, solicited the representation, it did not disclose to the

Tribe that its primary motive was to use the Tribe's standing and DAPL as a publicity platform

through which Earthjustice and the other Enterprise members could raise money.  This would

become increasingly clear as Earthjustice selected strategies designed to grab headlines and

create outrage rather than serving the Tribe's best interests.

88.     The lawsuit was just the curtain-raiser for the Enterprise's intended real objective:

a sensational production of an international media spectacle that would ultimately be highly

detrimental to the Tribe's interests.  The lawsuit was accompanied by materially false,

misleading, and defamatory headlines claiming that the "Dakota Access Pipeline [] Threatens

Livelihoods, Sacred Sites, And Water."  A press release issued by Earthjustice announcing the

lawsuit misrepresented that DAPL approval was "fast-tracked," "wrote off the Tribe's concerns,"

"ignored the pipeline's impacts to sacred sites and culturally important landscapes," and created

an "existential threat" of an "inevitable" spill that would poison the Tribe's water supply.

Quoting Jan Hasselman, lead counsel for SRST, the press release purported to warn: "There have been shopping malls that have received more environmental review and Tribal consultation than this massive crude oil pipeline.  Pipelines spill and leak -- it's not a matter of if, but when. Construction will destroy sacred and historically significant sites."  Revealing the true purpose of the suit and sensational and false press release, the press release concluded with a request to "Join Our Fight" and provided a link to donate to Earthjustice with a suggested minimum donation of $100.

89.     Earthjustice's publicity campaign continued in the days that followed.  The very next day, it launched a "Case Overview" page which headlined the Enterprise's false charge that "an oil spill [under Lake Oahe] would constitute an existential threat to the Tribe's culture and way of life."  Throughout the next month, under the false auspices of serving as pro bono counsel for the tribe, Earthjustice continued its campaign to generate revenues through donations by aggressively publicizing its work on behalf of the tribe, including through development of a Frequently Asked Questions ("FAQ") page concerning DAPL and the pending litigation which was featured prominently on Earthjustice's website along with links to access all case filings.  In the months that followed, these pages were updated regularly.

90.     After Earthjustice commenced the campaign, other Enterprise members quickly followed suit.   No later than August 2016, radical eco-terrorist organizations manufactured an international #NODAPL movement based on the false narrative launched by Earthjustice, and expanded the campaign to direct action against DAPL.  These groups immediately set up "resistance camps" near DAPL construction sites as a base for coordinating violent protests and fomenting public disorder to disrupt DAPL construction.  They recruited new members through videos and social media, encouraging and even paying them to travel to the camps, before

training them to engage in criminal trespass, violence, and property destruction. They supplied materials for and directed these attacks, and provided free legal representation and bail for those arrested for such illegal activities.

91.   The radical militant group Red Warrior Camp was funded both directly and indirectly by the Enterprise. Earth First! gave $500,000 of seed money to Red Warrior Camp to establish its presence near the juncture of the pipeline construction and the Lake Oahe crossing. The purpose of Red Warrior Camp's infiltration of more peaceful demonstrators was to instigate criminal behavior, incite violent incidents, and generate sensational video and still images that these groups could use to foment public emotions worldwide, generating donations for all the Enterprise members engaged in this "cause." Red Warrior Camp quickly established itself as an outlier, rogue element, among the thousands gathering in North Dakota at the Oceti Sakowin Camp, refusing to cooperate with the loose affiliation of tribal authorities that was attempting to manage the throngs of native and non-native activists that descended upon the region and repeatedly taking unilateral criminal action without consulting with or getting approval from, and in direct opposition to, the Tribe.

92.   Outside of North Dakota, on August 3, 2016, a coalition of putative environmental groups, including 350.org, RAN, Sierra Club, Bold Alliance, and Food and Water Watch, issued a statement repeating the claims in Earthjustice's materially false, misleading, and defamatory press statements. Moreover, on August 24, 2016, 350.org issued a press release accusing DAPL of "wreaking havoc on nearby sacred lands and contaminating water."

93.   The Enterprise wasted no time in escalating the dispute to violence in order to generate the most sensational coverage and public interest.   By way of example only, on August 10, 2016, roughly 100 members directed and funded by the Enterprise and led by members of

Red Warrior entered onto Dakota Access property near Lake Oahe without permission and obstructed company workers from gaining access to the property.  One Enterprise member chained himself to a Dakota Access fence.  Another carried a 12-inch knife strapped to his hip and warned that any Dakota Access personnel who tried to enter the site would get "hurt."

94.      On August 11, 2016, roughly 200 members of the Enterprise led by Red Warrior entered onto Dakota Access property near Lake Oahe without permission and obstructed and delayed pipeline construction.  Enterprise members tore down Dakota Access's barricades intended to prevent trespassers from entering Dakota Access's property or otherwise disrupting construction activities, jumped a fence -- one with a knife in hand -- and ran towards Dakota Access personnel.  On August 12, 2016, roughly 350 members of Red Warrior entered onto Dakota Access property, again without permission.  Due to threats of violence, Dakota Access personnel had to be evacuated from Dakota Access's property by police escort.  Enterprise members swarmed departing company vehicles and threw rocks and bottles at them.

95.      On August 24, 2016, the U.S. District Court for the District of Columbia heard argument on SRST's motion for a preliminary injunction to enjoin construction of DAPL under Lake Oahe.  During the hearing, the Court signaled that SRST had not met their burden to demonstrate that any cultural resources were imminently threatened to warrant stopping construction.

96.      In response, the Enterprise scrambled for a catalyst to halt construction of DAPL.  On August 25, 2016 the Enterprise sent a letter to President Obama which Enterprise Member RAN featured prominently on its website.  The letter, which was signed by, among others, RAN, 350.org, Food and Water Watch, Greenpeace, Sierra Club, and Bold Alliance falsely claimed that DAPL will "cross[] through . . . tribal land," "threaten sacred sites and culturally important

landscapes," "constitute an existential threat to the Tribe's culture and way of life," and "pose[] significant threats to the environment, public health, and tribal and human rights."  In an effort to lend legitimacy to its trumped up claims, the letter referenced the lawsuit commenced by Earthjustice on behalf of SRST in Washington, D.C.  Notably, while Earthjustice is not a signatory to the letter, its involvement and influence in drafting the letter is clear from the regurgitation of Jan Hasselman's prior unsubstantiated prediction that when it comes to an oil spill in Lake Oahe, it is not a matter of "'if' but 'when.'"

97.     In addition, over two years after Energy Partners began the planning and consultation process during which SRST was consulted and provided with information and a platform to voice concerns, and was otherwise provided ample opportunity to object to routing through any particular site, Earthjustice, ostensibly on behalf of the Tribe, hired a consultant to fabricate the existence of sacred sites along the pipeline route.

98.     Within four days of the August 24 hearing, Mentz gained access to private land directly north of the Standing Rock Reservation, and purported to conduct an additional cultural survey of the land adjacent to the pipeline corridor, which Mentz understood would be the next segment of the pipeline slated for construction.  Remarkably, despite the Tribe having never identified sacred features or otherwise raising objections related to this particular site, even though they had access to the Company's cultural surveys of the site for over eight months, in a matter of days this consultant purported to have discovered for the first time various purported sites of cultural significance in and around the pipeline corridor.  But neither Earthjustice nor the Tribe bothered to raise these findings with Energy Transfer or USACE for consultation, but instead undertook purported Class III surveys of the pipeline corridor and the land adjacent to the pipeline path.

99.     According to Mentz, over the next three days, between August 30 and September 1, a miraculous concentration of rare and high-value cultural resources were identified that neither the Tribe nor anyone else had ever identified or raised objections about over the prior two years, despite the fact that Energy Transfer had previously provided the results of its cultural surveys to SRST, including concerning the area that Mentz purported to survey.

100.    At no time during the three days during which Mentz purported to conduct these cultural surveys did Earthjustice inform Energy Transfer or USACE of these purportedly rare discoveries or request rerouting or mitigation of the pipeline -- which Energy Transfer had previously implemented on multiple occasions in response to tribal concerns and cultural surveys.  Instead, with complete knowledge of the pipeline construction schedule, Earthjustice sat on these findings until the Friday afternoon before Labor Day weekend, and only at the eleventh hour, informed counsel for USACE and Energy Transfer that that it would -- within the hour -- file a supplemental declaration in further support of SRST's motion for preliminary injunction setting forth Mentz's putative findings if Energy Transfer did not consent to delay construction of the pipeline corridor along Lake Oahe.

101.    The Mentz declaration was not designed to reveal sacred sites, or prevent their destruction, but rather was intentionally crafted and timed to sandbag the company on the eve of Labor Day weekend on a tract of land that was slated for construction the very next day.  The Enterprise was well aware that there were no remaining intact cultural resources along the pipeline right-of-way.  Aerial photographs of the right-of-way taken decades ago in connection with the development and construction of the Northern Border pipeline demonstrate that most of the land surface within the right-of-way had already been graded with heavy construction equipment and trenched decades ago.  Moreover, Energy Transfer had previously conducted

50

cultural surveys at the very site that Mentz purported to study -- the results of which were
reviewed and affirmed by the North Dakota SHPO and shared with SRST.  Most importantly, the
cultural sites Mentz claimed were located inside the pipeline corridor were actually outside that
corridor according to Mentz's own GPS coordinates.

102.    In fact, Earthjustice's threatened motion for a TRO was merely a pretext to ignite
a violent standoff between protestors and the Company that the Enterprise could use to focus
international media attention falsely claiming that Energy Transfer's scheduled clearing, grading,
and preparation of its pipeline right-of-way over Labor Day desecrated fifty-three sacred sites.
Notwithstanding its direct knowledge to the contrary, the Enterprise disseminated this false and
sensational charge as a catalyst to generate widespread hysteria and to spur violent riots and
protests throughout Labor Day weekend.

103.    On Saturday, September 3, the Enterprise knowingly made the false claim that
DAPL construction crews had been intentionally relocated over the weekend from another
location to clear and grade the site of Mentz's purported discovery of cultural resources.  This
was an outright lie, and in fact the complete opposite was true.  Weeks prior to September 3,
2016 (only days before an annual international powwow and leaders summit held by the United
Tribes Technical College in nearby Bismarck, ND from September 6-11), Energy Transfer
elected to shift construction to accommodate those visiting the area for an annual powwow and
summit, and to avoid enflaming protesters gathering nearby.  Thus, not only was Energy
Transfer's work on September 3 not designed to desecrate important cultural resources, it was
planned to respect tribal traditions, and to reduce, not enflame, tensions.

104.    The Enterprise's conduct had its intended effect.  On Saturday, September 3,
2016, gathering protestors, led and whipped into a frenzy by Red Warrior and the false report

that construction crews had purposely accelerated construction to destroy putative newly discovered sacred sites revealed in 11th hour court filings the day before, marched along Highway 1806 and attacked DAPL construction crews working within the pre-existing pipeline right-of-way, and away from any cultural resources identified by Mentz. The protesters illegally blocked traffic, and quickly became violent, trampling a wire construction fence and stampeding with hundreds of protesters, horses, dogs, and vehicles onto land where construction was ongoing. Protesters threatened security personnel with knives, hit them with fence posts and flagpoles, and otherwise physically attacked private security personnel retained by Energy Transfer, resulting in multiple security guards and dogs being hospitalized.

105. Consistent with its playbook, the Enterprise sought to capitalize on the violent clashes it had intentionally incited between the protesters and DAPL construction workers and security guards to further their false narrative that Energy Transfer responded to "peaceful" protesters with excessive use of force, as a pretext for additional fundraising efforts. In furtherance of this objective, the Enterprise falsified a photograph purporting to show a seven-year-old girl mauled by guard dogs at the DAPL construction site. In fact, the photo of the little girl was taken from a news story titled "Dog left out in Texas heat bits face of 3-year-old girl," originally published in the N.Y. Daily News on June 26, 2012. The Enterprise then sought to further exploit the violence incited by its own falsehoods when it sought a temporary restraining order on September 4, 2016, falsely claiming that it was necessary to stop further purposeful desecration of cultural resources. The Enterprise immediately publicized its efforts to obtain a restraining order and its false claims that construction crews had purposely changed construction schedules to clear and grade the area identified by Mentz. At no time did the Enterprise state the truth -- that Energy Transfer had decided out of respect for upcoming tribal events to shift

construction weeks prior to Mentz's manufactured Friday night report of newly discovered cultural resources, and that the Enterprise exploited that shift in construction and created a violent flashpoint when they falsely contended that the exact area of planned construction contained a newly-discovered cache of cultural resources literally on the eve of that planned construction.

106.     Not only did the Enterprise incite violence, it also directly and indirectly funded and supported encampments for radical violent protestors at Standing Rock to ensure that attention grabbing clashes with workers on the pipeline and company security would continue.  On September 8, 2016, Greenpeace announced that it was organizing and hosting supply drives to fund, feed and house Red Warrior Camp in 10 cities across the country.

107.     The Enterprise's sensational lies about DAPL's rushed approval process and lack of consultation concerning the existence of intact cultural and tribal resources were revealed when, on September 9, 2016, the U.S. District Court for the District of Columbia denied SRST's preliminary injunction motion to enjoin construction of the pipeline under Lake Oahe.  The 58-page decision squarely rejected the Enterprise's allegations of USACE's and Energy Transfer's disregard for SRST's concerns, holding that the facts "tell a different story" and "the Corps exceeded its NHPA obligations."

108.     In reaching this conclusion, the court carefully set forth in "significant detail" "how Dakota Access chose the pipeline route" to avoid encroaching on Native People's rights, lands and sacred sites, and "the facts surrounding the Corps' permitting and concurrent Section 106 process for the project," which the Court found to be above and beyond what the law required.

109.    First, the court emphasized Energy Transfer's careful consideration of historic artifacts, noting that Energy Transfer "prominently considered" the "potential presence of historic properties" in choosing the route for the pipeline, consulting past cultural surveys and hiring professionally licensed archaeologists to conduct "extensive new cultural surveys of its own."   The court further noted that Energy Transfer rerouted when the survey revealed previously unidentified historic or cultural resources and "[b]y the time the company finally settled on a construction path, [ ] the pipeline route had been modified 140 times in North Dakota alone to avoid potential cultural resources. . . . All told, the company surveyed nearly twice as many miles in North Dakota as the 357 miles that would eventually be used for the pipeline."

110.    Second, the court detailed Energy Transfer's efforts to reach out to the SRST. The Court determined that "the Tribe largely refused to engage in consultations" despite "dozens of attempts to engage Standing Rock in consultations to identify historical resources at Lake Oahe and other PCN crossings."   Nonetheless, the Court concluded that USACE exceeded consultation requirements because when USACE and representatives of SRST did meet, they "engaged in meaningful exchanges that in some cases resulted in concrete changes to the pipeline's route."   In particular, the Court emphasized that "the Corps took numerous trips to Lake Oahe with members of the Tribe to identify sites of cultural significance," "[USACE] also met with the Tribe no fewer than four times in the spring of 2016 to discuss their concerns with the pipeline," and that Energy Transfer and USACE even moved the pipeline at the Jones River crossing "in response to the Tribe's concerns about burial sites."

111.    Notwithstanding the District Court's findings, that same day, in response to the extreme opposition to DAPL and the pressure on the government generated by the Enterprise, the Department of Justice ("DOJ"), Department of the Army ("DOA") and Department of

Interior ("DOI"), issued a joint statement halting construction on federal lands bordering or under Lake Oahe until USACE determined whether to reconsider its EA and its decision to authorize permits for construction of the pipeline.

112.    The Enterprise immediately touted the government's decision to halt construction under Lake Oahe -- which they themselves had generated -- as an endorsement of their campaign and used it as a pretext for additional grassroots efforts.  For example, on September 9, 2016, Rachael Prokop of Greenpeace USA published "How You Can Help Standing Rock Activists Stop The Dakota Access Pipeline," which falsely alleged, "The pipeline was approved without adequate environmental reviews or consultation from the community -- and any spill is a direct threat to water supplies for the Standing Rock Sioux. President Obama can make this 'pause' a stop, but he'll only take action if we put the pressure on him."  Prokop concluded with a plea for donations "to keep the growing peaceful opposition to the pipeline going as long as possible."

113.    Likewise, Sierra Club called on the public to "take action" against the pipeline in a September 13, 2016 article "A Tribal Activist War Rages On: The Dakota Access Pipeline and The Fight for Justice."  The article falsely alleged that Energy Transfer Partners "uproote[d] and destroy[ed] the Standing Rock Sioux Reservation" and that a leak of the pipeline was "highly probable."  Sierra Club further claimed that the Company obtained permits in a "fast-track approval" process that "seems to be the oil companies' perfect skirt around the fervent backlash from opposing parties," and accused USACE of "flagrant disregard for both tribal and environmental rights, as well as a lack of compliance with federal consultation policies." Lauding the government's decision to temporarily stop construction, the article concluded with a call to the public to sign a petition to demand that the Corps "conduct a thorough, honest, environmental impact statement."

114. The next day, Michael Brune, Sierra Club's Executive Director, made similarly false allegations in an article titled "A Light Shines in the Dakotas" celebrating the "tremendous victory" and touting Sierra Club's efforts purportedly on behalf of the Tribe. The article falsely claimed that it was "inconceivable that [DAPL] was approved without a thorough and meaningful consultation" when "a spill would have catastrophic effects on the sole drinking water supply of the Standing Rock Sioux." Sierra Club called for a reevaluation of the pipeline to consider the pipeline's effects on climate change, and concluded by demanding that the pipeline cannot be justified and must "be canceled in its entirety."

115. Greenpeace echoed these pleas to join "the resistance" in a September 26, 2016 article "How Your Generosity Is Helping #NODAPL Camps Keep Up The Resistance" and an October 27, 2016 post "Greenpeace Statement Of Solidarity With Standing Rock Water Protectors," which purported to affirm Greenpeace's commitment to "stand[ ] in solidarity with and lend[ ] full support to the water protectors at Standing Rock" to oppose DAPL, which Greenpeace described as "a direct threat to the life, rights, and water of the Standing Rock Sioux" in that it poses a "serious risk to the nation's water supply, violat[es] federal trust responsibilities . . . and desecrat[ed] sacred burial, religious and other historical sites." The October 27 post concluded by falsely stating, "The fast-track process of approval disregarded key U.S. legislation, including the Clean Water Act, the National Environmental Policy Act, and the National Historic Preservation Act."

116. Likewise, on October 6, 2016, Earthjustice published "Making History At Standing Rock: Tribes Are Leading Action To Preserve the Planet," written by Earthjustice's president, Tripp Van Noppen, which criticized the "federal government's deeply flawed process for permitting the pipeline . . . without any comprehensive environmental review or meaningful

consultation with [SRST]."  The post likewise peddled the Enterprise's false narrative that DAPL was "[r]outed through sacred sites"; that Energy Transfer "rushed to bulldoze and destroy ancestral burial grounds that lie in the route's new path"; and a spill "would poison water for Standing Rock and potentially millions of people downstream."  Most egregiously, Van Noppen falsely accused Energy Transfer of shifting the original route of the pipeline toward SRST's reservation when it became clear that a leak or a spill would contaminate drinking water in the relatively prosperous, overwhelmingly white city of Bismarck.  Significantly, without referencing the September 9, 2016 decision by the District Court for the District of Columbia, which held that Energy Transfer and USACE had exceeded their consultation obligations under NHPA, Van Noppen brashly alleged "this case has highlighted the need for a serious discussion on whether there should be nationwide reform with respect to considering tribes' views on these types of infrastructure projects."  Van Noppen commended the "power of the movement that is growing in North Dakota" -- which Earthjustice, along with its co-conspirators generated -- for creating "a dramatic shift in position and tone by the U.S. federal government," and concluded with a plea for continued action: "Now is the time to help [the opposition movement] grow."

117.    Over the course of the next eight months, and continuing up until the filing of this action, the Enterprise ubiquitously disseminated alarmist and sensational claims about DAPL, which were untethered to any facts to manufacture a sense of crisis and drive "sustained public pressure," including riots and violent protests.  These intentionally inflammatory claims, which were continuously disseminated in high-profile reports, websites, blog posts, and on social media, including Facebook and Twitter, were deliberately false and misleading for the reasons set forth below:

### i.   The Enterprise Disseminates False Claims About DAPL

#### 1.   The Enterprise Misrepresents That DAPL Traverses SRST Tribal Treaty Lands

118.    Through intentional and repeated misstatements, the Enterprise has created the widespread misperception that the pipeline travels through SRST Reservation land or, alternatively, that there is some legitimate dispute about whether the Sioux Tribe holds title to some of the land the pipeline crosses in North Dakota.

119.    By way of example only, the Enterprise has falsely claimed that:

- DAPL "is cutting through Native American sacred territories and unceded Treaty lands," resulting in "gross violations of Native land titles";

- DAPL "has violated the sovereignty of the Standing Rock Sioux and their right to determine the future of their lands . . . .";

- "The Dakota Access pipeline is a direct violation of the sovereign rights and culture of the Standing Rock Sioux . . . violating federal trust responsibilities guaranteed through treaties"; and

- "The Dakota Access Pipeline project . . . would extend . . . across North Dakota . . . crossing through . . . tribal land."[1]

---

[1] The Enterprise ubiquitously disseminated its false claims that DAPL crosses tribal land in violation of tribal sovereignty, including, by way of example, the following false and defamatory publications:

- November 7, 2016 open letter from BankTrack (and signed by among others Greenpeace, Sierra Club, RAN) to an international consortium of banks financing DAPL construction, which falsely stated that "the pipeline trajectory is cutting through Native American sacred territories and unceded Treaty lands . . . ."

- November 7, 2016 Press Release, "RAN Statement on Citigroup's Leading Role in Financing Dakota Access Pipeline," in which RAN falsely alleged that DAPL "has violated the sovereignty of the Standing Rock Sioux and their right to determine the future of their lands . . . ."

- November 30, 2016 open letter from BankTrack (and signed by among others Greenpeace, 350.org, Bold Alliance, Sierra Club, RAN) to the banks financing DAPL, which accused Energy Transfer of "gross violations of Native land titles . . . ."

- Undated post on Greenpeace's website, "Another Major Norwegian Investor Divests From Companies Behind Dakota Access Pipeline," in which Enterprise member Perry Wheeler stated, "The financial institutions . . . are realizing that it is bad business to invest in companies willing to disregard Indigenous sovereignty to destroy sacred Native Lands. . . ."

- Undated post on Greenpeace's website, "Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans," in which Enterprise member Perry Wheeler stated that Energy Transfer is "willing to destroy Standing Rock's sacred land . . . ."

120.     None of this is true.  In fact, the pipeline is located approximately one-half a mile north of the acknowledged legal boundary of the SRST Reservation where it crosses Lake Oahe north of Cannonball, North Dakota -- the epicenter of the Enterprise's manufactured controversy.

121.     The 7,500 feet -- or 1.4 miles -- of land beneath and just adjacent to Lake Oahe is not part of the SRST reservation, nor is it the sovereign land of any other Native American tribe. Instead, it is indisputably federally-owned property.

122.     Lake Oahe is a man-made reservoir built between 1948 to 1959 pursuant to the Flood Control Act of 1944, a response to the prolonged drought in the Missouri River Basin in the 1930s -- responsible for Dust Bowl conditions in the region during the depression-era -- followed by severe flooding in 1943.

123.     Included in the Flood Control Act was the Pick-Sloan Plan, which called for construction of four dams -- the Garrison, Fort Randall, Big Bend, and Oahe -- and 1,500 miles of levees on both sides of the Missouri River from Sioux City, Iowa to St. Louis, Missouri.  The Missouri River was dammed just north of Pierre, South Dakota, creating the 231-mile, 370,000 acre Lake Oahe, which runs from just north of Pierre, to just south of Bismarck, North Dakota. Building the Oahe Dam was a massive public works project which controls floods, irrigates arid portions of the Missouri River Basin, and generates hydroelectricity.

124.     And, like virtually all of the pipeline's 357-mile pipeline route through North Dakota, the land on either side of the federally-owned Lake Oahe parcel is privately owned.

---

- January 26, 2017 Press Release, "RAN Statement on Continued Investment in Energy Transfer Equity," in which RAN stated that DAPL "violates the rights of the Standing Rock Sioux to self-determination and Free, Prior and Informed Consent [] regarding decisions on their traditional lands."

- November 1, 2016 post to Sierra Club's website, "Tell Big Banks to Divest from Dakota Access Pipeline," in which Sierra Club stated that DAPL is constructed "through sacred Sioux tribal lands."

Additional examples of false publications claiming that DAPL crosses tribal land in violation of tribal sovereignty are set forth in Appendix A.

125.     SRST's argument that portions of the private land (as well as the federally-owned parcel beneath and adjacent to Lake Oahe), is "unceded" tribal land has been fully resolved by the United States Supreme Court.  In United States v. Sioux Nation of Indians, 448 U.S. 371 (1980), the Court held that through the Act of February 28, 1877 (the "1877 Act"), the federal government exercised its Constitutional power of eminent domain and "effected a taking of tribal property."  That Constitutional taking encompassed land north of the current legal boundary of the SRST reservation, including the parcel -- now privately owned -- used for staging and construction.

126.     Because SRST has no ownership interest in or legal title to any of the property used for the construction or operation of DAPL, the project does not cross tribal lands or impinge on the Sioux Tribe's sovereignty.

127.     Finally, while SRST does maintain certain fishing and recreational rights to the waters of Lake Oahe, the United States District Court for the District of Columbia  held that construction of DAPL will not impair the Tribe's rights to hunt and fish on that body of water. The Court further upheld the Corp's conclusion that operation of the pipeline will not have an adverse impact on Lake Oahe.

128.     Highlighting the disingenuous nature of the Enterprise's overwrought claims of cataclysmic risks posed by the pipeline, at the same time people were being incited to physical violence and terrorism to prevent fictional risks and impingement on tribal sovereignty, not far away crude oil was being transported right through SRST's reservation by rail -- a vastly more dangerous mode of transportation -- as it has been for decades without objection.

## 2. The Enterprise Misrepresents That DAPL Will Poison Tribal Water

129.   In addition to intentionally creating the false impression that DAPL traverses the SRST reservation, the Enterprise also falsely alleges that Energy Transfer is "poisoning the water of thousands of people," and "destroy[ing] tribal water supply."  The purported basis for these statements is the Enterprise's unfounded assertion that DAPL's operation will inevitably result in a catastrophic oil spill: "it is not a matter of if, but a matter of when the pipeline will spill." These claims misrepresent, distort, and omit the relevant science and facts.[2]

130.   First, as USACE concluded during the permitting process, the risks of pipeline rupture are generally minimal, and an oil spill is a highly unlikely occurrence.   According to reports issued by the American Petroleum Institute, pipelines are widely acknowledged as the

---

[2] The Enterprise ubiquitously disseminated its false claims that DAPL will poison and contaminate water, including, by way of example, in the following false and defamatory publications.

- September 22, 2016 article "A Strategy to Stop the Funding Behind the Dakota Access Pipeline," in which Bill McKibben of 350.org falsely alleged that DAPL "threatens precious water . . . ."

- November 7, 2016 Press Release, "RAN Statement on Citigroup's Leading Role in Financing Dakota Access Pipeline," in which RAN claimed without any basis that DAPL "poses a devastating public health threat to the Tribe's drinking water."

- Undated post on Greenpeace's website, "Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans," which claimed that Energy Transfer is "willing to destroy Standing Rock's . . . water supply . . . ."

- Undated post on Bold Alliance's website, "Tell President Obama: Stop the Dakota Access Pipeline," which falsely asserted that DAPL "threatens our land, water and climate."

- November 7, 2016 open letter from BankTrack (and signed by among others Greenpeace, Sierra Club, RAN) to an international consortium of banks financing DAPL, which falsely claimed that DAPL "threatens air and water resources in the region and further downstream . . . Given the presumed Indigenous rights commitments of [banks], it is for us inexplicable that . . . threats to water sources . . . have not been identified early on as reasons for EPFIs to not provide funding for this project."

- September 1, 2016 post to Sierra Club's website, "Time to Stop a Bad Idea," in which Michael Brune stated, "[I]t has never been a question of *whether* a pipeline will spill but only of when the next disaster will happen. . . . A spill from the Dakota Access could contaminate the Missouri River and Lake Oahe, which are the water sources for the Standing Rock Sioux Tribe." (emphasis in original).

Additional examples of false publications claiming that DAPL will poison and contaminate water are set forth in Appendix B.

safest way to transport energy products.  A barrel of crude oil or petroleum product reaches its destination safely by pipeline 99.999% of the time.  PHMSA data reflects that in 2015, there were only 77 reported significant incidents on 72,562 total miles of crude oil pipelines, or 0.106% of significant incidents per mile per year.

