**UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| ) | |
| ) | |
| ENERGY TRANSFER EQUITY, L.P., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | NO. 17-CV-00173-DLH |
| ) | |
| GREENPEACE INTERNATIONAL, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**GREENPEACE INTERNATIONAL AND GREENPEACE, INC.'S
MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)
AND MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ................................................................................5

    A.    THE INSTANT LAWSUIT ..............................................................5

        1.    PARTIES ...........................................................................5

            a. Greenpeace Entities.................................................5

            b. Plaintiff ....................................................................6

            c. Other Parties and Non-Parties ................................7

    B.    THE SRST LAWSUIT ....................................................................7

    C.    THE *RESOLUTE v. GREENPEACE* LAWSUIT AND DISMISSAL ...................8

ARGUMENT ......................................................................................................9

    A.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ...................................................................9

        1.    Applicable Pleading Standards .................................................10

        2.    Plaintiff Fails to Plead a Plausible Claim for Defamation .......................11

            a. Traditional Advocacy Is Protected by the First Amendment ...............11

            b. Plaintiff Cannot Combine Defendants' and Non-Parties' Speech ........13

            c. Failure to Plead Statements with Specificity ........................15

            d. Greenpeace's Challenged Statements are Protected Opinion ...............16

            e. Plaintiff Cannot Plausibly Plead Statements Made with Actual Malice ...................21

            f. Greenpeace's Statements are Privileged.................................25

        3.    Energy Transfer Fails to Plead a Plausible Claim Under RICO ...............26

            a. The RICO Elements ................................................29

            b. Energy Transfer Has Not Plausibly Pled a RICO "Enterprise" ............30

     i. Common Purpose..................................................................31

     ii. Relationships...................................................................34

     iii. Application of the above elements ...........................................35

   c. Energy Transfer Has Not Plausibly Pled "Conduct"
    of an Enterprise .......................................................................40

   d. Plaintiff Has Not Plausibly Pled a "Pattern" of
    Racketeering Activity ...............................................................42

   e. Plaintiff Has Not Plausibly Pled Any Predicate
    Criminal Acts ..........................................................................43

   f. Plaintiff Cannot Plausibly Plead Proximate Cause...............................49

  4. The Tortious Interference Claims Should Be Dismissed...........................52

B. THE COURT SHOULD DISMISS OR TRANSFER FOR LACK
 OF VENUE...................................................................................54

  1. The Court Should Dismiss GPI for Lack of Jurisdiction Pursuant to
   Rule 12(b)(2)...........................................................................54

  2. The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)................55

   a. Convenience of the Parties...................................................56

   b. Location of Witnesses and Fact Discovery...........................57

   c. Interests of Justice ...............................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ............................................................16

*Abbas v. Foreign Policy Grp.*, *LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) .............................61

*Allstate Ins. Co. v. Donovan*,
    No. H-12-0432, 2012 WL 2577546 (S.D. Tex. July 3, 2012) ................................36

*Almanza v. United Airlines, Inc.*,
    851 F.3d 1060 (11th Cir. 2017) ............................................................35

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) .....................................................................11, 49

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................ *passim*

*Atkinson v. McLaughlin*,
    462 F. Supp. 2d 1038 (D.N.D. 2006) .................................................52, 53

*Atlas Pile Driving Co. v. DiCon Fin. Co.*,
    886 F.2d 986 (8th Cir. 1989) .......................................................31, 44

*Avery v. Ward*,
    No. 1:16-cv-00055, 2017 WL 5451743 (D.N.D. 2017) ....................................60

*Baker v. IBP, Inc.*,
    357 F.3d 685 (7th Cir. 2004) ...........................................................33

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ..........................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................ *passim*

*Bell v. Rosen*,
    No. CV214-127, 2015 WL 5595806 (S.D. Ga. Sept. 22, 2015) ............................59

*Bennett v. Berg*,
    685 F.2d 1053 (8th Cir. 1982) ..........................................................10

*Bennett v. Berg*,
    710 F.2d 1361 (8th Cir. 1983) .................................................................40

*Bennett v. Google, Inc.*,
    No. 1:16-CV-02283 (TFH), 2017 WL 2692607 (D.D.C. June 21, 2017) ..............................14

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union,*
    *Local 655*,
    39 F.3d 191 (8th Cir. 1994) ...........................................................2, 28, 53

*Biro v. Condé Nast*,
    807 F.3d 541 (2d Cir. 2015)..........................................................15, 24

*Blatty v. New York Times Co.*,
    42 Cal. 3d 1033 (1986) .................................................................28

*Bose Corp. v. Consumers Union*,
    466 U.S. 485 (1985) .....................................................................29

*Bothuell v. Grace*,
    No. 16-11009, 2017 WL 892343 (E.D. Mich. Feb. 16, 2017), *report and*
    *recommendation adopted sub nom. Bothuell v. Grace*, No. 16-11009, 2017
    WL 878026 (E.D. Mich. Mar. 6, 2017) .................................................26

*Bowman v. W. Auto Supply Co.*,
    985 F.2d 383 (8th Cir. 1993) ...........................................................29

*Boyle v. United States*,
    556 U.S. 938 (2009)......................................................................31

*Brodkorb v. Minn.*,
    No. Civ. 12-1958 SRN/AJB, 2013 WL 588231 (D. Minn. Feb. 13, 2013). ...........................21

*Brokerage Concepts v. U.S. Healthcare*,
    140 F.3d 494 (3d Cir. 1998).............................................................48

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    713 F.2d 262 (7th Cir. 1983) (*dictum*)...................................................23

*Brown v. Kerkhoff*,
    504 F. Supp. 2d 464 (S.D. Iowa 2007) ...................................................57

*Browning v. Flexsteel Indus., Inc.*,
    955 F. Supp. 2d 900 (N.D. Ind. 2013) ...................................................34

*Buttons v. Nat'l Broad. Co.*,
    858 F. Supp. 1025 (C.D. Cal. 1994) ....................................................14

*CACI Premier Tech. v. Rhodes,*
  536 F.3d 280 (4th Cir. 2008) .......................................................................24

*Calcasieu Marine Nat'l Bank v. Grant,*
  943 F.2d 1453 (5th Cir. 1991) ......................................................................27

*Campbell v. Citizens for an Honest Gov't, Inc.,*
  255 F.3d 560 (8th Cir. 2001) ..............................................................15, 25

*Catchai v. Fort Morgan Times,*
  No. 15-CV-00678-MJW, 2015 WL 6689484 (D. Colo. Nov. 3, 2015),
  *judgment entered,* No. 15-CV-00678-MJW, 2015 WL 6689485 (D. Colo.
  Nov. 3, 2015) ...............................................................................................26

*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001)......................................................................................31

*Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley,*
  454 U.S. 290 (1981)......................................................................................12

*Cleveland v. United States,*
  531 U.S. 12 (2000)........................................................................................44

*Competitive Enter. Inst. v. Mann,*
  150 A.3d 1213 (D.C. 2016) ..........................................................................61

*Compuware Corp. v. Moody's Inv'rs Servs.,*
  499 F.3d 520 (6th Cir. 2007) ........................................................................22

*Container Mfg. Inc. v. CIBA-GEIGY Corp.,*
  870 F. Supp. 1225 (D.N.J. 1994) ..................................................................22

*Conte v. Newsday, Inc.,*
  703 F. Supp. 2d 126 (E.D.N.Y. 2010) ..........................................................47

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.,*
  528 F.3d 1001 (8th Cir. 2008) ........................................................29, 31, 33

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.,*
  No. 04-0074-CV-W-DW, 2005 WL 1279046 (W.D. Mo. May 25, 2005), *aff'd
  on other grounds,* 528 F.3d 1001 (8th Cir. 2008)........................................32

*Crest Constr. II, Inc. v. Doe,*
  660 F.3d 346 (8th Cir. 2011) ..................................................................10, 33

*Deripaska v. Associated Press,*
  No. CV 17-00913 (ESH), 2017 WL 4685297 (D.D.C. Oct. 17, 2017) ............24, 61

*Deupree v. Iliff*,
   860 F.2d 300 (8th Cir. 1988) ...........................................................................13, 19

*Diario El Pais, S.L. v. Nielsen Co. (US)*,
   No. 07cv11295(HB), 2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) .......................................24

*DMC Plumbing & Remodeling, LLC v. Fox News Network, LLC*,
   No. 12-CV-12867, 2012 WL 5906870 (E.D. Mich. Nov. 26, 2012) .....................................26

*Dodds v. Am. Broad. Co.*,
   145 F.3d 1053 (9th Cir. 1998) ...................................................................................16

*Doe v. Salisbury Univ.*,
   123 F. Supp. 3d 748, 761-62 (D. Md. 2015)......................................................................24

*Doe v. Unocal Corp.*,
   27 F. Supp. 2d 1174 (C.D. Cal. 1998) ...........................................................................54

*Egiazaryan v. Zalmayev*,
   No. 11 Civ. 2670 (PKC), 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ................................24

*Ellis v. J.P.Morgan Chase & Co.*,
   No. 12-cv-03897-YGR, 2015 WL 78190 (N.D. Cal. Jan. 6, 2015).......................................32

*Elsevier Inc. v. WHPR, Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010).............................................................................11, 34

*Fairbanks v. Roller*,
   No. 1:17-cv-01052-TNM, ECF No. 13 (D.D.C. filed Oct. 23, 2017) ....................................61

*Farah v. Esquire Magazine*,
   736 F.3d 528 (D.C. Cir. 2013) ..........................................................................13, 15, 16, 53

*Figueroa Ruiz v. Alegria*,
   896 F.2d 645 (1st Cir. 1990)...........................................................................................27

*Fitzgerald v. Chrysler Corp.*,
   116 F.3d 225 (7th Cir. 1997) ........................................................................................31

*Fladeland v. Satrom*,
   No. 2:12-cv-20, 2012 WL 12914317 (D.N.D. Oct. 26, 2012)........................................ *passim*

*Flowers v. Cont'l Grain Co.*,
   775 F.2d 1051 (8th Cir. 1985) .......................................................................................10

*Fogie v. THORN Ams., Inc.*,
   190 F.3d 889 (8th Cir. 1999) ........................................................................................31

*Gallagher v. Magner*,
    619 F.3d 823 (8th Cir. 2010) ...................................................................33

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ...................................................................................23

*George Lussier Enters., Inc. v. Subaru of New England, Inc.*,
    393 F.3d 36 (1st Cir. 2004) ......................................................................48

*Geraci v. Women's All., Inc.*,
    436 F. Supp. 2d 1022 (D.N.D. 2006) ........................................................30

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .....................................................................16, 22, 23

*Goldstein v. Climate Action Network, et al.*,
    No. 16-cv-00211-C, ECF No. 142 (N.D. Tex. June 12, 2017) ..................3

*H & Q Props., Inc. v. Doll*,
    793 F.3d 852 (8th Cir. 2015) ....................................................................44

*H.J., Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) .................................................................................42

*Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*,
    187 F.3d 941 (8th Cir. 1999) ....................................................................49

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) ......................................................29, 40, 42

*Hanks v. Wavy Broad., LLC*,
    Civ. No. 2:11cv439, 2012 WL 405065 (E.D. Va. Feb. 8, 2012) ..............24

*Hargrave v. Washington Post*,
    No. Civ. A. 09-0357(HHK), 2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*,
    365 F. App'x 224 (D.C. Cir. 2010) ...........................................................26

*Herschbach v. Herschbach*,
    667 F. Supp. 2d 1080 (D.N.D. 2009) ...................................................56, 59

*Hill v. Cosby*,
    665 F. App'x 169 (3d Cir. 2016) ...............................................................16

*Hollander v. CBS News Inc.*,
    16 Civ. 6624 (PAE), 2017 WL 1957485 (S.D.N.Y. May 10, 2017) .......3, 4

*Holmes v. Secs. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................29, 49

*Hourani v. Mirtchev*,
 796 F.3d 1 (D.C. Cir. 2015) ................................................................................43

*Humann v. KEM Elec. Coop.*,
 450 F. Supp. 2d 1006 (D.N.D. 2006), *aff'd*, 497 F.3d 810 (8th Cir. 2007) ......................15, 25

*Hustler Magazine, Inc. v. Falwell*,
 485 U.S. 46 (1988)................................................................................13, 29

*Hutchinson v. Proxmire*,
 443 U.S. 111 (1979)................................................................................22

*In re Apple, Inc.*,
 602 F.3d 909 (8th Cir. 2010) ................................................................................56

*Jacobus v. Trump*,
 55 Misc. 3d 470, 51 N.Y.S.3d 330 (N.Y. Sup. Ct. 2017) ................................................20

*Janklow v. Newsweek, Inc.*,
 759 F.2d 644 (8th Cir. 1985) ................................................................................19

*Janklow v. Newsweek, Inc.*,
 788 F.2d 1300 (8th Cir. 1986) ................................................................................18, 19

*Kahn v. iBiquity Digital Corp.*,
 No. 06 CIV. 1536 (NRB), 2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006), *aff'd*,
 309 F. App'x 429 (2d Cir. 2009) ................................................................................14

*Karaduman v. Newsday*,
 51 N.Y.2d 531 (1980) ................................................................................14

*Katzman v. Victoria's Secret Catalogue*,
 167 F.R.D. 649 (S.D.N.Y. 1996)*, aff'd*, 113 F.3d 1229 (2d Cir. 1997)................................11

*Kenna v. So-Fro Fabrics, Inc.*,
 18 F.3d 623 (8th Cir. 1994) ................................................................................60

*Kimberlin v. Nat'l Bloggers Club*,
 No. GJH-13-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015)........................................43, 50

*Kimm v. Lee*,
 No. 04-civ-5724(HB), 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005)............................43, 47, 50

*Klayman v. City Pages*,
 No. 5:13-cv-143-Oc-22PRL, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015),
 *aff'd*, 2016 WL 3033141 (11th Cir. May 27, 2016) ................................................24

*Koch v. Goldway*,
    817 F.2d 507 (9th Cir. 1987) ........................................................................................19

*Kuhn v. Chesapeake Energy Corp.*,
    No.1:123-cv-086, 2012 WL 4442798 (D.N.D. Sept. 25, 2012) ...............................54

*Lee v. TMZ Prods. Inc.*,
    No. 16-2736, 2017 WL 4675710 (3d Cir. Oct. 17, 2017)........................................26

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997)....................................................................................16

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988)...............................................................................24

*Lochthowe v. C.F. Peterson Estate*,
    692 N.W.2d 120 (N.D. 2005) ..................................................................................52

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003)...............................................................................23

*Magee v. Trustees of Hamline Univ., Minn.*,
    747 F.3d 532 (8th Cir 2014) ...................................................................................10

*Manax v. McNamara*,
    660 F. Supp. 657 (W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988).............50

*Mansmann v. Smith*,
    No. Civ. A. 96-5768, 1997 WL 145009 (E.D. Pa. Mar. 21, 1997).........................50

*Marietta Campbell Ins. Group, LLC v. Jefferson-Pilot Life Ins. Co.*,
    No. 07-cv-32, 2007 WL 3197311 (D.N.D. 2007)...................................................56

*Marks v. City of Seattle*,
    No. C03-1701, 2003 WL 23024522 (W.D. Wash. Oct. 16, 2003) ..........................50

*Maybelline Co. v. Noxell Corp.*,
    813 F.2d 901 (8th Cir. 1987) ...........................................................................56, 59

*Mayfield v. NASCAR, Inc.*,
    674 F.3d 369 (4th Cir. 2012) ...........................................................................15, 24

*McColl Farms, LLC v. Pflaum*,
    837 N.W.2d 359 (N.D. 2013) ..................................................................................52

*McDonald v. Wise*,
    769 F.3d 1202 (10th Cir. 2014) ..............................................................................15

*McNally v. United States*,
   483 U.S. 350 (1987)................................................................................44

*Michaelis v. CBS, Inc.*,
   119 F.3d 697 (8th Cir. 1997) ...............................................................26

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) .......................................................11, 15

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990)................................................................................16

*Miranda v. Ponce Fed. Bank*,
   948 F.2d 41 (1st Cir. 1991)..................................................................11

*Moldea v. N.Y. Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ..............................................................13

*Montgomery v. Risen*,
   197 F. Supp. 3d 219, 260 (D.D.C. 2016), *aff'd on other grounds*, No. 16-7096,
   2017 WL 5505131 (D.C. Cir. Nov. 17, 2017) ......................................25

*Mott v. Anheuser-Busch, Inc.*,
   910 F. Supp. 868 (N.D.N.Y. 1995), *aff'd*, 112 F.3d 504 (2d Cir. 1996) ................................22

*Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*,
   48 F.3d 1066 (8th Cir. 1995) ...............................................................10

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958)............................................................................12

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)........................................................................2, 12

*Nat'l Bank of Harvey v. Bathgate Capital Partners, LLC*,
   No. 06-cv-053, 2007 WL 1041122 (D.N.D. 2007)..........................56, 59

*Nelson v. Nelson*,
   833 F.3d 965 (8th Cir. 2016) ...........................................................31, 32

*Neubauer v. FedEx Corp.*,
   849 F.3d 400 (8th Cir. 2017) ...............................................................52

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................................12, 19

*Newton v. Tyson Foods, Inc.*,
   207 F.3d 444 (8th Cir. 2000) ...............................................29, 49, 50, 51

x

*Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*,
 111 F.3d 1386 (8th Cir. 1997) ........................................................................22

*Olin v. Dakota Access, LLC*,
 No. 1:17-CV-007, 2017 WL 4532581 (D.N.D. Oct. 10, 2017) ..............................10

*Ollman v. Evans*,
 750 F.2d 970 (D.C. Cir. 1984) .........................................................................19

*Org. for a Better Austin v. Keefe*,
 402 U.S. 415 (1971)........................................................................................11

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
 829 F.3d 576 (8th Cir. 2016) ...........................................................................16

*Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*,
 806 F.2d 291 (1st Cir. 1986)............................................................................27

*Pan Am. Sys., Inc. v. Hardenbergh*,
 871 F. Supp. 2d 6 (D. Me. 2012) ......................................................................24

*Parisi v. Sinclair*,
 845 F. Supp. 2d 215 (D.D.C. 2012) ..................................................................24

*Pauling v. Globe-Democrat Publ'g Co.*,
 362 F.2d 188 (8th Cir. 1966) ...........................................................................25

*Pippen v. NBCUniversal Media, LLC*,
 734 F.3d 610 (7th Cir. 2013) ...........................................................................15

