UNITED STATES DISTRICT COURT

DISTRICT OF NORTH DAKOTA

WESTERN DIVISION

|  |  |  |
|---|---|---|
| ENERGY TRANSFER EQUITY, L.P., and ENERGY TRANSFER PARTNERS, L.P., | ) ) ) ) | Case No. 17-cv-00173-DLH-CSM |
| Plaintiffs, | ) ) | **Amicus Curiae Brief of American Civil Liberties Union, American Civil Liberties Union of North Dakota, American Civil Liberties Union of South Dakota, Natural Resources Defense Council, ARTICLE 19, Brennan Center for Justice, First Amendment Coalition, and Rockefeller Brothers Fund in Support of Defendants' Motions to Dismiss** |
| v. | ) ) ) | |
| GREENPEACE INTERNATIONAL (aka "STICHTING GREENPEACE COUNCIL"); GREENPEACE, INC.; GREENPEACE FUND, INC.; BANKTRACK (aka "STICHTING BANKTRACK"); EARTH FIRST!; and JOHN AND JANE DOES 1-20, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**Table of Contents**

INTRODUCTION..............................................................................................................1

INTEREST OF AMICI ....................................................................................................1

SCOPE OF ARGUMENT ...............................................................................................3

ARGUMENT ....................................................................................................................4

I.     ETP's RICO Claims Should Be Dismissed .........................................................4

       A.     The acts ETP alleges to be mail fraud, wire fraud, and extortion
              are in fact protected speech ....................................................................... 4

       B.     ETP's theory of associated-in-fact enterprises would infringe on
              fundamental rights of speech and association.............................................7

       C.     RICO claims such as ETP's should be carefully scrutinized at
              the pleading stage to avoid chilling protected speech ............................10

II.    ETP's Defamation Claim Should Be Dismissed...........................................12

III.   ETP's Tortious-Interference and Civil-Conspiracy Claims Should
       Be Dismissed........................................................................................................17

CONCLUSION .............................................................................................................18

## Table of Authorities

### CASES

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655,*
    39 F.3d 191 (8th Cir. 1994) ............................................................................................... 7

*Carey v. Brown,*
    447 U.S. 455 (1980) ........................................................................................................... 5

*Crest Constr. II, Inc. v. Doe,*
    660 F.3d 346 (8th Cir. 2011)........................................................................................... 7-8

*Deupree v. Iliff,*
    860 F.2d 300 (8th Cir. 1988) ................................................................... 13, 14-15, 16

*Figueroa Ruiz v. Alegria,*
    896 F.2d 645 (1st Cir. 1990) ...................................................................................... 11, 12

*Flowers v. Cont'l Grain Co.,*
    775 F.2d 1051 (8th Cir. 1985) ...................................................................................... 7-8

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) .................................................................................................. 12, 17

*Hollander v. CBS News Inc.,*
    No. 16 Civ. 6624 (PAE), 2017 WL 1957485 (S.D.N.Y. May 10, 2017) ................................ 5

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988).............................................................................................................17

*In re Target Corp. Customer Data Sec. Breach Litig.,*
    847 F.3d 608 (8th Cir. 2017).............................................................................................11

*Janklow v. Newsweek, Inc.,*
    788 F.2d 1300 (8th Cir. 1986) (en banc)............................................. 12, 14-15, 16

*Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv'r's Servs., Inc.,*
    175 F.3d 848 (10th Cir. 1999) .........................................................................................17

*McGee v. Pub. Water Supply, Dist. #2,*
    471 F.3d 918 (8th Cir. 2006)............................................................................................16

*Miranda v. Ponce Fed. Bank,*
    948 F.2d 41 (1st Cir. 1991) ...............................................................................................10

*Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*,
    48 F.3d 1066 (8th Cir. 1995) ................................................................. 7-8

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................. 5

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) .................................................................. 5, 6, 8, 17

*Nitro Distrib., Inc. v. Alticor, Inc.*,
    565 F.3d 417 (8th Cir. 2009) ............................................................... 7-8

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .......................................................................... 5, 16

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ...................................................... 13, 14, 15

*Price v. Viking Penguin, Inc.*,
    881 F.2d 1426 (8th Cir. 1989) ...................................... 12-13, 15, 16, 17

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    No. 17-cv-02824-JST, 2017 WL 4618676 (N.D. Cal. Oct. 16, 2017) ........... 7-8, 13