131.    The risk of pipeline rupture and oil spill are even more remote with respect to DAPL, which was designed and constructed using the latest safety and environmentally protective technologies, and in strict compliance with federal safety requirements, safety codes, and industry best practices promulgated by, among others, the American Society of Mechanical Engineers, the National Association of Corrosion Engineers, and the American Petroleum Institute.

132.    In compliance with these stringent safety standards, Energy Transfer has implemented protective measures at all stages, from design and manufacture to installation and operation of DAPL, to ensure that a spill is unlikely to occur.  For example, a quality assurance program is in place for pipe manufacturers.  Qualified workers welded the pipeline joints.  High-performance external coating over the entire pipeline makes the risk of external corrosion and stress corrosion low.  Cathodic protection likewise decreases the risk of corrosion.

133.    Energy Transfer used horizontal direct drilling (HDD) to install the pipeline deep below bodies of water without disturbing them.  For installation at HDD sites such as Lake Oahe, external coatings over the pipe are resistant to abrasion and other damage that might occur due to rocks or other obstructions that may be present in the ground.

134.    Additionally, at major water body crossings, including Lake Oahe, DAPL is engineered with a 45 percent heavier wall thickness than standard pipe.  Remotely controlled shut-off valves are installed on both sides of Lake Oahe to avoid or minimize any spill effects.

135.    After construction and before installation, pipelines are hydrostatically tested to ensure that that the pipeline bears no manufacturing and construction defects.  By way of example, the segment of pipeline crossing Lake Oahe was hydrostatically strength-tested for 8 hours at a pressure 1.25 times greater than the <u>maximum available</u> operating pressure, with a pipeline design factor 2 times greater than the <u>expected</u> operating pressure.  The entire pipeline length was inspected by an internal inspection tool before startup.

136.    Once in operation, periodic pipeline integrity inspection programs use internal inspection tools to detect pipeline diameter anomalies indicating excavation damage or loss of wall thickness from corrosion.  Inspections for internal corrosion are performed periodically.

137.    Several advanced pipeline monitoring and leak detection systems are in place to prevent and detect pipeline leakage.  A continuous Supervisory Control and Data Acquisition ("SCADA") pipeline monitor remotely measures changes in pressure and volume on a continual basis at all valve and pump stations.  Pressure transmitters monitor flowing pressure in real time and alarm in the event of adverse pressure changes due to potential leaks.  Additionally, LeakWarn, a computational pipeline monitoring system, employs numerous monitored variables and a sophisticated computer algorithm to identify potential leaks.  The leak detection system includes ultrasonic meters at each pump station to continuously verify and compare flowrates along the pipeline in real-time.  The system is capable of detecting leaks down to one percent or better of the pipeline flow rate within a time span of approximately one hour or less and capable of providing rupture detection within one to three minutes.  All monitoring data is immediately analyzed to determine potential releases anywhere in the pipeline system.

138.    In the unlikely event of a release, various emergency response measures are in place.  At Lake Oahe, 92 feet of soil cover the pipeline underneath the lakebed, making any spill highly unlikely to affect drinking water.

139.    Upon detection of leakage, remotely controlled isolation valves at both sides of the river will be closed, and have a closure time of no greater than three minutes.  SRST's existing water intake near Fort Yates is 20 miles away and is the closest Native American water intake structure to the pipeline at Lake Oahe.  Sufficient time exists to close the nearest intake valve to avoid human impact.  The remote risk of contamination of SRST water-supply will soon be further mitigated when SRST's water intake structure is moved 50 miles further downstream, which is expected to occur within the year.  As USACE noted during the permitting process, SRST is constructing the Indian Memorial Intake, a new reservation-wide system intended to provide for all of the SRST reservation's water needs.  Once in operation, the intake at Fort Yates will be taken out of service.  The location of the new water intake 70 miles downstream from the Lake Oahe crossing allows for increased response time to prevent hydrocarbons from a pipeline spill at the Lake Oahe crossing from reaching the Indian Memorial Intake in the unlikely event of a spill.  In fact, given the safer mode of oil transportation by pipeline than rail, the oil-transporting Burlington Northern and Santa Fe Railway, which traverses the SRST reservation land and crosses Lake Oahe at Mobridge, South Dakota close to the new water intake, poses a far greater threat to tribal water resources than the pipeline 70 miles away.

140.    Finally, site-specific geographical response plans have been developed to limit any impact from a release, including measures for the deployment of containment or diversionary booms at predetermined locations and oil collection and recovery activities to

prevent migration of oil.  Emergency response notifications will be made to federal, state, and local agencies and tribal officials.

### 3. The Enterprise Misrepresents That DAPL Will Catastrophically Alter Climate

141.    The "NoDAPL" campaign also exploits the mass interest and concern about climate change with the false charge that DAPL is a "climate destroying project" that will ensure "guaranteed destruction of the planet."  This is a sensational lie.[3]

142.    In connection with its review of the potential environmental impacts of the Pipeline, USACE determined that DAPL will not have any appreciable impact on the aggregate supply and demand for crude oil or refined products in the United States.  Based on studies conducted by the Obama administration's Energy Information Administration, increased

---

[3] The Enterprise ubiquitously distributed its false claims that DAPL poses catastrophic risk to climate change, including, by way of example, in the following publications:

- September 22, 2016 article "A Strategy to Stop the Funding Behind the Dakota Access Pipeline," in which Bill McKibben of 350.org claimed that DAPL is a "$3.7 billion infrastructure project that threatens . . . the planet's unraveling climate. . . . *[A]t this point anyone who finances any fossil fuel infrastructure is attempting to make money on the guaranteed destruction of the planet.*" (emphasis in original).

- January 26, 2017 Press Release, "RAN Statement on Continued Investment in Energy Transfer Equity," in which RAN claimed, "Banks should reject Energy Transfer Equity's . . . climate-wrecking business model . . . ."

- March 10, 2017 post on Greenpeace's website, "In Solidarity, Greenpeace [sic] Supports Native Nations March in DC," which alleged that "The Dakota Access Pipeline . . . will face unrelenting opposition because of . . . their abuses of environment and their cost to our public health. These pipelines only make billionaires richer and keep us hitched to yesterday's energy source. Meanwhile the people closest to their impacts disproportionately pay the price of a catastrophically altered climate, unbreathable air, and undrinkable water."

- February 7, 2017 post on Greenpeace's website, "It's Time for DAPL Funders to Decide Which Side of History They Want to Be On," claiming that banks funding DAPL are "on notice for their role in supporting a project that . . . threatens our climate. . . . [F]inancial institutions funding the project have a role to play, a moral obligation, and their own policies to abide in breaking ties from this project.  Unless, of course, they want to be remembered as the company that . . . sped up catastrophic climate change."

- September 1, 2016 Press Release, "30 Iowans Arrested in Boone County in Peaceful Demonstration Against Dakota Access Pipeline and Risks to Water," in which Bold Iowa claims, "Dakota Access 'Bakken' oil pipeline . . . threatens our land, water and climate."

Additional examples of false publications claiming that DAPL poses catastrophic risk to climate change are set forth in Appendix C.

domestic production of oil does not result in a corresponding increase in U.S. consumption of

crude oil. To the contrary, while increased domestic production of oil has resulted in decreased

imports of foreign oil, consumption of U.S. oil has remained fixed, resulting in a net decrease in

crude oil consumption. Indeed, data published by the Energy Information Administration

demonstrates that as a result of increased domestic oil production, foreign oil imports decreased

from 12.55 million barrels per day in 2005, or 60% of daily U.S. consumption, to 7.45 million

barrels per day, or 40% of daily U.S. consumption, in 2012. Meanwhile, consumption decreased

from 20.8 million barrels per day in 2005 to 18.49 million barrels per day in 2012.

143.    In the context of fixed U.S. oil consumption rates, DAPL actually has a net

positive impact on climate change by providing much-needed infrastructure for domestic oil

production that would otherwise be transported by means that are less safe for the environment,

such as rail, truck, and barge.  As reported by the GAO, limitations in pipeline infrastructure

have resulted in an increased number of trains transporting crude oil which has in turn resulted in

increased greenhouse gas emissions from the combustion of diesel fuel in trains.  Likewise,

increased truck and rail traffic associated with the movement of oil from well sites creates engine

exhaust, containing air pollutants such as nitrogen oxides and particulate matter that affect the

environment. Trucking freight produces more air pollution than other transportation modes.

144.    Finally, without DAPL, more infrastructure for rail and trucking would be built to

transport oil in production, increasing both carbon emissions and the risk of spill. For example,

the Congressional Research Service reported that as of April 2014, manufacturers had a backlog

of 50,000 crude oil tank cars on order for rail transportation, on top of an existing fleet of 43,000,

to keep up with increased oil production. Meanwhile, the GAO has reported that thousands of

additional truck loads transporting oil on North Dakota roads have led to deterioration of roads,

66

which were designed to handle approximately 600 loads a day, and have necessitated rebuilding the roads. The Final EA estimates that six trains, of 125 rail cars each, would have to depart the tank terminal each day to transport the 450,000 barrel per day capacity of DAPL. Analyzing a rail alternative to the Keystone XL Pipeline, the Keystone XL Environmental Impact Analysis calculated a 27.8% to 41.8% increase in greenhouse gases compared to the proposed pipeline.

145. The Enterprise's exploitation of legitimate concerns about mitigating climate change to dupe the public into supporting a campaign that does the opposite lays bare that it is motivated entirely by money, not its proclaimed concerns about environmental impacts.

### 4. The Enterprise Misrepresents That Energy Transfer Used Excessive Force To Combat Peaceful Protests

146. Central to the Enterprise's campaign was its effort to falsely vilify Energy Transfer as a company driven by corporate greed that would go to any length to protect their investment in DAPL, including combatting peaceful protestors with excessive force involving "military equipment, tactics, and weapons to intimidate, assault, [and] arrest," "[the] indiscriminate use of attack dogs, rubber bullets, concussion grenades, tazers and mace," and "water cannons in sub-zero temperatures leading to life threatening situations."[4]

---

[4] The Enterprise ubiquitously disseminated its false claims that Energy Transfer and its private security contractors indiscriminately used excessive force on peaceful protesters, including, by way of example, in the following publications:

- November 7, 2016 Press Release, "RAN Statement on Citigroup's Leading Role in Financing Dakota Access Pipeline," in which RAN falsely stated that, "DAPL private security guards us[ed] pepper spray, rubber bullets and attack dogs on elders and children . . . ."

- November 30, 2016 open letter from BankTrack (and signed by among others, Greenpeace, 350.org, Bold Alliance, RAN, and Sierra Club) to banks financing DAPL, in which BankTrack falsely alleged "grievous human rights violations against water protectors," through the use of "military equipment, tactics and weapons to intimidate, assault, [and] arrest," including "[i]ndiscriminate use of attack dogs, rubber bullets, concussion grenades, tazers and mace," and attacks on protestors with "water cannons used in sub-zero temperatures leading to life threatening situations," and inhumane detention, including "being locked up naked, or cramped without food and warmth into dog kennels."

- April 24, 2017 post on Greenpeace's website, "Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans," in which Enterprise member Perry Wheeler falsely stated that funding banks condone the "human rights abuses we've seen from Energy Transfer Partners and its

147.    The facts, however, were just the opposite.  The so-called "peaceful protests" were anything but peaceful, and the Enterprise deliberately infiltrated the protest campaigns with violent radicals to ensure that end.  As the State of North Dakota has stated in response to "myths" propagated by the Enterprise, "[t]he real brutality [was] committed by violent protesters who use[d] improvised explosive devices to attack police, use[d] hacked information to threaten officers and their families, and use[d] weapons to kill livestock, harming farmers and ranchers." Indeed, protesters were reported yelling, "[w]e are willing to die for this," and "[w]e get paid for this," evidencing that their true purpose was to sow chaos and violence rather than to peacefully protest, as the Enterprise would have the world believe.

148.    The use of violence by certain protesters, particularly members of Red Warrior Camp, was detailed in numerous Morton County Sheriff's Department press releases.  For example, on September 3, 2016, Morton County reported on the protesters' particularly violent provocation, noting that protesters had launched a march from the protest camps on USACE land to a DAPL construction site on private property on the side of Highway 1806.  The protesters illegally blocked traffic, and quickly became violent, trampling a wire construction fence and stampeding with hundreds of protesters, horses, dogs, and vehicles onto land where construction was ongoing.  Protesters threatened security personnel with knives, hitting them with fence posts and flagpoles, and otherwise physically attacking security personnel.  One officer reported being

---

security team."

- January 26, 2017 RAN Press Release, which urged investors, without any basis, to divest from Energy Transfer and "reject Energy Transfer Equity's . . . egregious human rights abuses at Standing Rock."

- Undated post to Sierra Club's website, "Take Action: Tell Wells Fargo to divest from the Keystone XL and Dakota Access pipelines," in which Sierra Club falsely claimed, "In response to peaceful protest against the Dakota Access Pipeline, hundreds of Water Protectors at Standing Rock were injured when police fired rubber bullets, stinger grenades, sonic weapons, and water cannons in below freezing temperatures."

Additional examples of false publications claiming that Energy Transfer and its private security contractors indiscriminately used excessive force on peaceful protesters are set forth in Appendix D.

cornered by 40-50 protesters who hit him with a fence post, kicked him in the knees so he fell to the ground, and then call[ed] to other protestors to "stomp him, kick him."  The September 3, 2016 assaults resulted in hospitalization of several security officers.  As a result, Morton County Sheriff, Kyle Kirchmeier, stated at the time that "[a]ny suggestion that today's event was a peaceful protest, is false."

149.    Likewise, on September 9, 2016, 150-200 protesters swarmed an inactive DAPL construction site on private property two miles east of Highway 1806.  Again, law enforcement observed protesters carrying knives and hatchets, protesters on horseback, and protesters wearing masks and goggles.

150.    On September 26, approximately 200 anti-DAPL protesters led by Red Warrior trespassed at a DAPL construction site west of Highway 6, near St. Anthony, North Dakota and several miles northwest of the Lake Oahe crossing, and assaulted a DAPL security guard, including physically dragging him nearly 100 yards before releasing him.  Other protestors had knives and -- in one instance -- a handgun, according to Morton County Sheriff, Kyle Kirchmeier.

151.    The next day, Morton County reported that protesters led by Red Warrior had again gathered outside of St. Anthony in numbers of approximately 300 people, with vehicles and horses.  The group was firing weapons at road signs and the staged DAPL pipeline, and preventing local farmers from getting to their fields for harvest.  The violence continued into the next day, when protesters trespassed onto a DAPL construction site, stole property, and charged law enforcement on horseback, among other unlawful and aggressive conduct.

152.    USACE likewise documented protestor violence, including an instance of a Colorado woman who was charged with attempted murder while participating in protests, and

noted the strain the protests were placing on local law enforcement.  USACE reported that "[f]amilies of police officers are reportedly being threatened, followed home, and having their residence photographed and videotaped."

153.    Threats of violence by protesters were so severe that USACE instructed employees to "consider not wearing USACE logos or paraphernalia to and from work; Military members should consider wearing civilian clothes to and from work and change into uniform at the office," and to "identify multiple routes to and from work; avoid protesters completely and do not attempt to cross through gatherings; protests may appear peaceful but can escalate quickly."  Instructions included detailed de-escalation tactics, such as the use of active listening, expressions of empathy, and taking notes on protestor concerns, and ultimately advise employees to "[r]emove yourself from the situation at the first opportunity."

154.    By contrast, construction workers, private security officers, and law enforcement at DAPL worksites exercised extraordinary restraint in response to the violent protests, and only responded with force when necessary to protect themselves or unarmed construction workers from physical harm.

155.    As repeatedly reported by Morton County officials, private security forces, and law enforcement routinely de-escalated confrontations and retreated whenever the protesters attacked only property, though they were forced to respond as necessary on those occasions when protesters became physically threatening and/or violent to law enforcement, private security officers, DAPL construction workers, and fellow protesters.

156.    Indeed, the Red Warrior Camp protestors funded and directed by the Enterprise were so violent that in November 2016, they were evicted by the Standing Rock Sioux tribal counsel for their aggressive tactics including the intentional destruction of DAPL property.

157.    Consistent with Morton County officials' reports, footage from the documentary AWAKE: A Dream from Standing Rock, plainly demonstrates that when faced with aggressive protesters advancing onto private property or toward law enforcement barricades, law enforcement responded by calmly communicating with protesters.  For example, when protesters advanced toward stationary law enforcement on private property on Thanksgiving Day 2016, law enforcement pleaded with them: "we do not want a confrontation, the building of the bridge [across the Cannonball River] is an act of aggression to come over to this side, we cannot allow that to happen," and "we respect your right to assemble, please assemble on the other side of the river, . . . you can protest all day."  As protesters crossed the river, security personnel reiterated, "your actions are aggressive, we have to take it as an act of aggression . . . we will begin with water, please go back across the river."  On a similar occasion, when protesters marched on a law enforcement barricade, far from using excessive or unnecessary force, law enforcement pleaded with the protesters to "at this time move your ceremony," and to "please move to the south of the bridge."

158.    The Enterprise's most sensational and alarmist pieces of propaganda -- the false and misleading allegations concerning the use of private security dogs to attack peaceful protestors -- is belied by the very video clips the Enterprise misleadingly exalts as an example of private security's use of excessive force.  As an initial matter, security dogs were only used by private security forces to protect the construction workers from the horses protesters were using to charge and trample law enforcement, security personnel, and workers because horses will not charge dogs.   Indeed, video footage publicized by Enterprise member Democracy Now! shows construction workers and private security personnel behind a fence, working on the pipeline on September 3, 2016 when an angry mob of protesters broke through the fence onto private or

federal property and began attacking security guards and construction workers.  The mob consisted of protesters on horseback, and on foot, armed with fence posts, flagpoles, and projectiles.  Video footage plainly shows restraint by private security guards and Energy Transfer employees.  Security guards with K-9s are pictured controlling their dogs amongst protesters running amok through a clearing and grading site, and construction workers immediately retreating from the scene as protesters advanced.  The only dog off its leash is clearly trained to deter horses only, and passed protesters leaving them completely alone.  By contrast, the video depicts protesters lampooning security guards and K-9s with long flagpoles, hitting them with poles or fence posts, a protester's horse trampling a security dog, and throwing objects at the retreating security personnel and their K-9s.

**5.    The Enterprise Falsely Misrepresents That DAPL Was Routed And Approved Without Adequate Environmental Review Or Consultation With SRST**

159.    The Enterprise makes the inaccurate claims that Dakota Access unilaterally chose a pipeline route without considering its environmental effects or performing adequate tribal consultation before beginning construction.  By way of example only, the Enterprise has perpetuated the falsehoods that:

- DAPL approval process "was rushed, lacked proper government-to-government consultation with [SRST] and ignored the warnings of multiple government agencies . . .";

- "The pipeline was approved without adequate environmental reviews or consultation from the community . . . .";

- "DAPL is yet another example of an oil pipeline project being permitted without adequate public engagement or sufficient environmental review . . . avoiding the environmental review and public input required by the Clean Water Act and the National Environmental Policy Act. DAPL is a major project that should have required more thorough review and analysis under the Clean Water Act and the National Environmental Policy Act, the National Historic Preservation Act and the Native American Graves Protection and Repatriation Act, as well as federal trust responsibilities guaranteed in the

72

1851 and 1868 United States treaties with the Lakota, Dakota and Nakota tribes." And "[a]s long as Nationwide Permit 12 is being used to rubber-stamp oil pipelines, it ignores the intent of our laws and presents an ongoing threat to our water resources, our communities, and our climate.";

- "The Corps granted permits for the pipeline in July 2016 under a highly streamlined approval process . . . [that] circumvents any kind of close environmental review and public process."[5]

160.    Contrary to the Enterprise's false narrative, neither the governmental assessment of the pipeline nor its planning were rushed. Moreover, as the Federal District Court charged with reviewing SRST's complaint concluded, efforts to consult with the tribe were not "empty gestures." Instead, USACE and SRST "engaged in meaningful exchanges that in some cases resulted in concrete changes to the pipeline's route" and "exceeded [ ] NHPA obligations."

---

[5] The Enterprise ubiquitously disseminated its false claims that the consultation and environmental review processes for DAPL were rushed and inadequate, including, by way of example, the following:

- February 7, 2017 post on Greenpeace's website, "It's Time for DAPL Funders to Decide Which Side of History They Want to Be On," in which Enterprise member Mary Sweeters falsely alleged that the DAPL approval process "was rushed, lacked of proper government-to-government consultation with [SRST], and ignored the warnings of multiple government agencies."

- November 6, 2017 post on 350.org's website, "There Is Still Time to Stop the Injustice at Standing Rock," in which Bill McKibben falsely described the NEPA review for DAPL as a "farcical, fast-tracked 'environmental assessment' . . . ."

- October 6, 2016 post on Earthjustice's website, "Making History at Standing Rock: Tribes Are Leading Action to Preserve the Planet," in which Earthjustice criticized "the federal government's deeply flawed process for permitting the pipeline . . . without any comprehensive environmental review or meaningful consultation with the Tribe," and falsely claimed that "Dakota Access secured the necessary approvals from [USACE] using a self-service permitting scheme that is urgently in need of reform."

- January 24, 2017 post on 350.org's website, "Breaking: Keystone XL and Dakota Access," which falsely asserted that DAPL "crosses sacred lands and key water supplies for tribal communities and never once received an environmental review."

- September 14, 2016 post to Sierra Club's website, "A Light Shines in the Dakotas," in which Michael Brune falsely claimed, "The U.S. government attempted to fast-track a dangerous pipeline without properly and respectfully consulting the sovereign tribal nation whose ancestral lands and water it threatens. . . . It's inconceivable that the project was approved without a thorough and meaningful consultation with the first inhabitants of this land."

Additional examples of false publications claiming that the consultation and environmental review processes for DAPL were rushed and inadequate are set forth in Appendix E.

<u>Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers</u>, No. 16-01534 (JEB), 2016 WL 4734356, at *6 (D.D.C. Sept. 9, 2016).

### a) The Planning and Regulatory Processes Were Not Rushed

161.    The preliminary route for DAPL was devised in June 2014.  Because most of the route traverses privately held property, less than 3% of the work of the pipeline required federal approvals and only 1% of the pipeline has any impact on U.S. waterways.

162.    The planning and construction of the pipeline were not undertaken in secret.  At the same time in June 2014 that Dakota Access began acquiring property to survey its route, its representatives met with USACE to discuss its plans.

163.    In order to complete the Project, the company needed certain permits under federal laws, which in turn, require consideration of its environmental impact and consultations with local tribes concerning the potential effect of that permitted activity on places of cultural or religious significance to those tribes.

164.    After two years of planning, consultation, and regulatory review, on July 25, 2016, USACE issued the verifications and other authorizations necessary for, among other things, the work to construct the 1.4 mile portion of the pipeline beneath Lake Oahe.

165.    After acquiring necessary land rights, between December 15, 2014 and January 20, 2015, Dakota Access applied for permits in each state along the pipeline's route.  Through those applications, the Project was subject to evidentiary proceedings concerning its safety, environmental impacts, and potential to disturb cultural and historical resources.  At the conclusion of these proceedings and subsequent administrative review, Dakota Access received Certificates of Good Standing from each state, approving Dakota Access's applications to build DAPL.

166.    Likewise, in November 2015, a nearly 1,000 page draft environmental assessment ("Draft EA"), prepared by Dakota Access, and adopted by USACE was published, finding that the effects on the environment resulting from the pipeline would be "temporary and not significant as a result of avoiding, minimizing, and mitigating any potential impacts."  Eight months later, USACE issued a Final EA and FONSI, permitting the project to proceed.

167.    These environment assessments set forth factors considered during route planning, including, among other things, constructability, population centers, cost, and minimization of potential public, cultural, and environmental impacts.  Dakota Access sought to avoid crossing federal, state, tribal trust, and environmentally sensitive lands wherever possible.

168.    Other pipeline routes were considered, including an alternative to crossing Lake Oahe (the "North Bismarck Alternative") in the initial planning and analysis stages of the pipeline, and these alternative routes were rejected because they potentially would have had a more significant adverse impact on the environment and cultural and historical resources.  The North Bismarck Alternative would have impacted an additional 165 acres of land in North Dakota, and required several additional road and waterbody and wetland crossings.  The North Bismarck Alternative also would have required DAPL to travel close to several wellhead source water protection areas, encroached on the North Dakota Public Service Commission's 500-foot residential buffer requirements at several locations, and would have crossed several high consequence areas, which are areas designated by pipeline authorities as those in which a spill would have the most significant adverse consequences.

169.    The environmental assessments also "evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property," in addition to analyzing "the potential for the pipeline to impair . . . [Lake

Oahe]." The assessments concluded that the pipeline was an economically and environmentally sound alternative to road and rail transport for the crude oil being produced in North Dakota.

170.    As these environmental assessments were being undertaken and the pipeline planned, Dakota Access implemented a Public Awareness Program pursuant to 49 CFR 195.440. That Public Awareness Program educated local stakeholders, including the affected public, such as residents, businesses, school districts, and others located along the transmission pipeline, local public officials, and contractors working on the pipeline. That Program included information about:

- Use of a one-call notification system prior to excavation and other damage prevention activities;

- Possible hazards associated with unintended releases from a hazardous liquid or carbon dioxide pipeline facility;

- Physical indications that such a release may have occurred; and

- Steps that should be taken for public safety in the event of a hazardous liquid or carbon dioxide pipeline release.

171.    Ultimately, the pipeline was legally permitted by state and federal authorities. And, as the relevant North Dakota state agency explained when it approved the pipeline, the "project received thorough review which was totally transparent," and responsive to "broad public input."

### b) Dakota Access And All Relevant Agencies Made Every Effort To Consult With SRST

172.    Contrary to the Enterprise's narrative, it was SRST that elected not to meaningfully engage with Dakota Access or USACE.

173.    As the District Court's September 9, 2016 Order explained:

The Corps has documented dozens of attempts to engage Standing Rock in consultations to identify historical and cultural resources at Lake Oahe and other

76

> [] crossings [permitted by the Corps] . . . Suffice it to say that the Tribe largely refused to engage in consultations.  It chose instead to hold out for more, namely the chance to conduct its own cultural survey over the entire length of the pipeline.

Standing Rock Sioux Tribe, No. 16-01534 (JEB), 2016 WL 4734356, at *22 (D.D.C. Sept. 9, 2016).

174.     Even though the District Court concluded that there was no obligation to consult with SRST concerning the entire length of the pipeline, Dakota Access attempted to do so. SRST was the first tribe approached by Dakota Access to discuss the pipeline's implications and ways to avoid the Tribe's cultural and historical resources in 2014.

175.     Dakota Access offered to share details concerning its pre-construction review with SRST specifically, and provided access to all known tribes interested in conducting cultural surveys along the route.  Indeed, Dakota Access changed DAPL's route or avoided, mitigated, or minimized identified impacts to cultural resources as a result of that collaborative process.

176.      The Osage Nation engaged early in the pipeline route planning process.  The Osage Nation, Upper Sioux, and Northern Arapaho tribes participated in cultural surveys of the pre-construction notification areas.  And the Three Affiliated Tribes, Osage Nation, and Northern Arapaho tribes participated in surveys of non-preconstruction notification areas.

177.     In coordination with state and federal authorities, and tribes who provided comments, Dakota Access revised and improved its Unanticipated Discovery Plan to address cultural or historical resources that might be identified for the first time during pipeline construction.  Dakota Access coordinated with USACE to allow tribes to install tribal monitors at pipeline construction sites, both at sites where such monitoring is required and at sites where such monitoring was not obligatory.

178.    The overall consultation process was carried out in conformance with the 2004 Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act (the "Programmatic Agreement").  The Programmatic Agreement governs consultations between USACE, the tribes, other agencies, and other interested parties when a project under its purview may impact cultural or historical resources.

179.    Beginning on September 17, 2014, USACE Tribal Liaison, Joel Ames, attempted to schedule a meeting with SRST's Tribe Historic Preservation Officer, ("THPO"), Waste' Win Young ("THPO Young").  Ames was unsuccessful in this attempt (and in five other attempts that same month).

180.    Dakota Access met with SRST's Tribal Council on September 30, 2014 and delivered a presentation on DAPL to begin the consultation process.  After the initial meeting, Dakota Access maintained an open line of communication with THPO Young, including by, among other things, answering THPO Young's questions about Dakota Access's cultural survey process and inviting THPO Young's input concerning that process.  Indeed, on November 13, 2016, Dakota Access provided to THPO Young data related to Dakota Access's cultural surveys to facilitate further conversation.  THPO Young never responded.