*Podraza v. Whiting*,
 790 F.3d 828 (8th Cir. 2015) ...........................................................................13

*Polensky v. Continental Cas. Co.*,
 397 F.Supp.2d 1164 (D.N.D. 2005)...................................................................60

*Price v. Viking Penguin, Inc.*,
 881 F.2d 1426 (8th Cir. 1989) .........................................................................19

*Primary Care Inv'rs, Seven, Inc. v. PHP Healthcare Corp.*,
 986 F.2d 1208 (8th Cir. 1993) .........................................................................42

*Ragland v. Blue Cross Blue Shield of N. Dakota*,
 No. 1:12-CV-080, 2012 WL 5511006 (D.N.D. Nov. 14, 2012)............................15

*Raineri Constr., LLC v. Taylor*,
 No. 4:12-cv-2297(CEJ), 2014 WL 348632 (E.D. Mo. Jan. 31, 2014)....................34

*Reliance Ins. Co. v. Barron's*,
    442 F. Supp. 1341 (S.D.N.Y. 1977)................................................................22

*Rennell v. Rowe*,
    635 F.3d 1008 (7th Cir. 2011) ...................................................................48

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    No. 17-CV-02824-JST, 2017 WL 4618676 (N.D. Cal. Oct. 16, 2017)......................... *passim*

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
    No. CV 116-071, 2017 WL 2126323 (S.D. Ga. May 16, 2017)...............................8

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
    No. CV 116-071, 2016 WL 9308015 (S.D. Ga. Sept. 22, 2016)..............................8

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993).................................................................................40

*Riemers v. Mahar*,
    748 N.W.2d 714 (N.D. 2008) ...................................................................22

*Riley v. Harr*,
    292 F.3d 282 (1st Cir. 2002)......................................................................17

*Rilley v. MoneyMutual, LLC*,
    No. 16-4001, 2017 WL 3822727 (D. Minn. Aug. 30, 2017)................................31

*Rolin Mfg., Inc. v. Mosbrucker*,
    544 N.W.2d 132 (N.D. 1996) ...................................................................51

*Ryan v. Clemente*,
    901 F.2d 177 (1st Cir. 1990).....................................................................32

*S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*,
    284 F.3d 518 (4th Cir. 2002) ...................................................................45

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)..................................................................15, 24

*Scheidler v. Nat'l Org. for Women, Inc.*,
    739 F. Supp. 1210 (N.D. Ill. 1990) ......................................................26, 27, 47

*Schultz v. Boy Scouts of Am.*,
    65 N.Y.2d 189 (N.Y. 1985) .....................................................................61

*Schuster v. U. S. News & World Report, Inc.*,
    602 F.2d 850 (8th Cir. 1979) ...................................................................18

*Sebrite Agency, Inc. v. Platt*,
   884 F. Supp. 2d 912 (D. Minn. 2012) .................................................................42

*Secrist v. Harkin*,
   874 F.2d 1244 (8th Cir. 1989) ...........................................................................19

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985).............................................................................................50

*Sekhar v. U.S.*,
   133 S. Ct. 2720 (2013)........................................................................................47

*Sierra Club v. Butz*,
   349 F. Supp. 934 (N.D. Cal. 1972) .......................................................................2

*Slack v. Int'l Union of Operating Eng'rs*,
   No. C-13-5001 (EMC), 2014 WL 4090383 (N.D. Cal. Aug. 19, 2014)................48

*Smith v. Arkansas State Highway Emp., Local 1315*,
   441 U.S. 463 (1979).............................................................................................4

*Snyder v. Phelps*,
   562 U.S. 443 (2011)...........................................................................................11

*Soentgen v. Quain & Ramstad Clinic, P.C.*,
   467 N.W.2d 73 (N.D. 1991) ...............................................................................25

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..............................................................................48

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)......................................................................................21, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
   2017 WL 2573994 (D.D.C. June 14, 2017)...........................................................7

*State Farm Mut. Auto. Ins. Co. v. Cohan*,
   No. cv 09-2990(JS)(WDW), 2009 WL 10449036 (E.D.N.Y. Dec. 30, 2009)........31

*Steen v. Murray*,
   770 F.3d 698 (8th Cir. 2014) ..............................................................................59

*Stepnes v. Ritschel*,
   663 F.3d 952 (8th Cir. 2011) .........................................................................15, 22

*Summit Bank v. Rogers*,
   206 Cal. App. 4th 669 (2012) .............................................................................20

*Sura v. National Oilwell Varco, L.P.*,
   2016 WL 4217766 (D.N.D. Apr. 6, 2016) ............................................................61

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (*en banc*) ..........................................................23

*Teamsters Nat'l Freight Indus. Negotiating Comm. on Behalf of Teamster Local*
   *Union Numbers 116, 120, 123, 346, and 544 v. MME, Inc.*,
   116 F.3d 1241 (8th Cir. 1997) ...........................................................................30

*Terra Int'l. Inc. v. Miss. Chem. Corp.*,
   119 F.3d 688 (8th Cir. 1997) ................................................................ 55-56, 59

*Thornhill v. Alabama*,
   310 U.S. 88 (1940) .............................................................................................11

*Time, Inc. v. Hill*,
   385 U.S. 374 (1967) ...........................................................................................29

*Trade 'N Post, LLC v. World Duty Free Ams., Inc.*,
   628 N.W.2d 707 (N.D. 2001) .............................................................................52

*Turkish Coal. of Am., Inc. v. Bruininks*,
   678 F.3d 617 (8th Cir. 2012) .............................................................................16

*U.S .ex rel. Raynor v. Nat'l Rural Utils Coop.*,
   690 F.3d 951 (8th Cir. 2012) .............................................................................10

*Underwager v. Channel 9 Australia*,
   69 F.3d 361 (9th Cir. 1995) ...............................................................................21

*Unelko Corp. v. Rooney*,
   912 F.2d 1049 (9th Cir. 1990) ...........................................................................28

*United Broth. of Carpenters and Joiners of Am. v. Building and Constr. Trades*
   *Dep't*,
   770 F.3d 834 (9th Cir. 2014) .............................................................................47

*United States v. Bradley*,
   644 F.3d 1213 (11th Cir. 2011) .........................................................................45

*United States v. Chavis*,
   461 F.3d 1201 (10th Cir. 2006) .........................................................................45

*United States v. Eiland*,
   738 F.3d 338 (D.D.C. 2013) ..............................................................................34

*United States v. Enmons,*
    410 U.S. 396 (1973)...................................................................................47

*United States v. Kehoe,*
    310 F.3d 579 (8th Cir. 2002) ......................................................................39

*United States v. McArthur,*
    850 F.3d 925 (8th Cir. 2017) ......................................................................39

*United States v. Takhalov,*
    827 F.3d 1307 (11th Cir. 2016) ..................................................................44

*United States v. Turkette,*
    452 U.S. 576 (1981)..............................................................................30, 31

*Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.,*
    168 F. App'x 893 (11th Cir. 2006) (*per curiam*)......................................14

*Viacom Int'l v. Icahn,*
    747 F. Supp. 205 (S.D.N.Y. 1990)............................................................48

*Vill. of Schaumburg v. Citizens for a Better Env't,*
    444 U.S. 620 (1980)...................................................................................12

*Ward v. Bullis,*
    748 N.W.2d 397 (N.D. 2008) .....................................................................54

*Wash. Pub. Utils. Grp. v. U.S. Dist. Ct. of Wash.,*
    843 F.2d 319 (9th Cir. 1987) ......................................................................59

*Washington Post v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966)...................................................................15

*Watts v. United States,*
    394 U.S. 705 (1969)...................................................................................19

*Wesley v. Bryant,*
    No. 14-cv-5002, 2015 WL 2242161 (D. Minn. May 12, 2015) ................59

*White v. Fraternal Order of Police,*
    909 F.2d 512 (D.C. Cir. 1990)..............................................................25, 26

*Whitney v. California,*
    274 U.S. 357 (1927) (Brandeis, J., concurring).........................................4

*Wilcox v. Superior Ct.,*
    33 Cal. Rptr. 2d 446 (Cal. Ct. App. 1994).................................................2

xv

*Wilkow v. Forbes, Inc.*,
  No. 99 C 3477, 2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d
  552 (7th Cir. 2001)..................................................................................................26

*Williams v. Mohawk Indus.*,
  465 F.3d 1277 (11th Cir. 2006) .............................................................................11

*Wisdom v. First Midwest Bank, of Poplar Bluff*,
  167 F.3d 402 (8th Cir. 1999) .................................................................................44

*Zappin v. Daily News, L.P.*,
  No. 16 CIV. 8762 (KPF), 2017 WL 3425765 (S.D.N.Y. Aug. 9, 2017) .................26

*Zutz v. Kamrowski*,
  787 N.W.2d 286 (N.D. 2010) .................................................................................61

**Federal Statutes**

18 U.S.C. § 1343.....................................................................................................44

18 U.S.C. § 1951.....................................................................................................46

18 U.S.C. § 1951(b)(2) ...........................................................................................47

18 U.S.C. § 1961(4) ................................................................................................30

18 U.S.C. § 1962(a) ................................................................................................29

18 U.S.C. § 1962(c) ................................................................................................40

18 U.S.C. § 1962(d) ................................................................................................29

18 U.S.C. § 1962(e) ...........................................................................................29, 31

28 U.S.C. § 1391(b)(2) ...........................................................................................55

28 U.S.C. § 1392(b)(2) ...........................................................................................55

28 U.S.C. § 1404(a) ................................................................................................55

**State Statutes**

N.D. Cent. Code § 12.1-06.1-05 .............................................................................52

N.D. Cent. Code § 14-02-03 ..............................................................................15, 16

N.D. Cent. Code § 14-02-05 ...................................................................................25

**Rules**

Rule 9(b) ...........................................................................................................10, 26, 30, 44

Rule 12(b)(2) ............................................................................................................................54

Rule 12(b)(6) .......................................................................................................1, 8, 10, 16

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................. *passim*

**Other Authorities**

http://www.cnn.com/2017/11/16/us/keystone-pipeline-leak/index.html ........................................6

http://www.ohchr.org/EN/Issues/IPeoples/Pages/Declaration.aspx ...........................24

https://theintercept.com/2017/11/15/dakota-access-pipeline-dapl-tigerswan-
  energy-transfer-partners-rico-lawsuit/ .........................................................................27

https://www.bloomberg.com/news/articles/2017-08-28/how-a-corporate-assault-
  on-greenpeace-is-spreading ...........................................................................................3

https://www.cnbc.com/video/2017/08/25/we-were-greatly-harmed-lost-millions-
  of-dollars-energy-transfer-partners-ceo.html .................................................................3

https://www.nrk.no/sapmi/sparebank-1-selger-seg-ut-fra-omstridt-oljerorledning-
  1.13239446.........................................................................................................................24

https://www.reuters.com/article/us-energy-transf-lawsuit-nordics/nordic-
  investors-reject-dakota-pipeline-operators-allegations-idUSKCN1B928V ...........................52

https://www.theguardian.com/us-news/video/2016/aug/29/north-dakota-oil-
  access-pipeline-protest-video) .......................................................................................24

https://www.washingtonpost.com/news/morning-mix/wp/2016/11/01/dakota-
  access-protesters-accuse-police-of-putting-them-in-dog-kennels-marking-
  them-with-numbers/?utm_term=.f2550f15b9f9) ..................................................................24

S. Rep. No. 91-617 (1969) ..............................................................................................30

Defendants Greenpeace International ("GPI") and Greenpeace, Inc. ("GP Inc.")

(collectively "Greenpeace" or "Greenpeace Defendants") bring this motion under Rule 12(b)(6)

to dismiss in its entirety and with prejudice the Complaint of Energy Transfer Equity, L.P.

("ETE") and Energy Transfer Partners, L.P. ("ETP") (collectively, "Energy Transfer").

## INTRODUCTION

Energy Transfer is a multi-billion dollar company based in Texas that derives its revenue

from use of propane and natural gas, and owns over 70,000 miles of gas and crude oil pipelines.

One of its subsidiaries, Dakota Access LLC, curiously not a plaintiff in this case, is the direct

owner of a 75% interest in the Dakota Access Pipeline ("DAPL"), a 1,172-mile-long crude oil

pipeline that runs from the oil fields in northwest North Dakota, across South Dakota and Iowa,

and terminating in Illinois.  The project has generated widespread controversy, including

criticism and protests from Native American tribes beginning in the spring of 2016,[1] leading to

increasingly larger protests involving a wide range of groups and individuals in the fall and

winter of 2016-2017.

Despite the vigorous criticisms and protests, and to the dismay of many observers,

Dakota Access LLC plowed ahead with construction and DAPL was completed in early 2017,

and is now operational, although many legal cases involving protestors, the actions of private

security forces retained by Energy Transfer, and federal oversight of the project still linger in the

courts.  Several months after the pipeline began operations, and after many months of apparently

secret investigations by an unlicensed security firm, *see infra* n. 30, Energy Transfer brought the

instant case, alleging that the lawful protests violated the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), and attempting to place full responsibility for the DAPL protests

---

[1] Plaintiff does not appear to dispute this timeline, alleging the RICO "enterprise" began in April 2016, although as discussed *infra* § A.3.b.iii, it alleges no acts by that enterprise until four months later.

on two environmental organizations, Greenpeace and BankTrack, and an unincorporated

association, EarthFirst!.  However, despite gallons of ink spilled in the 228-page, 442-paragraph

Complaint, on careful review it becomes obvious that all Energy Transfer is really complaining

about is garden-variety environmental advocacy, not a criminal conspiracy.

Since the early days of this nation, advocates seeking to advance issues of civic

importance through public speech and demonstration have faced attempted suppression through

defamation law and similar causes of action targeting speech.  In modern times, large

corporations like Energy Transfer have opposed critical speech through aggressive litigation

tactics.  Some of the earliest such cases targeted environmental groups.  *See Sierra Club v. Butz*,

349 F. Supp. 934 (N.D. Cal. 1972); *Wilcox v. Superior Ct.*, 33 Cal. Rptr. 2d 446, 449 (Cal. Ct.

App. 1994).  As the Supreme Court has stated, however, "[s]peech does not lose its protected

character . . . simply because it may embarrass others or coerce them into action."  *NAACP v.

Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982); *see also Beverly Hills Foodland, Inc. v.

United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195 (8th Cir. 1994).  To

this end, the courts, as well as state legislatures, have developed legal tests and statutes designed

to give full strength to the First Amendment and flush out meritless lawsuits before the burdens

and costs of litigation have a chilling effect on public debate.

Nevertheless, aggressive attacks by large corporations on environmental advocates have

not disappeared, and a disturbing new tactic has emerged: The use of RICO to silence prototypi-

cal speech activity by public advocates.  The purpose of these suits, four of which have now been

filed (three against Greenpeace and other environmental groups and one against the press) is not

to vindicate Plaintiff's rights, but to give ordinary defamation claims a sinister gloss, attempt to

use RICO allegations as a basis for avoiding early motions to dismiss based on First Amendment

protections, and wield the threat of attorney's fees and obtain treble damages.  So far, this effort

has failed.  The new litigation tactic, initially developed by the same law firm that represents

Energy Transfer in the instant case – a law firm that has already sued Greenpeace on behalf of a

major timber company, Resolute Forest Products, and has threatened to bring more such suits[2] –

has been rejected three times this year by courts on motions to dismiss.[3]  It is incumbent upon

every court that faces these baseless claims to ensure a robust arena for political speech and weed

out efforts to suppress critical speech masquerading as RICO claims.

Although the Complaint identifies dozens of purported "enterprise members," it singles

out only three environmental groups as defendants.  In the case of Greenpeace, the factual

allegations are strikingly thin, and indeed almost 90% of the Complaint is directed towards the

acts of parties other than Greenpeace.  The Complaint is silent as to why Energy Transfer chose

to sue Greenpeace here, although Energy Transfer's CEO has suggested it was to send a signal to

environmental groups about their activism,[4] and in light of the prior case brought against

Greenpeace by Energy Transfer's law firm, it appears clear that Greenpeace is being targeted by

repeated lawsuits for the precise purpose of chilling its speech.

The Complaint alleges that Greenpeace published articles, social media posts, and letters,

and supported food and clothing drives for individuals protesting construction of DAPL – but these

activities are based entirely on Greenpeace's well-supported, public opinions about the impact of

---

[2] *See* https://www.bloomberg.com/news/articles/2017-08-28/how-a-corporate-assault-on-greenpeace-is-spreading.

[3] *See infra* at 7-9; *Goldstein v. Climate Action Network, et al.*, No. 16-cv-00211-C, ECF No. 142 (N.D. Tex. June 12, 2017); *Hollander v. CBS News Inc.*, 16 Civ. 6624 (PAE), 2017 WL 1957485 (S.D.N.Y. May 10, 2017) ("The First Amendment, and first principles of constitutional law, bar this lawsuit.").

[4] *See* https://www.cnbc.com/video/2017/08/25/we-were-greatly-harmed-lost-millions-of-dollars-energy-transfer-partners-ceo.html ("we've got to do something . . . everybody's afraid of these environmental groups and the fear that it may look wrong if you . . . fight back with these people.").

the fossil fuel pipeline on the environment and Indigenous peoples.  Although Energy Transfer cites a host of other acts, from drug trafficking to physical sabotage, supposedly taken by non-parties with no connection to Greenpeace that it chose not to name as defendants, Greenpeace's alleged activities resound in speech.  Energy Transfer's "remedy" for such speech is not a RICO suit, but rather "the time-honored, out-of-court, remedy that Justice Brandeis famously identified nearly a century ago" – "more speech."  *Hollander v. CBS News Inc.*, 2017 WL 1957485, at *4 (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

Energy Transfer's attempt to tie Greenpeace to a RICO scheme must fail in the face of the full panoply of First Amendment protections.  *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463 (1979).  Indeed, Energy Transfer is quite literally trying to transform First Amendment-guaranteed associational rights into criminal affiliations under RICO.  When the Court closely scrutinizes Energy Transfer's factual assertions, it will become abundantly clear that Greenpeace's activities are what they seem: Constitutionally-protected expression.

Turning to the specific deficiencies in Energy Transfer's pleading; the Complaint alleges 238 defamatory statements, of which only 77 were made by named parties.  Of those, ***only 47 statements by Greenpeace are actually in suit, and those statements appeared in just 33 Greenpeace publications***.  Upon review of those statements, Energy Transfer's defamation claim fails because (1) Greenpeace's speech is traditional advocacy, which is fully protected by the First Amendment; (2) the challenged statements constitute protected opinion; (3) Energy Transfer cannot plausibly plead Greenpeace published the statements with actual malice, the requisite and "daunting" degree of fault; and (4) many of Greenpeace's statements are privileged fair reports of official government proceedings.