*Scheidler v. Nat'l Org. for Women, Inc.*,
    537 U.S. 393 (2003) ............................................................................. 6

*Secrist v. Harkin*,
    874 F.2d 1244 (8th Cir. 1989) ........................................................ 14, 15

*SI03, Inc. v. Bodybuilding.com, LLC*,
    No. CV 07-6311-EJL, 2008 WL 11348458 (D. Idaho May 1, 2008) .............. 15

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) ............................................................... 7-8

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ........................................................................... 6-7

*Whitney v. California*,
    274 U.S. 357 (1927) ............................................................................. 5

## STATUTES

18 U.S.C. § 1951(b)(2) ........................................................................................... 6

18 U.S.C. § 1964(c) ............................................................................................... 10

## RULES OF COURT

Fed. R. App. P. 7 ................................................................................................... 11

Fed. R. Civ. P. 9(b) ............................................................................................ 7-8

## OTHER AUTHORITIES

Amy Dalrymple, *Audio: Tribe Objected to Pipeline Nearly 2 Years Before Lawsuit*,
     Bismarck Trib. (Nov. 30, 2016) ...................................................................... 17

Bill McKibben, *Why Dakota Is the New Keystone*,
     N.Y. Times (Oct. 28, 2016) ............................................................................ 17

Chiara A. Sottile, *Police Fire Rubber Bullets as Pipeline Protesters Try to*
     *Protect Sacred Site*,
     NBC News (Nov. 2, 2016, 6:35 PM) ............................................................... 17

Valerie Volcovici & Richard Valdmanis, *Keystone's Existing Pipeline Spills Far*
     *More than Predicted to Regulators*,
     Reuters (Nov. 27, 2017, 7:02 AM) ................................................................. 14

*Will Test Case Earn an 'A' with the Supreme Court?*,
     N.D. Emp. L. Letter (Vogel Law Firm, Fargo, N.D.), Mar. 2006 ............................ 11

## INTRODUCTION

The proposal to construct the Dakota Access Pipeline intensified a vital public debate about the role of fossil fuels in this country's future, and the role of government in that debate. Plaintiffs (ETP) wanted to build the oil pipeline; Defendants Greenpeace International, Greenpeace, Inc., and BankTrack (Defendants)—along with many others— spoke out and campaigned against it.[1] Defendants employed time-honored, lawful means to advance their views, protected by core constitutional rights of free speech and association. In response to that advocacy, ETP has attacked them under cover of the Racketeer Influenced and Corrupt Organizations Act (RICO), its North Dakota equivalent, defamation, tortious interference with business, and common-law conspiracy, seeking nearly one billion dollars in damages and attorneys' fees. If permitted to proceed beyond the pleading phase, this litigation would have the inevitable and impermissible consequence of stifling the activities of law-abiding nonprofit advocacy organizations across the political spectrum, upending democratic principles rooted in the First Amendment. Amici urge the Court to dismiss the complaint.

## INTERESTS OF AMICI

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan public-interest organization of more than 1.5 million members dedicated to defending the civil liberties guaranteed by the Constitution. The ACLU of North Dakota and the ACLU of South Dakota are, respectively, the North Dakota and South Dakota chapters of the ACLU. The protection of the First Amendment rights of free speech and association are of special

---

[1] Amici also support Greenpeace Fund, Inc.'s November 28, 2017, Motion to Dismiss for Failure to State a Claim, ECF No. 38.

concern to the ACLU, which has been at the forefront of numerous state and federal cases addressing those rights. To fund its advocacy, the ACLU depends on contributions from citizens and charitable foundations.

The Natural Resources Defense Council (NRDC) is a nonprofit, nonpartisan public-health and environmental advocacy organization with more than 400,000 members across the United States. To pursue its mission, NRDC often speaks out and litigates on controversial issues of public concern. Financial contributions from members and other donors fund NRDC's varied activities.

ARTICLE 19 is an international human-rights organization that defends and promotes freedom of expression and freedom of information. ARTICLE 19 considers freedom of expression to be a fundamental human right, and advocates for that right in the United States and across the world.

The Brennan Center for Justice is a nonpartisan public-policy and law institute that focuses on the fundamental issues of democracy and justice. The Brennan Center regularly participates in public debate on contentious issues, including national security and detainee policy, mass incarceration, and money in politics. Public donations support the Brennan Center's work.