181.    In October 2014, USACE personnel scheduled a meeting with the SRST Tribal Council and Dakota Access for October 2, but at the scheduled meeting time, Tribal Chairman, David Archambault ("Archambault") turned USACE away, claiming that the meeting had already occurred.  On November 6, when SRST had agreed to another meeting to discuss DAPL, SRST again prevented meaningful consultation, this time removing DAPL from the meeting agenda because THPO Young was not in attendance.

182.     In the late fall of 2014, USACE began its Section 106 consultation and review

("Section 106 Review") pursuant to the National Historic Preservation Act of 1966 ("NHPA") in

response to Dakota Access' request for a permit to begin drilling a series of four-inch soil bores

on the banks of Lake Oahe to determine whether the subsurface would support its plan for HDD

drilling.[6]  USACE's Section 106 Review began with an extensive review of existing cultural

surveys of areas impacted by DAPL's crossing at Lake Oahe.

183.     On October 24, 2014, USACE provided to all of the impacted tribes, including

SRST, information concerning, and maps documenting, cultural and historical sites USACE had

initially identified, including sites that fell outside the area that would be impacted by Dakota

Access's soil-bore test sites.  USACE requested feedback from the tribes within thirty days.

184.     Although USACE received and considered feedback from interested tribes and

the North Dakota SHPO, SRST did not respond by the deadline (or within the three-week

extension of time to respond, which USACE granted).  Having received no additional feedback,

on December 18, 2014, USACE determined that no historic properties would be affected by the

soil-bore drilling at the Lake Oahe crossing.  That same day, USACE mailed a Determination of

Effect letter to the North Dakota SHPO and all affected tribes, including SRST.  The next day,

December 19, 2014, USACE reached out again to THPO Young in an effort to schedule a

meeting with SRST in January 2015 to further discuss DAPL.  Again, SRST did not respond.

185.     Without any attempt by SRST to follow up with Dakota Access or USACE,

USACE Senior Field Archaeologist, Richard Harnois e-mailed THPO Young, individually, to

request comments on USACE's determination with respect to Dakota Access's application for a

---

[6] Section 106 of the NHPA requires federal agencies to consider the effects of projects they carry out, approve, or fund on historic sites.  Although Section 106 encourages preservation of historic sites, preservation is not required where the project at issue cannot proceed without disrupting such sites, and, under federal law, federal agencies may carry out, approve, or fund such projects despite their impacts to historical sites.

permit to drill soil-bores.  Neither THPO Young, nor any other representative of SRST

responded.

186.    Separately, THPO Young informed USACE Tribal Liaison, Joel Ames, that

SRST was working directly with Dakota Access, and therefore no additional consultation with

USACE was necessary.

187.    On February 18, 2015, USACE granted a preconstruction notice and verification

(a "PCN") for the soil-bore drilling pursuant to Nationwide Permit 12 ("NWP 12"),[7] clearing the

way for Dakota Access to test the ground for its planned HDD method of installing DAPL.

Although NWPs provide general pre-authorization to conduct certain types of activities, general

conditions attach, requiring a party seeking to take the pre-authorized action to comply with

those conditions before the exercise of activity permitted under the NWP.  Thus, although the

test soil-bore drilling was authorized under a general NWP, Dakota Access was still required to

apply for specific use permits for its testing.  USACE was obligated to, and did, conduct specific

analyses of the impact the soil-bores might have on cultural and historical sites in the area.

188.    On March 2, 2015, after several months of ignoring Dakota Access's and

USACE's attempts to consult with the Tribe, and after the PCN had been granted for the soil-

bore drilling, THPO Young finally contacted USACE by letter dated February 18 to raise

concerns about sites affected by the soil-bores.  On February 25, 2015, THPO sent a similar

letter to the USACE Regulatory Branch Chief, Martha Chieply.  These letters did not address

general concerns about the pipeline's construction, but in fact related only to the soil-bore

testing.

---

[7] Nationwide Permit 12 Utility Line Activities ("NWP 12") issued on March 19, 2012.  It pre-authorizes the construction of utility lines, including crude oil pipelines such as DAPL, in waters of the United States under certain conditions, including, among others, that "[n]o activity or its operation may impair reserved tribal rights, including, but not limited to, reserved water rights and treaty fishing and hunting rights."  NWP Final Notice, 77 F.R. 10184.

189.    Although SRST's decision to provide input on the soil-bore drilling came after the consultation process was completed, and the soil-bore drilling permits were already issued, USACE attempted to use the letters as a mechanism to resume consultation with SRST concerning DAPL generally.  Thereafter, North Dakota District Commander, Colonel John W. Henderson attempted to schedule a meeting with SRST Chairman Archambault, but SRST failed to make itself available to USACE to consult.

190.    In the interim, Dakota Access submitted completed applications for additional PCN permits on March 25.  On March 30, USACE sent a letter to SRST and other stakeholders identifying the Lake Oahe crossing and two DAPL crossing sites on Lake Sakakawea, and requesting comments from SRST and the other stakeholders as part of the Environmental Assessment process.

191.    Thereafter, on April 8, 2015, SRST finally responded to a February 17, 2015 letter from USACE concerning earlier PCN applications from Dakota Access.  The April 8, 2015 letter was received more than a week after the deadline set in the February 17 letter from USACE.  The same day, USACE personnel had a telephone call with SRST's Archaeologist, Dr. Kelly Morgan, to discuss potential DAPL realignments.

192.    In June 2015, USACE Tribal Liaison, Joel Ames, continued his attempts to foster dialogue with the SRST.   THPO Young informed him that she was unavailable until July 27, 2015.

193.    On July 22, 2015, USACE sent SRST a letter describing Dakota Access's plan to install the pipeline underneath Lake Oahe using the HDD drilling method.   The letter also noted that cultural sites had been identified within the planned staging area for the construction of the

Lake Oahe crossing, and that although that staging would take place on private land USACE
would treat that aspect of DAPL as if it were on United States land for consultation purposes.

194.    The July 22, 2015 letter requested a response from SRST within 30 days
concerning whether SRST intended to consult with USACE concerning the Lake Oahe crossing,
including whether SRST would provide information concerning current and previous cultural
surveys and known cultural sites that might overlap with the DAPL route.

195.    Tribal Chairman Archambault responded to Colonel Joel R. Cross, Commander
and District Engineer of USACE's Omaha District on August 19, 2015, claiming -- falsely -- that
he had never been contacted by USACE concerning the pipeline and demanding a meeting.
Tribal Liaison, Joel Ames, immediately reached out to Archambault's assistant to schedule a
meeting, but Ames was unable to secure one.

196.    THPO Young also sent a letter to USACE on August 21, 2015 claiming to have
been excluded from Dakota Access's cultural surveys.

197.    In response, on August 27, 2015, USACE planned a site visit at the Lake Oahe
crossing with SRST and the North Dakota SHPO to review the site together.  On September 3,
2015, USACE District Commander Henderson wrote to Tribal Chairman Archambault
reiterating USACE's request to consult with SRST, acknowledging Archambault's and THPO
Young's recent letters, and providing additional information concerning Dakota Access's
relevant PCN permit requests even though Archambault had declined to meet with USACE.
And on September 16, 2015, Stasch responded to THPO Young's letter, stating that he would
address SRST's questions and concerns during the planned, joint Lake Oahe site visit.

198.    On the same day, USACE Senior Field Archaeologist, Richard Harnois e-mailed
SRST Archaeologist, Dr. Kelly Morgan and individually invited her to participate in a Lake

Oahe site visit.  Ultimately, neither Dr. Morgan nor any other SRST representative participated in the site visit.

199.    In the fall of 2015, USACE continued its efforts to consult with the tribe without success.  SRST's Vice Chair canceled a meeting scheduled for October 28, 2015 and a November meeting, suggesting instead that SRST would meet with USACE personnel "in a few months."  Indeed, USACE documented no fewer than ten attempts to consult with SRST concerning the project in October 2015 alone, but the Tribe would not engage.

200.    Similarly, in November 2015, USACE invited the SRST, among many other tribes, to a December 8-9 meeting in Sioux Falls.  During the meeting USACE provided the tribes with access to Dakota Access's cultural surveys and USACE's own analysis of them.  SRST elected not to attend the December 8-9, 2015 meeting.  Indeed, in declining the meeting, SRST clarified that it would not participate in any tribal meetings until USACE Colonel John W. Henderson came to the Standing Rock Indian Reservation to meet directly with SRST, although he had already repeatedly offered to do so and had been unable to secure a meeting.

201.    Nevertheless, USACE continued to assuage SRST's demands.   Among other things, Colonel Henderson again attempted to schedule a meeting with SRST.  There was no response.

202.    On December 8, 2015, USACE released the Draft EA, which included a description of the Section 106 process.  The Draft EA acknowledged USACE's multitude of unsuccessful attempts to conduct on-site visits and government-to-government consultation with SRST, and invited all recipients of the Draft EA, including SRST, to review it and provide feedback within 30 days.

203.     On January 8, and March 24, 2016, SRST provided extensive comments to the Draft EA effectively disclaiming, contrary to fact, the efforts by USACE and Dakota Access to consult with SRST.

204.     Between January and May 2016, SRST finally engaged in a series of consultations over seven meetings.  During these meetings, the parties discussed Dakota Access's cultural surveys, tribal burial sites, and, in one instance, exchanged information that resulted in the re-routing of DAPL to avoid cultural resources at the site of the proposed James River crossing.  USACE's North Dakota District Commander, Colonel John W. Henderson attended at least four of these meetings, on February 18-19 and 26, April 29, and May 14, including a walk-through of the Lake Oahe crossing site, during which SRST Chairman Archambault directly communicated SRST's concerns and pointed out cultural or historical sites. During those meetings, Colonel Henderson committed to building DAPL with double-walled piping, a significant mitigation measure, designed specifically to address SRST's environmental concerns.

205.     But, by the spring of 2016, SRST had retreated from this more productive posture and refused an invitation by USACE and Dakota Access to participate, along with other interested tribes, in additional cultural surveys on private property, including at seven sites in North and South Dakota along DAPL's route.  This collaborative consultation between Dakota Access, USACE, and the other tribes was productive -- Dakota Access agreed to bury DAPL 111 feet underground in one location to avoid disturbing certain cultural resources near the surface, and in a separate instance, USACE agreed at the Osage Tribe's request to monitor construction at a separate location along DAPL.  SRST refused to participate unless USACE would agree to conduct a similar review of the entire pipeline.

206.     On March 8, 2016, USACE conducted another site visit at the Lake Oahe crossing site and the surrounding area, including up to 1.2 miles away from soil-bore sites and .6 miles away from the HDD workspace.  The site visit was attended by SRST Archaeologist Morgan and the Tribe's third THPO in the two-year review process, Jon Eagle.  This site visit identified additional historical sites, but did not result in any change to DAPL's route because all such historical resources were far enough away from the pipeline corridor that they would not be impacted by construction of DAPL.

207.     On March 22, 2016, USACE Senior Field Archaeologist, Richard Harnois conducted yet another site visit with SRST Archaeologist Morgan, during which Morgan asked for additional information about the cultural surveys conducted at the Lake Oahe crossing when the Northern Border Pipeline was completed in 1982.  Upon further review of the Northern Border cultural surveys and additional research, Harnois concluded that separate, additional cultural surveys would not be necessary.

208.     Having conducted an exhaustive examination of the Lake Oahe crossing site, USACE made a Determination of Effect on April 22, 2016 and promptly e-mailed it to the consulting stakeholders.  The materials included data and discussion concerning 41 potential historic sites and concluded that DAPL construction would not impact any historic properties. Days later, the North Dakota SHPO agreed with USACE's finding, and USACE notified SRST of North Dakota's concurrence.  Through Chairman Archambault and THPO Eagle, SRST objected to this finding, and claimed that none of SRST's requests for consultation or Class III surveys had been heeded.

209.     At this time, in response to SRST Chairman Archambault's complaints to the NHPA Advisory Council concerning tribal consultation, the Advisory Council communicated to

USACE its concerns and skepticism that the Section 106 Review process had been carried out sufficiently to make a determination of "no effects," and challenging USACE's conclusion that it did not have jurisdiction over the entire length of DAPL. The Advisory council requested a review of the Corp's "no effects" determination by Assistant Secretary of the Army for Civil Works, Jo-Ellen Darcy. USACE addressed the Advisory Council's concern in responding letters, and Assistant Secretary Darcy reviewed USACE's determination and reiterated its finding of no jurisdiction, confirmed that USACE had notified the tribes, including SRST, throughout its review process, provided them with additional information, and invited them to participate in the Section 106 process of review and consultation.

210.    Finally, in July 2016, as a result of more than two years of review to ensure environmental safety and observation and avoidance of disturbance to cultural and historical sites, USACE and Dakota Access concluded their review process. On July 25, 2016, USACE issued its final EA concerning DAPL, and issued a finding of no significant impact ("FONSI"). Simultaneously, USACE verified all 204 PCN permit applications Dakota Access sought under NWP 12. However, these determinations were subject to several restrictions, including a "Tribal Monitoring Plan," which required Dakota Access to permit a tribal monitor to be on site at every one of the 204 PCN permit sites while construction there occurred.

211.    Each member of the Enterprise was fully aware of the extensive efforts to consult by USACE and Dakota Access and pre-construction review efforts undertaken by Dakota Access and USACE. Yet, in willfully false statements it has alleged otherwise, when in fact every consultation failure was a result of its own unwillingness to confer with USACE and the Company.

### 6. The Enterprise Misrepresents That Energy Transfer Intentionally Desecrated Cultural Resources

212.     The most damaging, and yet wholly false statements disseminated by the Enterprise concern its repeated statement that DAPL employees and personnel "deliberately desecrated documented burial grounds and other culturally important sites," "destroyed sacred Native Lands . . . ," and "sacred burial grounds, religious, and other historical sites."   Indeed, the Enterprise, and particularly its ENGO participants, flagrantly accused DAPL construction workers of "deliberately desecrating *documented* burial grounds and other culturally important sites."[8]

213.     As set forth herein, the entire DAPL route was planned to avoid any sites that had already been listed on the National Register of Historic Places, or otherwise identified as eligible to be listed on that register.

---

[8] The Enterprise ubiquitously disseminated its false claims that Energy Transfer and DAPL construction workers deliberately destroyed culturally significant sites, including, by way of example, in the following false and defamatory publications:

- September 5, 2016 article on Common Dreams' website, "'Is That Not Genocide?' Pipeline Co. Bulldozing Burial Sites Prompts Emergency Motion," in which Jan Hasselman falsely stated, "Dakota Access Pipeline used evidence submitted to the Court as their roadmap for what to bulldoze. That's just wrong[.]"

- September 6, 2016 Democracy Now! interview, Enterprise member Hasselman falsely reported that "we have a sworn declaration . . . that describes [culturally significant] sites . . . we put all that in front of the court . . . [and Energy Transfer Partners] took that information and . . . went out and bulldozed the entire site."

- November 30, 2016 open letter from Defendants BankTrack, GP-International, GP-Inc. (by Enterprise member Annie Leonard), GP-Netherlands, 350.org and several of its affiliates, and RAN, among others, to the banks funding DAPL construction, which states that "DAPL personnel deliberately desecrated documented burial grounds and other culturally important sites."

- October 6, 2016 post to Earthjustice's website, "Making History At Standing Rock: Tribes Are Leading Action to Preserve the Planet," in which Trip Van Noppen falsely stated that the companies building the pipeline "rushed to bulldoze and destroy ancestral burial grounds . . . ."

- September 13, 2016 post on Sierra Club's website, "Thousands Nationwide Show Solidarity with the Standing Rock Sioux and #NODAPL," in which Sierra Club false claimed, "Energy Transfer Partners -- the company behind the pipeline -- rushed to destroy sacred sites while indigenous groups and their allies sought to halt the construction in courts."

Additional examples of false publications claiming that Energy Transfer and DAPL construction workers deliberately destroyed culturally significant sites are set forth in Appendix F.

214.    In North and South Dakota, Energy Transfer conducted a cultural survey of a 400 foot corridor along the entire planned route -- 200 feet to each side of that route.

215.    The cultural survey was conducted by archeologists from three different, highly respected firms, and have specific experience in engagement to support government-to-government consultation between federal and state agencies and Native American Tribes.  Those archaeologists engaged in either Class II -- walking visual inspections -- or a Class III -- systematic, detailed field inspection -- surveys for 100% of the route in North and South Dakota.  State regulations governed whether a Class II or Class III survey was used for any particular segment.

216.    In North Dakota, the cultural surveys found 149 potentially eligible sites, 91 of which had stone features.   In response, Dakota Access modified its workspace and route to avoid all 91 of these stone features.  It also modified its route in response to 49 of the remaining 58 sites where the surveys suggested a feature that might make the site eligible for the National Historic Register.  In those nine instances where re-routing was not feasible, Energy Transfer engaged in data recovery mitigation, in coordination with, and approved by, the North Dakota State Historic Preservation Office.  These data recovery mitigation measures included controlled excavation of multiple blocks at relevant sites to recover data for preservation purposes.

217.    In total, Dakota Access surveyed nearly twice as many miles in North Dakota than the 357 miles that would eventually be used for the pipeline.

218.    The Company also put in place a comprehensive Unanticipated Discovery Plan to address the possibility that it might encounter a cultural resource not detected by the surveys during construction.  Under the plan, if any foreign object was observed by any construction personnel that appeared to be cultural, paleontological, or human remains, an inspector was

notified, construction halted, and the site secured until the object was evaluated.  The Plan, which was developed in consultation with tribal leaders, and approved by the SHPO, provided for coordinating with the appropriate agencies and tribes, and construction did not resume until the site or find was mitigated or an alternative route was identified.   Over the course of construction, the Plan was utilized six times to handle the discovery of unanticipated cultural resources.

219.    The Company also specifically selected a route for DAPL that crosses "brownfield" locations, or tracts of land disturbed by previous infrastructure projects.  Where DAPL crosses Lake Oahe, as one example, the pipeline is co-located in parallel (but much deeper than) the Northern Border Gas Pipeline, as well as overhead power lines owned by Basin Electric.

220.    The pipeline was co-located at the site of previous projects because those prior ground-disturbing activities greatly reduce the likelihood that construction workers would encounter any intact cultural resources in that segment of the project.

221.    The Northern Border pipeline was constructed nearly forty years ago, in 1982, and above-ground compressor stations were added and upgraded along the route in the 1990s.

222.    In connection with the construction of the upgraded compressor stations, Northern Border directly solicited feedback from Native American Tribes in the region concerning whether the Northern Border Pipeline would affect any places of historic, cultural, or religious significance.  Although SRST responded to Northern Border's request for comment, it did not note the possibility that any potential archeological sites, much less sacred burial ground, at the new compressor sites in the same vicinity as the DAPL route.

223.     The type of drilling utilized by Dakota Access and the depth of the crossing at Lake Oahe also were chosen to avoid any potential cultural resource sites.  HDD drilling at depths between 90 and 115 feet is extraordinarily unlikely to impact cultural or tribal resources because the date of geologic features and soils at those depths predate human occupation.

224.     Finally, the belated "evidence" that Earthjustice attempted to submit on behalf of the Sioux Tribe to support its contention that cultural resources, objects, artifacts, or evidence of burial sites were ignored was inherently not credible.  Among other reasons, the declarant who claims to have personally observed the inadequate methodology of DAPL archeologists, states that he viewed this survey in the spring of 2014.  But as the company confirmed, whatever the consultant observed, it was not DAPL's archeological surveys, because those did not begin until months later in August or September 2014.

225.     Mentz's later "discovery" of a miraculous concentration of rare and high-value cultural resources within the construction corridor have since been disproven.  Following the violent riots and protests over Labor Day weekend incited by this purported "discovery," a Law Enforcement Task Force investigating the incident engaged a team of archaeologists from the State Historical Society of North Dakota to conduct a cultural resources survey of the 1.36 mile long DAPL corridor west of Highway 1806 where the Enterprise claimed that Energy Transfer desecrated documented cultural resources.  On September 21, 2016, the archaeologists traversed the corridor at seven-meter interval spacing inspecting the stripped ground surface and both sides of the two opposing stockpiled topsoil berms along the lateral margins of the corridor.  As the State Historical Society of North Dakota reported in a September 22 memorandum, "The inventory recorded 10 locations where rodent to bovine-sized mammal bone fragments and teeth were present.  No cultural material was observed in the inspected corridor.  No human bone or

other evidence of burials was recorded in the inventoried corridor."   The memorandum concluded, "[T]he cultural resources inventory and inspection conducted . . . yielded no evidence of infractions to or violations of North Dakota Century Code § 23-06-27 with respect to disturbance of human remains or significant sites."   The State Historical Society's findings are consistent with the fact that throughout the relevant area the existing gas pipeline runs parallel to the centerline for DAPL, and makes the existence of cultural resources along the corridor extremely unlikely.

226.    But the Enterprise's false claims had its intended effect.  After years of ignoring requests to consult and participate in the extensive cultural surveys related to the Project, and waiting until after the pipeline was substantially constructed to raise claims of cultural desecration, the Enterprise cleverly lodged claims that the Company, despite its diligence, could not easily disprove.  By the time the scheme was disproven, the hysteria prompted by the Enterprise's misinformation campaign had already erupted, resulting in more than enough media fodder to harm the company's reputation after its careful efforts over 2 years to avoid cultural resources.  In reality, if the Sioux Tribes believed there were sacred burial grounds on the site of the pipeline they would have raised those claims in response to the 2014 Environmental Assessment, which plainly disclosed the preferred route.

### ii.    The Enterprise Targets The Banks Financing DAPL

227.    Consistent with past campaigns, central to the Enterprise's scheme against DAPL was its efforts to aggressively target Energy Transfer's critical business constituencies with extortive public demands to sever ties with the Company and publicly endorse the campaign or face crippling boycotts and other illegal attacks.  Most aggressively targeted was the group of banks financing DAPL and Energy Transfer's other existing and prospective infrastructure projects.

228.    The coordinated strategy to interfere with financing for the banks, which the
Enterprise coined #DEFUNDDAPL was detailed in a series of articles published beginning in
September 2016.  First, on September 6, 2016, Hugh MacMillan and Jo Miles of Food and Water
Watch published "Who's Banking On The Dakota Access Pipeline" which exposed the
seventeen financial institutions financing DAPL and their share of the loan approximately as
follows: (1) Citibank NA -- 9.5%, (2) Bank of Tokyo/Mitsubishi -- 9.4%, (3) Mizuho Bank --
9.4%, (4) TD Securities USA -- 9.4%, (5) BayernLB -- 4.8%, (6) BBVA Securities -- 4.8%, (7)
BNP Paribas -- 4.8%, (8) Credit Agricole -- 4.8%, (9) DNB Capital -- 4.8%, (10) ICBC London
PLC -- 4.8%, (11) ING Bank NV -- 4.8%, (12) Intesa Sanpaolo -- 4.8%, (13) Natixis -- 4.8%,
(14) SMBC Nikko Securities -- 4.8%, (15) Societe Generale -- 4.8%, (16) SunTrust Robinson
Humphrey -- 4.8%; and (17) Wells Fargo -- 4.8%.

229.    The article also admonished other banks that "have also committed substantial
resources to the Energy Transfer Family of Companies so it can build out more oil and gas
infrastructure," including, banks providing the following loans and credit facilities: (i) a $3.75
billion revolving credit line that Energy Transfer Partners has for use in expanding its oil and gas
infrastructure holdings with commitments from 26 banks; (ii) a $2.5 billion Sunoco Logistics
line of credit commitment from 24 banks; and (iii) a $1.5 billion Energy Transfer Equities credit
line commitment from most of the same big international banks.  According to Food and Water
Watch, the banks providing credit facilities to Energy Transfer and its subsidiaries include,
among others: 1) Bank of Nova Scotia, (2) Royal Bank of Scotland, (3) JPMorgan Chase, (4)
Citizens Bank, (5) Comerica Bank, (6) U.S. Bank, (7) PNC Bank, (8) Barclays, (9) HSBC Bank,
(10) Bank of America, (11) Deutsche Bank, (12) Credit Suisse, (13) DNB Capital/ASA, (14)

Sumitomo Mitsui Banking Corporation, (15) Royal Bank of Canada, (16) UBS, (17) Goldman Sachs, (18) Morgan Stanley, and (19) Origin Bank (formerly Community Trust).

230.   Food and Water Watch concluded by criticizing Energy Transfer and its financial backers for building an infrastructure based on increased fracking which, according to Food and Water Watch will, over time, leave communities to "deal with the spills, explosions, water pollution, air pollution, and climate impacts that ensue," and specifically charged DAPL with posing "a direct threat to our air, water, and clean energy future."

231.   Bill McKibben of 350.org echoed Food and Water Watch's message in an article dated September 22, 2016 published in Yes Magazine, titled, "A Strategy To Stop The Funding Behind The Dakota Access Pipeline," which describes the pipeline as a "$3.7 billion infrastructure project that threatens precious water and myriad sacred sites, not to mention the planet's unraveling climate," and called on the public to engage in "sustained public pressure" on the banks.   Quoting Gloria Fallon of Rising Tide Chicago, McKibben wrote, "It's unlikely that Citibank customers support poisoning indigenous peoples' water, desecrating sacred burial sites, or contributing to global climate change" and further asserted, "*at this point anyone who finances any fossil fuel infrastructure is attempting to make money on the guaranteed destruction of the planet*."   (emphasis in original).   The article concluded by quoting Scott Parkin of RAN: "Oil companies are always going to drill for oil and build pipelines -- it's why they exist, [b]ut the banks funding this pipeline have a choice as to where they put their money.   Right now, Citibank, TD Bank, and others have chosen to invest in a project that violates indigenous rights and destroys the climate."

232.   Central to the #DEFUNDDAPL campaign was the effort to galvanize the public to pressure the banks funding DAPL and other Energy Transfer infrastructure projects to

terminate their relationship with Energy Transfer including, by among other measures: (i) boycotting banks funding DAPL by divesting existing personal, retirement, mortgage, and investment accounts; (ii) signing petitions to encourage the banks to sell their interests in DAPL; and (iii) participating in organized demonstrations in front of local branches throughout the country and the world.

233.    On September 29, 2016, Yes Magazine published the names and contact information of each bank's CEO.  Hundreds of thousands of people shared the article on Facebook, and it was reprinted widely in other media outlets, creating organized phone and email campaigns to protest the banks' involvement.  On October 10, 2016, demonstrators organized outside a Wells Fargo branch in Des Moines, Iowa, demanding the bank rescind its financial backing for the project.  Similar demonstrations were held outside hundreds of other local branches and bank headquarters throughout the country in October 2016, ranging from picketing to civil disobedience resulting in numerous arrests.

234.    In response to the mounting opposition, during an interview with NowThis news released on November 2, 2016, President Obama stated that USACE was analyzing alternate routes for the pipeline.

235.    Seizing on the government's response to the coordinated opposition, in the days that followed, the Enterprise escalated its campaign.  On November 2, 2016, Sierra Club launched a divestment campaign webpage titled "Tell big banks to divest from Dakota Access Pipeline," which featured the sensational and alarmist allegations that the pipeline "violates sacred land rights of the Standing Rock Sioux" and would carry "some of the dirtiest oil on the planet across four states, putting public health and welfare, critical water supplies, cultural resources and ancestral burial grounds in danger."

236.    On November 7, 2016, RAN issued a press release titled "RAN Statement on Citigroup's Leading Role In Financing Dakota Access Pipeline," "demanding that Citibank halt all further loan disbursements for the Dakota Access pipeline (DAPL) and ensure that the project sponsors immediately halt construction, unless all outstanding issues are resolved to the full satisfaction of the Standing Rock Sioux Tribe."  The press release stated among other things: "It's clear that the Dakota Access pipeline project has violated the sovereignty of the Standing Rock Sioux and their right to determine the future of their lands.  Citibank's leading role in financing the pipeline makes it complicit in gross violations of Indigenous and human rights." RAN concluded by reiterating its "solidarity with the Standing Rock Sioux and their Indigenous allies" and their opposition to DAPL, which RAN alleges "poses a devastating public health threat to the Tribe's drinking water."

237.    That same day, the Enterprise, led by BankTrack, wrote a letter to the Equator Principles Association ("EPA"), a consortium of global banks committed to responsible environmental and social practices, alleging "astonish[ment]" that thirteen EPA banks were funding DAPL, which the letter described as a "climate destroying project[.]"  The letter falsely asserted, among other things, that:

- DAPL "threatens air and water resources in the region and further downstream";

- "[T]he pipeline trajectory is cutting through Native American sacred territories and unceded Treaty lands"; and

- "Harm to Native areas ha[d] already occurred when DAPL personnel deliberately desecrated documented burial grounds and other culturally important sites."