Plaintiff's RICO claims also fail.  First, by identifying multiple parties but only suing a

few, Energy Transfer is attempting to create the illusion of a vast cabal comprised of virtually every entity to have taken issue with or protested DAPL, but it fails to plausibly allege the existence of such an enterprise, much less connect Greenpeace to that enterprise.  Specifically, Energy Transfer has not plausibly alleged any relevant relationships between the purported members; any common criminal purpose cognizable under RICO; that any entity manages or operates this alleged enterprise or that it had continuity through a pattern of racketeering activity. Second, any RICO "predicate acts" alleged to have been committed by Greenpeace are nothing more than allegedly false public statements.  Defamation has been held not to be a predicate act and merely relabeling defamation claims as RICO violations will not otherwise save the fatally flawed defamation claim. Finally, Energy Transfer has not pled any direct damages to Energy Transfer flowing from Greenpeace's purported actions and, therefore, lacks standing.

In light of the potentially stigmatizing effect that even baseless RICO claims may have on defendants, especially given the threat of treble damages, this Court should follow the example of the district court in the *Resolute v. Greenpeace* case, *see infra* at 7-9, and dismiss Energy Transfer's claims in their entirety.  Failure to do so will undeniably chill speech across a wide swath of public advocacy in the United States.

## FACTUAL BACKGROUND

**A.    THE INSTANT LAWSUIT**

    **1.    PARTIES**

        **a.    Greenpeace Entities**

Greenpeace is a network of independent non-profit legal entities with nearly 3 million individual supporters globally.  The 26 national and regional Greenpeace organizations ("NROs") pursue environmental conservation on many fronts, across many campaigns, without relying on financial support from corporations or government.  *See* Declaration of Lacy H.

Koonce, III ("Koonce Decl.") Ex. 1.  Indeed, Greenpeace's funding is nearly all provided by small, individual donations from 250,000 members in the U.S. and 2.8 million members worldwide.  *Id.*  GPI, whose ambit is limited to top-line global issues and strategies and whose governance structure is based on voting rights held by the NROs, is based in Netherlands.  *Id.* GPI is involved in setting the current overarching global campaign goals, which include climate and energy, oceans, forests, sustainable agriculture and toxics, but each NRO develops its own national campaign strategy for advancing those goals.  *Id.*  GP Inc. is the independent, non-profit entity that oversees all campaign activities in the United States.  *See id*.; Declaration of Thomas W. Wetterer.

For four decades, Greenpeace has been campaigning for a green and peaceful future for the Earth by investigating, exposing, and confronting environmental abuse, championing environmentally responsible solutions, and advocating for the rights and well-being of all people, including Indigenous groups.  Greenpeace's current global campaigns are: Saving the Arctic, Protecting Forests, Fighting Global Warming, Protecting Our Oceans, Living Toxic-Free, Promoting Sustainable Agriculture, and Defending Democracy.  Greenpeace has long publicly objected to, and protested against, the construction of oil and gas pipelines because they perpetuate reliance on and expansion of the use of fossil fuels, and represent a potential source of toxic spills.  Greenpeace's specific advocacy against DAPL thus fits within its mission, which includes similar advocacy against the Keystone Pipeline that suffered a recent major leak of some 210,000 gallons of oil in South Dakota, the consequences and environmental impacts of which are still being assessed.[5]

       **b.**       **Plaintiff**

There are two direct owners of DAPL: Dakota Access, LLC (75%) and Phillips 66

---

[5] http://www.cnn.com/2017/11/16/us/keystone-pipeline-leak/index.html.

(25%).  Koonce Decl. Ex. 2.  Neither are plaintiffs here.  Rather, this action was brought by ETP and its wholly-owned subsidiary ETP, Delaware partnerships headquartered in Texas.

### c.    Other Parties and Non-Parties

In addition to GPI and GP Inc., Energy Transfer has sued Greenpeace Fund ("GP Fund"), BankTrack, EarthFirst!, and a number of Jane and John Does.  The Complaint also identifies a large number of purported "enterprise members," including three other Greenpeace NROs (from the Netherlands, Japan, and Switzerland) and three Greenpeace employees, among many others.  As discussed *infra* § A.3.b, Energy Transfer deliberately blurs the lines between the named parties, the supposed enterprise members, and non-parties – purposely obscuring the statements or acts attributable to each.  Remarkably, of the 238 purported defamatory or fraudulent statements in suit, nearly 70% of those statements were allegedly made by non-parties.  *See infra* § A.2.b.

## B.    THE SRST LAWSUIT

In its Complaint, Energy Transfer discusses at length a lawsuit brought by the Standing Rock Sioux Tribe ("SRST") and other plaintiffs against the U.S. Army Corps of Engineers ("USACE") in the U.S. District Court for the District of Columbia, No. 16-1534 (D.D.C.) (the "SRST Lawsuit").  Energy Transfer portrays this case as a sham lawsuit brought by "enterprise member" Earthjustice to exploit the SRST and raise money, even though the ongoing action has resulted in the remand of the USACE's environmental analysis to the agency for reconsideration because it "did not adequately consider the impacts of an oil spill on fishing rights, hunting rights, or environmental justice, or the degree to which the pipeline's effects are likely to be highly controversial."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 2017 WL 2573994, at *1-2 (D.D.C. June 14, 2017).

C.      THE *RESOLUTE v. GREENPEACE* LAWSUIT AND DISMISSAL

In a recent case initially brought in the Southern District of Georgia, Resolute Forest

Products, Inc., a timber conglomerate using the same counsel representing Energy Transfer here,

sued Greenpeace, another environmental advocacy organization, and several of their employees

on grounds conspicuously similar to those advanced by Energy Transfer.  Resolute alleged that

the non-profits fraudulently profited from donations based on false information about Resolute's

environmental practices, and asserted claims for violation of RICO and state law claims of

defamation, racketeering, conspiracy, and tortious interference.  Defendants moved for dismissal

under Rule 12(b)(6), to strike Resolute's pleading under the Georgia anti-SLAPP statute, and to

transfer venue.  The court stayed discovery pending the outcome on the motions, stating that

"[b]ased on a preliminary peek at the defense motions," it found "an immediate and clear

possibility of rulings that would dismiss some or all of the claims and/or Defendants," and it

made "little sense to forge ahead with full discovery … especially … in light of the complaint's

grand scope of factual allegations, claims, and defendants."  *Resolute Forest Prod., Inc. v.*

*Greenpeace Int'l*, No. CV 116-071, 2016 WL 9308015, at *1 (S.D. Ga. Sept. 22, 2016).

The Georgia court subsequently granted defendants' motion to transfer the case for

improper venue to the Northern District of California because Resolute had not proven that a

substantial part of the events giving rise to its claims occurred in the Southern District of

Georgia.  *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, No. CV 116-071, 2017 WL 2126323

(S.D. Ga. May 16, 2017).  The court found venue was proper in the Northern District of

California because the Greenpeace employees who made the majority of the challenged

statements resided or worked regularly in San Francisco area, such that "a substantial part of the

events giving rise to Plaintiffs' claims occurred in the Northern District of California."  *Id.* at *2.

After transfer to the Northern District of California, Judge Jon Tigar dismissed the action,

in its entirety, with leave to amend.  *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-CV-02824-JST, 2017 WL 4618676 (N.D. Cal. Oct. 16, 2017) ("*Resolute*").  Despite Resolute's attempt to make its RICO claims the focus of the case, the court first addressed the defamation count, holding that the plaintiff was a limited purpose public figure whose record on the environment was the center of a public debate, and that it had failed to plausibly plead with the requisite specificity that the defendants acted with actual malice.  *Id*. at *6-8.  The court also held that many of the statements were shielded by the First Amendment as not provably false, statements of opinion based on disclosed facts, and/or "obviously overemphatic" language.  *Id*. at *9.  As many statements concerned matters of scientific debate, noting that "Greenpeace's publications at issue rely on scientific research or fact," the court concluded "[t]he academy, and not the courthouse, is the appropriate place to resolve scientific disagreements of this kind."  *Id*.

The court dismissed Resolute's RICO claims as they fell "far short" of the applicable heightened pleading requirements and failed to show proximate cause because the alleged fraud was against donors, not Resolute.  *Id*. at *10-11. The court rejected the claim that Greenpeace's communications to Resolute's customers contributed to the harm and amounted to extortion, concluding the plaintiff did not sufficiently plead proximate cause or extortion as a predicate act. *Id*.  The court granted the defendants' motions to strike pursuant to California's anti-SLAPP statute, finding defendants were entitled to attorneys' fees on each state law claim.  *Id*. at *12-14. The court concluded that defendants "were involved in protected activity with respect to Resolute's state claims," on concerns regarding "environmental harm," a "matter of public interest for the purposes of anti-SLAPP."  *Id*. at *13.

## **ARGUMENT**

### A.   **THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM**

Despite its attempts to disguise its claims as more far-reaching, Energy Transfer's

allegations boil down to nothing more than a mere defamation claim directed to Greenpeace's public advocacy, which is fully protected under the First Amendment.

### 1.   Applicable Pleading Standards

While on a Rule 12(b)(6) motion courts assume as true all alleged facts and construe reasonable inferences favorably to plaintiff, a complaint "must contain facts with enough specificity 'to raise a right to relief above the speculative level.'"  *U.S. ex rel. Raynor v. Nat'l Rural Utils Coop.*, 690 F.3d 951, 955 (8th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  Neither "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" nor "'naked assertion[s]' devoid of 'further factual enhancement'" meet the plausibility standard. *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir 2014) (citations omitted).

Fraud claims, including RICO claims sounding in fraud, must meet the higher pleading standard set forth in Rule 9(b).  *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995) (citing *Flowers v. Cont'l Grain Co.*, 775 F.2d 1051, 1054 (8th Cir. 1985)); *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011); *Olin v. Dakota Access, LLC*, No. 1:17-CV-007, 2017 WL 4532581, at *3-4 (D.N.D. Oct. 10, 2017).  Because all of the RICO claims pled against Greenpeace sound in fraud, Energy Transfer's allegations must be scrutinized to determine if they adequately set forth circumstances constituting fraud, including "the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby."  *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982); *see also supra* at 7-9; *infra* § A.3.

Several independent considerations further support the careful scrutiny of Energy

Transfer's pleadings.  First, where defamation claims are brought by public figures and thus require plaintiff to prove actual malice, courts apply the *Iqbal/Twombly* plausibility requirements to prevent "inappropriate suits" from moving forward and chilling speech.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *infra* § A.2.c.  Second, courts have recognized that because "[c]ivil RICO is … the litigation equivalent of a thermonuclear device," *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991),[6] courts must "flush[]out frivolous RICO allegations at the earliest possible stage of litigation." *Elsevier Inc. v. WHPR, Inc.*, 692 F. Supp. 2d 297, 300 (S.D.N.Y. 2010); *see also Williams v. Mohawk Indus.*, 465 F.3d 1277 (11th Cir. 2006) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)).

### 2.    Plaintiff Fails to Plead a Plausible Claim for Defamation

Courts routinely dismiss defamation claims at the pleading stage, before discovery, for the very deficiencies present in Energy Transfer's Complaint and identified herein.  Under North Dakota or any other applicable law, Energy Transfer's defamation claims fail as a matter of law.

### a.    Traditional Advocacy Is Protected by the First Amendment

Greenpeace's political advocacy criticizing Energy Transfer's practices is within the core of First Amendment protection.  Public reports, petitions, articles, and protests are types of speech and expression clearly entitled to protection – regardless of how "hurtful" they are to the recipient.  *Snyder v. Phelps*, 562 U.S. 443, 446 (2011).  Such speech may even, for instance, persuade others into boycotting businesses and still retain constitutional protection.  *Thornhill v. Alabama*, 310 U.S. 88 (1940); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971).  And "charitable appeals. . . involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are

---

[6] *See also Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 655 (S.D.N.Y. 1996)*, aff'd*, 113 F.3d 1229 (2d Cir. 1997).

within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).  It is long-established that an advocacy group like Greenpeace cannot be held liable for non-violent expressive speech activities.  *NAACP*, 458 U.S. 886.

Energy Transfer's claims run afoul of not just the right to free speech but also, in the context of its RICO and conspiracy claim, the right of association.  "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them."  *Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley*, 454 U.S. 290, 296 (1981).  For these reasons, the Supreme Court has long recognized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).  Greenpeace represents millions of supporters to advance their concerns, and Energy Transfer cannot use RICO laws to trample their associational rights.[7]

Energy Transfer's pleadings demonstrate that each of its claims is based on Greenpeace's expression about issues of public interest.  Energy Transfer itself breaks down the purported speech into categories that highlight the public issues being discussed, including criticism that (i) DAPL traverses Sioux tribal lands; (ii) DAPL poses a risk to water supply; (iii) DAPL poses a climate risk; (iv) Energy Transfer retained or supported security teams that combat protestors with excessive force; (v) DAPL was routed and approved with inadequate environmental review or consultation with the Sioux; and (vi) DAPL desecrated cultural resources.  Compl. ¶ 424 &

---

[7] Additional examples of these associational efforts include joint openly-published letters signed by the Greenpeace Defendants and over 500 other environmental advocacy organizations sharing their concerns about the DAPL project with President Obama and international banks.  *See* Suppl. App. Tabs 2 & 20.  The Supreme Court has long recognized the essential First Amendment protections for these collective, public expressions of opinion on matters of public importance.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 257 (1964) (petition signed by 64 individuals, many prominent "in public affairs, religion, trade unions, and the performing arts").

Apps. A-F.  These categories indisputably relate to issues of profound public importance.  A review of all 238 statements challenged as defamatory in the Complaint (only a fraction of which were made by Greenpeace) demonstrates that every one is of this type.

In addition to the significant First Amendment barriers to using RICO and its treble damages threat to chill speech, plaintiffs cannot evade constitutional free speech protections by reformulating their defamation claims as different causes of action.  For this reason, the *Resolute* court looked beyond the plaintiffs' RICO pleading to hold that all of the complained-of statements criticizing the company's logging practices could be dismissed insofar as they "constituted the expression of opinion, or different viewpoints that are a vital part of our democracy."  *Resolute*, 2017 WL 4618676, at *9 (internal quotation and citation omitted).  Courts in this Circuit similarly dismiss claims based on the same underlying speech that would otherwise state a defamation claim, if the defamation claim fails.  *See Deupree v. Iliff*, 860 F.2d 300, 305 (8th Cir. 1988) (intentional infliction of emotional distress claim).[8]

> ### b.  Plaintiff Cannot Combine Defendants' and Non-Parties' Speech

Notwithstanding the breadth of the Complaint, more than half of the alleged defamatory statements challenged by Energy Transfer cannot form the basis of their action.  Incredibly, 161 of the 238 total statements cited by Energy Transfer as defamatory were made by non-parties.  Koonce Decl. ¶ 5 & GP Defs' Table B.[9]  While Energy Transfer appears to contend Greenpeace may be held liable in defamation for non-party statements, under established defamation law, only one who takes a responsible part in a publication of defamatory material may be held liable

---

[8] *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 54-57 (1988); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Because [plaintiffs'] defamation claim fails, so do their other tort claims based upon the same allegedly defamatory speech"); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317, 320 (D.C. Cir. 1994) ("[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim.").

[9] Greenpeace requests that the Court take judicial notice of all facts and documents referenced in the complaint.  *See Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015).

for the publication.[10]  The *Resolute* court rejected a similar effort, noting that the actual speaker of statements in suit must be identified and specifically alleged to have had the requisite state of mind.  2017 WL 4618676, at *7-8.  Energy Transfer similarly fails to allege Greenpeace participated in preparing the publications attributed in its appendices to separate entities such as 350.org, Sierra Club, Bold Iowa, Rainforest Action Network, Bold Alliance, Bold Nebraska, or Earthjustice.  Energy Transfer does not allege Greenpeace knew of and approved the contents of the other entities' publications in advance of publication, or that Greenpeace holds any position of authority over any other defendant or non-party.  Energy Transfer only alleges generally that Greenpeace "coordinated" with "enterprise" members in a "disinformation campaign," Compl. ¶¶ 29, 38(c), 363,[11] but fails to allege they had any editorial authority.  *See Karaduman v. Newsday*, 51 N.Y.2d 531, 540-42 (1980); *see also Bennett v. Google, Inc.*, No. 1:16-CV-02283 (TFH), 2017 WL 2692607, at *2 (D.D.C. June 21, 2017).

Combining Appendices A through F, Energy Transfer's suit alleges 238 defamatory statements by various party and non-party entities.  Only 77 were made by named parties.  Of that sub-set, only 66 statements were made by the Greenpeace Defendants and many of those are challenged on more than one ground.[12]  Accounting for such duplicates, only 47 statements by Greenpeace are in suit, and those statements appeared in just 33 Greenpeace publications, including 7 tweets.  Koonce Decl. ¶ 6.  For the convenience of the Court, these 33 publications

---

[10] *Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*, 168 F. App'x 893 (11th Cir. 2006) (*per curiam*); *Buttons v. Nat'l Broad. Co.*, 858 F. Supp. 1025, 1027 (C.D. Cal. 1994); *Kahn v. iBiquity Digital Corp.*, No. 06 CIV. 1536 (NRB), 2006 WL 3592366, at *5 n.23 (S.D.N.Y. Dec. 7, 2006), *aff'd*, 309 F. App'x 429 (2d Cir. 2009).

[11] Insofar as Plaintiff alleges enterprise members received funding from GP Fund and GPI to execute their campaigns, Compl. ¶¶ 38(a), (b), monetary support alone is insufficient to hold another entity liable for defamation.  *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003).

[12] *See, e.g.*, Suppl. App. Tab 6 (statement challenged in Compl. Apps. A & C), Tab 8 (statement challenged in Compl. Apps. A & D), Tab 10 (statement challenged in Compl. Apps. A-D).

have been compiled, and the 47 statements identified, in Greenpeace's Supplemental Appendix ("Suppl. App.").

### c.     Failure to Plead Statements with Specificity

Every Circuit to have considered the issue has specifically held that the *Twombly/Iqbal* pleading standard must be rigorously applied in defamation actions, including to the pleading of "actual malice," the fault standard that must be met by a public figure such as Energy Transfer.[13] As one Circuit aptly explained, "application of the plausibility pleading standard makes particular sense when examining public figure defamation suits" because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). This is in keeping with the long-held view that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah*, 736 F.3d at 534 (quoting *Washington Post v. Keogh*, 365 F.2d 965, 998 (D.C. Cir. 1966)).