The First Amendment Coalition (FAC) is a nonprofit public-interest organization dedicated to advancing free speech, more open and accountable government, and public participation in civic affairs. To advance its mission to protect and promote freedom of expression and the people's right to know, the FAC engages in strategic litigation, free legal consultations, educational and informational programs, legislative oversight of bills, and public advocacy.

The Rockefeller Brothers Fund (Fund) is a private foundation helping to advance social change that contributes to a more just, sustainable, and peaceful world. Through its grantmaking, the Fund supports efforts to expand knowledge, clarify values and critical choices, nurture creative expression, and shape public policy. The Fund's programs are intended to develop leaders, strengthen institutions, engage citizens, build community, and foster partnerships that include government, business, and civil society. Grant programs are organized around three themes: Democratic Practice; Peacebuilding; and Sustainable Development.  The Fund strives to promote philanthropic excellence and to enhance the effectiveness of the nonprofit sector, a goal that includes supporting charitable organizations to educate and advocate on issues of public concern. The Fund and its grantees depend on First Amendment protections to express views and collaborate in their charitable and programmatic work.

Amici share a commitment to the vitality of First Amendment values, which protect their advocacy efforts. They thus have a strong interest in ensuring that courts apply RICO and common-law tort doctrine in a manner consistent with First Amendment freedoms.

## SCOPE OF ARGUMENT

The purpose of this amicus brief is to highlight for the Court the danger that ETP's liability theories pose to the freedom of nonprofit advocacy groups to pursue their legitimate and lawful missions. Under ETP's theories, ordinary political speech that runs counter to a corporation's business interests could expose the speaker to enormous, unwarranted liability. Public campaigns, routine fundraising appeals, conversations with allies, and vindication of legal rights in court could all be targeted. Law-abiding organizations could be held liable for the alleged unlawful acts of others who are connected

solely by a shared viewpoint. Even when a plaintiff's criminal and tort claims are ultimately deemed meritless, the credible threat of a drawn-out lawsuit will chill protected activity. For these reasons, claims like those presented by ETP must be evaluated carefully at the pleading stage. Here, ETP's claims do not survive scrutiny.

## ARGUMENT

### I.    ETP's RICO Claims Should Be Dismissed

#### A.    The acts ETP alleges to be mail fraud, wire fraud, and extortion are in fact protected speech

ETP would transform Defendants' public speech on important political issues into acts of mail fraud, wire fraud, and extortion punishable under RICO and its North Dakota equivalent. Compl. ¶¶ 372-73, 392, 399, 408-13. First, ETP alleges that some of Defendants' statements are attempts to defraud the public because they may encourage donations. Compl. ¶¶ 373-77. Next, ETP claims that legitimate calls for banks to withdraw funding for the Dakota Access Pipeline constitute extortion because they harm ETP while "provid[ing] a substantial benefit to [Defendants and other purported enterprise members] in the form of enhanced fundraising potential." Compl. ¶ 379. These claims are baseless and at odds with bedrock First Amendment principles.

To support its fraud allegations, ETP identifies six categories of statements—many of which were made by nondefendants—that it characterizes as "false": (1) that the Dakota Access Pipeline "crosses tribal land in violation of tribal sovereignty," Compl. ¶ 119 n.1; (2) that the pipeline "will poison and contaminate water," Compl. ¶ 129 n.2; (3) that the pipeline "poses catastrophic risk to climate change," Compl. ¶ 141 n.3; (4) "that [ETP] and its private security contractors indiscriminately used excessive force on peaceful protesters," Compl. ¶ 146 n.4; (5) "that the consultation and environmental review

processes for [the Dakota Access Pipeline] were rushed and inadequate," Compl. ¶ 159 n.5; and (6) "that [ETP] and [Dakota Access Pipeline] construction workers deliberately destroyed culturally significant sites," Compl. ¶ 212 n.8.