238.    The November 7, 2016 letter admonished the EPA, stating: "Given the presumed Indigenous rights commitments of [the Equator Principles Funding Institutions], it is for us inexplicable that gross violations of Native land titles, threats to water sources and the desecration of burial grounds have not been identified early on as reasons for [the Equator

Principles Funding Institutions] to not provide funding for this project."   The letter was signed by Johan Frijns, the Director of BankTrack.  Greenpeace United States (Diana Best, Climate and Energy Campaigner), Sierra Club (Nicolle Ghio, Senior Campaign Representative), and RAN (Amanda Starbuck, Climate and Energy Program Director) were also signatories to the letter.

239.     The Enterprise's campaign had its intended effect. In response to the "sustained public pressure campaign" and the letter to EPA, the Norwegian bank DNB, one of the 17 banks funding DAPL, announced that it "looks with worry at how the situation around the pipeline in North Dakota has developed," and will therefore "use its position to bring about a more constructive process to find a solution to the conflict."  DNB further threatened that "[i]f these initiatives do not give appeasing answers and results, DNB will consider its further involvement in the financing of the project."  Two weeks later, on November 17, 2016, DNB announced that it had sold off all assets in Energy Transfer, totaling approximately $3 million.  While DNB continued to finance approximately 10% of DAPL, it vowed to reconsider its loan.

240.     The Enterprise immediately touted their role in DNB's decision to divest its $3 million interest in Energy Transfer.  On November 18, 2016, Perry Wheeler, an outreach manager at Greenpeace USA, published "Largest Bank In Norway Sells Its Assets In Dakota Access," stating that "[t]he news follows the delivery of 120,000 signatures gathered by SumOfUs.org to DNB by Greenpeace Norway and others urging the bank and other financial institutions to pull finances for the project."  The article quoted Greenpeace Norway Sustainable Finance Campaigner Martin Norman who lauded DNB's sale of assets but called on DNB to "terminate its loans for the project immediately."  The article further quoted Greenpeace USA spokesperson, Lilian Molina, who warned: "The writing's on the wall for the Dakota access pipeline.  People power is winning.  The news that DNB has sold its assets and is considering

terminating its loans is a victory for the water protectors who are fighting to stop this disaster of a project. All financial institutions with a stake in the pipeline must quickly realize that financing this project is toxic. It would be smart for them to get out ahead of the growing movement of customers looking to divest from banks that finance the destruction of our planet and ignore Indigenous rights and sovereignty."

241. Likewise, Sierra Club lauded DNB's divestment in an update titled "Norway's largest bank divests from Dakota Access pipeline!" on its divestment campaign page and pressured DNB to terminate its relationship with Energy Transfer: "The bank is reportedly considering whether to terminate three separate loans to finance the pipeline as well. Energy Transfer Partners is pushing to complete the pipeline this year. Missing the January 1 deadline could mean its contracts with oil companies to ship oil may be cancelled. It's no time to let up: yesterday, police soaked water protectors in sub-freezing temperatures with water." The update concludes with a call to the public to continue telling banks to divest from DAPL.

242. On November 15, 2016, the Enterprise organized a "National Day of Action" under the banner of #NoDAPL. The Indigenous Environmental Network, in conjunction with 350.org, Greenpeace USA, Sierra Club, and Rainforest Action Network, among others, organized more than 200 protests across the United States targeting the banks financing DAPL, USACE, and Energy Transfer companies. These protests were held outside of Energy Transfer Partners' office on Main Street in Houston, Texas and a Bank of America in San Antonio, Texas, among other locations across the country.

243. Days later, Greenpeace's Perry Wheeler, published "Another Major Norwegian Investor Divests From Companies Behind Dakota Access Pipeline," which reported the decision by the Norwegian firm Odin Fund Management to sell off $23.8 million in investments in

DAPL-related companies.  The article quoted Greenpeace Norway Sustainable Finance Campaigner Martin Norman, who applauded Odin Management but continued to call on DNB to halt funding for the project as soon as possible.  Norman also called on other Norwegian funds, such as KLP and Storebrand, to divest.  Wheeler quoted Greenpeace USA spokesperson Mary Sweeters, who stated, "[t]he financial institutions behind the pipeline are realizing that it is bad business to invest in companies willing to disregard Indigenous sovereignty to destroy sacred Native Lands and water supply."  Touting the broad opposition they themselves generated as an endorsement of the campaign, Sweeters further alleged that "[t]he growing movement to divest from the project illustrates a broader recognition that this pipeline was ill-conceived from the beginning."  Thus, Sweeters specifically called on Citibank to "divest and halt its loan disbursements immediately," and threatened "[i]f they continue to allow human rights abuses to occur on their dollar despite their own policies against financing projects that violate Indigenous rights, we intend to bring a strong message to their doorstep across the country."

244.    On November 11, 2016, Greenpeace's Perry Wheeler published "Young Women Shut Down TD Bank, Call For Divestment of the Dakota Access Pipeline," which detailed protesters efforts to pressure TD Bank to withdraw its $130 million portion of the loan financing DAPL.  The post alleges that the pipeline "poses a significant threat to the water supply of the Standing Rock Sioux and millions of other people downstream, and would desecrate sacred burial grounds, religious, and other historical sites."  The article quotes Jessica Rohan, one of the protesters locked down in front of TD Bank's branch in Center City Philadelphia: "We're here to tell TD Bank that destroying indigenous land and poisoning the water of thousands of people is bad for business."

245.    On November 28, 2016, BankTrack (allegedly joined by hundreds of other ENGOs and public interest organizations) wrote to the CEO of BBVA in Spain, purporting to "share our deep concern about your participation in a credit agreement led by Citibank with Dakota Access LLC and Energy Transfer Crude Oil Company LLC to borrow up to $2.5 billion to construct the Dakota Access Pipeline . . . ."   The letter regurgitated the Enterprises' false and misleading claims that the "pipeline trajectory is cutting through Native American sacred territories and unceded Treaty lands," and "threatens air and water resources in the region and further downstream."   The letter repeated the claims made in the November 7 letter to the EPA "[g]iven that Indigenous rights are presumed to be respected by the [Equator Principles Financial Institutions], . . . it is for us inexplicable that . . . gross violations of Native land titles, threats to water sources and the desecration of burial grounds have not been identified early on as reasons for [BBVA] to not provide funding for this project," and similarly falsely charged Energy Transfer with "deliberately desecrat[ing] documented burial grounds and other culturally important sites."   The letter concluded by demanding that BBVA withhold further loan disbursements, demand that  DAPL sponsors halt construction, and, if a resolution satisfactory to SRST cannot be achieved, BBVA withdraw from the loan facility.

246.    On November 30, 2016, BankTrack sent identical letters to the other sixteen banks involved in the $2.5 billion loan for DAPL, including the Bank of Tokyo Mitsubishi UFJ, BayernLB, BNP Paribas, Citigroup, Wells Fargo, TD Bank Group, SMBC, Societe Generale, Natixis, Mizuho Bank, Intesa Sanpaolo, ING, ICBC, DNB Norway, and Credit Agricole.

247.    BankTrack immediately posted links to the letters sent to the banks on its website and proclaimed its "Global call on banks to halt loans to Dakota Access Pipeline," which it claims was supported by "500+ civil society organizations from more than 50 countries."  In

fact, many of the organizations signed multiple times, including for example, ten different signatures by 350.org (*see, e.g*., 350 Central Maine, 350 Colorado, 350 Louisiana, 350 Maine, 350 San Antonio, 350.org, 350.org Belgium, 350.org France, 350.org Japan, and 350NJ.org) and multiple signatures from various Greenpeace entities (including Greenpeace France, Greenpeace International, Greenpeace Netherlands, and Greenpeace USA).

248.    Also on November 30, 2016, Greenpeace Japan and 350.org Japan sent a separate letter to Japanese banks, Mizuho Bank, Sumitomo Mitsui, and Bank of Tokyo-Mitsubishi UFJ, "strongly demand[ing] that you immediately divest from the [DAPL]."  Among other things, the letter falsely alleged that the "project infringes on the [Sioux peoples'] traditional territories and threatens the health of their waterways," and is "likely to have a negative impact on the environment . . . ."  The letter purports to "attach[ ] documents for more detail," but, curiously, while the letter was publicly posted, the supporting documents these organizations alleged to have relied on were not included.   The letter concludes by requesting an in-person meeting to address the banks "loan[s] and lending policies in the energy sector to safeguard against the risk of investing in projects that contribute to climate change."

249.    In response to the Enterprise's sustained public pressure, on November 30, 2016, Citibank affirmed its commitment to fund DAPL, but announced the retention of Foley Hoag LLP, an independent human rights expert, to review various matters related to the permitting process including compliance with applicable laws related to consultation with Native Americans and the policies and procedures employed by Energy Transfer.   Over the course of the following four months, Energy Transfer was called upon to respond to countless requests for information and in-person interviews in connection with the Foley Hoag investigations, resulting in significant legal fees and diversion of company resources.

250.    Greenpeace immediately responded to Citibank's statement that it would continue to fund the project.  On December 1, 2016, Perry Wheeler published "Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans," which stated that "Citibank holds the largest share in the Dakota Access pipeline and helped lay the groundwork for other financial institutions to join in financing the controversial project."  The article quoted Greenpeace spokesperson, Mary Sweeters: "Citibank claims that it cares about Indigenous rights, yet has lead the way in financing this disastrous project on behalf of a fossil fuel company willing to destroy Standing Rock's sacred land and water supply[.]"  Sweeters further charged, "[n]ot only has the bank laid the groundwork for the project to move forward, in doing so it has signed off on the human rights abuses we've seen from Energy Transfer Partners and its security team."  Wheeler further criticized the original permitting for the project as "fast tracked without adequate tribal consultation and consent or environmental review."  Accordingly, Greenpeace sought to invoke "people power," and detailed activists' efforts to "visit[ ] local branches to close accounts and demand accountability from Citi," and "tak[e] to the phones throughout the day to pressure the bank to halt and rescind its loan disbursement."   The article also identified TD Bank, Bank of America, SunTrust, and Goldman Sachs as the subject of ongoing protests.

251.    Between December 2, 2016 and December 21, 2016, ten of the seventeen banks funding DAPL responded publicly to the Enterprise's public pressure to #DEFUNDDAPL. Significantly, in its December 5, 2016 response, Natixis reiterated, among other things that "[f]rom the beginning, the design and construction of the project have been led in compliance with the US legislation and regulation, as dictated both by the US Federal Government and by the States and local public authorities concerned by the project's route."  Natixis further stated that "[t]he matter has been referred to Courts of Justice on several occasions, but on each

occasion the Court has decided to reject [SRST's] claims and has confirmed the legality of the project." Credit Agricole S.A. echoed this same message: "[the] US justice has been referred to and has confirmed on several occasions that the project is legal and that the plaintiff tribes possess no rights on the territories crossed by the pipeline."

252.    Nevertheless, to stave off further oppositions and divestments, each of the ten banks affirmed their commitment to "protect human rights" and the "responsible development of all forms of energy":

- December 2, 2016: BNP Paribas responded to BankTrack's letter, stating "We are well aware of the issues at stake here" and "have engaged with our client and exposed our concerns." Moreover, BNP referenced the retention of Foley Hoag to "advise the lenders to the Dakota Access Pipeline and to review various matters related to the permitting process, including compliance with applicable law related to consultations with Native Americans."

- December 5, 2016:  Response Natixis On Open Letter DAPL, in which, in addition to reiterating the Project's compliance with applicable regulations and the Court decisions affirming the same, Natixis referenced the retention of "an expert on matters relating to indigenous communities and human rights" who "will deliver recommendations to Energy Transfer Partners and Sunoco, the two promoters of the project, to ensure the outcome is in compliance with international standards with regards to indigenous peoples rights, community engagement and cultural heritage."

- December 5, 2016: Response Mizuho Bank on open letter DAPL, which stated "we have taken notes of your concerns and forwarded the letter to the relevant divisions/departments/branches."  The letter concluded, "[w]e appreciate this kind of information so please keep us updated."

- December 6, 2016: Response Credit Agricole S.A. on open letter DAPL, which states "[w]e have given careful consideration to your analysis and the background information you forwarded to us."  The letter further referenced the retention of an "independent expert on the issue of consultations with the impacted populations" and stated, "we are monitoring the situation closely and continue to use all our action resources to favor a satisfying resolution to the problem," and concludes, "[s]hould this not be the case, no further commitments will [be] made relative to this project."

- December 7, 2016: Response DNB on open letter to DAPL, which reiterated DNB's "concern[ ] about how the situation surrounding the oil pipeline in North Dakota has developed," and claimed that DNB has "used our position as a lender to the project to encourage a more constructive process to find solutions to the conflict that has arisen." DNB further states, "[i]f these initiatives do not provide DNB with the necessary

comfort, DNB will evaluate its further participation in the financing of the project." DNB identified the retention of Foley Hoag as one such initiative, which DNB alleges will involve the "objective and fact-based evaluation of how the indigenous people's rights have been considered in the process," including a review of the "project's procedures."

- December 9, 2016:  Letter from Citibank Director of Sustainability, Valerie C. Smith, to BankTrack, which assured BankTrack "that Citi continues to be very concerned about the situation on the ground in North Dakota, and that this issue has the attention and focus of our senior executives."  The letter further referenced Citi's "extensive conversations with numerous stakeholders from the NGO, human rights, academic, socially responsible investor and tribal communities to understand different perspectives on this rapidly evolving situation."   In response to BankTrack's request that Citi withdraw from the loan, Citi stated, "we have signed a contract to provide the loan and cannot terminate this contract unilaterally."  Instead, Citi referenced the retention of Foley Hoag to "advise the lenders to the Dakota Access Pipeline and to review various matters related to the permitting process."  The letter states that Citi will be playing a leadership role with TD Bank to coordinate the Company's review and response to Foley Hoag's recommendations.

- December 9, 2016: Response by BayernLB on open letter to DAPL, which likewise purported to monitor the situation regarding DAPL, including the recommendations by Foley Hoag, which was retained to advise the lenders to DAPL.

- December 10, 2016: Response Wells Fargo on open letter to DAPL, which stated that Wells Fargo's loans for DAPL represent less than five percent of the total loan for the project, and reminded BankTrack that Wells Fargo is "contractually obligated to fulfill our commitment under the credit agreement so long as the customer is meeting all of its terms and conditions."  Wells Fargo's response further reiterated Wells Fargo's commitment to "protect human rights" and the "responsible development of all forms of energy," stating that the bank "provide[s] capital and financial services to more than 200 tribal entities in 27 states, including tribal community development projects," and is a "leader in the financing of renewable energy and clean technology."

- December 16, 2016:  Mizuho's Statement on the Dakota Access Pipeline, which reiterated Mizuho's "deep[ ] commit[ment] to upholding our social responsibilities and continue to encourage all parties to work in a collaborative, safe and respectful dialogue," including by seeking guidance by an independent human rights expert.

- December 21, 2016: Response of INTESA to BankTrack letter, which referenced the retention of Foley Hoag and the recent decision by USACE to conduct further environmental review of the pipeline and reiterated that "any new disbursements of the remaining part of the loan by Intesa Sanpaolo will occur only when the inherent permits are consistent and effective."

253.     On December 4, 2016, USACE announced that it would not issue an easement for DAPL until further environmental assessment was undertaken.  Energy Transfer immediately issued a response, reiterating that the Company has "comported with all legal requirements, including the use of an environmental assessment, rather than an environmental impact statement" and noted that USACE publicly condoned this approach in federal court filings, and the approach was subsequently "ratified by two federal courts."  The Company reaffirmed its commitment to "ensuring that this vital project is brought to completion and fully expect[s] to complete construction."

254.     Piggy-backing on USACE's announcement, the Enterprise declared December a "month of action," and organized protests and other actions in resistance to DAPL throughout the month.  On December 5, 2016, Mary Sweeters published, "3 Things You Need To Know About The Dakota Access Pipeline Win," which lauded the efforts to "put pressure on the financial institutions around the world funding the pipeline, closing your accounts, delivering letters to bank management, and rallying outside branch offices of funder Citibank to disrupt business as usual," but called on increased efforts, "we need to keep building this movement and prepare ourselves to continue resisting alongside the water protectors."  Days later, on December 8, 2016, Mary Sweeters published "How Global Solidarity Can Help Ensure The Dakota Access Pipeline Is Never Built," which detailed the continued efforts to target and pressure banks, including at (i) Citibank branches in San Diego, New York, D.C., Sacramento, Los Angeles, Orange county, Spain, and Moscow; (ii) RBS Bank in London;  (iii) Nordea Bank in Finland, Denmark, and Sweden; (iv) Mizuho Bank, Mitsubishi Tokyo UFJ, and SMBC Nikko Securities in Japan; and (v) TD Bank in Montpelier, Vermont.

255.    Also in December 2016, the Enterprise publicly reported that SRST had requested that each of the seventeen banks funding DAPL meet with trial representatives to hear their concerns.  The Enterprise closely monitored the banks' responses, and on January 13, 2017 posted "10 Banks Financing Dakota Access Pipeline Decline Meeting With Tribal Leaders," which exposed four banks that declined the invitation to meet with Standing Rock (BayernLB, BNP Paribas, Mizuho Bank, and SunTrust), six banks that did not respond to the Tribe's request (Bank of Tokyo-Mitsubishi UFJ, BBVA Compass, ICBC, Intesa Sanpaolo, Natixis, and Sumitomo Mitsui Banking Corporation), and the seven banks that met or agreed to meet with the Tribe and its allies (Citi, Credit Agricole, DNB, ING, Societe Generale, TD, and Wells Fargo). BankTrack threatened that "organizers are escalating their pressure on banks that refuse to engage," including "brand-damaging campaigns that have already led to the closure of thousands of accounts worth a self-reported $46,314,727.18."

256.    Working alongside BankTrack and Greenpeace, during December 2016, the Seattle chapter of 350.org took the lead in pressuring Seattle residents to divest holdings with Wells Fargo, falsely claiming that "[t]he corporations behind DAPL have failed to consult with tribes during the construction process, set attack dogs on nonviolent protectors, bulldozed Native American sacred sites, and brutally assaulted peaceful men, women and children."  In response to the pressure from 350.org, on December 12, 2016, the Seattle City Council introduced legislation that would end the city's $3 billion relationship with Wells Fargo.  To ensure that the bill was passed, activists organized by a local chapter of 350.org staged daily demonstrations in support of the measure outside the bank's Seattle corporate office, culminating in a January 5, 2017, "big day of action," involving the closing of hundreds of local Wells Fargo accounts in Seattle.

257.    Following 350.org's cue, the Sierra Club targeted Hawaii residents to withdraw

funds and close their accounts with First Hawaiian Bank, whose majority shareholder, BNP

Paribas, was financing the project in an effort to force BNP to divest.  In furtherance of this

effort, in a direct letter to First Hawaiian bank, the Sierra Club claimed that DAPL was a

"climate-killing energy infrastructure and a blatant example of environmental racism" that

"threatens to contaminate the Missouri River which is a primary water source for over 5 million

people and the sole water source for the Standing Rock Sioux Tribe."  These efforts had their

intended result.  In January 2017, Sierra Club boasted that its efforts resulted in more than $1

million in withdrawals.

258.    In January 2017, the Enterprise targeted banks involved in a $2.2 billion

refinancing loan to Energy Transfer Equity which was led by Swiss bank, Credit Suisse.  On

January 26, 2017, the day before the deadline for banks to commit to the refinancing loan, RAN

issued a "Statement On Continued Investment In Energy Transfer Equity," which warned that

"[DAPL] Still Represents A Disastrous Venture for Climate and Human Rights," and called on

banks to "reject Energy Transfer Equity's preliminary request for $2.2 billion of refinancing,

given the company's climate-wrecking business model and egregious human rights abuses at

Standing Rock."  The statement further contended that Energy Transfer "violates the rights of the

Standing Rock Sioux to self-determination and Free, Prior and Informed Consent (FPIC)

regarding decisions on their traditional lands."

259.    In response to this ongoing public pressure, during the last week of January, ING

sold $2.2 million of its holdings in Energy Transfer companies.

260.    On February 1, 2017, USACE suspended their supplemental environmental

review of the project, and on February 8, 2017, USACE granted an easement for the DAPL to

construct the pipeline on both sides of Lake Oahe.  In response to the green light for the pipeline, the Enterprise renewed their pressure on the banks to #DEFUNDDAPL.

261.     On February 2, 2017, BankTrack announced that ABN AMRO "threatens to stop financing company behind the controversial [DAPL]" if the project will "be constructed without the consent of the Standing Rock Sioux Tribe or if further violence will be used."  Evidencing that it was working in concert with Greenpeace, BankTrack reported that "Greenpeace Netherlands and BankTrack welcome the decision of ABN AMRO, and call on other banks, including ING in the Netherlands, to follow this example."

262.     Likewise, in an article posted on February 3, 2017, BankTrack reported that over 700,000 people had signed petitions to financial institutions to cut off funding and encouraged activists to show up in person at bank headquarters in New York, Montreal, Munich, Madrid, Moscow, Amsterdam, San Francisco, and elsewhere, demanding the withdrawal of the banks involved in the construction loan.

263.     Working in concert with BankTrack, on February 7, 2017, Greenpeace's Mary Sweeters posted an article, "It's Time for DAPL Funders to Decide Which Side of History They Want to Be On," which purported to put "banks on notice for their role in supporting a project that violates Indigenous rights and threatens our climate."  The article falsely claimed that the approval process for the project "was rushed, lacked of proper government-to-government consultation with the Standing Rock Sioux Tribe and ignored the warnings of multiple government agencies," which are directly refuted by the District Court's decision denying SRST's motion for a preliminary injunction.

264.     That same day, the Seattle City Council "unanimously approved a bill to terminate the city's approximately $3 billion depository banking relationship with Wells Fargo,

in part because of its business relationship with the company building the pipeline . . . ."  350.org immediately publicized the decision in a blog post titled "Big Win!" which touted the bill's passage and encouraged the Seattle residents to join the next movement on fossil fuels.

265.     The banks caved in response to the Enterprise's harassment and the sustained public pressure.  On February 8, 2017, Nordea announced that it would exclude ETP, Sunoco Logistics, and Phillips 66 from all investments.

266.     On February 13, 2017, the Enterprise targeted the President of CalPERS Board of Administration, noting that CalPERS has "significant direct holdings" in Energy Transfer Partners (ETP), Energy Transfer Equity (ETE), and Sunoco Logistics Partners (SXL)," the "companies building the fracked-oil Dakota Access Pipeline through the Standing Rock Sioux sacred lands in North Dakota," and called on CalPERS to "divest from the Dakota Access Pipeline companies immediately."  The letter falsely alleged that, "[i]n the process of construction to date, Energy Transfer Partners has already damaged numerous sacred sites and plans to drill under the Missouri River, the sole drinking water source of the Standing Rock Sioux Tribe."  The letter was signed by Chico 350.org, 350 Sonoma, 350 Conejo / San Fernando Valley, and Food & Water Watch, among others.

267.     In response, on February 15, 2017, CalPERS contacted Energy Transfer with an urgent request for a meeting to discuss CalPERS' investment in Energy Transfer and immediately issued a public response stating that it joined 100 fellow investors in asking 17 banks financing DAPL to "address or support the tribe's request for a reroute and utilize their influence as a project lender to reach a peaceful solution that is acceptable to all parties, including the tribe."  CalSTERS made similar requests for meetings and calls with Energy Transfer.

268.    On February 16, 2017, Greenpeace Switzerland wrote directly to Credit Suisse's Chief Risk Officer and Global Head of Public Policy referencing a meeting with the Credit Suisse Sustainability team on December 8, 2016 and "numerous calls with the team," whereby Greenpeace "demand[ed] [ ] for Credit Suisse to immediately stop banking relationship with [companies related to DAPL]."   The letter admonished Credit Suisse for "actively engag[ing] in new deals with the above mentioned clients," including a February 3, 2017 $2.2 billion senior secured term loan agreement led by Credit Suisse in participation with other banks.  The letter demanded a response from Credit Suisse on or before February 24, 2017.

269.    On February 16, 2017, a group of twenty Greenpeace activists "dug room for and planted 15 meters of super heavy pipe sections at the ING headquarters in Amsterdam." Greenpeace Netherlands published pictures via Twitter and vowed to extend the pipeline even further if ING did not change its position on the DAPL project.  In response, ING publicly responded "the bank itself is not comfortable with the construction of the pipeline, but is contractually obliged to provide the money once the necessary permits are issued."  The bank further stated that "[w]e openly distanced ourselves from this client, we sold our shares in the parent company and reject any new funding requests[,] but when it comes to the existing loan, ING cannot back out."

270.    On February 22, 2017, Greenpeace, quoting U.S. spokesperson Mary Sweeters, reiterated its desire to "expose every institution pushing the Dakota Access Pipeline project through and projects like it."  Similarly, on February 22, 2017, BankTrack reiterated that the "reputation of the Equator Principles has suffered recently from the Dakota Access Pipeline debacle in the US, and banks need to make sure these lessons are learned when it comes to TAP."

271.    Heeding the Enterprise's message, on March 1, 2017, Storebrand, a Norwegian private investment manager, announced that it had sold $34.8 million worth of shares in Phillips 66, Marathon Petroleum Corporation, and Enbridge.

272.    Greenpeace's ubiquitous attack on DAPL and the banks financing the project continued throughout March.  On March 7, 2017 Greenpeace published "Greenpeace Responds To Court's Ruling Against Standing Rock," which represents that Greenpeace "stand[s] with Indigenous leadership and millions of people around the world in condemning this decision and the criminal Dakota Access Pipeline."  Greenpeace further alleged that the "project violates the sovereignty of the Standing Rock Sioux Tribe, the National Environmental Protection Act, international conventions on the prior informed consent of indigenous peoples, and crystal clear moral imperatives that place the value of human life and the natural resources it depends upon over the interests of corporations."

273.    Likewise, on March 10, 2017, Greenpeace published "In Solidarity, Greenpeace Supports Native Nations March in D.C.," which alleged that "[t]he Dakota Access Pipeline is a violation of human rights," which will result in "catastrophically altered climate, unbreathable air, and undrinkable water."

274.    Days later, on March 17, 2017, KLP, a Norwegian pension fund, announced its decision to divest an estimated $68 million from ETP, Phillips 66, Enbridge, and Marathon Petroleum Corporation.

275.    On March 21, 2017, BankTrack announced that ING had sold its $120 million share of the $2.5 billion credit facility, becoming the first bank to do so.  BankTrack applauded ING's sale as "a belated good move," which "should now be followed by the 16 other banks involved in the overall $2.5 billion DAPL credit facility."  Johan Frijns, director of BankTrack,

admonished the bank for its part in the loan in the first place, stating "[T]his situation could have been avoided altogether if banks, when they were approached for funding, had conducted proper due diligence and had sought to engage with the tribe during their consideration of whether bankrolling DAPL was appropriate."  Noting that the "reputations of all banks involved have clearly taken a hammering due to their support for DAPL," Frijns concluded, "[M]oves like this from ING will only be meaningful if banks make different decisions in the future and avoid stumbling into more fossil fuel infrastructure follies such as the Keystone XL and Enbridge Line 3 pipelines, or the Trans Adriatic Pipeline.  Major banks have got to take heed of the DAPL debacle and ensure it marks the end of the line for their financing of destructive, unnecessary oil and gas pipelines.  Given the level of intense public scrutiny generated by DAPL, no bank can afford to decide otherwise."

276.    On March 22, 2017, Greenpeace's Perry Wheeler published "After Visiting Standing Rock, Swedish Bank Nordea Puts Companies Behind DAPL on Watch," which reported that Greenpeace had met with Nordea regarding DAPL, and in response to Greenpeace's demands Nordea announced that it will "demand guarantees from the companies building the Dakota Access Pipeline that it will not go through the Standing Rock Sioux Tribe's reservation land."  Greenpeace USA spokesperson Mary Sweeters commended Nordea and further stated, "[b]anks should not be funding projects that violate human rights and contribute to climate change . . . .  The recklessness of Energy Transfer Partners and Sunoco and the threat to the Standing Rock Sioux Tribe are real . . . .  This project is a crime against Indigenous sovereignty and human rights everywhere."

277.    In response, on March 26, 2017, DNB announced that it had sold to an undisclosed buyer its estimated $340 million loan to DAPL.  Shortly after, on April 5, 2017, BNP Paribas announced that it likewise had sold its $120 million loan.

278.    As of August 16, 2017, the #DEFUNDDAPL website reported a total divestment of approximately $4,408,081,805, consisting of $84,081,805 in personal divestments and $4,324,000,000 in city divestments.