To prevail in a defamation suit, therefore, Plaintiff must adequately allege and then prove that the statements complained of are i) defamatory; ii) capable of being proven true or false; iii) 'of and concerning' the Plaintiff; iv) false and v) in the case of public figures like Plaintiff, made with "actual malice." *Stepnes v. Ritschel*, 663 F.3d 952, 963 (8th Cir. 2011); *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001); *Humann v. KEM Elec. Coop.*, 450 F. Supp. 2d 1006, 1015 (D.N.D. 2006), *aff'd*, 497 F.3d 810 (8th Cir. 2007); N.D.

---

[13] *See Biro v. Condé Nast*, 807 F.3d 541, 544–45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). *See also Ragland v. Blue Cross Blue Shield of N. Dakota*, No. 1:12-CV-080, 2012 WL 5511006, at *2 (D.N.D. Nov. 14, 2012) (slander claim dismissed where plaintiff did not allege defendant "published any information to a third-party").

Cent. Code § 14-02-03.  In the instant case, Plaintiff's libel claim fails as a matter of law and

should be dismissed for three principal reasons.  ***First***, the publications at issue are protected

expressions of opinion.  ***Second***, Plaintiff does not – and cannot – plausibly allege that

Greenpeace published the challenged statements with "actual malice."  ***Third***, the publications

are fair and accurate reports of judicial and other official government proceedings.

###         d.         Greenpeace's Challenged Statements are Protected Opinion

All of Greenpeace's 47 statements are not only true and thus the requisite element of

falsity is absent, but also non-actionable expressions of opinion, aimed at swaying public opinion

regarding the environmental impacts of DAPL, and persuading banks to discontinue serving

Energy Transfer – quintessential advocacy to persuade the public to voice their own, parallel

concerns regarding the potential environmental and cultural consequences of DAPL.  Statements

of opinion like these are core protected speech and not defamatory.  *Milkovich v. Lorain Journal

Co.*, 497 U.S. 1, 20 (1990); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).  Whether a

statement is one of opinion is a question of law, *Others First, Inc. v. Better Bus. Bureau of

Greater St. Louis, Inc.*, 829 F.3d 576, 581 (8th Cir. 2016), and courts routinely dismiss

defamation suits on this basis alone.[14]  Where, as here, the publications in suit set out the factual

basis for the opinions presented, leaving it for the readers to evaluate for themselves, no

defamation claim can lie.

For example, Energy Transfer claims that the conclusion in the multi-party "Open Letter

to President Obama" that DAPL "would travel through the Standing Rock Sioux Tribe's

ancestral lands and pass within a mile of its current reservation," is defamatory.  Compl. App. A;

---

[14] *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 624-26 (8th Cir. 2012) (affirming Rule 12(b)(6) dismissal of claims challenging statements of opinion); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1337-39 (D.C. Cir. 2015) (same); *Farah*, 736 F.2d at 531 (same); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1065 (9th Cir. 1998) (same); *Levin v. McPhee*, 119 F.3d 189, 194-96 (2d Cir. 1997) (same); *Hill v. Cosby*, 665 F. App'x 169, 173 (3d Cir. 2016) (same).

Suppl. App. Tab 2.  On its face, the statement describes truthfully the path of the pipeline.  But even if there is any debate as to the veracity of the challenged statement (based, for instance, on what "ancestral lands" means), the statement is protected as an opinion based on facts disclosed in the letter, including references to the SRST Lawsuit "to block construction of the pipeline," because "the Army Corps of Engineers is violating the National Historic Preservation Act by failing to address the Tribe's concern about the pipeline's impact to sacred sites and culturally important landscapes…." Indeed, the Complaint confirms that SRST hired an expert to identify what, in his opinion, could be characterized as sacred sites.  Greenpeace's challenged conclusion based on these disclosed facts is a fairly protected expression of opinion.

Statements referencing DAPL's "threats to water sources" merely state the non-actionable opinion that there is a threat, not a certainty that the potential pollution has already occurred or will occur.  *See* Suppl. App. Tab 10 ("[T]his … pipeline[] pose[s] immediate threats to our land, water, and climate."), Tab13 ("Dakota Access Pipeline … directly threaten[s] the sacred lands and water source of the Standing Rock Sioux Tribe….").  Indeed, these kinds of statements have been found to be protected opinion in other cases.  *E.g., Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002) (statement tannery contaminated well water and caused "toxic waste dump" and owner "must have known" of condition of property protected opinion).  Moreover, Energy Transfer does not claim the assertion is false – just the opposite.  Energy Transfer argues only that a DAPL spill is unlikely (as TransCanada argued before its pipeline spill) and does not seriously deny that if a spill occurred, it could be catastrophic.  Just as important is that the challenged statements tying DAPL to climate change risk are clearly expressing the opinion that the existence of oil infrastructure contributes to the climate change problem – a matter of considerable public discourse.  *See* Suppl. App. Tab 9 ("Re-routing Dakota Access Pipeline

Won't Make it Less Dangerous to the Environment or Climate"), Tab 22 ("the rest of America will face the impacts of catastrophic climate change from burning fossil fuels").  This too has been held to be protected opinion.  *Resolute*, 2017 WL 4618676, at *9.

The Complaint alleges the Greenpeace Defendants (and others) made libelous statements that Energy Transfer used excessive force on DAPL protestors, but any challenged statements are protected opinion based on facts that were being reported at the time.  For example, an article titled "How You Can Help Standing Rock Activists Stop the Dakota Access Pipeline," repeats the widely reported facts that "private security forces set dogs and pepper spray upon a crowd that included young children, injuring 30 activists," and, based on those facts, concludes Energy Transfer's "crew have reacted with aggression and violence."  Suppl. App. Tab 3; *see also id.* Tab 12.  Similarly, Greenpeace's statements that the federal permitting process for DAPL was "rushed" are opinion based on the reported timeline of events.[15]  Suppl. App. Tab 21 ("The original permitting for the pipeline was fast tracked without adequate tribal consultation and consent or environmental review."), Tab 25 ("If this administration is going to fast track environmental destruction then relentless resistance will be the response.").  Accordingly, most if not all of the complained-of statements are opinions based on referenced facts and the opinions provided the speaker's interpretation of those facts.

Further, advocacy pieces like Greenpeace's here are quintessential opinion publications.  "[W]hen determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment."  *Janklow v. Newsweek,*

---

[15] And moreover, such statements are not "of and concerning" Energy Transfer, but rather the government's permitting process, and thus cannot form the basis of Plaintiff's defamation claim (especially where the government cannot sue for defamation).  *Schuster v. U. S. News & World Report, Inc.*, 602 F.2d 850, 854 (8th Cir. 1979).

*Inc.*, 788 F.2d 1300, 1303 (8th Cir. 1986).  Accordingly, the context of the publication is critical.  *Id*. at 1302.  *See also Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989); *Secrist v. Harkin*, 874 F.2d 1244 (8th Cir. 1989); *Deupree v. Iliff*, 860 F.2d 300 (8th Cir. 1988).  Each of the publications remaining in suit is attributed to Greenpeace, which is well-known and identified with environmental advocacy.  The publications include various obvious statements of opinion, such as "We … support the tribes and landowners along the pipeline route in their fight against the [DAPL] project," Suppl. App. Tab 2.[16]  Advocacy pieces like these are similar to a newspaper's op-ed page, understood by reasonable readers to be inherently opinion-based.[17]

Eight of the 33 Greenpeace publications at issue are press releases,[18] which in the context of a political campaign "signal political opinion" just "as a newspaper editorial or political cartoon" would.  *Secrist*, 874 F.2d at 1249.  Indeed, "debate on public issues should be uninhibited, robust, and wide-open," *Sullivan*, 376 U.S. at 270, and courts go so far as to say that "language in the political arena" can even be "vituperative" or "inexact," *Watts v. United States*, 394 U.S. 705, 708 (1969).  Thus, accusations made "in the contest of political, social or philosophical debate" are understood to be opinion.  *Ollman*, 750 F.2d at 987 (*en banc*); *see also id.* at 1013 (MacKinnon, J., concurring); *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987).  Here too, Greenpeace's political advocacy is understood, in context, to be statements of opinion.

The seven Tweets in suit are part of the vibrant political debate that takes place over

---

[16] *See also, e.g.*, Suppl. App. Tab 15 ("We're here to tell TD Bank that destroying indigenous land and poisoning the water of thousands of people is bad for business"); Tab 25 ("If this administration is going to fast track environmental destruction then relentless resistance will be the response."); *supra* at 16.

[17] *Ollman v. Evans*, 750 F.2d 970, 985 (D.C. Cir. 1984); *Secrist*, 874 F.2d at 1249 ("The 'literary context' factor includes the type of forum or 'social context' in which the statement was made, the category of publication, its style of writing, and the intended audience.").  *Cf. Janklow v. Newsweek, Inc.*, 759 F.2d 644, 651-52 (8th Cir. 1985), *on reh'g*, 788 F.2d 1300 (8th Cir. 1986).

[18] Suppl. App. Tabs 8, 10, 11, 23, 28, 29, 30, 33.

social media and are recognized in appropriate circumstances as opinion, not fact.[19]  The

Complaint places the Tweets squarely in the context of a campaign to advocate regarding DAPL

and Energy Transfer's pipeline operations and practices.  Compl. ¶ 117.  A reader would

naturally understand accusations and slogans made on Twitter, in a political context, reflect

subjective disagreements because it is a forum for the pithy exchange of opinions.  "Not only

commentators, but courts as well have recognized that online blogs and message boards are

places where readers expect to see strongly worded opinions rather than objective facts."

*Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696-97, (2012) (collecting cases).  This principle

applies even more strongly to Twitter, where users are limited to 140 characters to post off-the-

cuff thoughts in a continually updating stream.  *See, e.g., Jacobus v. Trump*, 55 Misc. 3d 470,

484, 51 N.Y.S.3d 330, 343 (N.Y. Sup. Ct. 2017).  Accordingly, Greenpeace tweets with slogans

such as "We have rights, and one of those rights is the right to clean water,"[20] Suppl. App. Tab 1,

"Re-routing Dakota Access pipeline won't make it less dangerous to the environment or our

climate!," *id*. Tab 9, and "Militarized response to peaceful protest and indigenous rights is

indefensible," *id*. Tab 16, are protected speech expressed in a medium universally recognized for

opinionated and pointed commentary.

Finally, the complained-of statements that, for example, Energy Transfer was "willing to

destroy Standing Rock's … water supply," Suppl. App. Tab 21, along with other strong language

such as DAPL is "a project that tramples Indigenous rights and pushes us closer to climate

disaster," *id*. Tab 6, constitute the type of "colorful," language given wide latitude under the First

---

[19] Suppl. App. Tabs 1, 9, 12, 16, 17, 19, 25.  *See also id.* Tabs 13 & 31 (collecting non-party tweets expressing parallel concerns regarding DAPL).

[20] This quote originated with a representative of the Hooper Valley tribe, and was tweeted along with a link to a video published by The Guardian newspaper in which the statement was made. As such, the tweet provided the factual context for the quote and the quote came from a reputable news source.  *See infra* n. 24.

Amendment.  *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995).  The

Supreme Court has confirmed time and again that the First Amendment protects vigorous speech

on matters of public debate, and Eighth Circuit courts have only added to this body of law.  *See,*

*e.g., Brodkorb v. Minn.*, No. Civ. 12-1958 SRN/AJB, 2013 WL 588231, at *14 (D. Minn. Feb.

13, 2013).  The *Resolute* court criticized the plaintiff's "overly literal approach to obviously

overemphatic speech," affirming that rhetorical flourishes are "protected speech."  *Resolute*,

2017 WL 4618676, at *9.  Because environmental issues generally, and climate change debate in

particular, are notoriously contentious topics, recipients of these publications would expect

emphatic language from Greenpeace.  Energy Transfer complains that referring to DAPL as

"devastating to Native communities and lands," Suppl. App. Tab 8, is defamatory (even

criminally fraudulent), but such charged statements indisputably signal nonactionable opinion.

> ### e.        Plaintiff Cannot Plausibly Plead Statements Made with Actual Malice

Even if the complained-of statements were not protected opinion (and they are), the

Complaint fails to state a claim as a matter of law because it does not allege the requisite high

degree of fault on the part of Greenpeace.  As a public figure, Energy Transfer does not and

cannot plausibly plead actual malice.  The First Amendment makes clear that a public figure

plaintiff may recover for injury to reputation only on clear and convincing proof of "actual

malice," a state of mind the Supreme Court has defined as a subjective awareness of the truth

through "a showing that a false publication was made with a high degree of awareness of

probable falsity," and that the defendant "in fact entertained serious doubts as to the truth of his

publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (internal quotations omitted).

The alleged defamatory speech in this case clearly addresses matters with which the

public has legitimate concern.  The public is legitimately interested in all manner of

environmental harm and the treatment of Indigenous communities.[21]  And, Energy Transfer's practices as a pipeline operator have been the subject of substantial media reporting.

In *Gertz*, the Supreme Court discussed the distinction between private and public figures, noting two fundamental differences.  First, public figures usually have greater access to the media, which gives them "a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 U.S. at 344; *see also Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979) ("[R]egular and continuing access to the media … is one of the accouterments of having become a public figure.").  Second, "public figures … voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them."  *Gertz*, 418 U.S. at 345.  In short, public figures "invite attention and comment."  *Hutchinson*, 444 U.S. at 134.  The essentiality of demanding the highest standard of fault for public figures has been thoroughly embraced under North Dakota law.  *Riemers v. Mahar*, 748 N.W.2d 714 (N.D. 2008).

There is no question that ETE and ETP are publicly-traded, highly visible corporations that must plead and prove "actual malice."[22]  Compl. ¶¶ 30-31.  *See Compuware Corp. v. Moody's Inv'rs Servs.*, 499 F.3d 520, 525 (6th Cir. 2007); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977).  Corporations subject to regulation by state or federal authorities invite public scrutiny by voluntarily entering such businesses.  *See Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393-94 (8th Cir. 1997) (highly regulated corporations

---

[21] *See, e.g., Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 874 (N.D.N.Y. 1995) , ("admitted violations of environmental regulations implicate issues of environmental safety and public health," and are issues of public concern), *aff'd*, 112 F.3d 504 (2d Cir. 1996); *Container Mfg. Inc. v. CIBA-GEIGY Corp.*, 870 F. Supp. 1225, 1234-35 (D.N.J. 1994) (storage of chemicals "pose potentially severe health environmental risks to society" and is an issue of public concern).

[22] Energy Transfer is also a limited purpose public figure based on the significant public controversy concerning its pipeline management, and the alleged defamatory statements are germane to its participation in the controversy.  *See Stepnes*, 663 F.3d at 964 (affirming limited public-figure status of real estate developer in connection with house lottery public controversy); *Resolute*, 2017 WL 4618676, at *5.

public figures); *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir.

1983) (*dictum*) ("there seems no reason to classify a large corporation as a private person.")

As a public figure, Energy Transfer is thus required to plead facts showing Greenpeace

acted with actual malice by clear and convincing evidence – but it cannot plausibly do so.  *See*

*Gertz*, 418 U.S. at 331-32.  The "actual malice" standard imposes a heavy burden on plaintiffs.

It "is not measured by whether a reasonably prudent man would have published, or would have

investigated before publishing."  *St. Amant*, 390 U.S. at 731.  Rather, the plaintiff has the burden

of pleading and ultimately proving that the defendant made the statements with a "high degree of

awareness of their probable falsity."  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  As the D.C.

Circuit has explained this bedrock Constitutional principle, a public figure can only support a

libel claim with allegations that the defendant was subjectively aware the story was "(1)

fabricated; (2) so inherently improbable that only a reckless person would have put [it] in

circulation; or (3) based wholly on an unverified anonymous telephone call or some other source

that [plaintiff] has obvious reason to doubt."  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C.

Cir. 2003).  "'For [the actual malice] standard to be met, the publisher must come close to

willfully blinding itself to the falsity of its utterance.'"  *Tavoulareas v. Piro*, 817 F.2d 762, 776

(D.C. Cir. 1987) (*en banc*) (citation omitted).  Energy Transfer cannot clear this high hurdle,

even at the pleading stage.  Moreover, in the wake of *Iqbal* and *Twombly*, a plaintiff cannot state

a claim simply by making conclusory assertions of the elements of actual malice, which is all the

Complaint does here. Federal courts in the Eighth Circuit and across the country now routinely

dismiss defamation cases for failure to state a claim where, as here, the plaintiff fails to plead

specific facts to make actual malice plausible.[23]

Because the challenged statements expressly rely on previously published articles in reputable publications and statements in official court records, scientific reports, and government reports, Energy Transfer cannot plausibly meet the "daunting" standard of actual malice and instead conclusively demonstrates Greenpeace's lack of actual malice as a matter of law. Reliance on previously published material from reputable publications precludes Energy Transfer from pleading actual malice. *See, e.g., Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988). For example, numerous challenged publications cite and hyperlink to the sources upon which they rely, including news coverage of the DAPL protests,[24] news coverage of bank divestments from companies that backed DAPL,[25] news reports that protestors were met with excessive force,[26] and official United Nations statements on Indigenous peoples' rights.[27] Reliance on these reputable sources defeats actual malice, as a matter of law.[28]

---

[23] *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012); *Mayfield*, 674 F.3d at 378; *Egiazaryan v. Zalmayev*, No. 11 Civ. 2670 (PKC), 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Hanks v. Wavy Broad., LLC*, Civ. No. 2:11cv439, 2012 WL 405065, at *12 (E.D. Va. Feb. 8, 2012); *Pan Am. Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d 6, 17 (D. Me. 2012); *Diario El Pais, S.L. v. Nielsen Co., (US)*, No. 07cv11295(HB), 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 761-62 (D. Md. 2015); *Biro*, 963 F. Supp. 2d at 288; *Parisi v. Sinclair*, 845 F. Supp. 2d 215 (D.D.C. 2012); *Deripaska v. Associated Press*, No. CV 17-00913 (ESH), 2017 WL 4685297, at *5 (D.D.C. Oct. 17, 2017).

[24] Suppl. App. Tab 1 (https://www.theguardian.com/us-news/video/2016/aug/29/north-dakota-oil-access-pipeline-protest-video).