"[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)) (holding that the First Amendment protected picketing and a boycott of white merchants to advance racial justice). Each category of statements targeted by ETP speaks to an issue of public concern: respect for tribal rights and values; the environmental consequences of a 1,172-mile-long oil pipeline; confrontations with peaceful protesters; and compliance with environmental-review procedures mandated by law. They are part of a robust public debate protected by the First Amendment. ETP is free to contest this speech with speech of its own. *See Hollander v. CBS News Inc.*, No. 16 Civ. 6624 (PAE), 2017 WL 1957485, at *4 (S.D.N.Y. May 10, 2017) (urging plaintiffs "affronted by defendants' speech" to employ "the time-honored, out-of-court, remedy that Justice Brandeis famously identified": "'more speech'") (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). To allow RICO or tort liability for disputed statements by a nonprofit organization would deny "the freedoms of expression . . . the breathing space that they need . . . to survive." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964) (internal quotation marks omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

ETP's theory of extortion would likewise turn quintessentially political action—a call for divestment—into a federal crime. ETP's allegation that Defendants committed extortion appears to be based on their campaigns to convince financial institutions to stop

funding the Dakota Access Pipeline. Compl. ¶ 379; *see generally* Compl. ¶¶ 227-78. ETP alleges that Defendants called on account holders to forgo banking with these institutions, protested outside of bank offices, and wrote letters (cosigned by dozens or hundreds of other organizations not named as defendants) to the banks highlighting what they saw as a contradiction between the institutions' social-responsibility commitments and ETP's actions. *See generally* Compl. ¶¶ 237-38, 240, 242-47, 250, 254, 262-63, 270-76.

ETP's claim of extortion is empty, because ETP does not (and cannot) allege that Defendants "obtain[ed] . . . property from" ETP or the banks. 18 U.S.C. § 1951(b)(2); *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) (Where protesters "did not obtain or attempt to obtain property from" the target of their protest, "there was no basis upon which to find that they committed extortion under the Hobbs Act."). But the implications of the theory are breathtaking. If these activities constitute extortion, then any charitable organization that mounts a successful public-relations campaign against business interests could be liable to the target of its campaign for treble damages and attorneys' fees. This use of RICO would inhibit or foreclose public speech on any topic that might drive away business from a company, an unacceptable infringement of First Amendment freedoms. *See Claiborne Hardware*, 458 U.S. at 910 ("Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action.").

A common thread running through ETP's fraud and extortion arguments is that Defendants employ speech to enhance fundraising. *E.g.*, Compl. ¶ 42. But speech that is part of an appeal for donations retains its protected status. "[C]haritable appeals for funds . . . involve a variety of speech interests—communication of information, the dissemination

and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). Attacking protected speech under a new theory does not eliminate First Amendment concerns. *See Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) ("[A] plaintiff may not avoid the protection afforded by the Constitution . . . merely by the use of creative pleading.").

## B.   ETP's theory of associated-in-fact enterprises would infringe on fundamental rights of speech and association

ETP seeks to hold Defendants liable for acts of property destruction and cybercrime that it attributes to nondefendant groups and individuals, under the theory that they are part of a vast "illegal Enterprise." Compl. ¶¶ 38, 313-40, 371, 380-81. ETP would punish Defendants for the alleged actions of unrelated parties on the sole ground that they advocated for the same cause. This expansive vision of RICO liability clashes with First Amendment freedoms of speech and association.

For example, ETP tries to connect Defendants to Bold Iowa because, ETP alleges, the umbrella organization to which Bold Iowa belongs "widely disseminat[ed] the Enterprise's . . . disinformation" and "spread[] malicious and sensational lies about [ETP] and [the Dakota Access Pipeline]." Compl. ¶ 38(n). Similarly, ETP attempts to connect Defendants to Mississippi Stand on the sole ground that two of that organization's members "were incited by the Enterprise's misinformation campaign" to vandalize pipeline infrastructure. Compl. ¶ 38(s). Finally, ETP's assertion that the group Anonymous is a "front" for Defendants is predicated entirely on ETP's claim that Anonymous launched a campaign against the same targets as Defendants, at a time when the alleged Enterprise's campaign was particularly active. Compl. ¶ 332. These purported connections are a thin reed on which to base a claim

of racketeering, particularly given the applicable heightened pleading requirements for fraud. Fed. R. Civ. P. 9(b). *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995) (citing *Flowers v. Cont'l Grain Co.*, 775 F.2d 1051, 1054 (8th Cir. 1985)); *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citing *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009), and quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)); *see also Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-cv-02824-JST, 2017 WL 4618676 (N.D. Cal. Oct. 16, 2017) (RICO claims analogous to ETP's, and advanced by same counsel, dismissed by district court).