### iii.    Earthjustice's Continued Efforts To Profit Off The SRST Litigation

279.    Throughout this period that the Enterprise was engaged in a high-profile coordinated attack against the banks funding DAPL, Earthjustice likewise continued to fuel publicity for the Enterprise's fundraising campaign through a steady stream of high-profile, false, misleading and inflammatory reports, blog posts, and other internet publications under the guise of providing updates on the pending SRST litigation.  In addition to linking to each court filing as it became available, Earthjustice maintained a steady flow of sensationalist content on its website, including press releases, blog posts, feature articles, periodic updates on dedicated DAPL case overview and FAQ pages, and links to other media featuring interviews with Earthjustice attorneys.

280.    For example, immediately following President Obama's November 2, 2016 statement that USACE was considering alternate routes for the pipeline, Earthjustice's president Tripp Van Noppen issued a press release titled, "Earthjustice Echoes Standing Rock Sioux Tribe's Leader, Applauds President Obama," which reiterated that "Earthjustice is honored to represent the Standing Rock Sioux Tribe in court as it seeks to protect its people's sacred lands and water from the Dakota Access Pipeline" and called on USACE to conduct a full environmental impact statement, falsely alleging, "No such careful review has occurred to date.

Considering all that's at stake, that's simply unacceptable."  The press release linked to "resources on the litigation," including "Frequently Asked Questions: The Standing Rock Sioux Tribe's Litigation On The Dakota Access Pipeline," "Timeline Of Events," and "Legal Documents."  The blog concluded with a plea to "Join Our Fight" with a requested minimum donation of $100.

281.    That same day, Jan Hasselman wrote an op-ed for the Washington Post titled "Why It's Right To Keep The Brakes On The Dakota Access Pipeline," which regurgitated the Enterprise's false narrative of lack of consultation with SRST and catastrophic impacts from the pipeline.  Hasselman opened with the alarmist allegation that the "regulatory system for approval of crude oil pipelines is in grave disrepair, as pipelines are authorized under a streamlined permitting system."  While Hasselman immediately conceded that even under the streamlined nationwide permit process, construction of a major crude oil pipeline "requires thoughtful consideration," Hasselman nonetheless falsely alleged that with respect to DAPL, "[n]o such thoughtful consideration has occurred to date."  Ignoring the extensive evidence of tribal consultation -- which the District Court for the District of Columbia relied on in rejecting SRST's motion for a preliminary injunction -- Mr. Hasselman falsely asserted that:

> Initial federal permits, and partnership with affected tribes were treated as a "check the box" exercise.  Nowhere was there a careful analysis of how much the Missouri River crossing threatened water quality and tribal treaty rights.  Nowhere was there a thoughtful public discussion of whether a new major oil pipeline should be placed in a river providing drinking water to 17 million people."

282.    Mr. Hasselman also regurgitated the Enterprise's sensational lie that the route for the pipeline had previously been shifted away from an affluent, predominantly white neighborhood just north of Bismark, North Dakota and "moved to Standing Rock only when regulators expressed concern over the risk of a spill to the city's water supply."  As set forth

above, not only is there no factual basis for the assertion that the route to the pipeline was

shifted, the statement that the pipeline was "moved to Standing Rock" is intentionally false and

misleading in that the pipeline does not traverse the SRST reservation.  Mr. Hasselman

concluded by falsely painting Energy Transfer as a bad actor who rushed to build a pipeline that

"didn't have needed federal permits, hoping either that the permits would be an afterthought or

that it could pressure regulatory agencies into acquiescing."

283.    In the days that followed, Earthjustice continued to use alarmist media

propaganda to galvanize opposition to the pipeline.  In furtherance of this effort, on November 3,

2016, Earthjustice published "Pipeline Expert: Government Underestimated Risk Of An Oil Spill

From Dakota Access Pipeline," which purported to summarize the conclusion of SRST's

putative expert Accufacts, Inc., ("Accufacts") that the government's environmental assessment

of the pipeline's environmental impact was inadequate in that, among other things, it

"significantly underestimated the risk of an oil spill into sensitive areas."  Earthjustice further

reported that Accufacts also found: (i) shoddy pipeline construction; (ii) the risks posed by

landslides were underestimated; (iii) lack of proper safety constructions to contain spills; (iv)

failure to review impact to residents and environment downstream of the site; and (v) a risk

review of industry spills and containment at similar sites that document problematic regulatory

oversight of the industry in North Dakota.

284.    The Accufacts report is a sham and its conclusions are refuted by the plain text of

the 160 page EA and the 1200 pages of supporting appendices.  First, the Accufacts report claims

that the EA "fails to properly evaluate the impact of the DAPL, including the risk of oil spills, on

the federal easements and waters of the United States."  This is patently false.  The EA

extensively analyzed the risk of spill, and concluded that a spill is extremely unlikely given "the

engineering design, proposed installation methodology, quality of material elected, operations measures and response plans."  Moreover, despite concluding that the risk of spill was low, the EA addressed the impact of a potential spill on both groundwater and in the water body crossings.  The EA addressed potential water contamination in the context of a catastrophic spill based on a number of extremely unlikely and conservative assumptions: (i) one hour of release; (ii) the entire volume of crude oil reaches the waterbody due to catastrophic failure of pipeline; (iii) complete and instantaneous mixing occurs; (iv) the entire hazardous benzene content is solubilized into the water; and (v) the receptor is located at the immediate site of a crude oil spill. Even applying these ultra-conservative assumptions, the EA concluded that the acute toxicity threshold for aquatic organisms for benzene would not be exceeded under any spill scenario and the most probable scenario (4 barrels or less) would not yield benzene concentrations that exceed the drinking water criteria.   Indeed, as set forth in detail below, the United States District Court for the District of D.C. rejected Accufact's unsubstantiated allegations concerning the adequacy of the EA's spill analysis,  holding that "[t]he EA's explanation . . . is [] enough to give substance to the Corps' conclusion that the risk of a spill is low" and further recognized that "in setting out the specific factors that undergirded its risk analysis and explaining their application to DAPL, the EA reasonably gives the necessary content to its top-line conclusion that the risk of a spill is low."  Memorandum Opinion, *Standing Rock Sioux Tribe, et al. v. U.S. Army Corps of Engineers, et al.*, No. 16-cv-01534-JEB, ECF No. 239, at 27-30 (D.D.C. June 14, 2017).

285.    Second, the report claims that the "ability to timely remotely identify oil releases are overstated and unsubstantiated."  This is false.  DAPL is equipped with two forms of highly advanced pipeline monitoring equipment, SCADA and Leakwarn.  First, the SCADA system continuously and remotely monitors changes in pressure and volume on a continual basis at all

valve and pump stations.  SCADA takes into account variables such as fluid properties, pressure, temperature, and flowrate.  The system includes pressure transmitters that monitor the pressure in real time and alarm in the event of adverse pressure changes.  It also includes custody transfer quality meters to monitor pipeline receipts and deliveries in real time and alarm in the event of flowrate discrepancies due to potential leaks and releases.  Second, Leakwarn, a leak detection system, is a computational pipeline monitoring system that monitors the pipelines for leaks using computational algorithms performed on a continual basis.  Leakwarn includes separate ultrasonic meters at each pump to continuously verify and compare flowrates along the pipeline in real time.  Leakwarn polls various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds, and is specially tailored to DAPL facilities.  It is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes.  An Operations Control Center immediately analyzes all data on both systems to determine potential product releases anywhere in the system.  The predictive evaluation of the technology's performance takes into account the capabilities of the monitoring program along with the number and type of data inputs to be provided.  DAPL will have more data inputs than other operational pipelines.

286.    Third, the Accufacts Report claims that the "lack of specific information in the EA strongly suggests deficiencies in the worst case discharge determination that could affect the unusually sensitive areas and related oil spill response planning."  This amounts to a claim that there must be a deficiency in the worst case discharge determination without the report ever having even reviewed it.  This "finding" relies on the flawed and unscientific assumption that if information is not provided, even if for legitimate reasons, there must be deficiencies.  The

flawed conclusion ignores the fact that the EA, along with supplemental information and the confidential material, was reviewed by representatives from each state and USACE -- all of which approved the project after careful consideration.  For instance, the PHMSA Director with Emergency Support & Security Division independently reviewed a draft of the DAPL Facility Response Plan and found that it was consistent with other response plans he had reviewed from other operators.

287.    Finally, the Accufacts Report states that nondestructive testing for girth weld inspection should clearly specify 100% radiographic testing, which is important to the soundness of HDD crossings and pipeline segments.  A close read of the EA reveals that it does specify 100% radiographic testing: "All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects."  As a whole, the 10-page Accufacts Report lacks scientifically accepted methodology, relies on flawed assumptions, and fails to support its assertions with fact or data.  It is not at all the "detailed pipeline technical review" it purports to be, but is instead a manufactured faux scientific analysis intended to further galvanize the public.

288.    On November 22, 2016, Raul Garcia, Legislative Counsel at Earthjustice published "We're Missing 90 Percent of the Dakota Access Pipeline Story" which lauded the momentum and impact of the Enterprise's campaign stating, "[O]ver the past few months, the Dakota Access pipeline and the Standing Rock Sioux tribe that opposes this oil project went from anonymity to full blown national news coverage."  Nevertheless, consistent with the Enterprise's efforts to shift the narrative away from the opposition's militant tactics and to paint Energy Transfer as the bad actor, Garcia purported to expose "misrepresentations" concerning the opposition movement and dismisses media reports of chaos and tumult -- which the

Enterprise itself generated as a pretext for its publicity and fundraising campaigns -- as "fake news." Instead, Garcia peddled the false narrative of peaceful demonstrations and alleges, quite ironically, "I have not seen a single news report that elevates this type of story. That's because peace may be what we value and aspire to as a nation, but peace doesn't generate clicks." In fact, it was Garcia and Earthjustice that were misrepresenting the nature of the protest movements, which was anything but peaceful.

289.   Earthjustice's attack against Energy Transfer and DAPL continued throughout December 2016. Immediately following USACE's December 4, 2016 announcement that it would prepare an Environmental Impact Statement for DAPL, Earthjustice issued a press release titled "Victory for Standing Rock: DAPL Easement Not Granted," which touted USACE's decision and perpetuated the Enterprise's false claims of solidarity with SRST and putative disregard for catastrophic environmental and cultural risks:

> Today is a historic day both for the Standing Rock Sioux Tribe and for indigenous people everywhere. This pipeline never should have been routed near these sacred lands in the first place, and it absolutely never should have received permits without a thorough and meaningful discussion of the risks and benefits to affected Indian Tribes.

The press release linked to Earthjustice's FAQ page for background information on the SRST litigation.

290.   On December 14, 2017, Earthjustice linked to a highly sensational article published in High Country News titled "Feds withheld key documents from Standing Rock Sioux" which accuses USACE of "with[olding] key studies that could have helped the tribe evaluate the risks." The article quoted Jan Hasselman: "There's this secret stuff that even we don't have in the litigation. We were aware there were documents not available to us and we've been asking for them." In fact, USACE disclosed the studies to SRST during a December 2, 2015 meeting, and endeavored to execute a confidentiality agreement with the Tribe so that

118

USACE could make the studies available to SRST; however SRST rebuffed USACE's efforts at consultation.

291.    Two days later, on December 16, 2017, Jan Hasselman posted, "Where Do We Go From Here?," which touted USACE's December 4 decision to withhold the easement for DAPL to cross Lake Oahe pending completion of an Environmental Impact Statement, and the Enterprise's role in that decision, stating, "It was a breathtaking achievement for the Tribe, its many supporters and allies . . . In Indian country, people will be talking about this day for decades."  Significantly, Hasselman explicitly credited Earthjustice with developing "a political and media strategy against the pipeline" including purportedly advancing "the Tribe's vision of social and environmental justice, which historically has been trampled in the rush to develop the Tribe's treaty lands and resources."  To substantiate this false narrative, Hasselman denied that SRST rebuked efforts at consultation, falsely stating: "This is one of the unfortunate -- and incorrect -- narratives that emerged from the early stages of the Tribe's litigation."  While Hasselman pointed to a recording of a meeting between the Tribe and Energy Transfer in September 2014 as putative evidence that SRST registered their opposition to the pipeline early in the process, Hasselman neglected to mention USACE's repeated efforts to contact the Tribe in the months following, to no avail.  Tellingly, Hasselman concluded by calling for support and linking to donation pages for Earthjustice and Stand with Standing Rock: "Everyone understands that the battle is far from over, but we are further along than anyone could have hoped when this fight started.  The Standing Rock Sioux Tribe, its legal team and water protectors everywhere need your continued support."

292.    That same day, in an article titled "An Earthjustice Year in Pictures" featuring various campaigns, Earthjustice spotlighted its representation of SRST.  The article applauded

"the generous investment and partnership of our supporters" and concluded by calling for more support: "As we enter the new year, Earthjustice attorneys will continue advancing and defending everyone's right to a healthy environment. . . . With you by our side, we are ready for it. Thank you." A "Join Our Fight" button leads readers to a donation page.

293.    On January 24, 2017, President Trump issued a Presidential Memorandum directing the Assistant Secretary of the Army for Civil Works and USACE to take all actions necessary and appropriate to (1) "review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL," (2) "consider, to the extent permitted by law and as warranted, whether to rescind or modify" the December 4 decision to prepare an Environmental Impact Statement, (3) "consider, to the extent permitted by law and as warranted, prior reviews and determinations, including the Environmental Assessment issued in July of 2016 for the DAPL, as satisfying all applicable requirements," (4) "review and grant, to the extent permitted by law and as warranted, requests for waivers of notice periods arising from or related to USACE real estate policies and regulations," and (5) "issue, to the extent permitted by law and as warranted, any approved easements or rights-of-way immediately after notice is provided to the Congress."

294.    Seizing the Executive Order as a catalyst to escalate the opposition movement, Earthjustice's president Tripp Van Noppen immediately published a press release titled "Earthjustice Condemns President Trump's Presidential Memorandum on Keystone XL and Dakota Access Oil Pipelines," which claimed the Executive Order "circumvent[s] the ongoing environmental review process for the highly controversial Dakota Access pipeline." Moreover, consistent with the Enterprise's playbook, Earthjustice reiterated its alleged role in protecting

SRST against the fabricated catastrophic risks of DAPL, stating, "Earthjustice is honored to represent the Standing Rock Sioux Tribe in court as it seeks to protect its people's sacred lands and water from the Dakota Access pipeline.  We are shocked and dismayed by today's news because it puts water for millions at risk."

295.    Then, on February 8, 2017, following USACE's grant of an easement to construct DAPL under Lake Oahe, Earthjustice immediately published an "action alert" which called on supporters to take action against DAPL based on the sensational lies that the "Army Corps of Engineers is moving forward with the construction of the pipeline without completing an environmental impact statement, putting the drinking water of millions of people at risk of contamination."

296.    Desperate to find an alternate way to halt construction of the pipeline, on February 14, 2017, Earthjustice filed a motion for summary judgment challenging the easement under Lake Oahe.   Earthjustice immediately updated its FAQ page to include links to the summary judgment papers, and the purported premise of the action: "The lawsuit challenges the Corps' hasty and unexplained departure from its previous decision, and explains how the Corps ignored the Tribe's treaty rights and seeks to destroy culturally significant and sacred sites.  It also explains how the Corps violated federal statutes requiring close environmental analysis of significant and controversial agency actions."  Moreover, Mr. Hasselman warned that the decision to issue the easement for DAPL without preparing an environmental impact statement is "circumventing the law: wholly disregarding the treaty rights of the Standing Rock Sioux and ignoring the legally required environmental review."  Hasselman concluded with the dire warning, "It isn't the 1800s anymore—the U.S. government must keep its promises to the Standing Rock Sioux and reject rather than embrace dangerous projects that undercut Treaties."

297.    In its continued effort to regain momentum for the opposition movement, on February 23, 2017, Earthjustice again updated its FAQ page with a link to a report prepared by SRST titled "Setting the Record Straight, Standing Rock's Engagement in the Dakota Access Pipeline," which alleged that Energy Transfer's "narrative" that "the Standing Rock Sioux Tribe failed to 'engage' with DAPL and the Corps over the pipeline until late in the process," is a "false one," and purported to set the record straight by attempting to narrowly construe certain court holdings and explain away certain evidence presented in the D.C. action.

298.    First, notwithstanding the court's denial of SRST's motion for a preliminary injunction on the grounds that USACE exceeded its consultation requirements under the NHPA, the update claimed that "the Court denied the Tribe's request for a preliminary injunction based on an incomplete record, and on a highly compressed timeline" and reiterated that the court's decision was "a preliminary ruling, and did not constitute a final court determination on any factual or legal issues."  These contentions are belied by the plain language of the September 9, 2016 court decision which set forth in extensive detail the record on consultation and determined that the Tribe was unlikely to succeed on the merits of its NHPA claim.  Specifically, the court found that USACE exceeded NHPA obligations by engaging in meaningful exchanges with the Tribe that resulted in changes to the pipeline, including implementation of extensive mitigation measures.

299.    Next, the update attempted to minimize findings of extensive consultation between USACE and 55 tribes, asserting that the claim that USACE held 389 meetings with 55 tribes "comes from a spreadsheet produced by the Corps, and submitted to the Court, at a preliminary stage in the litigation.  The spreadsheet logged every 'contact' between the Corps and any Indian Tribe."  The update attempted to undermine the claim of 389 meetings by

asserting that "[a] significant number of the 389 contacts were requests *from* Tribes to the Corps seeking information about the proposed pipeline and the Corps' process for reviewing it, raising concerns and objections and requesting meetings to discuss those concerns . . . ." (emphasis in original). Yet, the update itself revealed Energy Transfer's and the governments' extensive attempts at consultation with SRST. For example, SRST conceded that it was advised of the proposed route for DAPL as early as 2014 and voiced its concerns about DAPL directly to the Company as early as September 2014. Moreover, SRST further conceded that it participated fully in the NEPA process, including "submit[ing] three lengthy sets of technical and legal comments on the [December 2015] draft EA, comprising hundreds of pages, raising objections and seeking better analysis of spill risks and the Tribe's treaty rights."

300. In addition, SRST attempted to rebut findings in the litigation that it rebuffed USACE's attempts at consultation by alleging, "From the very start of the administrative process, the Tribe repeatedly and vocally expressed its concerns about damages to sacred sites, risks of oil spills, and the Government's heightened responsibility to ensure that the Tribe's treaty rights were protected," and falsely charged that "[d]uring the early part of the process, these concerns were totally ignored." SRST further stated "[t]he Tribe made its objections to the route that DAPL chose at the doorstep of the reservation totally clear. DAPL and the Corps repeatedly dismissed Tribal concerns, claiming that the risk of an oil spill to the Reservation was low. But neither the Corps nor DAPL ever explained why, if the pipeline was so safe, they didn't select the alternative route and cross the Missouri River North of Bismarck where the river is narrower." Yet, to the contrary, both Energy Transfer and USACE have repeatedly explained that the Oahe route was chosen over the Bismarck route because it avoided tribal land, was co-

located with an existing natural gas pipeline, complied with North Dakota rural residence avoidance requirements, had fewer water crossings and avoided HCAs as identified by PHMSA.

301.   Finally, SRST claimed, "Here, the Corps relied on flawed, one-sided analysis prepared by DAPL -- and never subjected to any independent review -- minimizing the risks of oil spill, and ignored the Tribe's treaty rights to water, fishing and hunting."  However, as the report itself acknowledged, it is not the number of meetings held or letters sent that is ultimately determinative, but "what the Corps does with that information in light of the Tribe's treaty rights."  Here, the record reveals that USACE took the Tribe's concerns very seriously.  When the Tribe did consult with USACE, USACE responded by proposing changes to the pipeline's route to avoid a particular site.  When the Tribe sent comments on the Draft EA, including that the Draft EA did not mention the tribe, did not discuss oil spill risks or response, and left the reservation off the maps, USACE responded by including those very things in the Final EA.  When the Tribe continued to raise concerns over the risk of spill, USACE imposed thirty-six special conditions to mitigate the risk.

302.   That an EIS was not prepared does not mean that USACE "repeatedly dismissed" or "totally ignored" tribal concerns.  Significantly, the NEPA process does not mandate a particular result -- it imposes only procedural requirements to avoid uninformed agency decisions.  The law requires only that the USACE accurately identify environmental concerns (which it did) and take a hard look at the concern in preparing the EA and make a convincing case for its finding of no significant impact, or that even if there is a significant impact, that an EIS is unnecessary because changes of safeguards in the project sufficiently reduce the impact to a minimum.  USACE met those procedural requirements here.

303.    On March 22, 2017, as Energy Transfer was preparing to place DAPL into service, Earthjustice held a teleconference, "Standing With Standing Rock," featuring a conversation between Jan Hasselman and Abigail Dillen, VP of Litigation for Climate & Energy, and moderated by Minna Jung, VP of Communications, for the express purpose of bringing the DAPL fight back into the public eye, fight the "misconception that the fight is winding to an end," and remind the public that the fight is "not over."  Earthjustice opened the teleconference by stating that DAPL "has become one of the most high profile cases that Earthjustice has ever worked on" and credited the role of Earthjustice's Communications and Donor Relations departments in generating publicity for the opposition -- which Jan Hasselman conceded was a critical component of Earthjustice's strategy in light of difficult legal challenges.  Specifically, Mr. Hasselmen stated that Earthjustice "recognized that the law was really hard," but "the thinking was, we can use this case to help raise awareness about the problem and leverage some political opposition."  Revealing the true purpose of the teleconference, Mr. Hasselman stated, "I am a little troubled that this issue has kind of dropped from the public consciousness after the closure of the camps.  You don't see it in the newspaper everyday like you used to.  You don't get that sense that it's on the front burner."

304.    To generate renewed opposition to DAPL, Mr. Hasselman reiterated the Enterprise's sensational and alarmist narrative that:

> [A] pipeline spill wouldn't just be an economic and environmental disaster.  It would be a cultural disaster.  It would be an existential threat to these people, who rely on the Missouri River, not just for drinking water and for irrigation of farms, but for the core of their cultural and spiritual essence, where the river has an impact.

305.    Mr. Hasselman also regurgitated the Enterprise's false claim that the EA was insufficient:

We do EIS's for dog parks.  We do EIS's for restoration activities and drinking
water plants.  The idea that we will be routing a 30-inch pipeline, carrying almost
six hundred thousand barrels a day of crude oil, underneath a waterway that
serves 17 million people, without an EIS, is completely nuts.  That's not a
technical legal term—that's just a statement of fact.  The law requires a full EIS.
They can't issue the permit until they have that "hard look" at all the risks and the
consequences, particularly to the Tribe.

306.    Finally, Mr. Hasselman claimed, without any basis:

The concept is environmental justice.  And I've never seen a balder case of
environmental justice concerns than this one.  The alternative route proposed by
the company for this pipeline would have crossed just north of Bismarck, North
Dakota. Bismarck is the capital city.  It is 92 percent white, according to the
Census.  And it's a relatively wealthy community.  People said, "Oh no, you can't
put a pipeline there."  So they moved it to the doorstep of the Standing Rock
Sioux Tribe's reservation.  They crossed the Missouri [River], literally, half a mile
upstream. The Standing Rock reservation is one of the lowest-income
communities in the country….The idea of moving a pipeline to place the risk on
top of the people who can manage that risk the least is really galling.

307.    Earthjustice concluded the teleconference by reiterating the fight is "not over yet"

and called for continued support for Earthjustice in the fight against DAPL and other fossil fuel

infrastructure.  Specifically, Mr. Hasselman applauded the public's efforts, highlighting the

importance of "bringing the creativity on all the different kinds of advocacy tools, *from beating*

*up on banks that finance [fossil fuel infrastructure projects]* to bringing shareholder actions, to

bringing in the United Nations in talking about human rights.  All of these tools can be replicated

throughout the country" (emphasis added).

308.    Consistent with their message that the fight against DAPL is not over, on April 5,

2017, Earthjustice updated its FAQ page to include a link to a SRST news release entitled

"Standing Rock Sioux Applauds BNP Paribas' Decision To Divest From DAPL."  Along with

the link, the FAQ Page featured a quote from SRST Chairman Dave Archambault:  "As

corporate greed continues to fuel dirty energy projects on our land, it is heartening to see that

some banks recognize the imminent harm to our people posed by DAPL, and are taking actions

126

accordingly[.]  We appreciate BNP Paribas, ING and DNB leadership and their advanced understanding and respect of tribal sovereignty and Indigenous Peoples' rights."

309.    Revealing the true purpose behind the SRST lawsuit and the Enterprise's attack on DAPL, on April 11, 2017, Jan Hasselman stated, "Oil may be in the pipeline, but nobody at Energy Transfer looks at this and thinks, 'What a great success it's been.'  They have lost many hundreds of millions of dollars.  Their name and reputation has been greatly damaged."

310.    Even after construction of the pipeline was completed, Earthjustice continued to peddle the false claims of lack of consultation and disregard for cultural and tribal impacts.  For example, in an April 14, 2017 article "Is Nothing Sacred? How Archaeological Reviews Imperil Tribal Lands," Earthjustice attorney, Stephanie Tsosie, made the sensational claim: "Imagine a company wanted to build a pipeline through the Sistine Chapel or Arlington (National) Cemetery without regard to anyone who cared about those places?  All the sacred sites we were seeking to protect have been destroyed.  If the intent of the law is to protect sacred sites, it's a sign something has to change."  Tsosie likewise repeated the false allegation that consultation between the Tribe and USACE were insufficient, stating, "The consultation wasn't, 'Hey, we are thinking about putting this pipeline a half-mile upstream of your reservation.  What do you think about it?' It was, 'We're building this.  Let us know if you have any sites around.'"

311.    Similarly, on April 18, 2017, Earthjustice published a blog post titled "'Paddling Side by Side,' from Standing Rock to Lower Snake River," by Rebecca Bowe, an Earthjustice Advocacy Press Secretary, which falsely claimed that "the rights and interests of tribes were barely acknowledged before the construction of massive, environmentally harmful infrastructure."

312.    Consistent with the Enterprise's playbook, and revealing the true purpose of Earthjustice's sensational allegations about DAPL, each blog post, feature, and press release on Earthjustice's website was flanked top and bottom with links to "Donate."  At the bottom of each page, a "Join Our Fight" link was pre-populated with a $100 suggested donation.

### iv.    Destruction of DAPL, Construction Sites, Equipment, And Federal Lands

313.    Consistent with the Enterprise's past campaigns, radical eco-terrorist organizations, incited, activated, and funded by the Enterprise's disinformation campaign, hijacked SRST's peaceful protest and engaged in a campaign of trespass, violence, arson, and property destruction -- including on federal land -- in violation of the Patriot Act, in an effort to create a pretext for the Enterprise's fundraising campaign.

314.    No later than August 2016, radical eco-terrorist organizations manufactured an international #NODAPL movement based on the false narrative launched by the Enterprise, and expanded the campaign to direct action against DAPL and Energy Transfer personnel.  These eco-terrorist organizations immediately set up "resistance camps" near DAPL construction sites as a base for coordinating violent protests and fomenting public disorder to disrupt DAPL construction.  Red Warrior Camp, and other radical groups, recruited new members through videos and social media, encouraging and even paying them to travel to the camps, before training them to engage in criminal trespass, violence, and property destruction.  They supplied materials for and directed these attacks, and provided free legal representation and bail for those arrested for such illegal activities.   The purpose of the criminal behavior was to generate sensational video and still images that these groups could use to foment public emotions worldwide and thereby generate donations for all the Enterprise members engaged in this "cause."

315.    By way of example only, on August 29, 2016, Bold Iowa launched its campaign against DAPL by calling on the public to "Sign the Bakken Pledge of Resistance," a pledge to take direct action against DAPL by traveling to "one or more designated locations" and "risk[ing] arrest to physically stop pipeline construction."  To radicalize the public and induce donations, Bold Iowa reiterated many of the Enterprise's sensational lies, including that "[i]f the pipeline breaks and leaks (it's really just a matter of time), it will occur in the Mississippi River watershed, which is the water lifeline for a huge portion of our country."  The post called for "everyone who cares about protecting our land, water and climate to join our efforts to stop the Bakken pipeline," and, for those who were not willing to take that drastic measure, Bold Iowa, tellingly, suggested donations to support those who were.  Bold Iowa boasted that thousands of people took the pledge to risk arrest to stop construction.

316.    The Enterprise's goal was to create conflict that would halt construction whenever possible.  The more violent the conflict the more sensational the videos it could create to drive media content and donations.  To stop construction, Bold Iowa organized and trained "Bold Action Teams" ("BAT") which consisted of teams of five people who mobilize repeatedly to prevent construction until the point that the BATs were threatened with arrests.  Bold Iowa members trespassed on live construction zones and physically prevented construction by lying in front of bulldozers or other construction equipment.  Bold Iowa combined the BAT method with regular press releases openly touting the effectiveness of the BAT method of shutting down construction.  BAT disruptions ultimately resulted in dozens of arrests.