[25] *Id.* Tab 18 (https://www.nrk.no/sapmi/sparebank-1-selger-seg-ut-fra-omstridt-oljerorledning-1.13239446).

[26] *Id.* Tab 20(http://nymag.com/daily/intelligencer/2016/11/hundreds-injured-in-dakota-access-pipeline-protest.html) (https://www.washingtonpost.com/news/morning-mix/wp/2016/11/01/dakota-access-protesters-accuse-police-of-putting-them-in-dog-kennels-marking-them-with-numbers/?utm_term=.f2550f15b9f9).

[27] *Id.* Tab 7 (http://www.ohchr.org/EN/Issues/IPeoples/Pages/Declaration.aspx).

[28] *Klayman v. City Pages*, No. 5:13-cv-143-Oc-22PRL, 2015 WL 1546173, at *16-17 (M.D. Fla. Apr. 3, 2015) (no actual malice when relied on judicial opinions and public filings), *aff'd*, 2016 WL 3033141, at *5 (11th Cir. May 27, 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice."); *CACI Premier*

Energy Transfer claims that Greenpeace made false statements with the intent of injuring its reputation and interfering with its business relationships, Compl. ¶ 427, but a defamation defendant's "intent" is insufficient to establish actual malice. *Pauling v. Globe-Democrat Publ'g Co.*, 362 F.2d 188, 198 (8th Cir. 1966). Nor do the political motivations of the speakers establish actual malice. *Campbell*, 255 F.3d at 569. To plead actual malice, Energy Transfer must allege facts sufficient to give rise to a reasonable inference that the alleged false statements were made with knowledge that they were false or with reckless disregard of whether they were false. *Id.*; *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73 (N.D. 1991). This analysis applies only to the actual person who uttered the statement (or the party with control over the publication). *Resolute*, 2017 WL 4618676, at *8. The Complaint does not allege – and cannot allege – facts suggesting Greenpeace entertained any serious doubts that the 47 challenged statements published regarding Energy Transfer's pipeline operations were true.

### f.    Greenpeace's Statements are Privileged

Energy Transfer's defamation claims also should be dismissed because the challenged statements are privileged fair reports of judicial and official governmental proceedings. The privilege protects against defamation and related claims where, as here, a publication accurately summarizes statements in court records and government reports. N.D. Cent. Code § 14-02-05; *Humann v. KEM Elec. Coop.*, 450 F. Supp. 2d 1006, 1016 (D.N.D. 2006), *aff'd*, 497 F.3d 810 (8th Cir. 2007); *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 77 (N.D. 1991). Even if the underlying information ultimately proves false, the privilege applies if "the reports were substantially accurate" and "concern a governmental proceeding." *White v. Fraternal*

---

*Tech. v. Rhodes*, 536 F.3d 280, 292 (4th Cir. 2008) (no actual malice where relied on official reports); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 260 (D.D.C. 2016), *aff'd on other grounds*, No. 16-7096, 2017 WL 5505131 (D.C. Cir. Nov. 17, 2017).

*Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990).  Whether the privilege applies is a question

of law courts routinely decide on a motion to dismiss by comparing the publication in suit with

official records, subject to judicial notice.[29]

Numerous publications in suit are privileged fair reports of judicial or official

government proceedings, including reports on the SRST Lawsuit, *see* Suppl. App. Tab 2, 3, 29,

and reports on the official federal government process for permitting the pipeline, *see id.* Tabs 3,

8, 9, 11, 24, 26, 28.  Greenpeace's publications reporting on each of these proceedings plainly

fall within the scope of the fair report privilege, *White*, 909 F.2d at 527 (privilege "extends

broadly to the report 'of any official proceeding,'" including allegations or findings that prompt

such proceedings), and Energy Transfer thus cannot claim liability for Greenpeace's privileged

statements.  *See Michaelis v. CBS, Inc.*, 119 F.3d 697 (8th Cir. 1997) (liberally construing

qualified privilege for fairly and accurately reporting judicial proceedings).

### 3.    Energy Transfer Fails to Plead a Plausible Claim Under RICO

In the *Resolute* case, despite a 168-page complaint intended to create the illusion of

specificity and depth, Judge Tigar in the Northern District of California held that Resolute's

claims fell "far short" of the Rule 9(b) standard for pleading fraud with specificity.  Energy

Transfer's 228-page complaint – overstretched for the very same reason – should fare no better.

---

[29] Courts routinely dismiss defamation suits where the statements are privileged fair reports.  *See, e.g., Lee v. TMZ Prods. Inc*., No. 16-2736, 2017 WL 4675710, at *5 (3d Cir. Oct. 17, 2017); *Wilkow v. Forbes, Inc.*, No. 99 C 3477, 2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001); *Hargrave v. Washington Post*, No. Civ. A. 09-0357(HHK), 2009 WL 1312513, at *1 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224 (D.C. Cir. 2010); *Catchai v. Fort Morgan Times*, No. 15-CV-00678-MJW, 2015 WL 6689484, at *4 (D. Colo. Nov. 3, 2015), *judgment entered*, No. 15-CV-00678-MJW, 2015 WL 6689485 (D. Colo. Nov. 3, 2015); *Bothuell v. Grace*, No. 16-11009, 2017 WL 892343, at *6 (E.D. Mich. Feb. 16, 2017), *report and recommendation adopted sub nom. Bothuell v. Grace*, No. 16-11009, 2017 WL 878026 (E.D. Mich. Mar. 6, 2017); *Scheidler v. Nat'l Org. for Women, Inc.*, 739 F. Supp. 1210, 1215 (N.D. Ill. 1990); *DMC Plumbing & Remodeling, LLC v. Fox News Network, LLC*, No. 12-CV-12867, 2012 WL 5906870, at *6 (E.D. Mich. Nov. 26, 2012); *Zappin v. Daily News, L.P.*, No. 16 CIV. 8762 (KPF), 2017 WL 3425765, at *8-14 (S.D.N.Y. Aug. 9, 2017).

That is because there is simply no precedent under the case law in any Circuit for finding a RICO enterprise of the type Energy Transfer urges.  Putting aside the specific elements that Energy Transfer must plead and prove – which it cannot, as discussed in detail below – it is important to understand, in a larger sense, what Energy Transfer is attempting to accomplish.  It is trying to transform prototypical public advocacy by environmental groups of many different stripes who here have added their voices in support of existing protests (and in the case of Greenpeace, mainly by writing articles and letters), into a purposeful, organized conspiracy formed to commit criminal acts.  *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 298 (1st Cir. 1986) ("A civil RICO suit is in effect quasi-criminal in nature.").  Under Energy Transfer's virtually unprecedented view, nearly any "cause" that rallies people and advocacy groups together – whether the focus is the environment, politics, civil rights, federalism, or anything else – would provide sufficient evidence of a RICO enterprise.

While the complaint contains an exhaustive account of Energy Transfer's many apparent grievances against anyone and everyone who ever criticized or protested DAPL, glaringly absent are the criminal intent, the links, the coordination and the structure connecting all of the disparate entities to criminal acts that would make this a plausible RICO enterprise.[30]  Courts have taken pains to curtail the expansion of RICO into areas completely outside the intended bounds of that statute, especially given the "stigmatizing" effect on defendants named in a RICO case. *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).  *See also Scheidler* 537 U.S.at 401-08; *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir. 1991). This case is

---

[30]These deficiencies are all the more glaring since Energy Transfer purportedly hired (unlicensed) private investigators to use fake social media accounts, masquerade as protestors and use fake news to try and develop its RICO theory for this lawsuit.  *See* https://theintercept.com/2017/11/15/dakota-access-pipeline-dapl-tigerswan-energy-transfer-partners-rico-lawsuit/.

another such attempted expansion that must be halted in its tracks.

At most, Energy Transfer's allegations amount only to garden-variety defamation claims, which as discussed *supra*, must be proven against each defendant individually, and fail here for multiple reasons.  Energy Transfer cannot avoid First Amendment scrutiny by ***mislabeling*** its claims as extortion, fraud, tortious interference, conspiracy, racketeering, or money laundering, if the roots of each are merely alleged falsehoods causing reputational harm.  Defamation standing alone is ***not*** a predicate act under RICO. *See infra* § 3.e.(1), *infra*.  Here, Energy Transfer's claims, all based on Greenpeace's very public speech on matters of environmental advocacy or association, must comport with the First Amendment.  *See Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990) (claims sufficiently similar to defamation, such as tortious interference, "are subject to the same first amendment requirements that govern actions for defamation").  Courts must look beyond the labels affixed to claims and consider whether they would unconstitutionally suppress protected speech.  *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042-43, 1045 (1986) (plaintiffs cannot circumnavigate First Amendment limitations by "creative pleading" "affix[ing] labels other than defamation to injurious falsehood claims").

The necessity of looking past creative pleading to the core of a claim also mandates that Energy Transfer cannot avoid the requirement that it plead and prove actual malice simply by trying to repackage its defamation claims as RICO predicate acts.  *Beverly Hills Foodland, Inc.*, 39 F.3d at 196  ("[T]he malice standard required for actionable defamation claims during labor disputes must equally be met for a tortious interference claim based on the same conduct or statements. This is only logical as a plaintiff may not avoid the protection afforded by the Constitution and federal labor law merely by the use of creative pleading.").  Although the *Resolute* court expressly did not reach whether actual malice applies to RICO claims based on

alleged falsehoods (because it found the complaint failed to state a claim on other grounds, *see* 2017 WL 4618676, at *11 n.14), the Supreme Court has had no difficulty holding claims sounding in injurious falsehoods and alleging reputational damage are subject to the actual malice standard.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (intentional infliction of emotional distress); *Bose Corp. v. Consumers Union*, 466 U.S. 485, 513-14 (1985) (product disparagement); *Time, Inc. v. Hill*, 385 U.S. 374, 386-87 (1967) (false light invasion of privacy).  "[A] rule that would impose strict liability" for allegedly false assertions "would have an undoubted chilling effect on speech relating to public figures that does have constitutional value. Freedoms of expression require breathing space."  *Hustler Magazine,* 485 U.S. at 52 (citations omitted).  This interpretation applies with equal force to claims based on allegedly false statements that are repackaged as RICO claims.

###### a.        The RICO Elements

Energy Transfer brings claims under Section 1962(a), (c) and (d)[31] of the RICO statute. A RICO plaintiff must plead: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (*i.e.*, predicate criminal acts).  *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008); *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); *Fladeland v. Satrom*, No. 2:12-cv-20, 2012 WL 12914317 (D.N.D. Oct. 26, 2012).  A plaintiff has standing to bring a RICO claim if it suffered a sufficiently direct injury and proximate causation.  *Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 446-47 (8th Cir. 2000) (citing *Holmes v. Secs. Inv'r Prot. Corp.,* 503 U.S. 258, 265–68 (1992)).  Courts in the Eighth Circuit

---

[31] A claim under section 1962(d) for conspiracy to violate RICO cannot stand unless a plaintiff can sustain a viable claim for commission of predicate acts under another subsection, which Plaintiff cannot do here.  *Bowman v. W. Auto Supply Co.*, 985 F.2d 383, 388 (8th Cir. 1993).

routinely grant motions to dismiss civil RICO claims,[32] and here Energy Transfer has not sufficiently pled ***any*** of the necessary elements, including causation, much less pled the elements with the requisite specificity under Rule 9(b).[33]

### b. Energy Transfer Has Not Plausibly Pled a RICO "Enterprise"

The goal of the federal RICO statute was "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce."  S. Rep. No. 91-617, at 76 (1969); *see Geraci v. Women's All., Inc.*, 436 F. Supp. 2d 1022, 1037 (D.N.D. 2006).  The law also has been interpreted to cover not just corruption of legitimate entities, but operation of illegitimate ones.  *United States v. Turkette*, 452 U.S. 576 (1981).  A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity."  18 U.S.C. § 1961(4).

Energy Transfer takes great pains to avoid delineating the outlines of the alleged "enterprise" in this case, devoting one conclusory sentence in its 228-page complaint to defining it.[34]  Compl. ¶ 38.  Plaintiff alleges the existence of an "association-in-fact" enterprise comprised of 17 environmental groups, eight identified individuals, and a host of unnamed persons who purportedly "illegally misappropriate proprietary and other confidential information from Energy

---

[32] *See*, *e.g.*, *Teamsters Nat'l Freight Indus. Negotiating Comm. on Behalf of Teamster Local Union Numbers 116, 120, 123, 346, and 544 v. MME, Inc.*, 116 F.3d 1241 (8th Cir. 1997); *Fladeland*, 2012 WL 12914319.

[33] For many of its RICO allegations, Energy Transfer offers no more than legal conclusions or bare allegations of wrongdoing, which are neither plausible nor particular under *Twombly* and *Iqbal*.  At a minimum, the Court should strike all bare allegations from the Complaint relating to: money laundering (Compl. ¶¶ 372, 394, 399)**;** interstate transportation of stolen property (*id*. ¶¶ 372, 394, 399); DDoS attacks (*id*.); "credential harvesting" spam attacks (*id*.); and (iii) "doxing" against Energy Transfer employees (*id*.).

[34] Elsewhere, Plaintiff appears to assert that environmental groups were once legitimate, but all have now been infiltrated by criminal actors.  *See* Compl. ¶ 41.  Whatever "shadowy interests" Energy Transfer believes has infiltrated the ENGOs, it does not identify them or sue them here.

Transfer through … hacking and other illegal cyber-activity…. [and] have also organized and participated in violent, criminal protests against Energy Transfer."[35]  Compl. ¶ 38(u).

While the definition of an association-in-fact is not rigid, "it does need some sort of discrete existence and structure uniting its members in a cognizable group."  *Nelson v. Nelson*, 833 F.3d 965 (8th Cir. 2016).  The Supreme Court, in *Boyle v. United States*, held that an "association-in-fact" enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 556 U.S. 938, 944-45 (2009) (citing *Turkette*, 452 U.S. at 583); *State Farm Mut. Auto. Ins. Co. v. Cohan*, No. cv 09-2990(JS)(WDW), 2009 WL 10449036, at *8 (E.D.N.Y. Dec. 30, 2009) (warning that a plaintiff cannot "simply tack[] on entities" to the alleged enterprise "which do not in fact operate as a 'continuing unit' or share a 'common purpose.'").  An association-in-fact thus must have (1) a common purpose of engaging in a course of conduct, (2) relationships among those associated with the enterprise, and (3) sufficient longevity to permit the associates to pursue the purpose.  *Boyle*, 556 U.S. at 946.  Plaintiff has failed to plausibly allege any of these elements.

>    i.    **Common Purpose.**  "[A]lthough much about the RICO statute is not clear, it is very clear that those who are 'associate[s],' 18 U.S.C. § 1962(e), of a criminal enterprise must share a 'common purpose.'"  *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.* 528 F.3d 1001 (8th Cir. 2008) (quoting *Ryan v. Clemente*, 901 F.2d 177, 180 (1st Cir. 1990); *see, e.g., Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989); *Fladeland*, 2012 WL

---

[35] Plaintiff elsewhere appears to argue that even without other alleged members, Greenpeace and its own employees act as a RICO enterprise.  *See* Compl. ¶¶ 2-8.  However, a plaintiff must demonstrate that the RICO "person" and "enterprise" are distinct from each other. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  Courts do not recognize claims that an employer and its employees, or a parent and its wholly-owned subsidiaries, constitute a RICO enterprise.  *See Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997) (employees); *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 896 (8th Cir. 1999) (subsidiaries).

12914319, at *2-3.  To plead an enterprise, a plaintiff "must show that all persons joined the enter-

prise for a common racketeering purpose."  *Rilley v. MoneyMutual, LLC*, No. 16-4001(DWF/

LIB), 2017 WL 3822727 (D. Minn. Aug. 30, 2017) (citing *Nelson v. Nelson*, 833 F.3d 965, 968 (8th

Cir. 2016)); *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, No. 04-0074-CV-W-DW, 2005 WL

1279046, at *2 (W.D. Mo. May 25, 2005), *aff'd on other grounds*, 528 F.3d 1001 (8th Cir. 2008).

Energy Transfer alleges that the "purpose" of the enterprise here was to spread false

information about DAPL in the media, in order to use that false information to pressure

environmental donors and Plaintiff's partners, and incite violence.  Compl. ¶ 39.  Importantly,

the "common purpose" Plaintiff identifies here is ***not*** protesting the construction of DAPL,

protecting the environment, defending Native American rights, which were some of the many

purposes contemporaneously identified by Greenpeace and others for supporting the DAPL

protests.  *See*, *e.g.*, Suppl. App. Tabs 2, 3.  Nor does it allege that merely generating media

attention for the DAPL opposition was the common purpose.  Energy Transfer well knows that

those types of goals do not state a common racketeering purpose under RICO, but rather are

social and political goals protected by the rights of free speech and association.  So, Energy

Transfer simply ***invents*** a fraudulent purpose to fit the malevolent alternative reality it peddles

here.  Yet the existence of such a purpose is not supported by factual allegations that would

"render plausible [the] claim that the enterprise members actually knew of the alleged fraudulent

common purpose, or that they 'formed' the enterprise to participate in [the common purpose]—

much less that they 'devised a scheme to [accomplish the purpose].'"  *Ellis v. J.P.Morgan Chase

& Co.*, No. 12-cv-03897-YGR, 2015 WL 78190, at *5 (N.D. Cal. Jan. 6, 2015).

The Complaint is devoid of factual allegations regarding a common racketeering purpose;

there are no alleged communications between the enterprise members around the claimed

purpose, no alleged agreements between the members on any overall scheme or even particular course of action, and no alleged knowledge on the part of any enterprise member that it was part of an enterprise pursuing the purpose.  At best, the Complaint includes vague, conclusory pronouncements that the purported members "engaged in a mutually understood, agreed upon, and coordinated campaign of racketeering activity directed at Energy Transfer," Compl. ¶ 38(u), which cannot satisfy Plaintiff's obligation to allege facts sufficient to render plausible an agreement by the enterprise members around a common purpose.  *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011) (affirming dismissal and finding similar vague "bare assertions" insufficient to form basis of RICO claim) (citing *Gallagher v. Magner*, 619 F.3d 823, 842 (8th Cir. 2010)).  As an example, Plaintiff states "[t]he Enterprise's goal was to create conflict that would halt construction whenever possible.  The more violent the conflict the more sensational the videos it could create to drive media content and donations."  Compl. ¶ 316. Again, this merely states a conclusion rather than plausibly pleading *facts* suggesting the enterprise members agreed to create violent conflicts to serve the purported goal.  Just because particular protest activity *generated* press coverage (intended or not), cannot alone transform protests into an intentional effort to spread false information, pressure donors and business partners, and incite violence.  It is Plaintiff's burden to plausibly allege the enterprise members agreed to cause these violent protests to serve a common purpose, and it has not met that burden.