ETP's theory would deter speech and association related to any issue that might provoke various forms of protest, that is to say, almost any controversial matter of public import about which people hold passionate views—the decision to go to war, the barring of immigrants from certain nations, the boundaries of police officers' actions, the legality of abortion, and the tension between federal authority and local control, to name just a few. Each of these issues generates vast amounts of protected speech and, in extreme cases, unlawful acts or even violence. If an organization calls for a peaceful demonstration and a handful of demonstrators break windows, only that handful of law-breakers should be held accountable for the damage. "For liability to be imposed by reason of association alone, it is necessary to establish that . . . the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. ETP makes only conclusory statements of Defendants' intent, unsupported by any factual allegation. *E.g.*, Compl. ¶ 383. Rhetoric and length are not a substitute for substance.

ETP's liability theory could ensnare Amici. For example, NRDC, which does not engage in civil disobedience, might publish a scientific paper on the adverse human health

8

effects of pesticides, and file a lawsuit challenging a government initiative to weaken pesticide regulation. These acts might be accompanied by a plea to NRDC members to financially support the anti-pesticide campaign. A separate group, known or unknown to NRDC, might organize a protest at a pesticide plant, during which a protestor might trespass on private property. Under ETP's RICO theory, NRDC could be liable to the pesticide company for treble damages and attorneys' fees for that protestor's action because NRDC shared a substantive point of view (pesticides need to be regulated more strictly) with a person who broke the law while expressing that view.

To take another example, the ACLU, which also does not engage in civil disobedience, might file a lawsuit challenging a surveillance program operated by the National Security Agency and government contractors. The lawsuit might be accompanied by a press release describing the program as "Orwellian" and discussing the sorts of private information it could be used to obtain, and by an email to ACLU members and supporters urging them to protest the program. A separate individual or group, known or unknown to the ACLU, might hack the government contractors' systems to stymie the program. Under ETP's RICO theory, the ACLU could be civilly liable to the contractors for treble damages and attorneys' fees, and could even face criminal charges, because it shared a substantive point of view (the government's surveillance programs sweep too broadly) with a person or group that took unlawful measures to oppose government action.

To vindicate the fundamental First Amendment right to associate, advocates must be free to pursue a common cause with unrelated organizations without fear that they will become RICO defendants.

### C.       RICO claims such as ETP's should be carefully scrutinized at the pleading stage to avoid chilling protected speech

A RICO allegation is "the litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). The possibility of being dragged into a RICO lawsuit poses serious, sometimes existential, risks to any organization. Nonprofit organizations, which often lack significant financial resources and depend on public goodwill, are especially vulnerable to these harms. The possibility of facing a RICO lawsuit for the mere act of speaking out on a contentious issue may deter nonprofits from engaging in political debate. While advocacy organizations are not immune to RICO suits, the practical consequences of this type of litigation argue for careful scrutiny of the case's merits at the pleading stage.

First, RICO's civil-action provision allows plaintiffs to recover treble damages and attorneys' fees, amplifying the risks of litigation even when a defendant's odds of losing a suit are slim. 18 U.S.C. § 1964(c). Organizations may rationally decide not to engage in public discourse on particular issues for fear of prompting a RICO suit. To the extent that the threat of RICO liability chills organizations from soliciting donations necessary for their operations, their very existence will be threatened.

Second, RICO lawsuits can be burdensome to defend. Extensive staff time may be necessary for document production, depositions, and working with counsel and co-defendants. If the case rests, as this suit does, on the intent of members of the organization's staff in engaging in public speech and on the organization's fundraising

10

processes, a plaintiff may be able to obtain intrusive discovery into an organization's finances, donor-identification processes, and advocacy strategies.[2]

Third, should a RICO plaintiff succeed in district court, a defendant organization may be deterred from appealing by the prospect of a costly appeal bond. District courts can require appellants to post a bond sufficient to cover the costs the appellant would have to pay if the appeal is unsuccessful. Fed. R. App. P. 7. This can include attorneys' fees in cases where a fee-shifting statute applies, as in RICO. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 615 (8th Cir. 2017). The cost of covering a corporate plaintiff's attorneys' fees, on top of the other burdens outlined above, would debilitate many nonprofit advocacy organizations.[3]

Finally, RICO suits allow civil plaintiffs to allege federal crimes. "The mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect on those named as defendants." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990). As ETP's counsel has written, the term "RICO" "conjures up images of wide-lapeled suits, Tommy guns, and names like Lucky and Mugsy." *Will Test Case Earn an 'A' with the Supreme Court?*, N.D. Emp. L. Letter (Vogel Law Firm, Fargo, N.D.), Mar. 2006, at 4. This stigma alone could harm an organization's public image, undermine the effect of its advocacy, limit its fundraising

---

[2] Litigation burdens may extend to third parties purported to have participated in the enterprise. Those groups too would face discovery, or at least the task of opposing a plaintiff's discovery demands. Given the breadth of the conspiracy ETP alleges here, this burden could fall on a large number of nonprofit groups.