317.    Likewise, Mississippi Stand repeatedly engaged in illegal activities to shut down construction.  Following Earth First!'s Direct Action Manual of property destruction and illegal activity, Mississippi Stand marketed itself as the "shutdown caravan," with the goal of "locking

down" construction whenever, wherever, and however possible.  Mississippi Stand's tactics were deliberately attention-grabbing and high-profile in order to fundraise, and included members regularly using "steel or sleep dragons" to lock themselves to construction equipment and construction sites and climbing into sections of the pipe to occupy the pipe so construction cannot proceed.  Its "lockdowns" were frequently recorded on video and disseminated through its website and social media, each accompanied with a call for donations.  Mississippi Stand's direct actions resulted in numerous arrests, and the eco-terrorist group has arranged for crowdfunding to raise donations for legal funds specifically to bail out arrestees and keep its operation going.

318.    Mississippi Stand's methods had its intended effect.  For example, in a direct action on November 10, 2016, Mississippi Stand activists, armed with screwdrivers, climbed into a section of pipe to occupy it and prevent construction.  After the activists were removed and arrested, construction workers were forced to rip out the plastic section of the pipe to ensure that the activists did not drill any holes in the pipeline with their screwdrivers.   Immediately after the event, Mississippi Stand posted a video of the pipeline occupation on Facebook, touting the "successful action of over 16 hours of interfering with the Dakota Access pullback under the waters" and, tellingly, called on the public to "Please donate, every little bit helps."  Ruby Montoya, Mississippi Stand's press representative, told press that members were "willing to risk everything."

319.    Red Warrior Camp, a front for Greenpeace, Earth First! and the rest of the Enterprise, formed at the protest camps, and sought to radicalize the indigenous protest movement by coordinating and employing militant tactics to disrupt DAPL construction.   Earth First! provided Red Warrior with $500,000 of seed money to fund its violent operations.  Red

Warrior Camp advertised their violent confrontations to secure additional funding, and used other illegal means, including selling drugs bought with donated money to other protestors at the camps to finance their operations and line their own pockets.  In September 2016, Greenpeace organized donation drives to fund, feed, and house the militant group in 10 cities across the country.  Sierra Club's Director of Equity, Inclusion and Justice Nellis Kennedy-Howard spent five days at the Red Warrior Camp in October 2016.

320.    Red Warrior Camp also used militant footage for recruitment videos, encouraging the public to travel to the camps, where Red Warrior members trained new members on how to conduct attacks and evade security and police.  Red Warrior then coordinated large-scale attacks on construction sites that concluded with arson, property destruction, and arrests.   For example, on October 27, 2016, a large group of people incited and led by Red Warrior Camp entered Dakota Access property near Highway 1806, set up roadblocks, and established an encampment. After law enforcement "requested them to remove the barricade and have protestors vacate the private property," Enterprise members returned, and further requests that Enterprise members leave the Dakota Access property were met with violence.  Enterprise members set up makeshift barriers and lit them on fire to prevent the officers from accessing the site and threw Molotov cocktails, logs, rocks, debris, and even urine at the officers.  Enterprise members even attempted to stampede a nearby group of buffalo at law enforcement.  They also set fire to numerous vehicles, three pieces of Dakota Access construction equipment, and two bridges.  During the course of the attack, Red Fawn Fallis, a radical eco-terrorist, fired three shots from a pistol at a police officer, narrowly missing a police deputy.  Fallis has since been arrested and charged with attempted murder.

321.     At the same time, spurred by the Red Warrior's messages of violence and

disorder, members of another radical eco-terrorist group called Akicita Group attacked a Dakota

Access security guard who went to investigate equipment that was on fire.  Upon the security

guard's arrival in his work vehicle, Israel Hernandez and Michael Fasig, both Akicita members,

repeatedly and intentionally rammed the security guard's vehicle to force him off the road.  Once

the security guard's vehicle was in a ditch, a group of protesters approached the security guard,

some of whom were brandishing knives.  Protesters, armed with knives, encircled the security

guard and seized a rifle that was in his possession and then, holding him against his will,

eventually released him to the Bureau of Indian Affairs.  The security guard's vehicle was later

set on fire.  Hernandez and Fasig were charged with reckless endangerment and criminal

mischief as a result of this attack.

322.     Red Warrior Camp's militant actions were taken without the approval of the

SRST, or other ad hoc governing bodies at the protest camps.  As a result of their aggressive and

violent tactics, on November 1, 2016, the SRST Tribal Council voted 10-0 to ask Red Warrior

Camp to leave the protest camps out of concern for the safety of the peaceful protesters opposing

DAPL.  After the vote, Mississippi Stand endorsed Red Warrior's tactics on Facebook, throwing

its support behind Red Warrior.

323.     Despite SRST's formal effort to evict them, Red Warrior Camp did not leave, and

instead incited even more violent action.  On November 20, 2016, approximately 650 protesters,

incited and led by Red Warrior Camp, gathered at Backwater Bridge in Mandan, North Dakota,

which had been closed since October due to concerns about its structural integrity.  At around

6:00 pm, in what the police described as an organized tactical movement, Red Warrior Camp

attempted to flank and attack police officers in a very aggressive manner.  Members of Red

132

Warrior Camp, some of whom claimed to be carrying firearms, attempted to move several trucks that had been burned by rioters on October 27 in order to facilitate crossing the bridge and entering Dakota Access property.  Protesters started numerous fires on and around the bridge and camps and threw objects and homemade weapons, including grenades and flares, at law enforcement officers.  They also threw flares into the sky and aimed strobes and high-output spotlights at Dakota Access security helicopters.  Red Warrior Camp also employed at least three drones in the vicinity of the bridge and were seen crossing barbed wire to enter onto Dakota Access property without permission, with one member laying across the wire to allow others to enter.

324.    Additionally, Enterprise members and those they incited and directed by the lies disseminated by the Enterprise, have taken other extreme measures to sabotage the pipeline, including repeated acts of arson on construction equipment and pipeline destruction.  In August 2016, three fires were reported in Jasper Country, Reasnor, and Mahaska County, Iowa.  In each instance, heavy equipment, including bulldozers and backhoes, were intentionally burned. In total, the fires caused almost $2 million in damages.  In October 2016, unknown individuals set fire to construction equipment along the pipeline route near the town of Reasnor, Iowa, causing more than $2 million in damages to construction equipment.

325.    On November 8, 2016, Enterprise members Jessica Reznicek and Ruby Montoya, both of veteran members of Mississippi Stand and trained in the method of property destruction, traveled to a Dakota Access construction site in Mahaska County, Iowa, where they added motor oil and rags to six coffee canisters and placed them on the seats of six pieces of machinery, piercing the coffee canisters once they were in place and striking several matches, anticipating that the seats "would maintain a fire long enough to make the machines obsolete."  They were

correct.  Their arson damaged two excavators, a bulldozer, and a side boom, causing more than $1 million in damages.  Thereafter Reznicek and Montoya, recognizing the success of the method, set fire on several other occasions, using gasoline and rags along with tires.  In May 2017, a contractor-owned skid loader and pipeline equipment in Newell, Iowa were set on fire. The fire caused nearly $150,000 in damages.

326.    Finally, on at least three occasions, Reznicek and Montoya used blowtorches to cut holes into the pipeline.  While Reznicek and Montoya had previously used arson on construction equipment, stopping construction for at least a day, they sought to up the ante. Leading up to March 2017, Reznicek and Montoya "began to research the tools necessary to pierce through 5/8 inch steel pipe."  They purchased equipment used to affect the destruction outside their city "in efforts to maintain anonymity," as their goal was to "push this corporation beyond their means to eventually abandon the project."  Having practiced with their equipment, they "were able to get the job down to 7 minutes."  On approximately March 13, 2017, Reznicek and Montoya "began to apply this self-gathered information" by using oxy-acetylene cutting torches to pierce a hole through an above-ground safety valve in Mahaska County, Iowa. Recognizing the effectiveness of the pipeline destruction which they claimed "successfully delay[ed] completion of the pipeline for weeks," Reznicek and Montoya "began to use this tactic up and down the pipeline, throughout Iowa (and a part of South Dakota), moving from valve to valve until running out of supplies, and continuing to stop the completion" of DAPL.  On approximately March 17, 2017, in Sioux County, South Dakota, Reznicek and Montoya used a blowtorch to cut holes at two valve sites near Sioux Falls.  On both occasions, oil had not yet been flowing through the pipeline.  And on May 3, 2017, in Wapello County, Iowa, Reznicek and Montoya cut through a chain link fence protecting a section of DAPL and attempted to use a

blowtorch to cut into the aboveground section of the pipe in which crude oil was already flowing. Fortunately, the Reznicek and Montoya failed to cut through the thick steel but left visible burn marks. Reznicek and Montoya claim their tactics of arson and pipeline destruction were "peaceful," but they are the exact opposite. Had the blowtorch successfully cut through the pipeline as in the prior two attempts to destroy the pipeline, the blowtorch would have ignited the oil inside and caused an explosion. These acts of sabotage not only damaged the pipeline, but endangered the public at-large and the very lands and waters the Enterprise claims it seeks to protect.

327.     These terrorist acts of arson and pipeline destruction were directly incited by the Enterprise's misinformation campaign. Indeed, in a July 24, 2017 statement, Reznicek and Montoya publicly claimed responsibility for the arson and pipeline destruction, citing to the Enterprise's misrepresentations regarding violations of "rule of law, indigenous sovereignty, land seizures, state sanctioned brutality." Their statement is a direct response to the Enterprise's call to action, and Reznicek and Montoya acknowledge they acted after participating in other aspects of the Enterprise's campaign, including "Civil Disobedience" and "boycotts and encampments." Evidence of the Enterprise's direction and control is likewise reflected in Reznicek and Montoya's echoes of the Enterprise's false claims that DAPL "brutalize[s] the land, water, and people," "wishes to poison literally millions of us irreparably by putting us all at risk of another major catastrophe with yet another oil spill," and will leak "until the oil is shut off and the pipes are removed from the ground."

328.     Reznicek and Montoya concluded with a call for others to follow in their path: "We are speaking publicly to empower others to act boldly, with purity of heart, to dismantle the infrastructures which deny us our rights to water, land and liberty. . . . [I]t is our

duty to act with responsibility and integrity, risking our own liberty for the sovereignty of us all."  To "inspire others to act boldly," Reznicek and Montoya provide a roadmap for arson and pipeline destruction," outlining details of their "peaceful direct action" including by informing the public of materials that can be used to commit arson and pipeline destruction, where and how they should be purchased, the hindrance of scouting and the importance of "trust[ing] your spirit, trust[ing] the signs," and even how to interact with federal agents.

329.    The Enterprise glorified Reznicek's and Montoya's violent actions.  Since Reznicek and Montoya came forward with their confessions, Mississippi Stand!, the radical eco-terrorist group, has provided Reznicek and Montoya with a platform for their call to action.  The group now seeks to "legitimise and humanise these land defence methods in our current climate chaos."   The group's website launched a page titled "Peaceful Property Destruction," calling on the public to engage in destruction of "machines and infrastructure," claiming among other things that "Jess and Ruby's actions were peaceful" and that such property destruction may be justified under the "necessity defense," while prominently featuring Reznicek and Montoya's statement—complete with instructions—on its website.   Consistent with their past campaigns, the group launched a new contribution page, requesting the public to "Contribute to Defense Fund," as the "legal battle ahead will set many precedents, including the necessity defence."

330.    Already, Reznicek and Montoya's call to action has had effect.  On August 7, Mississippi Stand! shared on Facebook a statement of anonymous individuals who blockaded an oil train in Vancouver.  The individuals stated that their action "is in solidarity with Ruby Montoya and Jessica Reznicek – who successfully taught themselves how to sabotage the Dakota Access pipeline (DAPL), delayed construction of DAPL for weeks, and never got caught until they turned themselves in recently. . . . We feel Ruby and Jessica showed inspirational leadership

in getting us to step outside of our privileges and comfort zones and ask ourselves, 'What are we willing to sacrifice and how far are we willing to go in our resistance?'"

331.    In the final analysis the Enterprise, exploited the Native American tribes, permitting the protestors it purposefully incited to destroy the very lands the Native Americans hold sacred.  Notwithstanding the protestors' purported objective to improve environmental conditions, Forbes reported that protesters left 250 truckloads of trash and waste at the protest grounds, noting that "[d]espite the fact that [environmental activists] have managed to raise millions of dollars from contributors all over the country to support their protest effort, protest organizers, whose people created all the mess, do not appear to be making any effort to assist in remediating the site."  On February 1, 2017, the chairman of SRST was forced to issue a public statement on Facebook, imploring the protesters to leave the camp site, as their actions had become a liability to the SRST's agenda and livelihood.   Indeed, not later than December 2016, SRST began re-directing funds it had raised to challenge the pipeline to defray the financial hardship caused by the protestors' occupation, which drove tourists away from its casinos.  In total, millions of dollars were diverted from its efforts to prevent the completion of the pipeline to the Tribe itself to compensate for damage caused by the Enterprise to SRST.  Yet, the monies diverted to the Tribe represented only a tiny fraction of the revenues the Enterprise generated through its illegal scheme and fell far short of compensating the Tribe for the mayhem that the scheme caused.   That windfall the Enterprise kept for itself to line the pockets of its senior executives and staff, and to launch other illegal campaigns to raise further revenues and raise their respective organizations' profiles.

### v.    Cyber-attacks

332.    Like its prior campaigns, the Enterprise launched cyber-attacks against Energy Transfer under the guise of the front Anonymous.  Simultaneous with the Enterprise's "Call to

Action" at the Standing Rock camps, in August 2016, Anonymous launched an #OpNoDAPL

campaign consisting of death threats, attempted denials of service, and harvesting attacks.

333.   For example, on September 8, 2016 Anonymous published a video directly

threatening Energy Transfer CEO Kelcy Warren, employees of Dakota Access, and members of

the National Guard:

> The time to act is now. . . . The Dakota Access Pipeline is what broke the camel's
> back.  Not only is the media trying to cover this up, but they're actually
> demonizing the protesters, who have done nothing wrong.  Kelcy Warren, we
> know where you live, everyone you know, and everything there is to know about
> you, but that isn't very threatening, is it?  We also know your employees, and
> your family.  No one here can promise that that information will remain safe.
> You and the government have unleashed a force you cannot control.  There is a
> reason cyberterrorism is the number one threat to national security.  Anyways, in
> case you want to know, Mr. Warren lives at [address].  Do whatever you feel is
> necessary concerning that address.  Watchers of this video, share this video to
> news-sites and all over the internet, because, Mr. Warren, if you do not want to
> make an enemy of Anonymous and all groups related to Anonymous, I would
> suggest you not only stop harming innocent protesters, but end construction of the
> pipeline as compensation for your [unintelligible] actions.  Employees working to
> create the Dakota Access Pipeline, quit, and you will avoid any action from us.
> And to the National Guard, do you really think we are afraid of you?  Each of you
> are individuals, no different from the rest of us.  If pipeline construction doesn't
> stop, and you guys continue to threaten the natives and others, we will strike hard
> against you.  Uninvolved watchers of this video, you may wish to stand by and let
> this modern day racism, injustice, and inhumane act go unnoticed.  However,
> every person who helps makes a difference.  Sign petitions, DM me, do whatever
> you feel is necessary besides sitting idly by.  We are the Anonymous agents.  We
> are legion.  We do not forgive the unforgiveable.  We never forget.  Expect us.
> We would have never gotten involved if you would have just remained peaceful
> to those who did the same to you.  Anonymous.  Time to mobilize.  Time to
> become legion.

334.   Similarly, on October 22, Anonymous published another video threatening

Warren:

> Kelcy Warren, you have angered Anonymous for the last time.  This time we will
> not hold back.  You have two days to respond to this message.  If you do not
> respond, Anonymous will strike you directly.  We already have an operation with

your name on it. . . . Should you fail, this operation will be engaged, and you will be taken down in a massive cyber-attack. People like you are nothing but cancer on this planet, and we are the cure. Remember, Warren: two days. Do not test us. We are Anonymous. We are legion. We do not forgive. We do not forget. Kelcy Warren, you should have expected us.

335.    While these threats are presented in a voiceover, further defamatory and harmful statements are made over still images of Warren, including: "I'M KELSEY [sic] WARREN CEO OF ENERGY TRANSFER PARTNERS THE COMPANY BEHIND THE DAKOTA ACCESS PIPELINE . . . I TURN ATTACK DOGS ON PEACEFUL PROTESTORS . . . MY HOME ADDRESS IS [address]."

336.    In addition to the unwanted and unauthorized publication of Warren's personal information, hacktivists operating under the Anonymous cloak committed other instances of doxing against Energy Transfer employees in an effort to demonize them for their mere association with the Company and implicitly inviting attacks on those employees using the improperly published personal information. These cyber-attacks took place under the alias of LulzJet, among others, indicating an affiliation with Anonymous' s elite subset of hackers, LulzSec. They were also tied to the overall anti-DAPL campaign, using the hashtags, #OpNoDAPL and #nodapl, among others.

337.    Anonymous made good on its threat to Warren, and beginning in October 2016 perpetrated a blitz of criminal cyber-attacks on Energy Transfer. Beginning in early October and peaking on October 24, spam attacks against the Company skyrocketed, rising from typical lows of single instances or up to the low 100s per day to nearly 2,700 attacks on October 24. These attacks consisted of, among other variations, fake invoices sent to Energy Transfer employees designed to extract personal and Company information through "credential harvesting."

338.     In addition to the spam campaign, cyber-criminals also spiked their efforts to sabotage Energy Transfer by denial of service ("DDoS") attacks, through which cyber criminals render online services unavailable by artificially flooding them with unmanageable data traffic from numerous sources.  It is a cheap but effective way of interrupting online services and resources.  Steadily climbing during the last few days of October and into November, DDoS attacks on Energy Transfer peaked on November 3, reaching more than ten times the number of attacks the Company typically faces.  Between October 27 and November 3, the cyber criminals attacked Energy Transfer's websites, including www.energytransfer.com, www.daplpipelinefacts.com, and portal.energytransfer.com, flooding these sites with crippling loads of data from nearly 80,000 individual IP addresses.

339.     In addition to the direct attacks against Energy Transfer, similar cyber-attacks and criminal videos targeted Energy Transfer, the governor of North Dakota, local law enforcement, the National Guard, and former President Barack Obama.  In a show of unity with the Enterprise, Anonymous and affiliated hacktivists have tied their cyber-attacks and/or threatening videos to the broader anti-DAPL movement using hashtags #OpNoDAPL, #OpBlackSnake, and #nodapl.

340.     In a particularly sensational and suggestive, although factually unmoored video, Anonymous presented a montage of unidentified protest clips and themes promoting and inspiring violent opposition to the pipeline.  While Prolific the Rapper's "Black Snakes" plays in the background, images and words flash across the screen, including: "SABOTAGE" overlaid on the Anonymous symbol, attributing the video to the "Anon Resistance Movement," flashing "OpNoDAPL" and "NoDAPL" throughout, and identifying their movement as "a popular mothafuckin insurrection."  A voiceover makes comments throughout the video, including, among other things: that Anonymous has been "heavily involved in the operations against the

DAPL pipeline since" the summer of 2016, and has worked with hacktivists all around the

nation, gathering supporters using the OpBlackSnake hashtag and call sign; that Anonymous has

been able to keep "Anons" on the ground in Standing Rock since the fall of 2016; and false

claims of attacks on peaceful protesters, "chemical warfare on the protectors," use of crop duster

planes to spray protesters with chemical agents.  The voiceover accuses Morton County and

North Dakota police and National Guard of treason and crimes against humanity, and warns

them to leave Standing Rock because "things will only get worse from here."  It attributes law

enforcement's alleged wrongdoing to "the corporations [government] answers to."  The video

also promises supporters that "there are many networks and means to get you to Standing Rock

at little or no cost to you," including rideshare networks, Anonymous-led convoys of "Anons"

traveling to the protest camps, and promises, "once you arrive at Standing Rock you will be

cared for [by] donations and physical goods [] pouring in from around the world."  Anonymous

brags that the anti-DAPL movement created, enabled, and empowered by the Enterprise has

"cost the pipeline over $100 million," and closes with the common request for donations to the

camp as well as direct action from supporters wherever they are: "THIS IS AN

INTERNATIONAL CALL OUT FROM THE FRONT LINES," "Go to the streets . . . do

whatever you can to help us, to protect us, take action where you are, take railroads, take bridges

do it . . . anyone who is fighting resource extraction . . . ."

### C. The District Court Found That The Environmental And Cultural Review Processes For DAPL Substantially Complied With NEPA And NHPA

341.    On June 14, 2017, the United States District Court for the District of Columbia

issued a decision on SRST's motions for summary judgment on their claims that USACE

violated NEPA.  In a 91-page decision, the District Court squarely rejected SRST's claims of a

rushed and inadequate environmental review and consultation process and concluded that

USACE and Energy Transfer "substantially complied" with NEPA in many areas.  The decision, which details the extensive environmental and regulatory review directly refutes the false and misleading allegations about DAPL peddled by the Enterprise.

342.    Most significantly, the Court found that, far from rubber-stamping or rushing the environmental analysis as the Enterprise has ubiquitously claimed, USACE "independently evaluated and verified the information and analysis undertaken in th[e] EA and [took] full responsibility for the scope and content contained therein."  The Court found that USACE "provided ample input to Dakota Access on the proper EA drafting procedure and on its substance," and had "meaningful back-and-forth engagement" with Dakota Access, with some USACE comments going back and forth for nearly a year.  Noting that 17 different USACE officers involved in the review certified that DAPL would not be injurious to Lake Oahe or the public interest, the Court concluded that USACE "met its responsibility to make its own evaluation of the environmental issues."

343.    Likewise, the Court found that USACE adequately considered most of the relevant NEPA factors, such as viable alternatives to the route, the risk of spill and certain impacts of a potential spill, the impacts of construction on water resources and hunting and fishing rights, and cumulative environmental impacts.  Of particular importance, the court found that USACE adequately considered alternatives to the Lake Oahe crossing near the SRST reservation and presented a number of reasons for rejecting a route crossing the lake 10 miles north of Bismarck, North Dakota.  Contrary to the Enterprise's assertions that USACE moved the route down to Lake Oahe in a gesture of "environmental racism" after white citizens of Bismarck complained, USACE rejected the route as not viable because, among other reasons, the Bismarck alternative would have roughly 165 additional acres of environmental impacts, crossed

through or in close proximity to several wellhead source water protection areas, would have been co-located with existing utility or pipeline routes for only 3 percent of the route and thus have more impact on cultural resources, and cost $33 million more.

344.    Significantly, the Court also noted that the two closest water intakes for Bismarck were at Mandan, 7.3 miles downstream and serving 19,381 people, and Bismarck, 11.6 miles downstream and serving 65,123 people.  By contrast, at the Oahe crossing, the closest drinking water intake is at Emmons, 11.1 miles downstream and serving 3,491 people in Emmons County, and second closest (the first SRST intake for public consumption) is 26.2 miles downstream at Fort Yates, serving 229 people in Fort Yates and up to 4,317 in Sioux County.  The Court accordingly found not only that the "Bismarck crossing thus would have been much closer – nearly four miles – to a drinking-water intake than the Oahe crossing" but also that "[t]he drinking-water intakes near Bismarck also serve many more people than the two closest to the Oahe crossing."  Further, the Court noted that this difference "will be even more pronounced" once the SRST's water intake is moved and located 50 miles further downstream than Fort Yates.

345.    The Court likewise rejected SRST's claim that the EA failed to adequately consider the risks of an oil spill.  Rather, the Court held that the EA, which "devotes several pages to discussing DAPL's 'reliability and safety,'" provided "the necessary content" to support its conclusion that the risk of a spill is low by "setting out the specific factors that undergirded its risk analysis and explaining their application to DAPL."

346.    First, the Court noted that the EA analyzed compliance with applicable regulatory standards when assessing impacts, including detailing the inspections throughout construction and following installation, regular inspections during operation, utilization of leak detection

technologies that are "capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes," and in the event of a leak, "remotely operated valves [that] are to be triggered and closed within 3 minutes."

347.    Moreover, the Court noted that the EA addressed nine industry-recognized pipeline integrity threat categories: (1) third-party damage; (2) external corrosion; (3) internal corrosion; (4) pipe-manufacturing defects; (5) construction-related defects; (6) incorrect operations; (7) equipment failure; (8) stress-corrosion cracking; and (9) natural forces, and concluded that "spill risk due to third-party damage is low because the pipeline is positioned 92 feet below the lakebed; spill risk from manufacturing defects is also slim because the pipeline will be 'hydrostatically strength-tested'; and spill risk from 'incorrect operations (*e.g.*, overpressure event caused by human error)' is low because the pipeline is designed to withstand twice the maximum-allowable operating pressure."

348.    Finally, the Court rejected SRST's claim (as set forth in the Accufacts report) that the EA improperly omitted discussion of borehole leaks, landslides, leak-detection systems, water quality, or winter temperatures, citing to the EA's discussion of each.  To the extent the Tribes' experts disagreed with the Corps' technical assessments or overall conclusions, the Court held that "such disagreements are 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise'" and courts "must defer to 'the informed discretion of the responsible federal agencies.'"

349.    Additionally, in determining that the EA "adequately discussed the impacts" in the unlikely event a spill did occur, the Court found that the EA "presented a model estimating the concentrations of benzene, a potentially toxic compound found in crude oil, that could be

released during a very small, small, moderate, or large spill at the Oahe crossing, and discussed how those results might vary during winter months when temperatures are likely to be colder." Even with conservative assumptions, "the model concluded that under no spill scenario would the acute toxicity threshold for aquatic organisms be exceeded," and under the "'most probable spill volume,' benzene concentrations would not 'exceed the drinking water criteria.'"

350.    Notwithstanding the foregoing, the Court granted SRST's and CRST's motion on three very narrow grounds finding that the EA did not sufficiently address spill impacts on the Tribes' hunting and fishing rights, environmental justice considerations, and the controversial impacts of the pipeline.

351.    The Court found that USACE did not adequately consider "the degree to which the effects on the quality of the human environments are likely to be highly controversial," a factor that is required in evaluating the significance of a project's impact.  The Court first found that "none of the evidence before the Corps as of July 25, 2016 – including Standing Rock's comments – suggested substantial methodological or data flaws in the Corps' analysis." However, expert reports were thereafter submitted to USACE after the Final EA was published but before USACE again decided in February 2017 that an EIS was not required.  The Court held that these expert reports present scientific critiques that must be addressed, and that USACE violated NEPA when it failed to adequately address these critiques.   Importantly, the Court held that *"[i]t may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects . . . but the Corps never said as much.*" (emphasis added). The Court recognized that Dakota Access provided an assessment of the critiques' "material flaws," but

noted that USACE's "decision to grant the easement is devoid of any discussion of the methodological and data flaws identified in the reports."

352.    Moreover, while acknowledging that USACE adequately considered the risk of a spill on water resources, the EA did not adequately address the potential impact of a spill on the Tribe's hunting and fishing rights.

353.    Finally, the Court remanded for further analysis of whether DAPL would have disproportionate impacts on minority populations.  USACE had limited its geographic analysis for its environmental justice assessment to a 0.5 mile radius around the crossing, which did not include Sioux County and the SRST reservation that was 80 yards beyond the 0.5 mile limit downstream.  In support of its 0.5 mile buffer Dakota Access and USACE pointed to transportation infrastructure and gas pipeline projects where the 0.5 mile buffer was deemed adequate for an environmental justice analysis.  However, the Court noted that the cases USACE relied on did not involve the potential for oil spills which requires larger buffers, and noted that recent analyses for Keystone and Line 67 Expansion looked at spill impacts 14 miles downstream and 40-river-miles downstream, respectively.

354.    In sum, the June 14, 2017 decision directly refutes the Enterprise's false and sensational misrepresentations of the environmental and cultural impacts of DAPL.  The limited grounds on which the Court granted in part SRST's motion for summary judgment do not render USACE's analysis "rushed," "inadequate," or a mere "rubber stamp," or demonstrate that USACE failed to consult with the Tribes.  To the contrary, as the Court explicitly found, USACE independently evaluated and took responsibility for the analysis, and provided adequate support for most of the relevant factors, including the low risk of spill and its consideration of alternatives.

### D.  The Scheme's Connections To North Dakota

355.    The Enterprise's campaign against Energy Transfer has had significant contact with, and effects in, North Dakota where Energy Transfer has been actively involved in the construction of 357 miles of DAPL, causing nearly $33 million in damages to North Dakota taxpayers to pay for state and local responses to the protests and related illegal activities.