Further, "'divergent goals' among members of a purported association-in-fact enterprise is a 'fatal problem' to a RICO claim," *Craig Outdoor Advertising,* 528 F.3d at 1027 (citing *Batzel  v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)), yet Energy Transfer fails to provide a factual basis for alleging that 17 environmental groups and a host of individuals, each with their own disparate agendas, subverted those independent goals to the common criminal purpose

posited here. *See Fladeland*, 2012 WL 12914319, at *2-3.  As an example, while Energy

Transfer labels all of the individual protestors on the ground in North Dakota as members of the

enterprise, *see*, *e.g.*, Compl. ¶¶ 93, 94, 314, 320, it is entirely implausible that these protestors

each would have shared the common purpose of generating international media attention to

further the common purpose of using such attention to defraud environmental groups' donors, or

unlawfully pressure Plaintiff's customers.  In short, nothing in the Complaint substantiates the

existence of the alleged or ***any*** common racketeering purpose, other than Plaintiff's speculation.

        ii.    **Relationships.**  "In order to satisfy the relationship requirement for

an association in fact at the pleading stage[,] the question a court must ask is whether all of the

defendants in the association in fact were working together on a common scheme[.]" *Raineri*

*Constr., LLC v. Taylor*, No. 4:12-cv-2297(CEJ), 2014 WL 348632, at *4 (E.D. Mo. Jan. 31,

2014) (quotations omitted) (citing *Elsevier*, 692 F. Supp. 2d at 306); *see also Browning v.*

*Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 913 (N.D. Ind. 2013).  While members need not have

"fixed roles" and can "perform different roles at different times," a "plaintiff must allege facts

'tending to make it plausible that the Court is confronted with something more than parallel

conduct of the same nature and in the same time frame by different actors in different

locations.'"*Raineri*, at *4; *see also United States v. Eiland*, 738 F.3d 338, 360 (D.D.C. 2013).

    The Complaint is remarkably silent as to any purported "relationships" at all between the

alleged enterprise members, other than (1) "seed funding" of the Red Warrior Camp by

EarthFirst!, Compl. ¶¶ 13, 38, 91, 319; (2) the existence of long-extant organizational links

between the Greenpeace entities themselves, *id.* ¶ 38; (3) joint letters of protest from multiple

environmental groups, *id.* ¶¶ 38, 237-38, 245-46; and (4) public drives for food and clothing by

numerous environmental groups, including Greenpeace, in support of protestors, including Red

Warrior Camp, *id.* ¶¶ 28, 106.  Other than the intra-Greenpeace relationships – which cannot

serve as the basis for a RICO enterprise, *see supra* n. 35 – these few additional, public ties

between the groups do not suggest an "ongoing organization" with members functioning as a

"continuing unit."  And other than these ties, the Complaint merely alleges independent activities

of the enterprise members that do not evince parties working towards a common, criminal

purpose.  Plaintiff has not presented any facts that suggest that the actions of the purported

enterprise members were anything other than they appear on their face: Various groups and

individuals engaged in environmental advocacy around a particular cause – opposition to the

pipeline – and each for their own reasons.  *See Almanza v. United Airlines, Inc.*, 851 F.3d 1060

(11th Cir. 2017).  Plaintiff's sinister alternate agenda is spun from whole cloth.

As a partial consequence of failing to identify the relationships that connect the parties,

Plaintiff also has failed to sufficiently allege the role – fixed or not – of Greenpeace in the

alleged RICO enterprise.  Indeed, in many instances Plaintiff makes no effort to even identify

which purported enterprise member was responsible for a particular purported action, and often

just alleges vaguely that the "enterprise" took the action.  *See, e.g.*, Compl. ¶ 105 ("the Enterprise

falsified a photograph purporting to show a seven-year-old girl mauled by guard dogs at the

DAPL construction site").  In the *Resolute* case, the court found that "[w]hile Resolute's

complaint lists reports authored by Greenpeace . . . in many cases it does not identify the author

of the reports . . . . [it also] claims that the Defendant 'processed millions of dollars in

fraudulently induced donations,' without describing a single donor…."  *Resolute*, 2017 WL

4618676, at *10.  The same fatal flaws plague Energy Transfer's complaint.

     iii. **Application of the above elements.**  Taken together, Plaintiff has

not come close to plausibly pleading the existence of a RICO enterprise, much less pleading a

RICO claim with specificity.  It has not pled how the enterprise was formed, how the common purpose was agreed upon, who (if anyone) was in charge, how decisions were made, or how the alleged enterprise members communicated.  *Fladeland*, 2012 WL 12914319; *see also*, *e.g., Allstate Ins. Co. v. Donovan*, No. H-12-0432, 2012 WL 2577546, at *14 (S.D. Tex. July 3, 2012) (no enterprise where complaint lacked such factual allegations).  For example, Energy Transfer alleges the purported enterprise "burst to the surface" once the USACE gave final approval for DAPL in early September 2016, Compl. ¶ 87, yet fails to detail how this came about.  There are no allegations regarding any prior communications, agreements or discussions among the alleged enterprise members leading to the enterprise bursting forth – Plaintiff asks the Court to **presume** that coordination and development must have occurred.  And what was the first act of this criminal enterprise?  Seeking access to the justice system.

According to Plaintiff, the "enterprise" "burst to the surface" when SRST's "putative lawyers"[36] with Earthjustice filed a lawsuit challenging USACE's approval.  *Id*.  There are of course no factual allegations that explain how a legal filing – especially one that ultimately resulted in a partial remand of USACE's approval – could constitute a RICO predicate act, or how other members conspired with Earthjustice on the filing, or who made decisions for the enterprise concerning the filing.  Instead, Plaintiff darkly suggests that Earthjustice "did not disclose to the Tribe that its primary motive was to use the Tribe's standing and DAPL as a publicity platform through which Earthjustice and the other Enterprise members could raise money," without any support for this claim.  *Id*.  In any event, even if Energy Transfer could plausibly allege Earthjustice had a different motive than the one stated on the face of its

---

[36] Plaintiff uses phrases like "putative" and "under the false auspices of serving as pro bono counsel for the tribe" to impugn non-defendant Earthjustice (and in doing so, insult SRST), but nowhere explains why Earthjustice was unqualified to act as counsel, or why its role was a sham.

complaint (to challenge the Corps' decision on the merits) or that raising money to support the legal action was criminal, the motive of SRST's legal counsel is not before this Court, but rather whether the alleged enterprise members agreed to a ***common*** purpose.

The Complaint then states that once Earthjustice filed suit and issued a press release and donation requests, "other Enterprise members quickly followed suit" by "manufactur[ing] an international #NODAPL movement based on the false narrative launched by Earthjustice, and expanded the campaign to direct action against DAPL." Compl. ¶ 90. Energy Transfer suggests, again without plausibly alleging, that groups of "enterprise members" set up resistance camps, recruited other members, and trained them "to engage in criminal trespass, violence, and property destruction." *Id.* First, other groups "following suit" in speaking publicly after Earthjustice initiated legal action is the ***very definition of parallel conduct***, not a coordinated scheme. But most importantly, this paragraph simply does not identify any entities, groups or individuals who participated in the alleged acts, or how they coordinated with each other or agreed to any common purpose (especially any violent or criminal purpose). Notwithstanding Plaintiff's "eco-terrorist" epithets, the media campaign described by Plaintiff constituted classic advocacy where different groups, acting independently, rally around a vital, public dispute.

The Complaint then ***finally*** mentions a party named as a defendant in this lawsuit, alleging EarthFirst! provided "seed money" for Red Warrior Camp ("RWC"), which Plaintiff labels a "radical militant group," but has not sued here. Compl. ¶ 91. Even assuming *arguendo* that this characterization of RWC is accurate, Energy Transfer does not allege any organizational ties, structure, or other relationships that would suggest a RICO enterprise between those two entities, much less with Greenpeace, or that the funding served the "common purpose" identified above; Plaintiff also does not allege any links between this funding and Greenpeace or any other

named Defendants. Compl. ¶ 91.  Plaintiff then alleges that other environmental groups (again, none sued here) issued press statements about DAPL, again without suggesting how these press statements resulted from the actions of an "enterprise."  Compl. ¶ 92.

From there, the Complaint simply presumes the existence of an "enterprise" without any further attempt to provide a factual grounding for the allegation, and turns to detailing the supposed "bad acts" (whether or not alleged to be RICO predicate acts) of virtually every group or individual involved in DAPL protests in North Dakota, or who challenged Energy Transfer's actions through public advocacy elsewhere.  Such paltry allegations cannot sustain Energy Transfer's burden of plausibly pleading an enterprise, and its RICO claims must therefore fail.

Notably, there also are no allegations in the Complaint purporting to explain how Greenpeace fit into the alleged enterprise.  The first mention of Greenpeace in connection with DAPL is a public letter to the President of the United States signed by many environmental groups nearly a month after the supposed commencement of the "enterprise" by Earthjustice. Compl. ¶ 96.  As discussed previously, a letter such as this one, on a matter of public concern and addressed to the President, could not be more quintessential advocacy – the right to petition government – and, as such, at the core of First Amendment protected speech.  *See supra* at A.2.a. Yet Plaintiff calls it an act of the criminal "enterprise."  *Id.*  The next mention of Greenpeace is that it held public supply drives to gather food and clothing for RWC.  Compl. ¶ 106.  Again, Plaintiff does not explain how such public efforts support the allegation of a RICO enterprise.

Contrast how the Eighth Circuit recently described a plausible RICO enterprise claim involving a gang whose "[m]embers worked to promote the [gang], develop its reputation, and protect its territory and members," operating as "a coherent unit," with "meetings," and common "colors, signals, and symbols," and a defined "hierarchical leadership structure."  *United States*

*v. McArthur*, 850 F.3d 925, 934 (8th Cir. 2017); *see also United States v. Kehoe*, 310 F.3d 579, 586 (8th Cir. 2002).  Here, the only coordination alleged between members of the ostensible enterprise was publication of articles and letters on the same topics.

Finally, it is necessary to address what are perhaps the most sinister of Plaintiff's allegations in the Complaint, ¶¶ 313-331 ("Destruction of DAPL, Construction Sites, Equipment, and Federal Lands"), ¶¶ 332-340 ("Cyber-attacks").  ***None*** of these acts are alleged to have been directly taken by Greenpeace or any Defendant.  In many instances the Complaint does not identify any specific entity or individual at all.  At most, Energy Transfer alleges that RWC was "a front for Greenpeace, Earth First! and the rest of the Enterprise," Compl. ¶ 319, again with no support for that conclusory statement.  While several actions are purported to have been taken by "enterprise members" Mississippi Stand! and Bold Iowa, there are no allegations ***linking*** those actors (or acts) to the supposed enterprise or even to Greenpeace.

The Complaint also details the actions of two individuals, Jessica Reznicek and Ruby Montoya, whom Plaintiff says were "Enterprise members" that committed arson and sabotage, among other acts.  Compl. ¶¶ 325-330.  Nowhere does Plaintiff allege why these two individuals should be considered "enterprise members," other than a conclusory statement that they are "veteran members" of Mississippi Stand!, Compl. ¶ 325, which Plaintiff, again, has not plausibly linked to an "enterprise," much less Greenpeace.  Indeed, Plaintiff later concedes Reznicek and Montoya "were directly incited by the Enterprise's misinformation campaign" and that their public statements were "a direct response to the Enterprise's call to action."  Compl. ¶¶ 325-327.  Even if true, "responding" or being "incited by" a public campaign on a matter of public concern does not make these individuals members of a RICO enterprise.

The section on cyber-attacks, incredibly, does not even ***mention*** any Defendant ***or***

enterprise member.  Although Plaintiff begins by saying that "the Enterprise launched cyber-attacks against Energy Transfer under the guise of the front Anonymous," Compl. ¶ 332, the only alleged **connection** between the secretive hacker group Anonymous and the alleged enterprise is the following: "They were also tied to the overall anti-DAPL campaign, using the hashtags, #OpNoDAPL and #nodapl, among others."  Compl. ¶ 336.  The idea that using a Twitter hashtag can be the basis for participation in a RICO enterprise is preposterous.  Further, this is the second lawsuit in which a large company (represented by the same law firm) has conclusorily alleged that environmental groups have used Anonymous to launch cyber-attacks, suggesting that these frivolous suggestions are nothing more than a deliberate effort to "stigmatize" environmental groups.  If Energy Transfer believes Anonymous was an enterprise member, it must have a plausible factual basis for the claim; if not, the claim is frivolous.[37]

### c.   Energy Transfer Has Not Plausibly Pled "Conduct" of an Enterprise

"Liability under § 1962(c) extends only to those persons associated with or employed by an enterprise who 'conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"  *Handeen*, 112 F.3d at 1347.  In this Circuit, to determine whether a plaintiff has plausibly pled this element, courts ask whether a defendant has taken part in "the operation or management of the enterprise itself."  *See Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir. 1983).  The Supreme Court, approving this "operation or management" test, explained that "[i]n order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *see also Handeen*, 112 F.3d at 1348.

---

[37] This is not the only instance in the Complaint where Energy Transfer alleges bad acts by the "enterprise," but states that the actors are "unknown."  *E.g.* Compl. ¶ 324.  However, it is not just the identities of these parties that Plaintiff fails to allege, but in every instance Plaintiff also fails to allege any facts supporting their membership in the alleged enterprise or to specify its factual basis for alleging a connection to Greenpeace.

Here the Complaint is silent as to what party or parties allegedly operated or managed the enterprise.  Certainly there are no allegations that Greenpeace operated or managed it.  The only allegations regarding how Greenpeace participated in the purported enterprise are simply inapposite, because they relate only to long-established interrelationships between various Greenpeace entities, and do not set forth how those ties serve the alleged RICO enterprise.  Specifically, as to GPI, the Complaint inaccurately states it "provides grants and disbursements back to select [regional Greenpeace] organizations to support its international campaigns," Compl. ¶ 38(a), but even if taken as true, the allegation provides no basis for concluding GPI engaged in the operation and management of a putative RICO enterprise.  With respect to GP Inc., Plaintiff says that it receives financial support from GPI and GP Fund, and that it and Leonard, Wheeler, and Sweeters "aggressively prosecuted the disinformation campaign to fraudulently induce donations that were then used to fund GP Inc.'s operations and enrich GP Fund and GPI."  Compl. ¶ 38(c).  Again, there are no allegations tying GP Inc. to any enterprise members besides Greenpeace entities with which it already had relationships.  As noted, if Plaintiff intends to allege that these Greenpeace entities have been "infiltrated" and corrupted, it has not come close to supporting such a claim.  *See supra* n. 34.  If instead Energy Transfer intends to allege that Greenpeace is part of a larger "enterprise," it has not included any factual allegations to claim GP Inc. or GPI engage in operation or management of that enterprise.  "Prosecution" of the "disinformation campaign" – that is, publishing articles and writing public letters – simply does not speak to operation and management of a larger enterprise, but rather only to direction of, and participation in, the affairs of GP Inc. itself.[38]

---

[38] Energy Transfer's allegations against Greenpeace Netherlands, Greenpeace Japan, and Greenpeace Switzerland contain more of the same.  Compl. ¶ 38 (d)-(f).

### d.     Plaintiff Has Not Plausibly Pled a "Pattern" of Racketeering Activity

"It is by now familiar doctrine that a pattern of racketeering activity is present only when predicate acts are linked by 'continuity plus relationship.'"  *Handeen*, 112 F.3d at 1349 (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  Continuity can be either closed- or open-ended, depending on the timeframe of the alleged acts.  Here, the specific actions by the enterprise, as set forth in the Complaint – including all of the publications and letters that Plaintiff says constitute mail and wire fraud – did not begin until August 2016, and concluded in April 2017 or before.  Given the short period of time during which these acts allegedly took place, Plaintiff cannot show "closed-ended" continuity.  *Primary Care Inv'rs, Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215 (8th Cir. 1993).

Plaintiff therefore alleges an "open-ended" series of RICO predicate acts committed "on an on-going basis."  *See* Compl. ¶¶ 369-370.  This description too is inaccurate because the Complaint does not allege any predicate acts since April 2017.  Predicate acts will only "meet the definition of open-ended continuity to the extent they 'involve a distinct threat of long-term racketeering activity.'"  *Handeen*, 112 F.3d at 1349 (citing *H.J., Inc. v. Nw. Bell*, 492 U.S. at 242)(emphasis omitted).  Although Plaintiff states in summary fashion that "the Enterprise's racketeering activities threaten to continue in the future," Compl. ¶¶ 385, 402, 418, it provides no support for this conclusion, especially in light of the fact that DAPL has been completed and is now in operation.  As a court in this Circuit has held, where facts indicate "all criminal activities [have] ceased," the plaintiff does not plausibly allege the requisite predicate acts to plead RICO.  *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 921 (D. Minn. 2012) (citing *H.J., Inc. v. Nw. Bell*, 492 U.S. at 242).  Here, where the only facts pled by Plaintiff point to a cessation of activity, not a threat of future acts, its RICO claims must fail.

### e.    Plaintiff Has Not Plausibly Pled Any Predicate Criminal Acts

Energy Transfer claims the alleged enterprise engaged in the following predicate criminal acts[39] under RICO: "(i) violating or otherwise funding, directing, controlling, and intentionally inciting acts of terrorism that violate the U.S. Patriot Act, including damaging or attempting to damage an energy facility and committing arson on federal property and on private property used for interstate commerce; (ii) using the mails and wires as part of a scheme to defraud donors, supporters, state and federal treasuries, and others; (iii) tax fraud; (iv) interstate drug trafficking; (v) transporting and transmitting misappropriated funds and property through interstate commerce; and (vi) conspiracies to do the same."  Compl. ¶ 38.  Even assuming Plaintiff had plausibly pled the existence and conduct of an enterprise, and a pattern of either closed- or open-ended activity, it has not sufficiently pled these predicate criminal acts themselves.