[3] While many organizations carry professional-liability insurance, a RICO defendant will still face costs, win or lose. Some insurance policies do not cover RICO actions. If there is coverage, the organization's deductible will have to be paid, and its insurance provider may raise its premium. In addition, RICO's hefty damages provision could lead to a recovery that exceeds a policy's coverage cap.

ability, and perhaps threaten its survival. In part for this reason, well-heeled businesses subject to advocacy campaigns might relish the public-relations benefit of painting their political adversaries as criminals, as well as the opportunity to impose significant litigation costs on cash-strapped nonprofits.

That advocacy organizations may be burdened by RICO lawsuits does not immunize them from liability under the statute. But the harms faced by such organizations underscore the serious threat posed by RICO litigation to the freedoms of speech and association. Consequently, courts should be vigilant to "flush out frivolous RICO allegations at an early stage." *Figueroa Ruiz*, 896 F.2d at 650.

## II.     ETP's Defamation Claim Should Be Dismissed

ETP also claims that Defendants' advocacy against the Dakota Access Pipeline amounted to defamation. Compl. ¶¶ 424-29. Like its RICO claims, ETP's defamation claim seeks to impose liability for political advocacy, in violation of the First Amendment.

To state a claim for defamation, a defendant must allege a false assertion of fact; statements of opinion do not qualify. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340-41 (1974). The Eighth Circuit uses a four-factor test to distinguish between statements of fact and opinions, focusing on: (1) specificity, (2) verifiability, (3) literary context, and (4) public context. *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302-04 (8th Cir. 1986) (en banc). In this case, all four factors support the conclusion that Defendants' allegedly defamatory statements constitute statements of opinion entitled to First Amendment protection, particularly insofar as they relate to matters of public concern.

The first two factors require that an allegedly defamatory statement have a specific, "singular[]" meaning that is "[]verifiable," to prevent a fact finder from "exercising . . .

12

personal dispositions regarding the contents of the statement, its author, or its subject."

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1432 (8th Cir. 1989) (citation and internal

quotation marks omitted). Even statements that seem superficially specific may fail the

specificity prong when considered in context. *Deupree v. Iliff*, 860 F.2d 300, 303 (8th Cir.

1988) (citing *Ollman v. Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984)). And even statements that

could be put to a finder of fact in litigation may fail the separate verifiability prong if they

are not "objectively capable of proof or disproof." *Ollman*, 750 F.2d at 981-82.

Many of the allegedly defamatory statements in this case are not sufficiently specific

to meet this test. Some of the statements lack a singular meaning because they use

language that is open to interpretation. *See Price*, 881 F.2d at 1432. For example, the

meaning of Bill McKibben's claim that "anyone who finances any fossil fuel infrastructure is

attempting to make money on the guaranteed destruction of the planet" depends on the

reader's understanding of the word "destruction." Compl. ¶ 141 n.3 (emphasis omitted);

*see Resolute Forest Prods.*, 2017 WL 4618676, at *9 (noting that the term "destroy" is

susceptible to different interpretations, and could represent nothing more than the

speaker's use of "obviously overemphatic speech").

In other cases, arguably precise statements "lose[] much of [their] fact-specific

quality" when considered alongside other statements in the same article or online post. *See

Deupree*, 860 F.2d at 303 (holding that statement lost its factual specificity when

considered together with other statements regarding the speaker's "traditional moral

codes" and "middle class morality"). For instance, Michael Brune's blog post claiming that

"[i]t has never been a question of *whether* a pipeline will spill but only of when the next

disaster will happen," Compl. ¶ 129 n.2, also included references to prior pipeline spills. *See*

13

Greenpeace International and Greenpeace, Inc.'s Mot. to Dismiss, app. E 43, ECF No. 40-16, at 181. Viewed in the context of these prior spills, Mr. Brune's statement could easily be understood as argumentative opinion.[4]

Many of the statements cited by ETP also "lack[] a plausible method of verification." *Ollman*, 750 F.2d at 979. "Lacking a clear method of verification with which to evaluate a statement—such a[s] labelling a well-known American author a 'fascist[]'—the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Id.* at 981 (citation omitted). That is precisely the danger here. For example, whether Greenpeace Campaigner Mary Sweeters accurately criticized the Dakota Access Pipeline approval process as "rushed" and lacking "*proper* government-to-government consultation with [the Standing Rock Sioux Tribe]," Compl. ¶ 159 n.5 (emphasis added) (internal quotation marks omitted), is a subjective determination. Two people might reasonably disagree as to what "rushed" means, or what "proper" consultation requires, based in large part on their opinions about ETP, Defendants, Native rights, or the environment.