356.    On federal land alone, it took USACE approximately 3 weeks in March and April 2017, and $1.1 million of taxpayers' money to pick up after the protesters, who left 835 dumpsters worth of trash and debris in their wake (not including recyclable materials such as lumber and propane tanks that were also left behind), showing once again that any former grassroots opposition to DAPL was hijacked by the Enterprise and professional protesters with no concern for tribal rights or the environment.  Indeed, SRST had to begin a major cleanup and restoration project in January 2017, which required the help of outside sanitation services, just to prevent snowmelt from washing tens of thousands of pounds of garbage into the Cannonball and Missouri Rivers, contaminating the very waters the Enterprise falsely claimed it sought to protect.  Along with their garbage, protesters also abandoned at least 12 dogs at the protester camps, which were later rescued by a Bismarck-Mandan rescue organizations.

357.    Enterprise members, including Greenpeace Fund, Inc. and Greenpeace, Inc., RAN, Sierra Club, and 350.org are foreign nonprofit corporations registered to do business in North Dakota as charitable organizations.

358.    A large portion of the Enterprise's campaign of disinformation has been directed at disrupting lawful activity on a specific strip of land on the western bank of the Missouri River just north of the SRST reservation.  Indeed, many of the Enterprise's false statements concerning DAPL and Energy Transfer are designed, or explicitly followed by pleas, to "stand with Standing Rock," and a variety of more specific conduct that falls within that slogan, including sending

money and supplies to protester camps and traveling to Standing Rock to occupy the protester camps and harass DAPL construction workers and law enforcement, among other illegal anti-DAPL, anti-Energy Transfer activity.

359.    Thousands of Energy Transfer employees, contractors, and subcontractors have worked on the construction of DAPL in North Dakota, and DAPL's operations in North Dakota alone are projected to produce upwards of $110 million in annual tax revenue, not to mention the hundreds of millions of dollars spent in secondary markets in local economies near DAPL worksites.

360.    As a result of the Enterprise's wrongful acts, Energy Transfer has suffered substantial damage in North Dakota, including costs of delayed construction, unanticipated costs of professional security services to ward off violent protesters, and costs associated with combatting the Enterprise's campaign of disinformation within North Dakota.

### E.  Plaintiffs' Damages

361.    The Enterprise's scheme has inflicted enormous damage on Energy Transfer's reputation and business operations.  The scheme's dissemination of negative misinformation devastated the market reputation of Energy Transfer as well as the business relationships vital to its operations and growth.  Industry participants important to the businesses including creditors, investors and shippers -- paid close attention to the Enterprise's negative publicity campaign and were understandably influenced by it in their dealings with the Company.  As a result of this misconduct, Plaintiffs suffered no less than hundreds of millions of dollars in damages.

362.    First, the Enterprise has impaired or otherwise damaged multiple contractual relationships.  The Enterprise engaged in an explicit campaign to fraudulently induce investors to divest their shares in Energy Transfer and affiliated companies, and to fraudulently induce Energy Transfer's lending partners to exit their contractual relationships with Energy Transfer.

This aspect of the Enterprise's illegal scheme has already succeeded, directly resulting in the losses of direct investors, and relationships with lenders.

363.     Second, the Enterprise's sustained disinformation campaign against Energy Transfer and DAPL has severely damaged Energy Transfer's reputation and standing within the communities that Energy Transfer operates.  The Enterprise targeted Energy Transfer's brand, reputation, and goodwill with the marketplaces, communities, and government agencies that are critical to its business.

364.     Third, Energy Transfer has suffered direct monetary damages resulting from disruptions in DAPL construction caused by the Enterprise, not only as a result of their baseless claims in litigation, but also by direct criminal actions taken to disrupt construction at DAPL worksites, damage construction equipment, and destroy segments of pipeline.  Estimates of increased cost as a result of the Enterprise's conduct are not less than $300 million, with the full extent of damage that Energy Transfer has suffered can only be determined at trial.

365.     Fourth, Energy Transfer has suffered direct monetary damages as a result of the Enterprise's illegal cyber-attacks, including the costs of personal security measures taken in response to cyber-attackers' death threats, and the costs of defending against, and mitigating the effects of, attempted denials of service, and harvesting attacks, among other damages to be determined at trial.

366.     Finally, Energy Transfer has been forced to expend substantial resources in an effort to mitigate the Enterprise's relentless and baseless attacks on DAPL and Energy Transfer.

## CAUSES OF ACTION

### COUNT I

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(c)
### (AGAINST ALL DEFENDANTS)

367.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

368.     Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

369.     Beginning no later than April 2016 and continuing through the present (the "Scheme Period"), Defendants and Enterprise members were associated in fact and comprised an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual knowledge of the illegality of their actions and those of the enterprise.  The Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

370.     The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme, each of which caused direct harm to Plaintiffs.

371.     During the Scheme Period, each of the Defendants agreed to and did conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

372.     The Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to, the predicate racketeering acts of: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) money laundering in violation of 18 U.S.C. §§ 1956-57; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. §

1952; (vi) interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314-15;; (vii) destruction of an energy facility in violation of 18 U.S.C. § 1366(a); (ix) destruction of a hazardous liquid pipeline facility in violation of 18 U.S.C. § 60123(b); (ix) arson and bombing of government property risking death in violation of 18 U.S.C. § 844(f)(2); (x) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (xi) injuring and committing depredation to federal property in violation of 18 USC § 1361; and (xii) corresponding North Dakota statutes criminalizing the same conduct, and which constitute a pattern of racketeering activity pursuant to § 1961(5).

373.    Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of:  (i) preparing false and misleading reports concerning Energy Transfer and DAPL; (ii) broadly disseminating the false and defamatory reports and other statements through the Enterprise's various websites and other internet platforms, such as Twitter, and in direct emails, telephone communications, and U.S. mail; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Energy Transfer; (iv) disseminating the false and misleading allegations directly to government regulators and officials, and Energy Transfer's creditors, investors, and other critical market constituencies through email, U.S. mail, and phone; (v) infiltrating Energy Transfer's computer systems to obtain and misappropriate proprietary and other trade secret information from Energy Transfer; (vi) attacking and disabling

Energy Transfer's computer systems and websites; (vii) harassing Energy Transfer's creditors with extortionate threats; (viii) transmitting extortionate threats of death, serious bodily harm, and crippling cyber-attacks; (ix) soliciting fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (x) wiring fraudulently obtained funds to promote and sustain the Enterprise's unlawful "campaign" against Energy Transfer; (xi) submitting materially false and misleading tax submissions and financial information, (xii) perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property; and (xiii) drug-trafficking. Defendants committed and participated in these unlawful acts willfully and with knowledge of their illegality.

374.     Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to Energy Transfer's business and reputation. While Energy Transfer does not have the full knowledge of the extent of the use of the wires and mails by the Enterprise in furtherance of the scheme, the following charts show some, but not all, of those violations.

375.     The Enterprise authored and published numerous reports and other Energy Transfer-related updates and blog posts on their websites, as set forth in Table A. Each publication constitutes a separate fraudulent wire communication:

**TABLE A**

| 350.ORG PUBLICATIONS | |
|---|---|
| TITLE | DATE |
| After 525 Years, It's Time to Actually Listen to Native Americans | 8/24/2016 |
| Court delays ruling in Standing Rock Sioux Tribe case to stop construction of Dakota Access Pipeline | 8/24/2016 |
| Bill McKibben: Hillary Clinton needs to take a stand on the Dakota Access Pipeline | 9/7/2016 |
| Despite climate commitment, Bank of America still funds Dakota Access Pipeline | 9/19/2016 |
| A Strategy to Stop the Funding Behind the Dakota Access Pipeline | 9/22/2016 |
| The View from Standing Rock | 10/3/2016 |
| Why Dakota Is the New Keystone | 10/28/2016 |
| #NoDAPL: KEEP IT IN THE GROUND:  Reflections on the Call of Standing Rock at this Moment in History | 11/4/2016 |
| There Is Still Time to Stop the Injustice at Standing Rock | 11/6/2016 |
| NYC Call To Action: We Stand With #StandingRock | 11/12/2016 |
| Bill McKibben: What's next? Solidarity with Standing Rock, Nov. 15 | 11/13/2016 |
| November 15th: #NoDAPL Day of Action | 11/14/2016 |
| 350.org Japan and Green Peace Japan Hold Joint #NoDAPL Action Encouraging Japanese Banks' to Divest from the Dakota Access Pipeline | 12/1/2016 |
| U.S. Army Corps Blocks Final Permit Needed for Dakota Access Pipeline | 12/4/2016 |
| The victory at Standing Rock could mark a turning point | 12/4/2016 |
| Breaking: Keystone XL and Dakota Access | 1/24/2017 |
| #NoDAPL: We Fight On | 2/1/2017 |
| Trump's Pipeline and America's Shame | 2/8/2017 |
| The War on Water Protectors | 5/30/2017 |
| President Obama: Stop the Dakota Access Pipeline | Undated |

| BANKTRACK PUBLICATIONS | |
|---|---|
| TITLE | DATE |
| An open letter to the Equator Principles Association | 11/7/2016 |
| Global call on banks to halt loan to Dakota Access Pipeline | 11/30/2016 |
| ABN AMRO threatens to stop financing the company behind the controversial Dakota Access Pipeline | 2/2/2017 |
| Dakota Access Pipeline: Overview | Undated |

| BOLD PUBLICATIONS | |
|---|---|
| TITLE | DATE |
| 30 Iowans Arrested in Peaceful Demonstration Against Dakota Access Pipeline and Risks to Water (Bold Alliance) | 9/1/2016 |

| | |
|---|---|
| Tribal Nations, Pipeline Fighters to Rally at Omaha Army Corps HQ Thursday to Tell Pres. Obama to Halt Construction of the Dakota Access Pipeline (Bold Nebraska) | 9/7/2016 |
| Pipeline Fighters React to Obama Administration's Call for Construction Halt on Dakota Access Pipeline at Key Areas Near Sacred Stone Camp That Threaten Water, Sacred Sites (Bold Iowa) | 9/9/2016 |
| Nebraskans to Join Nationwide Rally in Solidarity with Tribal Nations, Farmers on Tuesday to Protect Our Water from the Dakota Access Pipeline (Bold Nebraska) | 9/9/2016 |
| Dakota Access Pipeline Opposition Continues to Grow | 9/16/2016 |
| Police from 5 States Escalate Violence, Shoot Horses to Clear 1851 Treaty Camp (Bold Iowa) | 10/28/2016 |
| Army Corps Withholds Final Dakota Access Pipeline Permit, Will Consult Further With Standing Rock Tribe (Bold Alliance) | 11/14/2016 |
| PETITION to Pres. Obama: Declare a Standing Rock National Monument to stop Dakota Access (Bold Iowa) | 11/20/2016 |
| Water Cannons Fired at Water Protectors in Freezing Temperatures, Hundreds Injured (Bold Iowa) | 11/20/2016 |
| Week at Standing Rock Day One: Our Arrival (Bold Iowa) | 11/27/2016 |
| Week at Standing Rock Day 4: Dakota Access' Smiling Faces (Bold Iowa) | 11/30/2016 |
| Obama Administration Denies Final Dakota Access Easement Permit; Army Corps Orders Review of Route, Full Environmental Impact Statement | 12/4/2016 |
| Week with Water Protectors at Standing Rock (Bold Iowa) | 12/8/2016 |
| Bold Iowa Responds to Army Corps of Engineers Unprecedented Order Canceling Environmental Review of Dakota Access Pipeline (Bold Iowa) | 2/7/2017 |

| EARTHJUSTICE PUBLICATIONS | |
|---|---|
| **TITLE** | **DATE** |
| Opposing the Dakota Access Pipeline: An Inter-Tribal Spiritual Relay | 5/18/2016 |
| Standing Rock Sioux Tribe Takes Action to Protect Culture and Environment From Massive Crude Oil Pipeline | 7/27/2016 |
| Standing with Standing Rock | 9/1/2016 |
| Making History at Standing Rock: Tribes Are Leading Action To Preserve the Planet | 10/6/2016 |
| Earthjustice Echoes Standing Rock Sioux Tribe's Leader, Applauds President Obama | 11/2/2016 |
| Why It's Right To Keep The Brakes On The Dakota Access Oil Pipeline | 11/2/2016 |
| Pipeline Expert: Government Underestimated Risk of an Oil Spill from Dakota Access Pipeline | 11/3/2016 |
| We're Missing 90 Percent of the Dakota Access Pipeline Story | 11/22/2016 |
| Victory For Standing Rock: DAPL Easement Not Granted | 12/4/2016 |

| | |
|---|---|
| Where Do We Go From Here? | 12/16/2016 |
| Earthjustice Condemns President Trump's Presidential Memorandum On Keystone XL And Dakota Access Oil Pipelines | 1/24/2017 |
| In Conversation: Standing with Standing Rock | 3/22/2017 |
| "Paddling Side by Side," from Standing Rock to the Lower Snake River | 4/18/2017 |
| The Dakota Access Pipeline: Case Overview | Undated |
| Updates & Frequently Asked Questions: The Standing Rock Sioux Tribe's Litigation on the Dakota Access Pipeline | Undated |

| GREENPEACE PUBLICATIONS | |
|---|---|
| **TITLE** | **DATE** |
| Supply Drives for the Red Warrior and Sacred Stone Camps | September 2016 |
| How You Can Help Standing Rock Activists Stop the Dakota Access Pipeline | 9/9/2016 |
| "These Are Our Prayers in Action" -- A look at Life in the #NoDAPL Resistance Camps | 9/24/2016 |
| How You Can Show Your Solidarity in the Fight Against the Dakota Access Pipeline | 10/28/2016 |
| There Are No Safe Options for 'Rerouting' the Dakota Access Pipeline | 11/2/2016 |
| Greenpeace Calls on President Obama to Take Immediate Action for Standing Rock Water Protectors | 11/4/2016 |
| Greenpeace Responds to Army Corps' Decision to Engage Standing Rock Sioux Tribe on Dakota Access Pipeline | 11/14/2016 |
| #NoDAPL Day of Action Draws Tens of Thousands, Lights Up Social Media | 11/16/2016 |
| Largest Bank in Norway Sells Its Assets in Dakota Access Pipeline | 11/18/2016 |
| Exxon Just Reminded Us Why Fossil Fuels are On The Way Out | 11/18/2016 |
| Young Women Shut Down TD Bank, Call for Divestment of the Dakota Access Pipeline | 11/21/2016 |
| Another Major Norwegian Investor Divests From Companies Behind Dakota Access Pipeline | 11/25/2016 |
| Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans | 12/1/2016 |
| 3 Things You Need to Know About the Dakota Access Pipeline Win | 12/5/2016 |
| After Visiting Standing Rock, Swedish Bank Nordea Puts Companies Behind DAPL on Watch | 12/19/2016 |
| Pipe Dreams: Why Trump's Dakota Access and Keystone XL Plans Don't Add Up | 1/27/2017 |
| It's Time for DAPL Funders to Decide Which Side of History They Want to Be On | 2/7/2017 |
| NoDAPL: Greenpeace Responds to Granting of Easement | 2/7/2017 |
| Energy Transfer Partners' PR Firm Works Behind the Scenes at Iowa's Governor's Office | 2/21/2017 |
| Greenpeace Responds to Court's Ruling Against Standing Rock | 3/7/2017 |

| In Solidarity, Greenpeace Supports Native Nations March in DC | 3/10/2017 |
| Native Nations Rise: Showing Solidarity in the Movement for Indigenous Sovereignty | 3/10/2017 |
| Indigenous Youth Travel From Standing Rock to Clinton Headquarters to Demand Answers on Dakota Access Pipeline | Undated |
| Greenpeace Statement of Solidarity With Standing Rock Water Protectors | Undated |

| RAINFOREST ACTION NETWORK PUBLICATIONS | |
| --- | --- |
| **TITLE** | **DATE** |
| Obama: Take a Stand Against Dakota Access Pipeline | 8/30/2016 |
| RAN Statement on Citigroup's Leading Role in Financing Dakota Access Pipeline | 11/7/2016 |
| RAN Statement on Continued Investment in Energy Transfer Equity | 1/27/2017 |
| URGENT: Call Now. Resist Dakota Access Pipeline | 2/2017 |
| Over 500,000 people tell banks, No DAPL! | 2/2/2017 |
| RAN Statement on Final Loan Disbursements for Dakota Access Pipeline | 2/10/2017 |
| Energy Transfer: Which Banks Continue to Support the Company Behind DAPL? | 4/6/2017 |

| SIERRA CLUB PUBLICATIONS | |
| --- | --- |
| **TITLE** | **DATE** |
| Time to Stop a Bad Idea | 9/1/2016 |
| Obama Administration Sides With The Standing Rock Sioux | 9/9/2016 |
| A Tribal Activist War Rages On: The Dakota Access Pipeline and The Fight for Justice | 9/13/2016 |
| Thousands Nationwide Show Solidarity with the Standing Rock Sioux and #NoDAPL | 9/13/2016 |
| A Light Shines in the Dakotas | 9/14/2016 |
| Dakota Access Pipeline Water Protectors Being Forcibly Removed by Militarized Police | 10/27/2016 |
| Tell Big Banks to Divest From Dakota Access Pipeline | 11/2/2016 |
| Will Justice Ever Be Served | 11/4/2016 |
| Tens of Thousands #StandWithStandingRock | 11/16/2016 |
| Police In Standing Rock Spray Water Protectors With Water Cannons In Freezing Temperatures | 11/20/2016 |
| Standing Up for Standing Rock | 11/30/2016 |
| BREAKING: Dakota Access Pipeline Construction Halted! | 12/4/2016 |
| Breaking: Army Corps issues final approval for Dakota Access Pipeline – take action! | Undated |
| Take action: Tells Wells Fargo to divest from the Keystone XL and Dakota Access pipelines | Undated |

376.   The Enterprise also disseminated falsehoods about Energy Transfer by phone, through electronic mail, U.S. mail, and posts on social media platforms, such as Twitter, which resulted in direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and the identities of all enterprise members is not yet known, but members of the Enterprise engaged in the following phone calls, e-mails, and U.S. mailings as set forth in Table B, each constituting a separate mail or wire communication in furtherance of the fraudulent scheme:

## TABLE B

| ADDITIONAL MAIL AND WIRE FRAUD COMMUNICATIONS | | | | |
|---|---|---|---|---|
| SENDER/CALLER | RECIPIENT | DATE | SUBJECT | METHOD |
| 350.org | N/A | 8/25/2016 | "The brave and resilient Sioux people oppose the pipeline threatening their land. Will @HillaryClinton say #NoDAPL?" | Twitter |
| Rainforest Action Network; Bold Alliance; 350.org; Minnesota 350; 350 Madison; Greenpeace; Sierra Club | President Barack Obama | 8/25/2016 | Letter: Halt Construction and Repeal the Army Corps of Engineers Permits for the Dakota Access Pipeline Project | U.S. Mail or E-mail |
| Greenpeace | N/A | 8/30/2016 | "We have rights, and one of those rights is the right to clean water. #NoDAPL #WaterIsLife" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 9/3/2016 | "A Marine Corps veteran looks on in disbelief at #NoDAPL destroying sacred sites https://flic.kr/p/LJ9g4D tweet @potus ask him to step in" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 9/3/2016 | "Word from #StandingRock is police using dogs now on folks https://www.facebook.com/wrexie.bardaglio/posts | Twitter |

| | | | /10210438624779074 … where is @PHMSA_DOT or @Interior overseeing? #NODAPL" | |
|---|---|---|---|---|
| 350.org | N/A | 9/4/2016 | "Peaceful protestors defending their land vs fossil fuel execs deploying dogs? Time for @POTUS to take a side #NoDAPL" | Twitter |
| Rainforest Action Network | N/A | 9/4/2016 | "Standing with those taking a stand: Native American Protesters Attacked with Dogs and Pepper Spray" | Twitter |
| Bill McKibben (350.org) | N/A | 9/5/2016 | "Using dogs on demonstrators says something about your system. Something not good  #NoDAPL" | Twitter |
| Earthjustice | N/A | 9/5/2016 | "BREAKING: Standing Rock Sioux filed an emergency motion for TRO against DAPL after sacred site destroyed #nodapl http://ejus.tc/2bOADzY" | Twitter |
| 350.org | N/A | 9/6/2016 | "Fossil fuel companies sic dogs on peaceful protestors. The choice is clear: #noDAPL. #StandWithStandingRock" | Twitter |
| Bill McKibben (350.org) | N/A | 9/6/2016 | "Handy list of the banks paying for guard dogs to bite Native protectors (and build polluting pipeline) http://www.foodandwaterwatch.org/news/who%27s-banking-dakota-access-pipeline … #NoDAPL" | Twitter |
| 350.org | N/A | 9/6/2016 | "As bulldozers destroy burial sites, oil industry bullies try to provoke | Twitter |

| | | | violence from native leaders saying #NoDAPL" | |
|---|---|---|---|---|
| Bill McKibben (350.org) | N/A | 9/8/2016 | "#NoDAPL is a leadership test @HillaryClinton should not duck. When they sic dogs on people, it's time to speak out." | Twitter |
| Bill McKibben (350.org) | N/A | 9/8/2016 | "This is so foul. Docs show Big Oil demanded, and got, 'fast-track' review of Dakota pipeline by Obama admin #NoDAPL" | Twitter |
| 350.org | N/A | 9/8/2016 | "Climate justice and clean water go hand-in-hand. Time for our leaders to side with native protectors. #NoDAPL" | Twitter |
| Bill McKibben (350.org) | N/A | 9/16/2016 | "The numbers that had a whole new dimension to the #NoDAPL fight. This pipeline is another giant climate bomb" | Twitter |
| 350 Action | N/A | 9/16/2016 | "All pipelines leak. #NoDAPL" | Twitter |
| 350 Action | N/A | 9/16/2016 | "Dakota Access destroys sacred burial ground. It must be stopped. #NoDAPL http://thenaturalhistorymuseum.org/archaeologists-and-museums-respond-to-destruction-of-standing-rock-sioux-burial-grounds/ …" | Twitter |
| Greenpeace | N/A | 9/18/2016 | "It's not if a pipeline will spill, it's when. #NoDAPL" | Twitter |
| Bill McKibben (350.org) | N/A | 9/21/2016 | "1,200 archaeologists call for halt to Dakota pipeline, desecration of graves http://thenaturalhistorym | Twitter |

| | | | useum.org/archaeologists-and-museums-respond-to-destruction-of-standing-rock-sioux-burial-grounds/ … #NoDAPL | |
|---|---|---|---|---|
| 350 Action | N/A | 9/22/2016 | "Climate change is already here and building more pipelines will only worsen it. #NoDAPL" | Twitter |
| Greenpeace | N/A | 9/26/2016 | "Archaeologists are denouncing the Dakota Access pipeline for destroying Indigenous artifacts #NoDAPL http://bit.ly/2cOrjuf" | Twitter |
| Sierra Club | N/A | 9/26/2016 | "It's never a question of if a pipeline will spill, but rather a question of when: http://sc.org/2deBSbr #NoDAPL" | Twitter |
| 350.org | N/A | 9/27/2016 | "Happening now: police are blockading a peaceful rally by water protectors right now in ND. http://bit.ly/2d4u66g #NoDAPL | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 9/29/2016 | "First attack dogs, now chemicals being dumped on Native water protectors. Waiting for Dem leaders. Cops have loaded shot guns. #NoDAPL" | Twitter |
| Sierra Club | N/A | 9/29/2016 | "It's heartbreaking to see the unwarranted military-style response to a peaceful #NoDAPL prayer camp in North Dakota:" | Twitter |
| Greenpeace | N/A | 10/1/2016 | "Peaceful #NoDAPL demonstrators confronted by riot police during prayer ceremony. Please RT to spread the word." | Twitter |

| Greenpeace | N/A | 10/25/2016 | "It's not if, but when. A Pennsylvania pipeline burst, spilled 55,000 gallons of gasoline this weekend. http://bit.ly/2eDw0Io #NoDAPL" | Twitter |
|---|---|---|---|---|
| Annie Leonard (Greenpeace) | N/A | 10/27/2016 | "Protesters should not have to face intimidation by weapons of war. Resharing this in support of #NoDAPL http://usat.ly/2bTbAsk #WaterIsLife" | Twitter |
| Bill McKibben (350.org) | N/A | 10/29/2016 | "NYTimes reminds us that Dakota pipeline was originally going to go by Bismarck. But, white people. #NoDAPL http://nyti.ms/2dUFMTt" | Twitter |
| 350 Action | N/A | 10/30/2016 | "The #NoDAPL fight is an egregious example of the nexus between racism and climate injustice. #StandWithStandingRock" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 10/30/2016 | "Yes, Dakota Access pipeline has destroyed sacred sites. You can come up to ND and we would be happy to show you #NODAPL" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 11/2/2016 | "Brutal force happening now at Standing Rock #NoDAPL Pics by @joshfoxfilm, ABC pundit @erinschrode hit with rubber bullets @GStephanopoulos" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 11/2/2016 | "Dakota Access pipeline is for export using eminent domain for private gain and ignoring the Sovereign Rights of Indigenous Nations. #NoDAPL" | Twitter |

| Sierra Club | N/A | 11/2/2016 | "'There is no acceptable route for this dirty and dangerous pipeline.' Our statement in response to @POTUS: http://sc.org/2fvJUzo #NoDAPL" | Twitter |
|---|---|---|---|---|
| 350.org | N/A | 11/3/2016 | "More brutal attacks on peaceful water protectors as they defend sacred sites. @POTUS: Send DOJ observers now http://nbcnews.to/2fis1Rg  #NoDAPL" | Twitter |
| Sierra Club | N/A | 11/5/2016 | "A #NoDAPL Map: This pipeline could endanger the drinking water of millions. http://sc.org/2fyMB39 (@northlandiguana @HuffingtonPost)" | Twitter |
| BankTrack; Greenpeace; Rainforest Action Network; Sierra Club | Nigel Beck, Standard Bank, Chair of the Equator Principals Association; All Equator Principles Financial Institutions | 11/7/2016 | Concerning: Equator Principles climate commitments, and EPFI financing of the Dakota Access Pipeline, for discussion at your Annual Meeting and Workshop in London | U.S. Mail or E-mail |
| Rainforest Action Network | N/A | 11/7/2016 | ".@Citi says they consider #humanrights in financing. So why are they financing the Dakota Access Pipeline? #NoDAPL http://www.ran.org/ran_statement_on_citigroup_s_leading_role_in_financing_dakota_access_pipeline …" | Twitter |
| Greenpeace | N/A | 11/15/2016 | "Peaceful Water Protectors at Standing Rock have been met with violence from private | Twitter |

| | | | security & construction crews. We stay for them. #NoDAPL" | |
|---|---|---|---|---|
| Earthjustice | N/A | 11/15/2016 | "U.N. officials denounce 'inhuman' treatment of Native American pipeline protesters http://ejus.tc/2fe9iEU #NoDAPL #StandWithStandingRock k" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 11/20/2016 | "ND and Big Oil are tear gassing and putting water hoses on #NoDAPL folks right now in 20 degree weather and at night https://www.facebook.com/myron.dewey1?fref=ts …" | Twitter |
| Sierra Club | N/A | 11/20/2016 | "NOW: Shocking livestream from #standingrock of peaceful water protectors sprayed w/ water in freezing temperatures bit.ly/2feDhMa" | Twitter |
| Greenpeace | N/A | 11/24/2016 | "As you enjoy this day with your family, don't forget that Indigenous people are still under attack. #NoDAPL http://huff.to/2gmUqpi" | Twitter |
| Jane Kleeb (Bold Alliance) | N/A | 11/26/2016 | "If you have to build your pipeline using razor wire, guns, tear gas and extreme violence maybe you are building the wrong America? #NODAPL" | Twitter |
| Greenpeace | N/A | 11/27/2016 | "NOW: 100s gather to demand @TheJusticeDept intervenes & stops the violence used against #StandingRock water protectors. #NoDAPL" | Twitter |

| BankTrack; 350 Central Maine; 350 Colorado; 350 Louisiana; 350 Maine; 350 San Antonio; 350.org; 350.org Belgium; 350.org France; 350.org Japan; 350NJ.org; Bold Alliance; Bold Iowa; Bold Louisiana; Bold Nebraska; Bold Oklahoma; Greenpeace France; Greenpeace International; Greenpeace Netherlands; Greenpeace USA; Rainforest Action Network; Sierra Club | Takashi Oyamada, Bank of Tokyo-Mitsubishi UFJ[9] | 11/30/2016 | Concerning: Halt your support to the Dakota Access Pipeline | U.S. Mail or E-mail |
| Jane Kleeb (Bold Alliance) | N/A | 12/1/2017 | "Dakota Access CEO flat out lying http://bismarcktribune.com/news/state-and-regional/audio-tribe-objected-to-pipeline-nearly-years-before-lawsuit/article_51f94b8b-1284-5da9-92ec-7638347fe066.htm … Chairman with Standing Rock and other Sioux Nations objected from day 1 #NoDAPL" | Twitter |
| Earthjustice | N/A | 12/2/2016 | "Tribes ask International Human Rights | Twitter |

---

[9] BankTrack and the other Enterprise Members sent identical letters to the CEOs of sixteen other banks: Johannes-Jörg Riegler, BayernLB; Carlos Torres Vila, BBVA; Jean-Laurent Bonnafé, BNP Paribas; Michael Corbat, Citigroup; Timothy Sloan, Wells Fargo; Bharat Masrani, TD Bank Group; Takeshi Kunibe, SMBC; Frédéric Oudéa, Société Générale; Laurent Mignon, Natixis; Nobuhide Hayashi, Mizuho Bank; Carlo Messina, Intesa SanPaolo; Ralph Hamers, ING; Jiang Jianqing, ICBC; Rune Bjerke, DNB Norway; Philippe Brassac, Credit Agricole; William H. Rogers, Jr., Suntrust; and Nobuhide Hayashi, Mizuho Bank; Tsuyoshi Kunibe, Sumitomo Mitsui; Takashi Oyamada, Bank of Tokyo-Mitsubishi UFJ.

| | | | Commission to stop violence against Water Protectors at Standing Rock http://ejus.tc/StandingRockFAQ  #NoDAPL" | |
|---|---|---|---|---|
| Rainforest Action Network | N/A | 12/3/2016 | "The water protectors are being attacked in the name of profit." #NoDAPL | Twitter |
| Sierra Club | N/A | 12/6/2016 | "It's not an 'if' a pipeline will spill, it's when" | Twitter |
| Rainforest Action Network | N/A | 12/27/2016 | "DAPL is a direct threat to drinking water for millions of people." #DefundDAPL #NoDAPL | Twitter |
| Rainforest Action Network | N/A | 12/28/2016 | "We can't let the destructive DAPL project continue." #NoDAPL | Twitter |
| Greenpeace | N/A | 1/25/2017 | "If this administration is going to fast track environmental destruction then relentless resistance will be the response. #NoDAPL #NoKXL" | Twitter |
| Bold Nebraska; Bold Alliance | N/A | 2/1/2017 | "UPDATE: Army Corps takes 'initial steps' to fast-track #DakotaAccess; final easement NOT granted: http://reuters.com/article/us-northdakota-pipeline-army-idUSKBN15G4RF… #NoDAPL @USACEHQ" | Twitter |
| Mary Sweeters (Greenpeace) | N/A | 2/2/2017 | "An Environmental Impact Statement is underway for the Dakota Access pipeline, as it should've been done earlier. Pls comment! #NoDAPL" | Twitter |
| Bill McKibben (350.org) | N/A | 2/7/2017 | "Just a reminder that building Dakota pipeline | Twitter |

| | | | is carbon equivalent of building 30 coal-fired power plants http://priceoffoil.org/2016 /09/12/the-dakota-access-pipeline-will-lock-in-the-emissions-of-30-coal-plants/ … #nodapl" | |
| Greenpeace | N/A | 2/20/2017 | "Pope Francis: Indigenous people should have final say about their land http://bit.ly/2lVMldD #NoDAPL" | Twitter |
| Jan Hasselman | N/A | 3/22/2017 | Accusing Energy Transfer of endangering water and circumventing environmental review | Phone |
| Greenpeace | N/A | 4/13/2017 | "Try a bottle of pure Dakota spring water #NoDAPL #WaterIsLife Brought to you by @CreditSuisse" | Twitter |

377.     The Defendants have also processed millions of dollars in fraudulently induced donations over the wires in thousands of individual transactions.  These transactions were made in furtherance of the Enterprise's unlawful scheme.  Each such transaction constitutes a predicate act.