### (1)    Defamation Is Not a Predicate Act

The law is clear that mere defamation is not, by itself, a predicate act under RICO. *Hourani v. Mirtchev*, 796 F.3d 1, 10 n.3 (D.C. Cir. 2015); *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *9 (D. Md. Mar. 17, 2015); *Kimm v. Lee,* No. 04-civ-5724(HB), 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005).  Although Greenpeace does not dispute that the same underlying facts may in appropriate cases support separate causes of action if additional elements are present, that is not the case here.  The alleged acts – at the very least all those pled against Greenpeace – are no more than garden-variety defamation claims.  As such, Plaintiff's effort to transform defamation claims into fraud or extortion cannot be sustained.

---

[39] Plaintiff also spends ten pages stringing together many unrelated events – none involving DAPL – over six years, to illustrate a "fraudulent scheme" perpetrated by all environmental groups.  Compl. ¶¶ 41-59.  This lengthy exposition is simply an attempt to indiscriminately throw dirt – a tactic with which Greenpeace is by now quite familiar.  *See* Koonce Decl. Ex. 6 (decision by Canadian court striking similar allegations by Resolute Forest Products).

**(2)      Plaintiff Cannot Plausibly Plead Mail and Wire Fraud**

As the Eighth Circuit has explained, "[w]hen pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856-57 (8th Cir. 2015) (citing *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999)).  A plaintiff must also plead "some degree of planning by the perpetrator," and further, "it is essential that the evidence show the defendant entertained an intent to defraud." *Id.* (citing *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir. 1989)).  Mail and wire fraud claims are "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987).  Thus, the alleged fraudulent scheme must be intentionally directed towards obtaining from another party property that is in their hands. *Cleveland v. United States*, 531 U.S. 12, 15 (2000).

As a threshold matter, almost all of the alleged acts of Greenpeace relate only to public publications and letters, which Plaintiff claims contain false statements that should also be treated as fraudulent.  Putting aside that this is wrong for reasons discussed *infra* at 45-46 & §A.3.e.(3), these allegations suffer from the same flaws identified by Judge Tigar in the *Resolute* case: The Complaint "fails to meet the[] heightened pleading requirements [of Rule 9(b)]," because "it does not identify the author of the reports," in suit, "and it never identifies the 'misconduct' or 'specific content' that constitutes fraud in the reports." *Resolute*, 2017 WL 4618676, at *10.

Courts in other Circuits have held that, given the focus on fraud directed toward property rights, mere false statements, without more, cannot rise to the level of mail and wire fraud for RICO purposes.  *See United States v. Takhalov*, 827 F.3d 1307, 1312-13 (11th Cir. 2016) (under 18 U.S.C. § 1343, "a defendant 'schemes to defraud' only if he schemes to 'depriv[e] [someone]

44

of something of value by trick, deceit, chicane, or overreaching.'" (citing *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011)).  Where a defendant does not intend to cause harm to the victim by "obtain[ing], by deceptive means, something to which [the defendant] is not entitled," there is no intent to defraud.  *Id.* at 1313 (citations omitted).  Here, Energy Transfer cannot simply plead that Greenpeace made false statements, but must plausibly plead that any such statements were made with the intent to defraud someone of their property.  *See infra* § A.3.e.(3).

Plaintiff has not pled that Greenpeace deceived Energy Transfer or anyone else, much less defrauded anyone, and certainly not that it intended to do so.  *See supra* § A.2.e (no facts supporting actual malice).  *See S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 531-32 (4th Cir. 2002) (defendant's good faith belief it provided true information complete defense to mail or wire fraud); *United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006) (same).  In Paragraph 38 of the Complaint, Energy Transfer states that the enterprise defrauded "donors, supporters, [and] state and federal treasuries," without providing further details.  Elsewhere, Energy Transfer states that the mailings and other communications were made "for the purpose of" "preparing" and "disseminating" "false and misleading reports" and "information," Compl. ¶ 373, but these allegations, on their face, concern only allegedly misleading or deceptive statements.  The Complaint goes on to say that such alleged mail and wire communications were used for the purposes of infiltrating Energy Transfer's computers to misappropriate trade secrets and attack those computers; extorting Energy Transfer's creditors; transmitting death threats; perpetrating acts of terrorism; and participating in drug trafficking, among other things, but these are entirely spurious conjecture with zero factual basis.  *Id.*

Even assuming *arguendo* that Energy Transfer has somehow pled deception of "donors,

supporters, [and] state and federal treasuries," it simply has not pled fraud. The closest Plaintiff comes to alleging any use of the mail or wires to obtain property from another party is that by disseminating public statements about DAPL, a donor might be misled into making a donation. This too, however, is merely speculative: Plaintiff has not pled a single specific instance of such alleged fraud. Plaintiff has not alleged any facts demonstrating (a) any specific statements made to potential donors; (b) any specific statements made in connection with fundraising; (c) the identity of any defrauded donor(s); (d) any donations that were fraudulently obtained; (e) an intent on the part of Greenpeace to defraud donors; or (f) that any donations have been used for purposes other than as promised. Even if Plaintiff could somehow show that donors were defrauded, it has no standing to assert such a claim. *See infra* § A.3.f.

Energy Transfer also vaguely alleges Greenpeace's statements about DAPL misled its investors and caused them to decide to divest, but, again, this at most would constitute deceit, not an attempt to defraud. To the extent Plaintiff argues the allegedly fraudulent statements pressured investors, this would appear to merge with or duplicate Energy Transfer's attempted claim for extortion, discussed below.

**(3)     Plaintiff Cannot Plausibly Plead Extortion**

Although Energy Transfer alleges "illegal interference with commerce in violation of 18 U.S.C. § 1951" under the Hobbs Act, its Complaint makes little effort to tie together any such general allegations of "extortion" with specific acts by the "enterprise." It appears the entirety of these allegations are based on open, public letters sent to banks by one or more environmental groups, advocating for the banks to stop funding DAPL given the numerous concerns around environmental impact, effect on Native American communities, and the like.

Extortion under the Hobbs Act consists of "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color

46

of official right."  18 U.S.C. § 1951(b)(2).  Threats of public criticism are insufficient to state a

claim for extortion, even if the criticism is defamatory.  *Conte v. Newsday, Inc.*, 703 F. Supp. 2d

126 (E.D.N.Y. 2010); *Kimm*, 2005 WL 89386.  Extortion requires a demand for property that is

transferrable from the party being extorted to the party doing the extorting; coercion or

interference is insufficient.  *Sekhar v. U.S.*, 133 S. Ct. 2720, 2725 (2013).  Obtaining property

under the Hobbs Act means "not only the deprivation but also the acquisition of property."

*Scheidler*, 537 U.S. at 404 (citing *United States v. Enmons*, 410 U.S. 396, 400 (1973)).

Any alleged "extortion" of creditors/investors here was not a demand for the transfer of

anything of value from those parties to Greenpeace, and at most constituted lawful conduct akin

to "hard bargaining."  Greenpeace is not alleged to have been attempting to "obtain" Energy

Transfer's relationships with these parties; if there were consequences of the alleged extortion, at

most they resulted from the decision by some parties to reconsider their relationships with

Energy Transfer.  This type of loss without a transfer to Greenpeace is not even coercion, and, in

any event, cannot stand as a predicate act.  As the *Resolute* court noted, addressing almost

identical claims, "RICO claims based on alleged Hobbs Act violations fail" where the plaintiff

"fails to allege predicate acts of extortion" because it has not alleged that the defendant

"demanded property from [plaintiff] … itself."  *Resolute,* 2017 WL 4618676, at *11.

While in appropriate cases extortion under the Hobbs Act may include "fear" of

economic loss in addition to threats of physical violence, "whether the threat of economic harm

is wrongful under the Hobbs Act depends on whether the defendant has a 'lawful claim' to the

property he seeks to obtain."  *United Broth. of Carpenters and Joiners of Am. v. Building and

Constr. Trades Dep't*, 770 F.3d 834, 838-41 (9th Cir. 2014).  Cases distinguish "hard business

bargaining" where parties in a free market exert economic pressure to achieve a goal, which does

not constitute extortion, from cases where a plaintiff has a "pre-existing entitlement" to "pursue business interests" free of pressure, such as where it had an extant contract. *Id.* at 840.[40]  To the extent Greenpeace uses marketplace pressure to convince customers to rethink doing business with Plaintiff, Energy Transfer had no preexisting right to be free of such public scrutiny.

Significantly, the activity that Plaintiff complains of as "extortion" was merely speaking out to companies about problems surrounding DAPL.  The only "threat" was being publicly exposed as having a relationship with owners of the project.  This alleged harm to reputation is only redressable by a defamation claim and, for reasons stated above, that claim fails.

### (4)   Plaintiff Cannot Plausibly Plead Violations of the Patriot Act, Drug Trafficking, or Computer Crimes

Many of the allegations in the Complaint have so little to do with the Defendants that they defy logic.  For instance, Plaintiff alleges RWC "used other illegal means, including selling drugs bought with donated money to other protestors at the camps to finance their operations and line their own pockets."  Compl. ¶ 13.  However, there are no allegations anywhere in the Complaint tying this alleged activity to the larger "enterprise," and certainly not to Greenpeace.  Similarly, allegations of computer crimes concern unknown parties without any alleged links to Greenpeace other than public Twitter hashtags.  *See supra* at 39.  Finally, while Greenpeace takes no position as to whether allegations about violations of the Patriot Act by two individuals could be successfully lodged against those persons in a federal prosecution, the lack of plausible allegations about how those acts are connected to the "enterprise," much less Greenpeace, suggest the allegations were included just to provide the illusion of "serious" crimes.

---

[40] *See also Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 503 (3d Cir. 1998); *Rennell v. Rowe*, 635 F.3d 1008, 1009 (7th Cir. 2011); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004); *Viacom Int'l v. Icahn*, 747 F. Supp. 205 (S.D.N.Y. 1990); *Slack v. Int'l Union of Operating Eng'rs,* No. C-13-5001 (EMC)*, 2014 WL 4090383, at *25 (N.D. Cal. Aug. 19, 2014).

### f.      Plaintiff Cannot Plausibly Plead Proximate Cause

"To have standing under RICO, a plaintiff must allege that the RICO violation

proximately caused injury to its business or property." *Resolute*, 2017 WL 4618676, at *11

(citing *Holmes v. Secs. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992); *see also Anza v. Ideal

Steel Supply Corp.*, 547 U.S. 451, 463-64 (2007)).  The Eighth Circuit has made clear that the

proximate cause requirement for RICO standing is intended to prevent plaintiffs from bringing

claims of damages based on wholly "attenuated" chains of causation purportedly leading from

the supposed racketeering conduct, such as the one advanced by Energy Transfer here:

> Since but-for causation, or causation in fact, has no logical ending point, the concept
> of proximate cause cuts off liability for those damages only distantly caused by a
> defendant's bad acts.  Using proximate cause as a standing requirement in civil RICO
> cases is justified on three grounds.  First, the proximate cause requirement reduces the
> need for apportioning between damages caused by the defendant's actions and
> damages caused by independent factors.  Second, it prevents two or more parties
> along the chain of causation from obtaining duplicative recovery.  Third, the need for
> deterrence can be met with recoveries by more directly injured parties.

*Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000).

In *Newton*, cattle producers claimed that public corruption on the part of poultry

producers reduced their costs of complying with regulations, enabling Tyson to drop the cost of

poultry, resulting in less demand for beef, which in turn "cost the cattle producers business and

profits." *Id.* at 445-46.  In rejecting this argument, the court explained "[t]he alleged injuries of

the cattle producers" were "far distant along the chain of causation from Tyson's alleged wrongs

and are too attenuated and removed from those wrongs to provide a basis for standing under

RICO." *Id.* at 446-47 (citing *Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 954

(8th Cir. 1999)).  For similar reasons, claims involving alleged reputational harm, such as

defamation claims, cannot provide RICO standing.  In *Hamm*, for example, plaintiffs who were

current and former employees of a pharmaceutical company, alleged "damage to their business

reputations" due to defendants' "fraudulent scheme promoting off-label drug use," 187 F.3d at 951, but the court concluded the scheme "was not directed" at the plaintiffs "but instead at hospitals, physicians and other medical personnel." [41]  *Id.*

Energy Transfer only has standing if it can show that it was directly injured by the alleged RICO enterprise.  Yet the only harm that it alleges is far too attenuated, and at most amounts to damage to its reputation, which is not cognizable under RICO.  First, to the extent it alleges the enterprise defrauded donors to environmental groups such as Greenpeace, Energy Transfer lacks standing because none of *its* injuries would have stemmed directly from such alleged fraud.  As the *Resolute* court held, a RICO plaintiff like Energy Transfer cannot claim to be the victim of an advocacy campaign directed toward them "given that the only persons who could have been defrauded were the donors who gave the money" to support the campaign.  *Resolute*, 2017 WL 4618676, at *11; *see also Kimberlin*, 2015 WL 1242763, at *13.  If Plaintiff had standing here and could otherwise state a claim, it would raise concerns identified by the *Newton* court: The potential for duplicative recoveries rather than a single recovery from the most directly injured party.

Finally, Energy Transfer has not plausibly pled a direct link between Greenpeace (or any Defendant, or the enterprise as a whole) and any actual loss of creditors or investors caused by racketeering activity, as opposed to the more general (and protected) campaign regarding DAPL. *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496-97 (1985).  In those instances where it appears to allege actual losses of investors, it does not specify whether and how those customers' departure flowed specifically from any deceptive or false statement, as opposed to general

---

[41] The plaintiff in *Kimberlin* made similar allegations, which were rejected.  *Kimberlin*, 2015 WL 1242763, at *9 (courts "universally hostile" to attempts to "spin an alleged scheme to harm a plaintiff's professional reputation into a RICO claim."); *see also Kimm*, 2005 WL 89386, at *5; *Marks v. City of Seattle,* No. C03-1701, 2003 WL 23024522, at *1 (W.D. Wash. Oct. 16, 2003); *Mansmann v. Smith,* No. Civ. A. 96-5768, 1997 WL 145009 (E.D. Pa. Mar. 21, 1997); *Manax v. McNamara,* 660 F. Supp. 657, 658 (W.D. Tex. 1987), *aff'd,* 842 F.2d 808 (5th Cir. 1988).

criticisms of DAPL, raising another concern identified in *Newton*: The difficulty of apportioning damages between those allegedly caused by the enterprise's actions and damages caused by independent, non-actionable factors.

Indeed, Plaintiff's allegations begin by citing a number of articles by parties that are neither Defendants nor alleged enterprise members, such as Food and Water Watch and Yes Magazine.  Compl. ¶¶ 228-233.  The first act alleged to have been undertaken by a Defendant is a letter from BankTrack to "a consortium of global banks committed to responsible environmental and social practices," signed by over 500 environmental organizations including GP Inc., which Plaintiff alleges caused the Norwegian bank DNB to "reconsider its loan." Compl. ¶ 239.  On the face of the Complaint, a letter to a consortium of banks that leads one bank to engage in a constructive process in light of publicly-raised concerns, and then reconsider its loans, ultimately leading to withdrawal of funds, does not state a causal chain causing direct harm to plaintiff.

The remainder of Plaintiff's allegations about lost investors are similar, although in many cases Plaintiff does not even allege the loss of investors, but rather merely that the banks who financed DAPL "affirmed their commitment to 'protect human rights' and the 'responsible development of all forms of energy,'" and in one case hired an "independent human rights expert, to review various matters related to the permitting process."  Compl. ¶¶ 249, 252.  Such actions by the banks caused no direct harm to Energy Transfer.  Where banks did allegedly terminate their investments in DAPL, it was always in response to the very public and ubiquitous criticisms levelled by environmental groups, and not specifically in response to particular alleged fraudulent statements, making the alleged damage even more attenuated.  *See, e.g.*, Compl. ¶¶ 259 ("In response to this ongoing ***public pressure***, during the last week of January, ING sold

51

$2.2 million of its holdings in Energy Transfer companies"), 265 ("The banks caved in response

to the Enterprise's harassment and the sustained ***public pressure***.") (emphases added).[42]

In light of the above, Energy Transfer has not plausibly pled a cognizable injury under

RICO, and for this and all the reasons stated previously, its RICO claims must be dismissed.[43]

### 4.      The Tortious Interference Claims Should Be Dismissed

To state a claim for tortious interference with business, a plaintiff must plead "(1) the

existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the

relationship or expectancy; (3) an independently tortious or otherwise unlawful act of

interference by the interferer; (4) proof that the interference caused the harm sustained; and (5)

actual damages to the party whose relationship or expectancy was disrupted." *Atkinson v.

McLaughlin*, 462 F. Supp. 2d 1038, 1057-58 (D.N.D. 2006) (citing *Lochthowe v. C.F. Peterson

Estate*, 692 N.W.2d 120, 126 (N.D. 2005). The requirement of an "independently tortious" act

means that a plaintiff must "prove that the defendant's conduct would be actionable under a

recognized tort." *Id.* (citing *Trade 'N Post, LLC v. World Duty Free Ams., Inc.*, 628 N.W.2d 707,

720 (N.D. 2001)). Even if defamation is alleged as that act," tortious interference requires the

pleading and proving of four elements in addition to defamatory statements in order to constitute

---

[42] In fact those decisions were made on the investors' own due diligence assessments, in which the information provided by the environmental groups was a factor. *See* https://www.reuters.com/article/us-energy-transf-lawsuit-nordics/nordic-investors-reject-dakota-pipeline-operators-allegations-idUSKCN1B928V.

[43] North Dakota's RICO statute recognizes a civil claim for "a person who sustains injury to person, business, or property by a pattern of racketeering activity," and largely tracks the federal claim. N.D. Cent. Code § 12.1-06.1-05. Thus, all of the flaws identified in connection with Plaintiff's federal claims apply equally to bar Plaintiff's state law claim. *Neubauer v. FedEx Corp.*, 849 F.3d 400 (8th Cir. 2017). Further, the statute requires plaintiff to plead with particularity that the alleged predicate acts are criminal – that is, a plaintiff must allege either a prior conviction or probable cause. *McColl Farms, LLC v. Pflaum*, 837 N.W.2d 359, 369 (N.D. 2013) (citing *Rolin Mfg., Inc. v. Mosbrucker*, 544 N.W.2d 132, 138 (N.D. 1996) (merely "stating an act is criminal is not enough to make it true").

an independent tort.  *Atkinson*, 462 F. Supp. 2d at 1058-59.