The third factor, literary context, calls for an analysis of "the type of forum or 'social context' in which the statement was made, the category of publication, its style of writing, and the intended audience." *Secrist v. Harkin*, 874 F.2d 1244, 1249 (8th Cir. 1989). A context that suggests to readers that they are likely to hear or read the speaker's *opinion* undermines the contention that the statement is factual. *See, e.g.*, *Deupree*, 860 F.2d at 303-

---

[4] The recent Keystone Pipeline spill in South Dakota demonstrates how Mr. Brune's opinion is grounded in the real risks posed by projects like the Dakota Access Pipeline. *See* Valerie Volcovici & Richard Valdmanis, *Keystone's Existing Pipeline Spills Far More than Predicted to Regulators*, Reuters (Nov. 27, 2017, 7:02 AM), https://reut.rs/2BswKdp.

04 (call-in radio show designed to foster debate on the appropriateness of sex education in schools); *Janklow*, 788 F.2d at 1303-04 (*Newsweek* article criticizing motivations of a state governor). The tone and context of editorials, for instance, generally signal that the author is conveying an opinion, rather than statements of fact, for purposes of defamation. *See Price*, 881 F.2d at 1433.

In this case, the context in which the allegedly defamatory statements were made strongly indicates that they were intended to express constitutionally protected political opinions. The vast majority of the cited statements are in forms such as blog posts, brief statements on Defendants' websites, tweets, or press releases. *See generally* Compl. apps. A-F. These forms of media are often more "polemical" and, "[b]ecause of obvious space limitations," more "condensed" than research monographs. *Ollman*, 750 F.2d at 986-87 (discussing newspaper editorial). Press releases and online postings written by political advocacy organizations are "at least as likely to signal political opinion as a newspaper editorial or political cartoon." *Secrist*, 874 F.2d at 1249; s*ee also SI03, Inc. v. Bodybuilding.com, LLC*, No. CV 07-6311-EJL, 2008 WL 11348458, at *8 (D. Idaho May 1, 2008) (providing examples of cases that treat internet communications like blog posts as "casual expressions of opinion").

Often, the statements themselves are also "entirely political in context and in wording," plainly situating them as opinion. *Secrist*, 874 F.2d at 1250 (internal quotation marks omitted). For example, BankTrack's letter alleging that the Dakota Access Pipeline is "cutting through Native American sacred territories and unceded Treaty lands," Compl. ¶ 118 n.1, begins as a personal request from the undersigned organizations to the Equator Principles Association's Chair, Nigel Beck. *See* Greenpeace International and Greenpeace,

Inc.'s Mot. to Dismiss, app. A 14, ECF No. 40-12, at 63. The letter's section on the pipeline continues in the same vein, grounding its call to action in the first person. *See id.* at 65. The letter describes the situation as "a national crisis and an international scandal," and notes that the "world is closely watching." *Id.* The letter's first-person style, argumentative tone, and political context inform the "intended audience" that the letter, as a whole, is "a statement of [Mr. Frijns's] position," *Deupree*, 860 F.2d at 304.

Because the allegedly defamatory statements also touch on matters of *public* concern, they implicate the fourth *Janklow* factor: public context. This factor requires the court to consider "the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment." *Janklow*, 788 F.2d at 1303. As discussed above, the public has a recognized interest in ensuring that "debate on public issues [is] uninhibited, robust, and wide-open." *N.Y. Times Co.*, 376 U.S. at 270. To protect this interest, statements that "played a role in a public debate" are more likely to be viewed as opinion rather than fact, even where such statements are otherwise "subject to verification." *Price*, 881 F.2d at 1433 (citation omitted).