378.     In addition, the Defendants have transmitted funds from inside the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States with the intent that the funds promote the carrying on of the Enterprise's unlawful racketeering activity.  Each such transfer constitutes a predicate act.

379.     The Enterprise took direct action against Energy Transfer's critical business constituencies, including banks providing financing to Energy Transfer and the Company's investors, whereby the Enterprise issued extortive threats demanding that such banks terminate

their relationships with Energy Transfer and endorse the Enterprise's position and efforts, which provided a substantial benefit to the Enterprise in the form of enhanced fundraising potential.

380.    The Enterprise directly incited and perpetrated acts of terrorism in violation of the U.S. Patriot Act, including (i) attempted and actual destruction of the pipeline; (ii) arson of property used in interstate commerce, including the pipeline, construction equipment, and private and public property; (iii) arson and bombing of federal property including during attacks on law enforcement; and (iv) damaging federal property, including by burning federal lands and leaving 835 dumpsters of trash and debris at protest camps.

381.    The Enterprise orchestrated cyber-attacks on Energy Transfer's computer systems and websites, including (i) DDoS attacks which entailed many thousands of individual wire communications aimed at overwhelming and disabling Energy Transfer's computer systems and websites, (ii) "credential harvesting" spam attacks aimed at stealing personal and Company information that the Enterprise could misappropriate in furtherance of its unlawful campaign; and (iii) doxing" against Energy Transfer employees in an effort to demonize them by their mere association with the Company and implicitly inviting attacks on those employees using the improperly published personal information.   Each of the thousands of wire communications making up these cyber-attacks were made in furtherance of the Enterprise's unlawful "campaign" against Energy Transfer, and each such communication constitutes a separate predicate act.

382.    The Defendants have also travelled in interstate and foreign commerce and used interstate and foreign commerce facilities with intent to commit or otherwise promote or facilitate the commission of the predicate acts alleged herein, and the Defendants did commit and

promote the commission of the predicate acts.  Each such use of the interstate or foreign

commerce facilities constitutes a predicate act.

383.    Each of the predicate acts referred to in the preceding paragraphs was for the

purpose of executing the Enterprise's fraudulent scheme, and Defendants and Enterprise

members engaged in such acts with the specific intent of furthering that scheme, willfully and

with knowledge of its falsity.  Each of the Defendants performed or participated in the

performance of at least two of the predicate acts.

384.    The conduct and actions set forth herein were related to each other by virtue of:

(i) common participants; (ii) a common victim; and (iii) the common purpose and common result

of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize

donations and cause harm to Energy Transfer's business and reputation.

385.    The Defendants' activities were interrelated, not isolated, and involved a

calculated series of repeated violations of the law in order to conceal and promote fraudulent

activity.  The Enterprise has existed with the current members and others as, yet unknown since

at least April 2016, and the conduct and activities have continued as of the date of this

Complaint, and the Enterprise's racketeering activities threaten to continue in the future.

386.    The Defendants' direct and indirect participation in the Enterprise's affairs

through the pattern of racketeering and activity described herein constitutes a violation of 18

U.S.C. § 1962(c).

387.    As a direct and proximate cause of the Defendants' violations of 18 U.S.C.

§1962(c), Plaintiffs have sustained damage to their business, property, and reputation, including

injury by reason of the predicate acts constituting the pattern of racketeering activity set forth

above that was not only foreseeable but intended as an objective of the predicate acts.  Plaintiffs'

damages include, but are not limited to:  impaired access to the capital markets and increased cost of capital; decreased market capitalization; lost profits; lost relationships with investors, lending partners, and other contractual relationships; business disruption losses and expenses; mitigation costs, substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces, communities, and government agencies critical to Plaintiffs' business; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

388.    As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million. Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT II

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(a)
### (AGAINST ALL DEFENDANTS)

389.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

390.    The Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in, or the activities of which affected, interstate and/or foreign commerce.

391.    In furtherance of the Enterprise, Defendants committed the predicate racketeering acts as pleaded herein.  It was the purpose of the Enterprise to create and disseminate false and misleading reports and information concerning Energy Transfer, under the guise of protecting

the environment, but in truth, for the unlawful purpose of soliciting fraudulent donations from the public at-large.  This widespread dissemination scheme was intended to, and did, result in substantial profits for the members of the Enterprise, and caused enormous harm to Energy Transfer insofar as it funded the Enterprise's racketeering activity against Plaintiffs which intentionally damaged its business and property.

392.    The Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) money laundering in violation of 18 U.S.C. §§ 1956-57; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952; (vi) interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314-15; (vii) destruction of an energy facility in violation of 18 U.S.C. § 1366(a); (ix) destruction of a hazardous liquid pipeline facility in violation of 18 U.S.C. § 60123(b); (ix) arson and bombing of government property risking death in violation of 18 U.S.C. § 844(f)(2); (x) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (xi) injuring and committing depredation to federal property in violation of 18 USC § 1361; and (xii) corresponding North Dakota statutes criminalizing the same conduct, and which constitute a pattern of racketeering activity pursuant to § 1961(5).

393.    In conducting the affairs of the Enterprise, Defendants used and invested income that was derived from the pattern of racketeering activity, directly or indirectly, in the operations of the Enterprise, which are entities and an enterprise engaged in, and the activities of which affect, interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).  Specifically, Defendants used funds they fraudulently procured through the alleged pattern of predicate acts

to:  (i) fund the Enterprise; (ii) fund the dissemination of materially false and fraudulent information used to induce donors to make contributions to the Enterprise and individual Enterprise Members; and (iii) fund the expanded attack on Energy Transfer and its relationships with creditors, investors, and other critical business constituents as alleged in this Complaint, including but not limited to the use of illicit funds from fraudulently induced donations to fund the direct actions against the banks financing Energy Transfer that caused the loss of those financing relationships, increased financing and other costs; (iv) fund acts of terrorism under the U.S. Patriot Act as alleged in this Complaint, including but not limited to the use of illicit funds from fraudulently induced donations to fund destruction of the pipeline and arson on construction equipment that caused delays in construction, harm and destruction to construction equipment and the pipeline, increased expenses to secure the pipeline against such attacks; and other costs, in an amount to be determined at trial but not less than $300 million.

394.    Accordingly, the racketeering activity consisted of multiple, related acts perpetrated during the Scheme Period that are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. §§ 1956-57 (relating to money laundering); 18 U.S.C. § 60123(b) (destruction of a hazardous liquid pipeline facility); 18 U.S.C. § 844(f)(2) (arson and bombing of government property); 18 U.S.C. § 844(i) (arson and bombing of property used in interstate commerce), as well as the other predicate acts alleged herein that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

395.    As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(a), Plaintiffs have sustained damage to their business, property and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above, as well as damage resulting from the Enterprise's use and investment of the illicit funds

derived through those predicate acts to target and harm Energy Transfer's business, property and reputation.  Plaintiffs' damages include, but are not limited to: impaired access to the capital markets and increased cost of capital; decreased market capitalization; lost profits; lost relationships with investors, lending partners, and other contractual relationships; business disruption losses and expenses; substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces, communities, and government agencies critical to Plaintiffs' business; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

396.    As a result of the violations of 18 U.S.C. § 1962(a), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million. Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(a), and disgorgement of Defendants' illicit proceeds.

## COUNT III

### CONSPIRACY IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (AGAINST ALL DEFENDANTS)

397.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

398.    During the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired to, and did further the efforts of the Enterprise to perpetrate the scheme against Energy Transfer through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(a).

399.    In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) money laundering in violation of 18 U.S.C. §§ 1956-57; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952; (vi) interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314-15; (vii) destruction of an energy facility in violation of 18 U.S.C. § 1366(a); (viii) destruction of a hazardous liquid pipeline facility in violation of 18 U.S.C. § 60123(b); (ix) arson and bombing of government property risking death in violation of 18 U.S.C. § 844(f)(2); (x) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (xi) injuring and committing depredation to federal property in violation of 18 USC § 1361; and (xii) corresponding North Dakota statutes criminalizing the same conduct, as set forth in N.D.C.C1 Ch. 12.1-06.1, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

400.    Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Defendants, for the purpose of executing the scheme to solicit fraudulent donations and harm Energy Transfer's business: (i) the preparation of false and misleading reports concerning Energy Transfer and DAPL; (ii) the broad dissemination of the false and defamatory reports and other statements through the Enterprise's various websites and other internet platforms, such as Twitter, and in direct emails, telephone communications, and U.S. mail; (iii) communication and coordination with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Energy Transfer; (iv) the dissemination of the false and misleading allegations directly to government regulators

and officials, and Energy Transfer's creditors, investors, and other critical market constituencies through email, U.S. mail, and phone; (v) the attempted infiltration of Energy Transfer's computer systems to obtain and misappropriate proprietary and other trade secret information from Energy Transfer; (vi) cyber-attacks and attempts to disable Energy Transfer's computer systems and websites; (vii) that harassment of Energy Transfer's creditors with extortionate threats; (viii) the transmission of extortionate threats of death, serious bodily harm, and crippling cyber-attacks; (ix) the solicitation of fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (x) the processing of millions of dollars of fraudulently induced donations in furtherance of the Enterprise's unlawful scheme; (xi) the wiring of fraudulently obtained funds to promote and sustain the Enterprise's unlawful "campaign" against Energy Transfer; (xii) the submission of materially false and misleading tax submissions and financial information; (xiii) the perpetration of acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property; (xiv) travelling in and using interstate and foreign commerce facilities for the purpose of committing and facilitating the commission of the predicate acts alleged herein in furtherance of the Enterprise's unlawful campaign; and (xv) illegal drug trafficking.

401. It was specifically intended and foreseen by Defendants that the Enterprise would engage in, and conduct activities which affected interstate commerce. Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

402.     The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  These activities in furtherance of the unlawful campaign against Energy Transfer have extended for at least fourteen months, have continued up to the commencement of this action, and threaten to continue in the future. The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), in violation of 18 U.S.C. § 1962(d).

403.     Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), and the overt acts taken in furtherance of that conspiracy, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Plaintiffs' damages include, but are not limited to: impaired access to the capital markets and increased cost of capital; decreased market capitalization; lost profits; lost relationships with investors, lending partners, and other contractual relationships; business disruption losses and expenses; substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces, communities, and government agencies critical to Plaintiffs' business; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

404.     As a result of the violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million. Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(d), together with interest, costs, and

attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT IV

### RACKETEERING IN VIOLATION OF N.D.C.C. § 12.1-06.1-03(2)
### (AGAINST ALL DEFENDANTS)

405.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

406.     Throughout the Scheme Period, Defendants and enterprise members were associated in fact and comprised an "enterprise" within the meaning of N.D.C.C. §§ 12.1-06.1-01(2)(b) and 12.1-06.1-03(2), which was engaged in, or the activities of which affected, interstate or foreign commerce.

407.     During the Scheme Period, each of the Defendants willfully, knowingly, and unlawfully conduct and participate in the efforts of the Enterprise to perpetrate the scheme against Plaintiffs through a pattern of racketeering activity within the meaning of N.D.C.C. §§ 12.1-06.1-01(2)(e) and (f) in violation of N.D.C.C. § 12.1-06.1-03(2).

408.     The Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to, the following predicate racketeering acts and attempts to commit such racketeering acts: (i) theft of property by deception in violation of N.D.C.C. § 12.1-23-02; (ii) computer fraud in violation of N.D.C.C. § 12.1-06.1-08(1); (iii) fraud in violation of N.D.C.C. § 12.1-06.1-01(2)(f)(15); (iv) unauthorized use of personal identifying information in violation of N.D.C.C. §§ 12.1-23-11(2) and (3); (v) unlawful threats to public servants in violation of N.D.C.C. § 12.1-12-06(2); (vi) willfully tampering with and damaging Plaintiffs' property in violation of N.D.C.C. §§ 12.1-21-05(a) and (b); (vii) terrorizing in violation of N.D.C.C. § 12.1-17-04; (viii) inciting riot in violation of N.D.C.C. § 12.1-25.01; (ix) leading a

criminal association in violation of N.D.C.C. § 12.1-06.1-02; and (x) conspiring to violate each of the above predicate acts in violation of N.D.C.C. § 12.1-06-04.

409.    Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of:  (i) preparing false and misleading reports concerning Energy Transfer and DAPL; (ii) broadly disseminating the false and defamatory reports and other statements through the Enterprise's various websites and other internet platforms, such as Twitter, and in direct emails, telephone communications and U.S. mail; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Energy Transfer; (iv) disseminating the false and misleading allegations directly to government regulators and officials, and Energy Transfer's creditors, investors, and other critical market constituencies through email, U.S. mail, and phone; (v) infiltrating Energy Transfer's computer systems to obtain and misappropriate proprietary and other trade secret information from Energy Transfer; (vi) attacking and disabling Energy Transfer's computer systems and websites; (vii) harassing Energy Transfer's creditors with extortionate threats; (viii) transmitting extortionate threats of death, serious bodily harm, and crippling cyber-attacks; (ix) soliciting fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (x) perpetrating acts violence, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of

property used in interstate commerce, and depredation of government property; (xi) wiring

fraudulently obtained funds to promote and sustain the Enterprise's unlawful "campaign" against

Energy Transfer; (xii) submitting materially false and misleading tax submissions and financial

information.  Defendants committed and participated in these unlawful acts willfully and with

knowledge of their illegality; and (xiii) illegal drug-trafficking.  These predicate acts were

committed for financial gain in furtherance of the Enterprise's common purpose, which was to

generate increased donations to the Enterprise members.

410.    Each such use of a wire communication and/or mailing in connection with the

described scheme constitutes a separate and distinct predicate racketeering act within the

meaning of N.D.C.C. § 12.1-06.1-01(2)(f), as they were each committed in furtherance of a the

Enterprise's fraudulent scheme to profit from their unlawful "campaign" against Energy Transfer

and each caused direct injury to Energy Transfer's business, property, and reputation.

411.    The Enterprise authored and published numerous reports and other Energy

Transfer-related updates and blog posts on their websites, as set forth in Table A (supra ¶ 375).

Each publication constitutes a separate predicate racketeering act.

412.    The Enterprise also disseminated falsehoods about Energy Transfer by phone,

through electronic mail, U.S. mail, and posts on social media platforms, such as Twitter, which

resulted in direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and

the identities of all enterprise members is not yet known, but members of the Enterprise engaged

in the phone calls, e-mails, and U.S. mailings set forth in Table B, each constituting a separate

predicate racketeering act.

413.    The Enterprise took direct action against Energy Transfer's critical business

constituencies, including banks providing financing to Energy Transfer and the Company's

investors, whereby the Enterprise issued extortive threats demanding that such banks terminate their relationships with Energy Transfer and endorse the Enterprise's position and efforts, which provided a substantial benefit to the Enterprise in the form of enhanced fundraising potential.

414.    The Enterprise directly incited and perpetrated acts of violence, including (i) attempted and actual destruction of the pipeline; (ii) arson of property used in interstate commerce, including the pipeline, construction equipment, and private and public property; (iii) arson and bombing of federal property including during attacks on law enforcement; and (iv) damaging federal property, including by burning federal lands and leaving 835 dumpsters of trash and debris at protest camps.

415.    The Enterprise orchestrated cyber-attacks on Energy Transfer's computer systems and websites, including (i) DDoS attacks which entailed many thousands of individual wire communications aimed at overwhelming and disabling Energy Transfer's computer systems and websites, (ii) "credential harvesting" spam attacks aimed at stealing personal and Company information that the Enterprise could misappropriate in furtherance of its unlawful campaign; and (iii) "doxing" against Energy Transfer employees in an effort to demonize them by their mere association with the Company and implicitly inviting attacks on those employees using the improperly published personal information.   Each of the thousands of wire communications making up these cyber-attacks were made in furtherance of the Enterprise's unlawful "campaign" against Energy Transfer, and each such communication constitutes a separate predicate act.

416.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and Defendants and enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and

with knowledge of its falsity.  Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

417.    The conduct and actions set forth herein were related to each other by virtue of: (i) common participants; (ii) a common victim; and (iii) the common purpose and common result of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize donations and cause harm to Energy Transfer's business and reputation.

418.    The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conceal and promote fraudulent activity.  The Enterprise has existed with the current members and others as yet unknown since at least April 2016, and the conduct and activities have continued as of the date of this Complaint, and the Enterprise's racketeering activities threaten to continue in the future.

419.    The Defendants' direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of N.D.C.C. § 12.1-06.1-03(2).

420.    As a direct and proximate cause of the Defendants' violations of N.D.C.C. § 12.1-06.1-03(2), Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended and an objective of the predicate acts. Plaintiffs' damages include, but are not limited to:  impaired access to the capital markets and increased cost of capital; decreased market capitalization; lost profits; lost relationships with investors, lending partners, and other contractual relationships; business disruption losses and expenses; substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces, communities, and government agencies critical to Plaintiffs'

business; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

421.     As a result of the violations of N.D.C.C. § 12.1-06.1-03(2), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with N.D.C.C. § 12.1-06.1-05(1), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of N.D.C.C. § 12.1-06.1-03(2), and disgorgement of Defendants' illicit proceeds.

422.     Pursuant to N.D.C.C. § 12.1-06.1-05(2), Plaintiffs are also entitled to injunctive relief to prevent, restrain and remedy the Enterprise's pattern of racketeering activity and violations of N.D.C.C. § 12.1-06.1-03(2).

## COUNT V

### DEFAMATION
### (AGAINST ALL DEFENDANTS)

423.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

424.     As set forth herein, Defendants knowingly and intentionally published false and injurious statements about Energy Transfer, including, among other things, that:

    (a)  DAPL traverses SRST tribal treaty lands;

    (b)  DAPL will poison SRST's water supply;

    (c)  DAPL will catastrophically alter the climate;

    (d)  DAPL was routed and approved without adequate environmental review or consultation with SRST;

    (e)  Energy Transfer used excessive and illegal force against peaceful protestors; and

    (f)  Energy Transfer intentionally desecrated SRST's cultural resources.

425.     Defendants published these false and misleading statements in many publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to the public, government regulators and officials, and Energy Transfer's creditors, investors, and other critical market constituents.

426.     The false and defamatory statements set forth herein concerning Energy Transfer were made and published with actual malice, as such statements were made by Defendants with knowledge of their falsity or reckless disregard for their truth.

427.     Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of injuring Energy Transfer's reputation, preventing others from doing business with Energy Transfer, and interfering with Energy Transfer's existing business relationships.  Those third-parties include, among others, Energy Transfer's creditors, investors, and other critical market constituents, as well as the general public, government agencies and officials, and other critical market constituents.

428.     Defendants' false statements directly harmed Energy Transfer's business, property, and reputation in numerous specific ways, including, but not limited to: lost financing; lost profits; increased expenses; legal fees; and costs expended to mitigate the impact of Defendants' malicious campaign.

429.     Defendants' publication of the false and defamatory statements cited herein have proximately caused Energy Transfer to suffer monetary damages in an amount to be determined at trial, but which constitute no less than $300 million.

## COUNT VI

### TORTIOUS INTERFERENCE WITH
### BUSINESS
### (AGAINST ALL DEFENDANTS)

430.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

431.     Energy Transfer had many existing and prospective valid business relationships with third-parties, including, but not limited to: (i) existing and prospective creditors; (ii) existing and prospective investors; and (iii) existing and prospective long-term capacity transportation shippers.

432.     Each of the Defendants knew of Energy Transfer's existing and prospective business relationships with these third-parties.

433.     Defendants intentionally maliciously interfered with Energy Transfer's existing and prospective business relationships with these third-parties by employing wrongful, tortious and unlawful means, including, but not limited to, the dissemination of false, misleading and defamatory statements concerning Energy Transfer's business and DAPL.  This interference was committed intentionally and without justification or excuse and was carried out by, among other things:

> (a) The publication of false, misleading and defamatory statements in numerous publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to Energy Transfer's creditors, investors, and other critical market constituents, government agencies and regulators and the public at-large.

> (b) Organizing and carrying out "brand-damaging campaigns" against Energy Transfer's creditors.

> (c) Organizing and carrying out hundreds of protests at Energy Transfer's headquarters, at banks financing Energy Transfer's business and its construction of the DAPL, and at the headquarters of the United States Army Corps of Engineers;

(d) Issuing Energy Transfer's critical business constituencies extortive public demands and threats to sever their ties with Energy Transfer or face crippling boycotts and other illegal attacks;

(e) Inciting and perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property

(f) Organizing and carrying out cyber-attacks against Energy Transfer; and

(g) Other overt acts to harm Energy Transfer's business and reputation.

434.   Energy Transfer had a reasonable expectation of obtaining the benefits of these existing and prospective business relationships.  Defendants' wrongful actions directly caused Energy Transfer to lose the business relationships described herein, thereby causing Energy Transfer to suffer significant economic damages.  Each of the Defendants was aware of, and intended to cause, this detrimental impact on Energy Transfer's existing and prospective business relationships.

435.   As a direct and proximate result of Defendants' intentional interference with Energy Transfer's existing and prospective business relationships with third-parties, Energy Transfer's business relationships were damaged, including but not limited to: (i) existing and prospective creditors; (ii) existing and prospective investors; and (iii) existing and prospective long-term capacity transportation shippers.

436.   The Defendants' wrongful, tortious, and unlawful interference with Energy Transfer's existing and prospective business relationships caused Energy Transfer to suffer monetary damages, stemming from, among other things, lost financing, increased cost of capital, increased operating costs, lost revenue, injury to reputation, mitigation costs and attorney's fees in an amount to be determined at trial, but which constitute no less than $300 million.

## <u>COUNT VII</u>

## **COMMON LAW CIVIL CONSPIRACY**
## **(AGAINST ALL DEFENDANTS)**

437.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

438.    As set forth herein, each of the Defendants, together with others, conspired with respect to Counts V through VI, and acted in concert to commit unlawful acts.  Each of the Defendants shared the same conspiratorial objective, which was to harm Energy Transfer and interfere with Energy Transfer's existing and prospective business relationships in order to induce fraudulent donations.

439.    Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

(a) The publication of false, misleading and defamatory statements in numerous publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to Energy Transfers' creditors, investors, and other critical market constituents, government agencies and regulators and the public at-large.

(b) Organizing and carrying out "brand-damaging campaigns" against Energy Transfer's creditors.

(c) Organizing and carrying out hundreds of protests at Energy Transfer's headquarters, at banks financing Energy Transfer's business and its construction of the DAPL, and at the headquarters of the United States Army Corps of Engineers;

(d) Issuing Energy Transfer's critical business constituencies extortive public demands and threats to sever their ties with Energy Transfer or face crippling boycotts and other illegal attacks;

(e) Inciting and perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property

(f) Organizing and carrying out cyber-attacks against Energy Transfer; and

(g) Other overt acts to harm Energy Transfer's business and reputation.

440.    The false and injurious statements about Energy Transfer created and disseminated by the defendants included, among others, that:

(a) DAPL traverses SRST tribal treaty lands;

(b) DAPL will poison SRST's water supply;

(c) DAPL will catastrophically alter the climate;

(d) DAPL was routed and approved without consultation with SRST;

(e) Energy Transfer used excessive and illegal force against peaceful protestors; and

(f) Energy Transfer intentionally desecrated SRST's cultural resources.

441.    At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

442.    As a direct, proximate result of the operation and execution of the conspiracy, Energy Transfer has been injured and suffered damages in an amount to be proven at trial, but which constitute no less than $ million.

## <u>DEMAND FOR JURY TRIAL</u>

Demand is hereby made for a trial by jury for all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment:

(a)     Awarding Plaintiffs compensatory damages in amounts to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

(b)     Awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial;

(c)     Awarding Plaintiffs treble damages, costs of suit, attorney's fees and costs of litigation under 18 U.S.C. § 1964(c) and N.D.C.C. § 12.1-06.1-05(1), in amounts to be determined at trial;

      (d)    Awarding Plaintiffs injunctive relief preventing Defendants from engaging in continued wrongful activity and disgorgement, as set forth herein, in the form that the Court may determine is just and proper, and requiring them to disgorge all monies they have improperly secured;

      (e)    Prejudgment and post-judgment interest; and

      (f)    Such other and further relief as is just and proper.

Dated:  August 22, 2017

**VOGEL LAW FIRM**

BY:  */s/ Robert B. Stock*_____
     Robert B. Stock (#05919)
     218 NP Avenue
     PO Box 1389
     Fargo, ND 58107-1389
     Telephone:  701.237.6983
     Email:  rstock@vogellaw.com
            RBSLitGroup@vogellaw.com (service)

     And


**KASOWITZ BENSON TORRES LLP**

Michael J. Bowe (*pro hac* application forthcoming)
Jennifer S. Recine (*pro hac* application forthcoming)
Lauren Tabaksblat (*pro hac* application forthcoming)

1633 Broadway
New York, NY 10019
212.506.1700
mbowe@kasowitz.com
jrecine@kasowitz.com
ltabaksblat@kasowitz.com

ATTORNEYS FOR PLAINTIFFS