Plaintiff's tortious interference claim, just like its defamation claims, must be pled and proved against each Defendant.  Yet Plaintiff lumps all Defendants together, and also lumps Defendants with other non-parties as if it could import its RICO allegations into its defamation claim.  For example, Plaintiff alleges that Defendants "[i]ncit[ed] and perpetrat[ed] acts of terrorism under the U.S. Patriot Act," and committed cyber-attacks.  Compl. ¶ 433.  As discussed *supra* at 38, there are no allegations in the Complaint that ***any*** Defendant, much less Greenpeace, engaged in terrorist acts or cyber-attacks.  *See* Compl. ¶¶ 325-326 (identifying non-parties), 332-340 (unknown persons). Similarly, Energy Transfer alleges the unlawful acts by Defendants that support a tortious interference claim included "[o]rganizing and carrying out hundreds of protests," Compl. ¶ 433, yet these allegations lump together a large number of non-parties, conflate events held in various locations, do not identify which entities participated in which protest event, and do not explain how peaceful protests were unlawful.  More critically, Plaintiff simply never pleads any of the requisite elements against Greenpeace.

It is hardly surprising that Plaintiff's claim of an "independently tortious or otherwise unlawful act of interference," in the end, boils down to a claim that Defendants' expressive activities were defamatory.  But for all the reasons the defamation claims fail, *supra* § A.2, so must the tortious interference claim.  *Farah v. Esquire*, 736 F.3d at 540; *Beverly Hills Foodland*, 39 F.3d at 196-7,   Additionally, with respect to the last two elements of an interference claim, because Plaintiff fails to plausibly plead proximate cause and direct damages under its RICO claims based on the same allegedly false statements, Energy Transfer cannot show a causal

relation between those statements and any harm it suffered.[44]

## B.  THE COURT SHOULD DISMISS OR TRANSFER FOR LACK OF VENUE

### 1.  The Court Should Dismiss GPI for Lack of Jurisdiction Pursuant to Rule 12(b)(2)

Defendant GPI is organized and located in the Netherlands.  Compl. ¶ 32.  The Complaint does not allege GPI transacts business in North Dakota either directly or through agents; took any actions within the state; derives substantial revenue in the state; is registered to do business in the state; or has consented to personal jurisdiction.  Indeed, the only mention of GPI at all, other than in a definitional section identifying the parties, is an allegation in a footnote that it signed a single public letter, along with over 500 environmental groups, sent to banks funding DAPL construction.  Compl. ¶ 212, n.8; Suppl. App. Tab 2.  GPI's only alleged ties to the United States are its organizational relationships with GP Inc. and GP Fund.  Compl. ¶ 38.

As a foreign party not amenable to service pursuant to the RICO service provisions, this Court's jurisdiction over GPI under RICO depends on application of the North Dakota long-arm statute, and Energy Transfer has not come close to showing minimum – or indeed any – contacts between GPI and North Dakota.  *Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1181-84 (C.D. Cal. 1998) (rejecting "national contacts" test in RICO case where service could not be effected under RICO service provisions).  *See* ECF No. 37, BankTrack Mot. Dismiss 8-20.  For these reasons,

---

[44] Energy Transfer also includes a claim for civil conspiracy under North Dakota law, Compl. ¶¶ 405-422, which requires "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage[s]."  *Kuhn v. Chesapeake Energy Corp.*, No.1:123-cv-086, 2012 WL 4442798, at *5-6 (D.N.D. Sept. 25, 2012).  "To constitute a concerted action, the plaintiffs [need] to present evidence of a common plan to commit a tortious act, the participants knew of the plan and its purpose, and the participants took substantial affirmative steps to encourage the achievement of the result."  *Ward v. Bullis*, 748 N.W.2d 397, 408 (N.D. 2008).  For all of the reasons stated previously, Energy Transfer has not plausibly pled a cognizable underlying tort, that the defendants were acting in concert to commit such a tort, that they agreed to any common plan, or that Energy Transfer was damaged.

GPI must be dismissed.

### 2.    The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)

Energy Transfer claims venue is proper in this judicial district under 28 USC. § 1391(b)(2), because "a substantial part of the events or omissions giving rise to the claim occurred" here.  Compl. ¶ 29.  It bases this argument on allegations that, *inter alia,* "[n]umerous" (yet unnamed) Defendants "traveled to the state to perform significant campaign-furthering acts," and that Defendants committed tortious acts outside the State with effects in North Dakota. *Id.*  Greenpeace does not, of course, dispute that DAPL runs through this judicial district, that protest activities occurred here, and that advocacy efforts focused on challenging construction of DAPL.  However, the vast majority of "acts" alleged in the Complaint were speech activities that took place ***outside*** this judicial district, and most of the non-speech acts alleged to have occurred within this district were taken, if at all, by parties not named as defendants in this action.[45]

However, the Court need not undertake an analysis of whether venue is proper under § 1392(b)(2), because it is ***abundantly*** clear the Court may exercise its discretion to transfer venue pursuant to 28 U.S.C. § 1404(a).  Whereas the test for improper venue examines where key acts occurred, the analysis for venue transfer under 1404(a) focuses instead on three factors: (1) the convenience of the parties, (2) the convenience of the witnesses, and the (3) interests of justice.  Here, an examination of these factors suggests the United States District Court for the District of Columbia – which is already presiding over the SRST Lawsuit which plays such a central role in Energy Transfer's pleading – is the most suitable forum to hear this action.[46]  Greenpeace therefore respectfully requests that this Court exercise its discretion under § 1404(a) to transfer the Action to the District of Columbia.  *See* 28 U.S.C. § 1404(a); *Terra Int'l. Inc. v. Miss. Chem.*

---

[45] Notably, the Georgia court in *Resolute* found venue was improper there because protests in that venue did not give rise to a cause of action.  *See supra* at 7-9.

[46] Alternatively, the above factors favor venue in the Northern District of California.

*Corp.*, 119 F.3d 688, 691 (8th Cir. 1997); *Herschbach v. Herschbach*, 667 F. Supp. 2d 1080,

1087-89 (D.N.D. 2009); *Marietta Campbell Ins. Group, LLC v. Jefferson-Pilot Life Ins. Co.*, No.

07-cv-32, 2007 WL 3197311, at *3 (D.N.D. 2007); *Nat'l Bank of Harvey v. Bathgate Capital*

*Partners, LLC*, No. 06-cv-053, 2007 WL 1041122, at *10-12 (D.N.D. 2007).

### a.      Convenience of the Parties

On balance, the District of Columbia is far more convenient for the parties than North

Dakota.  Critically, none of the parties reside here,[47] whereas two of the five defendants – GP,

Inc. and GP Fund – are located in Washington D.C.  Alleged enterprise member Perry Wheeler,

who is alleged to have authored 18 of the 33 allegedly defamatory Greenpeace publications at

issue, lives in Maryland and works out of GP, Inc.'s D.C. offices.  The three remaining

Defendants do not have a domestic locus because BankTrack and GPI are foreign entities based

in The Netherlands, and Earth First does not appear to be a legal entity.  Furthermore, Energy

Transfer is headquartered in Dallas, Texas, which serves to lessen the deference this Court

should afford its choice of venue. *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010).

In addition, given where the parties are located, travel to the District of Columbia would

be far more convenient for the parties than travel to this Judicial District.  Plaintiff would be able

to fly directly from Dallas to the District of Columbia in approximately three hours.  Koonce

Decl. Ex. 5.  By contrast, the vast majority of flights to Bismarck, North Dakota from Dallas

---

[47] The fact that some Defendants are licensed to do business in the State of North Dakota,
Compl. ¶ 29, is insufficient to establish venue.  Energy Transfer must show defendants are
engaged in intrastate and local activities to such an extent that would permit the state to require
the organizations to qualify to do business there.  *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901,
906 (8th Cir. 1987).  Plaintiff fails to satisfy this burden because they do not plead any
Defendant has offices, property or employees located in North Dakota, or that they raised a
substantial amount of funds in the state.  *Id.*

require at least one stop and five hours of travel.[48]  *Id.* Ex. 4.

### b.   Location of Witnesses and Fact Discovery

The District of Columbia is also more convenient for purposes of discovery.  Of the 47

allegedly defamatory statements at issue in this Action attributed to Greenpeace, all of them

(excepting two multi-signatory letters) were first published by Greenpeace, Inc., headquartered in

Washington, D.C.  Where individual author names were listed, 27 of the 47 statements were

authored by individuals working out of Greenpeace's Washington, D.C. office:  Wheeler (18

statements), D. Coleman (1), J. Coleman (1), Craghill (2), Johnson (1), Prokop (2), and Schwartz

(2).  Six statements were authored by individuals working out of Greenpeace's San Francisco

office:  Leonard (1), Molof (1), Schleeter (2), and Sweeters (2).  None of the statements were

initially published in this Judicial District; in fact, none of the statements made by any defendant

were made in this Judicial District.[49]  *See* GP Defs. Table B**.**

Additionally, any documentary evidence supporting Plaintiff's allegations that defendant

generated media attention and provided funding to other enterprise members, Compl. ¶¶ 3, 13,

would be found where the statements were published, where the servers hosting the publications are

located, and where any correspondence about the publications or between the parties and alleged

enterprise members is located.  For Greenpeace, this would primarily be where Greenpeace Inc.'s

offices are located (Washington, D.C. and San Francisco) or where the individual author of each

statement resides or works, which includes both Washington, D.C. and San Francisco (discussed

below).  Notably, the Southern District of Georgia transferred venue to the Northern District of

---

[48] Similarly, travel to San Francisco, California would be more convenient for the parties than North Dakota because of the availability of direct flights from the east coast, although somewhat less convenient than Washington, D.C.

[49] Plaintiff improperly seeks to conflate and blur allegations about alleged enterprise members with Defendants' actions to establish venue.  *See Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 517 (S.D. Iowa 2007) (noting Supreme Court rejected notion that plaintiff could establish venue for a nonresident based on the acts of third party co-conspirators not controlled by the non-resident).

California, where the bulk of the speech challenged in the *Resolute* case was initially published. *See supra* at 7-9.

Likewise, all or most of the potential witnesses in this case reside outside of this Judicial District, and many are located in Washington, D.C., or San Francisco. ***First***, to the extent known by Greenpeace,[50] the purported "enterprise members" identified but not sued in the Complaint are located in: Baltimore, Maryland (Wheeler); San Francisco, California (Greenpeace's Leonard, and Sweeters, Sierra Club, Earthjustice, and Rainforest Action Network); New York, New York (350.org and Democracy Now!); Nebraska (Bold Alliance); Iowa (Mississippi Stand, Reznicek and Montoya); the Netherlands (Greenpeace Netherlands and Frijns); Japan (Greenpeace Japan); and Switzerland (Greenpeace Switzerland). ***Second***, the writers of the allegedly defamatory statements reside in multiple locations outside of this Judicial District, including but not limited to Washington, D.C. (Greenpeace's Johnson and Jess Coleman) and San Francisco, California (Greenpeace's Schleeter). ***Third***, many of the (currently unidentified) witnesses who may have participated in or witnessed DAPL protests that occurred in North Dakota are not from the Judicial District, as indicated by Plaintiff's own admission. *See, e.g.*, Compl. ¶¶ 90, 91, 314.

The documentary evidence pertaining to supposed acts in furtherance of the alleged RICO conspiracy purportedly committed by the enterprise members not named as Defendants, also would likely not be found in this Judicial District. Many alleged acts are false statements, and the best evidence regarding them would again be found in or near the offices or residences of

---

[50] Greenpeace is unaware of the location of "Veterans Stands," "Climate Direct Action" or "Red Warrior Camp," to the extent that these are legal entities. Greenpeace is also unaware of the identities of Michael Wood and Wesley Clark, Jr., but based on social media accounts for individuals with these names, these individuals may reside in California.

the alleged enterprise members,[51] where statements were composed and first published.[52]

Energy Transfer purportedly brought its action in North Dakota because Defendants' alleged scheme supposedly affected the region.  Compl. ¶¶ 355-360.  However, courts considering venue have repeatedly held that venue is ***not proper*** in the district where plaintiff was injured if the conduct did not occur there.  *Steen v. Murray*, 770 F.3d 698, 703-04 (8th Cir. 2014); *Maybelline Co.*, 813 F.2d at 907; *Wesley v. Bryant*, No. 14-cv-5002, 2015 WL 2242161, at *8 (D. Minn. May 12, 2015).  Here, of course, Plaintiff itself is not even found in this judicial district, but rather only a small section of the 1200-mile pipeline that it indirectly owns – thus any financial impact from the alleged acts would have been in Texas, where Plaintiff is headquartered. Washington, D.C. is the only location where a plurality of witnesses and documentary evidence can be found and is a more convenient location for the parties and most of the third-party witnesses, especially any flying from abroad.

### c.   Interests of Justice

In determining interests of justice, courts may consider several factors, such as judicial economy and the comparative costs to the parties of litigating in each forum, choice of law, and obstacles to a fair trial[53] *Terra Int'l*, 119 F.3d at 691; *Herschbach*, 667 F. Supp. 2d at 1087-89; *Nat'l Bank of Harvey*, 2007 WL 1041122, at *11.  Here, it will be significantly more expensive for defendants to litigate in North Dakota than in the District of Columbia, given the costs of

---

[51] Many of the physical acts alleged to have been undertaken by enterprise members did not occur in North Dakota.  *E.g.*, Compl. ¶¶ 324 (Iowa fire); 325-326 (alleged pipeline destruction in Iowa and South Dakota); 38(n), (o) (global protests).

[52] Plaintiff does not allege a single named Defendant or enterprise member resides in North Dakota.

[53] Greenpeace requests that this Court take judicial notice of the fact that coverage and discussion of the DAPL protests in North Dakota have been extensive, such that it may be more difficult to find impartial jurors here.  *See Wash. Pub. Utils. Grp. v. U.S. Dist. Ct. of Wash.*, 843 F.2d 319, 327 (9th Cir. 1987); *Bell v. Rosen*, No. CV214-127, 2015 WL 5595806, at *14 (S.D. Ga. Sept. 22, 2015).

travel and the potential need to bring witnesses to North Dakota.

Choice of law principles suggest that the applicable state law in this case is that of Washington, D.C.  North Dakota has adopted a "significant contacts" analysis, which involves a two-pronged approach: First, determining "all relevant contacts that might affect the decision of which law to apply"; second, applying certain "choice-influencing considerations," including predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and applying the better rule of law. *Avery v. Ward*, No. 1:16-cv-00055, 2017 WL 5451743, at *7 (D.N.D. 2017); *Polensky v. Continental Cas. Co.*, 397 F.Supp.2d 1164, 1168-69 (D.N.D. 2005) (aim to identify forum that "because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation") (citations omitted); *see also Kenna v. So-Fro Fabrics, Inc.*, 18 F.3d 623, 626 (8th Cir. 1994) ("In tort actions, the fourth and fifth factors are the most significant.").  The contacts with North Dakota here include: (1) the presence of part of the pipeline, and some of the tribal lands that it crosses; (2) the location of DAPL protests; (3) pending legal cases involving protestors and Dakota Access's security company.  Contacts with the District of Columbia include: (1) the residence of two of the five Defendants; (2) the location where many of the alleged statements were made, as well as the residence of the individuals who made them [54]; (3) a pending litigation that features prominently in the Complaint (*see* Compl. ¶¶ 118-145; 159-211 (claims regarding Defendants' purported misrepresentations of the DAPL approval process and impact on tribal lands), 95, 107-111 (referencing SRST Litigation)).  Significantly, the contacts with North Dakota largely have little to do with Energy Transfer's legal claims – while DAPL and the protests may have been the subject matter of the allegedly

---

[54] Alternatively, these factors argue for application of California law.

defamatory (or fraudulent) statements, the crux of the legal claims is the purported harm to out-of-state companies caused by out-of-state defendants.

With respect to the "choice-influencing factors," given that the majority of statements by Defendants issued from Washington, D.C., that forum has a greater interest in adjudicating the tort claims in particular.  *See Sura v. National Oilwell Varco, L.P.*, 2016 WL 4217766, at *4 (D.N.D. Apr. 6, 2016) (noting continuing importance of *lex loci delicti* doctrine for tort claims); *Zutz v. Kamrowski*, 787 N.W.2d 286, 291 (N.D. 2010) (agreeing that Minnesota law applied to claim by Minnesota plaintiff against North Dakota defendant who made defamatory statements in a report published to a Minnesota muncipality); *see also Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 198 (N.Y. 1985) (noting when conflicting state laws involve appropriate standards of conduct or "rules of the road" the law of the place of the tort usually controls).[55]  By contrast, North Dakota has little interest in adjudicating claims about speech issuing in other states and allegedly harming out-of-state residents. Further, because the state law claims of tortious interference and civil conspiracy, as well as Plaintiff's RICO claims – as pled against the actual Defendants here – all sound in speech, the District of Columbia's interest in setting "rules of the road" for statements first uttered in that district outweighs the interests of other jurisdictions.

This 28th day of November, 2017.

---

[55] Anticipating that the District of Columbia or California law will apply, Greenpeace is availing itself of those jurisdictions' robust protections from SLAPP suits and moving to strike and dismiss Energy Transfer's action for the reasons in its motion to dismiss.  The *Resolute* court granted Greenpeace's motion to strike and awarded fees on the state law claims under the California anti-SLAPP Act. *Resolute*, 2017 WL 4618676, at *14. D.C. has an anti-SLAPP law modeled on California's statute.  *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 9 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).  The D.C. Circuit has held that it does not apply in federal court, *id.* at 1328, but a subsequent decision from D.C.'s highest court, *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1238 n.32 (D.C. 2016), has thrown that ruling into question.  *See e.g.*, *Deripaska*, No. CV 17-00913 (ESH), ECF No. 16 (D.D.C. Oct. 17, 2017)*; Fairbanks v. Roller*, No. 1:17-cv-01052-TNM, ECF No. 13 (D.D.C. filed Oct. 23, 2017).  Greenpeace will seek leave to brief its motion to strike in the event the Court finds either D.C, or California law applies and/or venue is transferred.

Respectfully submitted,

/s/   *Lacy H. Koonce, III*

Derrick Braaten, ND Bar # 06394
BAUMSTARK BRAATEN LAW
PARTNERS
109 North 4th Street, Suite 100
Bismarck, ND 58501
701-221-2911
derrick@baumstarkbraaten.com

Lacy H. Koonce, III (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE, LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 603-6467
lancekoonce@dwt.com

Laura Handman (admitted *pro hac vice*)
Lisa Zycherman (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006-2401
(202) 973-4200
laurahandman@dwt.com
lisazycherman@dwt.com

Thomas R. Burke (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6500
thomasburke@dwt.com

*Attorneys for Defendants Greenpeace International and Greenpeace, Inc.*