Here, the claims relating to the Dakota Access Pipeline's crossing tribal land, poisoning local water, lacking appropriate review or consultation, and destroying cultural resources are grounded in "issue[s] of national importance," including "the treatment of Indian people." *Janklow*, 788 F.2d at 1305; *see also, e.g.*, *McGee v. Pub. Water Supply, Dist. #2*, 471 F.3d 918, 920 (8th Cir. 2006) ("Environmental and public safety issues are obvious examples of matters that are of concern to the general public."). For example, criticism of ETP's "rush[] to bulldoze and destroy ancestral burial grounds," Compl. ¶ 212 n.8, attacks on its "climate-wrecking business model," Compl. ¶ 258, and expressions of concern about

16

"human rights abuses" by ETP personnel, Compl. ¶ 250, all constitute core political speech on matters of significant public concern. Such speech must be protected from liability to ensure the robust public debate guaranteed by the First Amendment.[5]

## III.   ETP's Tortious-Interference and Civil-Conspiracy Claims Should Be Dismissed

ETP piles on to its complaint claims for tortious interference with business and civil conspiracy. Compl. ¶¶ 430-42. These claims target the same protected speech and association that bar the RICO and defamation claims. While this brief does not address those claims in detail, Amici note that ETP cannot circumvent the First Amendment by recasting its defamation claims as tortious interference or civil conspiracy. *Claiborne Hardware*, 458 U.S. at 891, 915 (applying First Amendment protections to state-law claims, including "malicious interference with the plaintiffs' businesses"); *accord Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv'r's Servs., Inc.*, 175 F.3d 848, 857 (10th Cir. 1999); *cf. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53-54 (1988) (applying First Amendment protections to intentional infliction of emotional distress).

---

[5] ETP is also a public figure for First Amendment purposes. *See Gertz*, 418 U.S. at 342, 345. It played more than "a substantial role" in the controversy over the Dakota Access Pipeline, *Price*, 881 F.2d at 1431; it is the primary owner of the project. Compl. ¶¶ 30-31. ETP and the Dakota Access Pipeline have been the subject of countless "news accounts and editorials," *Price*, 881 F.2d at 1431. *E.g.*, Amy Dalrymple, *Audio: Tribe Objected to Pipeline Nearly 2 Years Before Lawsuit*, Bismarck Trib. (Nov. 30, 2016), http://bismarcktribune.com/news/state-andregional/audio-tribeobjected-to-pipelinenearly-years-beforelawsuit/article_51f94b8b-1284-5da9-92ec-7638347fe066.htm; Chiara A. Sottile, *Police Fire Rubber Bullets as Pipeline Protesters Try to Protect Sacred Site*, NBC News (Nov. 2, 2016, 6:35 PM), http://nbcnews.to/2fFDn4n; Bill McKibben, *Why Dakota Is the New Keystone*, N.Y. Times (Oct. 28, 2016), https://nyti.ms/2jD89Jg. Moreover, ETP's economic impact is enormous, see Compl. ¶ 30 (noting ETP's "annual revenues of approximately $40 billion"), and the "criticism of [its] actions . . . implicat[es] the type of public debate at the core of the first amendment." *Price*, 881 F.2d at 1431.

**CONCLUSION**

ETP's RICO liability theory could strip key rights to free speech and association from any charitable organization that solicits donations. It would make innocent parties liable for the criminal acts of others simply because they advocate for the same cause. ETP's rewriting of RICO and defamation law would empower any plaintiff with sufficient funding and disregard for open political debate to threaten dissident groups with high litigation costs and reputational injury. Shorn of its excessive rhetoric, the complaint accuses Defendants of advocacy, not racketeering. Amici urge the Court to dismiss ETP's complaint in its entirety.

//

Dated: December 5, 2017                  Respectfully submitted,

                                       /s/ Daniel N. Carpenter-Gold
Daniel N. Carpenter-Gold (admitted *pro hac vice*)
N.Y. Bar No. 5515911

Mitchell S. Bernard (admitted *pro hac vice*)
N.Y. Bar No. 1684307

Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
(212) 727-4656
dgold@nrdc.org

Counsel of Record

Jennifer J. Cook
N.D. Bar No. 06531
American Civil Liberties Union of North Dakota
P.O. Box 1190
Fargo, ND 58107
(701) 478-9924
jcook@aclu.org

Brian M. Hauss
N.Y. Bar No. 5437751
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

Counsel for Amici
American Civil Liberties Union,
American Civil Liberties Union of North Dakota,
and
American Civil Liberties Union of South Dakota