**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**

|  |  |  |
|---|---|---|
| ENERGY TRANSFER EQUITY, L.P., *et al.*, | ) | CIVIL ACTION FILE |
|  | ) | NO. 17-CV-00173-BRW-CSM |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| GREENPEACE INTERNATIONAL, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
| _____ | ) |  |

**GREENPEACE INTERNATIONAL AND GREENPEACE INC.'S**
**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO
      RULE 12(B)(6) .......................................................................................................... 3

      A.    Energy Transfer's Claims Are Based on Speech Subject to First
            Amendment Scrutiny, And Do Not State A Claim For Defamation ............... 3

            1.    Courts Must Police Complaints That Chill Speech At Pleading
                  Stage ..................................................................................................... 3

            2.    Statements in Suit Are Protected Opinions ........................................... 5

            3.    Energy Transfer Fails to Sufficiently Plead Actual Malice ................. 8

            4.    Greenpeace's Statements Are Privileged ............................................ 10

      B.    Energy Transfer Has Not Plausibly Pled The Existence of a "Criminal
            Enterprise" or Proximate Cause and Thus Fails to Plead a Plausible
            Claim Under RICO ...................................................................................... 11

            1.    ETP Has Not Plausibly Pled a RICO "Enterprise" ........................... 11

                  (a)    Common Criminal Purpose ...................................................... 12

                  (b)    Relationships and Roles ........................................................... 13

            2.    Plaintiff Has Not Plausibly Pled a "Pattern" of Racketeering
                  Activity ............................................................................................... 14

            3.    Energy Transfer Has Not Plausibly Pled Any Predicate
                  Criminal Acts ...................................................................................... 15

            4.    ETP Has Not Plausibly Pled Proximate Cause and Direct Harm ....... 17

II.   THE COURT SHOULD TRANSFER VENUE ...................................................... 19

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abrams v. United States*,
  250 U.S. 616 (1919)..................................................................................5

*Adelson v. Harris*,
  973 F. Supp. 2d 467 (S.D.N.Y. 2013).......................................................11

*Am. Dental Ass'n v. Khorrami*,
  2004 WL 3486525 (C.D. Cal. Jan. 26, 2004) ...........................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................8

*Atlas Pile Driving Co. v. DiCon Fin. Co.*,
  886 F.2d 986 (8th Cir. 1989) ..............................................................12, 15

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................8

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984)..................................................................................3

*Boyle v. United States*,
  556 U.S. 938 (2009)..................................................................................13

*Dameron v. Wash. Magazine, Inc.*,
  779 F.2d 736 (D.C. Cir. 1985)...................................................................11

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004)......................................................................12

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)..............................................................................3, 4, 8

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)..................................................................................10

*In re Duramax Diesel Litig.*,
  2018 WL 949856 (E.D. Mich. Feb. 20, 2018) ..........................................13

*Janklow v. Newsweek, Inc.*,
  759 F.2d 644 (8th Cir. 1985) ....................................................................9

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) ...................................................................10

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) .......................................................................9

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ........................................................................................9

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ........................................................................5

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ........................................................................................4

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................................3, 8, 9

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ....................................................................6, 8

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
    829 F.3d 576 (8th Cir. 2016) .....................................................................4, 15

*Peoples Bank & Tr. Co. of Mountain Home v. Globe Int'l Publ'g, Inc.*,
    978 F.2d 1065 (8th Cir. 1992) ......................................................................10

*Pippen v. NBCUniversal Media, LLC*,
    734 F.3d 610 (7th Cir. 2013) ..........................................................................4

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    2017 WL 4618676 (N.D. Cal. Oct. 16, 2017)............................................ *passim*

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014)...............................................................6

*Rilley v. MoneyMutual, LLC*,
    2017 WL 3822727 (D. Minn. Aug. 30, 2017) ...............................................12

*Salinas v. United States*,
    522 U.S. 52 (1997)..........................................................................................12

*Secrist v. Harkin*,
    874 F.2d 1244 (8th Cir. 1989) ....................................................................5, 7

*SI03, Inc. v. Bodybuilding.com, LLC*,
    2008 WL 11348458 (D. Idaho May 1, 2008) .................................................6

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................................3

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    2017 WL 2573994 (D.D.C. June 14, 2017) ...................................................7, 9

*United States v. Alvarez*,
    567 U.S. 709 (2012) ............................................................................................5

*Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*,
    168 F. App'x 893 (11th Cir. 2006) .....................................................................4

*Wilkow v. Forbes, Inc.*,
    2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552
    (7th Cir. 2001) ....................................................................................................4

*Zidon v. Pickrell*,
    344 F. Supp. 2d 624 (D.N.D. 2004) .............................................................19, 20

**State Cases**

*Adelson v. Harris*,
    402 P.3d 665 (Nev. 2017) .................................................................................11

*Hurt v. Freeland*,
    589 N.W.2d 551 (N.D. 1999) .............................................................................4

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................... *passim*

**Federal Statutes**

28 U.S.C. § 1404(a) ...................................................................................................19

**State Statutes**

Cal. Civ. Proc. Code § 416.10 ..................................................................................20

**Rules**

Federal Rule of Civil Procedure 4(h) ........................................................................20

Federal Rule of Civil Procedure 4(k)(2) ...................................................................20

Federal Rule of Civil Procedure 9(b) ........................................................................14

Federal Rule of Civil Procedure 12 ...............................................................................4

N.D.R.Civ.P. 4(D).......................................................................................................20

**Other Authorities**

https://www.greenpeace.org/usa/campaign-updates/supply-drive-for-dakota-red-
        warrior-camp/.......................................................................................................14

https://www.reuters.com/article/us-energy-transf-lawsuit-nordics/nordic-
        investors-reject-dakota-pipeline-operators-allegations-idUSKCN1B928V ...........................19

## INTRODUCTION

In its Response, Energy Transfer makes a surprisingly candid admission.  It complains that "the impact" of the Dakota Access Pipeline ("DAPL") protest movement "was far more **effective** than any single environmental group acting alone could have been." ECF No. 65, Pls.' Resp. ("Opp.") 44 (emphasis added).  This statement underscores that what **really** bothers Energy Transfer is the strength of collective voices seeking to hold it accountable.  As much as such criticism may sting a company like Energy Transfer, the First Amendment not only allows **but encourages** debate, even heated debate, over issues of public concern.  The fact that those who share similar ideologies can bring about real progress by raising their voices against perceived injustices is a powerful reminder of how important freedoms of speech and association are in our society.  When companies like Energy Transfer resort to tactics like the one deployed in this Action, seeking in excess of $900 million under the RICO statutes to silence its critics, it is clear that such advocacy is working.

To ensure breathing room for these important rights, the First Amendment demands that as a threshold matter courts ensure claims which may chill speech are carefully scrutinized, even when they masquerade as other causes of action like Energy Transfer's RICO claims here.  As the Greenpeace Defendants demonstrated in their motion, application of bedrock First Amend-ment principles mandates dismissal of Plaintiff's claims, however labeled.  With respect to its defamation claim, each of the 47 challenged Greenpeace statements[1] constitutes protected speech that Energy Transfer is free to challenge in the marketplace of ideas, but not in court.  Nor has Energy Transfer plausibly pled actual malice where the challenged statements show Greenpeace

---

[1] Energy Transfer does not dispute that its defamation claim is considerably more limited than the 238 statements identified in the Complaint, given that 161 statements were made by non-parties, leaving only 66 statements published by the Greenpeace.  Opp. 67.  Of these, taking into account that Energy Transfer alleges some statements are allegedly defamatory on several grounds, only 33 Greenpeace publications, containing 47 statements, are actually in suit.  ECF No. 40-1, Greenpeace Defs.' Mot. Dismiss & Mem. ("GP Br.") 13-15 & Suppl. App.

expressly relied on published articles, court records, and government reports.

In its zeal to dress up its garden-variety defamation claims as predicate acts supporting a RICO claim, Plaintiff tries to tie together disparate events and parties (most not named as defendants) solely by virtue of their common – and protected – interests.  Yet RICO is a particularly bad fit on the facts pled here, as no court has ever found a RICO enterprise that looks anything like the one Plaintiff proposes: Multiple advocacy organizations and individuals working in parallel, for their own respective reasons, around the same general cause.[2]  Nor has Energy Transfer plausibly pled – as it must to state a claim – a common racketeering purpose, relevant relationships, key organizational elements, or the specific roles of each member in operating or managing the alleged enterprise.  It also cannot show any predicate acts by the Greenpeace Defendants, or that the purported enterprise proximately caused Plaintiff harm.

In light of these fatal flaws, Energy Transfer repeatedly asks this Court not to look too closely at its claims.  It urges the Court not to view its allegations through the lens of the First Amendment and to disregard the approach taken in *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 2017 WL 4618676 (N.D. Cal. Oct. 16, 2017), despite that the claims rejected in that case were virtually identical to those brought here.  It asks the Court to ignore that its claims of a conspiracy involving virtually every major environmental organization and every group and individual who protested DAPL, are wholly speculative, with no basis in plausible facts, and deeply stigmatizing.  Finally, it asks the Court to overlook that the only alleged RICO predicate acts not based in speech involve parties not before the Court and unrelated to Defendants.

---

[2] As *amici* have noted, Energy Transfer's now-former counsel memorably summed up RICO as "conjur[ing] up images of wide-lapelled suits, Tommy guns, and names like Lucky and Mugsy." *See* ECF No. 52, Br. of ACLU *et al.* in Support Defs.' Mots. Dismiss 11 (citing *Will Test Case Earn an "A" with the Supreme Court?*, N.D. Emp. L. Letter (Vogel Law Firm Mar. 2006)).  The Vogel Law Firm withdrew as Plaintiff's counsel after Defendants' motions and supporting amicus brief were filed.  ECF No. 62.

By contrast, the Greenpeace Defendants urge the Court to carefully review each of the statements at issue here, as doing so will reveal what Energy Transfer does not want the Court to see:  That far from being defamatory, much less the lynchpin for some criminal conspiracy, these statements are without question the type of public advocacy that receives the highest level of protection under the First Amendment.

## ARGUMENT

**I.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6)**

**A.    Energy Transfer's Claims Are Based on Speech Subject to First Amendment Scrutiny, And Do Not State A Claim For Defamation**

**1.    Courts Must Police Complaints That Chill Speech At Pleading Stage**

Energy Transfer's claims all sound in defamation, and all of the challenged statements by the Greenpeace Defendants relate to issues of significant public concern.  GP Br. 11-13.  Rather than acknowledge that this means the Court must, in the first instance, analyze its claims under First Amendment principles, Energy Transfer asks this Court to put the cart before and horse and find that because it has labeled its claims otherwise, no such scrutiny is required.  This is not the law.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508 (1984) (in drawing "the line between speech unconditionally guaranteed and speech [that] may legitimately be regulated," courts "examine for [them]selves the statements in issue and the circumstances under which they were made.") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).

Moreover, Greenpeace's statements are either true or obvious expressions of opinion, and are especially protected here because "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned."  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'"  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison*, 379 U.S. at 74-75).  Greenpeace's advocacy criticizing Energy Transfer's insistence

on locating its pipeline on lands identified as critical cultural sites and water sources lies within the core of First Amendment protection and, to succeed, Energy Transfer must demonstrate more than substantial falsity; it must also show knowing falsity or high degree of awareness of falsity– a standard it simply cannot meet (especially as here it cannot show any falsity at all). *Garrison*, 379 U.S. at 73-74; *see also* GP Br. 23-25.[3]

      To broaden the reach of its claim, Energy Transfer asserts Greenpeace can be held liable for the alleged defamatory statements of purported "co-conspirators," Opp. 69 n.35, but this argument holds no water. <u>First</u>, as Plaintiff acknowledges, only one who takes a responsible part in a publication of purportedly defamatory material may be held liable for the publication. *Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*, 168 F. App'x 893 (11th Cir. 2006) (*per curiam*); *see also* Opp. 67-68 & n. 33. <u>Second</u>, Plaintiff has not specifically alleged the existence of an agreement between the Greenpeace Defendants and any other entity to publish the specific statements in suit. *See Hurt v. Freeland*, 589 N.W.2d 551 (N.D. 1999). Instead, Energy Transfer alleges only that a purported RICO "enterprise" collaborated on messaging, but defamation is not a predicate act under RICO, GP Br. 28, 43, and there is no support in the statute or case law for using RICO as a substitute for showing that a party took a responsible part in a particular publication. *See Resolute*, 2017 WL 4618676, at *7-8. <u>Third</u>, Plaintiff's "conspiracy" theory among organizations that share common messages runs afoul of the constitutional right of association. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

      Energy Transfer does not plausibly plead that the 47 Greenpeace statements in suit are

---

[3] Energy Transfer suggests pre-discovery dismissal is unsupported by the caselaw (Opp. 64 n.30, 70, 76), but that is hardly the case. Courts routinely grant Rule 12 motions to dismiss defamation claims on the same grounds asserted in Greenpeace's motion. *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 581 (8th Cir. 2016) (opinion); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (actual malice); *Wilkow v. Forbes, Inc.*, 2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) (fair report); *see also* GP Br. 15 & nn. 13, 14, 23, 29.

actionable. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).  Instead, in its

Response Energy Transfer reverts to the same summary allegations set forth in the Complaint,

which grossly mischaracterize the statements at issue, claiming it has "allege[d] the elements for

a defamation claim," rather than demonstrating that the Complaint addresses the specifics of the

statements themselves. *See, e.g.*, Opp. 62.  The content of the publications, reflecting the sources

relied upon and demonstrating that the statements at issue are protected expressions of opinion,

controls when considered against Energy Transfer's conclusory allegations.

### 2.    Statements in Suit Are Protected Opinions

Without question, the Greenpeace Defendants and Energy Transfer are on different ends

of the environmental spectrum, and have very different opinions on key public issues.  But if

Energy Transfer bristles at Greenpeace's criticism, Supreme Court precedent teaches that Energy

Transfer's remedy lies through counterspeech in the crucible of public debate – not by using

litigation to stifle free expression.  *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality

op.).  Put simply, "[t]he theory of our Constitution is 'that the best test of truth is the power of

the thought to get itself accepted in the competition of the market.'"  *Id.* (quoting *Abrams v.

United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).  Accordingly, companies like

Energy Transfer that stake out positions on controversial issues must and do rebut criticism and

compete for public acceptance of their ideas.

Energy Transfer myopically focuses on its contention that statements of opinion are not

"categorical[ly] protect[ed]," Opp. 62-63, but the statements challenged in this suit are protected

opinion because of a variety of factors, including their context in quintessential advocacy by a

well-known environmental issues organization.  GP Br. 16-21. In assessing whether commentary

on a matter of public concern is protected, context is crucial, *Secrist v. Harkin,* 874 F.2d 1244,

1249 (8th Cir. 1989), and here, Greenpeace's publications are known for advancing the

5

organization's advocacy mission and opinions, and moreover, the challenged publications were part of a heated public debate encompassing large-scale protests and global news coverage where criticism and emphatic speech are coin of the realm.  This context does not "cloak" Greenpeace from legitimate libel claims, Opp. 63, but it does signal to readers that they are encountering the statements of an advocate such that the reader will understand them in the appropriate context.[4]

Yet Plaintiff continues to deliberately misconstrue the advocacy context of Greenpeace publications.  For example, many statements in suit are short Twitter communications – all self-evident advocacy bearing slogans including "Re-routing Dakota Access pipeline won't make it less dangerous to the environment or our climate! #NoDAPL," Suppl. App. Tab 9; "Peaceful Water Protectors at Standing Rock have been met with violence from private security & construction crews.  We stay for them.  #NoDAPL," *id*. Tab 12; and "Militarized response to peaceful protest and indigenous rights is indefensible.  #NoDAPL #StandingWithStandingRock #WaterIsLife," *id*. Tab 16.[5]  These tweets include obvious expressions of opinion and emphatic speech consistent with Greenpeace's commitment to environmental activism.  The publications in suit are thus similar to declarations made in a newspaper's op-ed page, understood by reasonable readers to be inherently opinion-based.  *Ollman v. Evans*, 750 F.2d 970, 985 (D.C. Cir. 1984) (*en banc*); *see also SI03, Inc. v. Bodybuilding.com, LLC*, 2008 WL 11348458, at *8 (D. Idaho May 1, 2008); GP Br. 20.

---

[4] Plaintiff's reliance on *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705 (S.D.N.Y. 2014), is misplaced and the case is distinguishable.  That court found the statements in issue were not protected opinions because they implied the existence of supporting facts "unknown to persons reading or hearing it," *id*. at 719, whereas the Greenpeace statements in suit here readily set forth and disclosed the facts upon which they relied.  *See, e.g.*, Suppl. App. Tab 3.  Opinion based on disclosed true facts is protected.  GP Br. 16-17.

[5] Some tweets merely describe activities of other protestors, including one quoting a pipeline protestor: "'We have rights, and one of those rights is the right to clean water.'  #NoDAPL #WaterIsLife," *id*. Tab 1, and one describing a protest in Washington, D.C., *id*. Tab 19.  Energy Transfer makes no showing how such descriptive statements are defamatory, or even how Plaintiff was harmed by these tweets.

Nor does Energy Transfer dispute that many of the publications are Greenpeace's *press releases* – communications that, in addition to conveying facts, are understood to sometimes affirm advocacy positions on controversial public issues. Indeed, the press releases are placed directly in the context of responding to public statements of government officials, such as President Obama, Suppl. App. Tab 8, the U.S. Army Corps of Engineers ("ACE"), *id*. Tabs 11 & 28, then-President-Elect Trump, *id*. Tab 22, and a court ruling allowing DAPL to resume construction, *id*. Tab 29; or to comment on North Dakota-based DAPL protests, *id*. Tabs 10 & 33, an investor's divestment from companies backing DAPL, *id*. Tab 18, a bank's public statements of concern over the DAPL, *id*. Tab 24, and a statement in support of a Washington, D.C. protest march, *id*. Tab 30. Energy Transfer entirely ignores cases holding such press releases are readily understood as statements of opinion in the context of public debate. GP Br. 19 (citing, *e.g.*, *Secrist v. Harkin*, 874 F.2d at 1249).

As for a letter from the Greenpeace Defendants and hundreds of other advocacy groups to DAPL-funding institutions, encouraging divestment, Plaintiff takes issue with the statement that Plaintiff's personnel "deliberately desecrated documented burial grounds and other culturally important sites." Opp. 65; *see* Suppl. App. Tab 20 at 2. But the location of culturally important sites is a matter of significant ongoing controversy even among experts. And whether a government agency issued an opinion on the matter, Opp. 65, does not render Greenpeace's contrary opinion, based on facts disclosed in the letter, actionable. The letter directly relies on the "long standing opposition to the project by the Standing Rock Sioux Tribe," and explains that "desecration of burial grounds" resulted as a consequence of those sites having "not been identified early on" in the DAPL planning process – a timeline probed in litigation between the Standing Rock Sioux Tribe ("SRST") and the ACE. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 2017 WL 2573994, at *1-2 (D.D.C. June 14, 2017). The statement challenged by

Plaintiff is opinion, couched in an advocacy communication endorsed by hundreds of environmental organizations, based on disclosed facts and, as such, is protected.

It is beyond cavil that "debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times*, 376 U.S. at 270.  Thus, accusations made "in the contest of political, social or philosophical debate" are understood to be opinion.  *Ollman*, 750 F.2d at 987 (citation omitted).  Here, Greenpeace's advocacy is understood to be opinion from the general context and tenor of the publications, aimed at convincing the public to join the cadre of voices challenging DAPL and convincing the project's financiers to rethink their support.

### 3.     Energy Transfer Fails to Sufficiently Plead Actual Malice

Plaintiff implicitly concedes that it is a public figure and thus may only prevail on its defamation claim by plausibly pleading that the Greenpeace Defendant published the statements at issue with actual malice.  Opp. 69-70.  But Energy Transfer never adequately addresses the high burden it must meet to plausibly plead actual malice.  A plaintiff cannot state a claim simply by making conclusory assertions of the elements of actual malice, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), but must plead and ultimately prove by clear and convincing evidence specific facts demonstrating that defendant made each statement with a "high degree of awareness of their probable falsity," *Garrison*, 379 U.S. at 74, and that the defendant "in fact entertained serious doubts as to the truth of his publications."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Rather than addressing each of the alleged defamatory statements, the Complaint lumps them together in appendices and, in opposition to Greenpeace's motion, hides behind the sheer volume of general allegations without even discussing or specifically addressing the communications.  Opp. 70-75.

A large portion of Plaintiff's arguments on actual malice involve information about Energy Transfer it says was omitted from the Greenpeace Defendants' publications.  Opp. 71,

74. For example, Energy Transfer wishes Greenpeace had noted in their communications that the DAPL route was "co-located" with a preexisting pipeline route, which Plaintiff contends was approved forty years ago on a finding that "no cultural resources were identified along the right of way."  *Id*.  But archaeological assessment, like environmental science, is not static, and the Greenpeace Defendants instead relied on contemporaneous accounts of disruption to identified sacred areas in concluding that Energy Transfer chose to locate DAPL in areas for which SRST had voiced concerns.  And although Energy Transfer would have liked Greenpeace to have acknowledged that "the SRST water intake was in the process of moving … downstream from the Lake Oahe crossing," (Opp. 67), this fact did not convince a federal judge that a spill was unlikely to impact SRST's water – instead, the court, like Greenpeace, expressed concern that the ACE had not conducted adequate review of potential harm a spill could cause to the water supply.  *See Standing Rock Sioux Tribe*, 2017 WL 2573994, at *1-2.  The Greenpeace Defendants have no legal obligation to include information that Energy Transfer would prefer they include, so long as their statements are not false.  *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 647-48 (8th Cir. 1985).  It is the function of advocates to hold the powerful to account, not to disseminate their marketing materials.  Choice of what to include in Greenpeace's advocacy is an editorial judgment which a defamation plaintiff cannot dictate and with which courts do not interfere.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).[6]

The Greenpeace Defendants' choice to highlight the Tribe's position and evidence that its

---

[6] The Greenpeace Defendants had no duty to "retract" their statements even after the State Historical Preservation Society found no cultural resources on the DAPL route.  Opp. 73.  The issue was still contested by SRST and its expert, subject to ongoing litigation, and a point of public controversy.  What constitutes sacred land is a subject for "[t]he academy, and not the courthouse."  *Resolute*, 2017 WL 4618676, at *9.  Further, that Greenpeace did not retract its previous statements is irrelevant to whether or not they were true at the time of publication.  *N.Y. Times*, 376 U.S. at 286; *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996).

sacred sites would be disrupted does not constitute "purposeful avoidance of the truth." Opp. 72.

Plaintiff's reliance on *Harte-Hanks Commc'ns, Inc. v. Connaughton* is thus inapt. In that case,

the defendant newspaper, relying on a single source, accused a candidate of using "dirty tricks"

to influence a grand jury so as to cast doubt upon his opponent. The newspaper failed to inter-

view the only witness who could credibly verify or disprove the source's account and failed to

review audiotapes that could have verified or disproved the allegations. 491 U.S. 657, 682-83

(1989). The Supreme Court held that this evidence supported the jury's finding of actual malice

because it was "likely that the newspaper's inaction was a product of a deliberate decision not to

acquire knowledge of facts that might confirm the probable falsity of [the] charges." *Id.* at 692.

Here, there is no evidence that the Greenpeace Defendants made a "deliberate decision not to

acquire knowledge" or "had obvious reasons to doubt" its sources, which included the public

statements of the SRST, its experts, government agencies, and a federal court. *Lohrenz v.*

*Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003). Insofar as Plaintiff disagrees with

Greenpeace's sources that does not even raise an issue of falsity, much less actual malice.[7]

### 4.      Greenpeace's Statements Are Privileged

Energy Transfer contends that Greenpeace's statements reporting on judicial and other

official government proceedings are not privileged fair reports because they lacked sufficient

attribution. Opp. 75. Generally, "[i]t must be apparent either from specific attribution or from

the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official

documents or proceedings." *Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir.

---

[7] Energy Transfer's reliance on *Peoples Bank & Tr. Co. of Mountain Home v. Globe Int'l Publ'g, Inc.*, 978 F.2d 1065 (8th Cir. 1992), is misplaced. There, the court found actual malice where a tabloid published an incredible and false story that an elderly newspaper carrier had impregnated another elderly newspaper carrier in Australia and failed to verify whether the subject of the story was deceased. *Am. Dental Ass'n v. Khorrami*, 2004 WL 3486525 (C.D. Cal. Jan. 26, 2004), is similarly inapposite where the defendant in that case sought to promote himself as an expert in dental amalgam lawsuits by citing subject matter experts who did not support his views and failing to conduct any research to support his claims.

1985).  Here, Greenpeace's attributions could hardly be more explicit.  *See* Suppl. App. Tab 2 (describing SRST Lawsuit), Tab 3 (hyperlinking ABC News report on action of "three federal agencies"), Tab 8 (responding to President Obama's statements), Tab 11 (reporting ACE announcement), Tab 26 (reporting impact of President Trump's memoranda), Tab 28 (hyperlinking ACE documents).[8]  Energy Transfer's assertion to the contrary is baffling.

### B. Energy Transfer Has Not Plausibly Pled The Existence of a "Criminal Enterprise" or Proximate Cause and Thus Fails to Plead a Plausible Claim Under RICO

Nothing in Energy Transfer's Response alters the conclusion that recognition of the purported racketeering enterprise it asks the Court to find here would represent a dangerous and unprecedented expansion of the RICO laws.  If this Court scours the entire landscape of RICO cases since enactment of the statute, it will not find any enterprise remotely like the one Energy Transfer attempts to conjure here.  That is because notwithstanding Plaintiff's arguments that the RICO statute should be interpreted broadly, Opp. 31-32, the statute was never intended to – and should not – reach the type of public conduct Energy Transfer attacks in this case. *See* GP Br. 27.

### 1. ETP Has Not Plausibly Pled a RICO "Enterprise"

Although the Complaint names only five defendants, it sets forth a putative enterprise comprised of 17 environmental groups across at least four countries; eight identified individuals; and a vast unknown number of unidentified groups and persons purportedly involved in some kind of conspiracy against ETP.[9]  Compl. ¶ 3.  The Greenpeace Defendants have challenged Energy Transfer's failure to plausibly plead key elements of its claim that an "enterprise" existed among all of these parties:  A "common purpose" shared by the alleged members, and

---

[8] Hyperlinking constitutes sufficient attribution for purposes of the fair report privilege. *Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013); *Adelson v. Harris*, 402 P.3d 665 (Nev. 2017).
[9] Energy Transfer also urges this Court to presume a conspiracy because Judge Hovland commented in other cases that protests surrounding DAPL were caused by out-of-state actors with "political interests . . . and hidden agendas."  Opp. 27.  Judge Hovland's decisions regarding individual protestors are necessarily limited to the facts of those cases.

relationships between members (including the roles each member played in the alleged scheme). GP Br. 31-34, 34-40.  Plaintiff has no answers for these fundamental gaps in its pleading.

### (a)    Common Criminal Purpose

Plaintiff does not dispute that purported members of an enterprise must reach agreement to pursue racketeering behavior.  Opp. 34; *see Rilley v. MoneyMutual, LLC*, 2017 WL 3822727 (D. Minn. Aug. 30, 2017) (requiring a "common racketeering purpose"); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (requiring a "common fraudulent purpose").  The Complaint alleges the common goal here was to use a media campaign to pressure others to act, Compl. ¶ 39; GP Br. 32, but even if this describes anything other than protected advocacy – and it does not – Plaintiff provides only sheer conjecture that the purported enterprise members actually agreed to such a joint purpose,[10] as opposed to pursuing their own varied, independently-held goals, such as protecting the environment and defending Indigenous rights.  GP Br. 32.  In its Response, Plaintiff attempts to redefine the common purpose as "disrupt[ing] lawful activity in North Dakota," Opp. 24, but there is no support in the Complaint that this was actually agreed upon by the supposed enterprise members.  Nor could such "disruption," if planned via public criticism, stand as a common racketeering or fraudulent purpose under the RICO statute.  *Cf. Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 994 (8th Cir. 1989) (common purpose was "defrauding subcontractors").[11]

---

[10] Plaintiff categorically states "each Defendant agreed with their co-defendants and enterprise members" to engage in illegal activity, Opp. 34, but then concedes it has no proof of any such agreement and requires discovery.  *Id.* 41-42. This is the very definition of a fishing expedition.

[11] Plaintiff argues that co-conspirators may be held liable for each other's acts if their respective roles are understood to be part of the enterprise's plan.  Opp. 34. Yet this inadvertently highlights what is missing from Plaintiff's allegations: The existence of an agreed-upon purpose tying the parties together in a conspiracy in the first place.  *See Salinas v. United States*, 522 U.S. 52, 64 (1997) ("***so long as they share a common purpose***, conspirators are liable for the acts of their co-conspirators") (emphasis added).

### (b)      Relationships and Roles

One of the "structural features" that must be shown for a RICO enterprise is the existence of "relationships among those associated with the enterprise." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Plaintiff conspicuously avoids discussion of this element, stating (in a foot-note) only that there were "longstanding interpersonal relationships" between a number of environmental groups, pointing to a website of one non-party listing Greenpeace and other groups as "friends and allies," and to another non-party calling Greenpeace and others "partners." Opp. n.18. Energy Transfer well knows that merely showing that certain advocacy groups are philosophically aligned and consider each other allies is hardly the type of relation-ship that provides a sufficient basis for a RICO enterprise. *Cf. In re Duramax Diesel Litig.*, 2018 WL 949856, at *30 (E.D. Mich. Feb. 20, 2018) (routine business relationships insufficient to impose RICO liability). And these few examples do not speak at all to the relationships Plaintiff must plead and prove among all the "enterprise members" it has identified, not to mention the much larger group of unnamed individuals and groups it says participated. Again, Energy Transfer asks the Court to assume factual allegations where none exist.

It is of critical importance to note that Energy Transfer does not plausibly allege any relationships or ties that suggest any type of organization or arrangement between the Greenpeace Defendants and any party that purportedly engaged in illegal acts in North Dakota, such as individuals it claims violated the Patriot Act. While it asserts that the named Defendants sought to "train protestors in violent tactics, and lead violent attacks," Opp. 48 (citing Compl. ¶¶ 90, 314, 319), the Complaint says nothing of the sort. Rather, it alleges that "Greenpeace organized donation drives to fund, feed, and house" protestors. Compl. ¶ 319. Greenpeace does not dispute that it posted a public notice on its website about a "supply drive" to arrange for

13

donations of basic supplies to DAPL protestors,[12] but again, this type of posting is protected speech, and in any event hardly the type of "relationship" suggesting a criminal conspiracy.  The suggestion that a public call for support provides the basis for RICO relationships is contrary to the most basic constitutional rights of association.

Energy Transfer spills significant ink, *see* Opp. 35-42, trying to justify why it has failed to identify with specificity the role of each named Defendant in operating and managing the alleged enterprise.  *See* GP Br. 40-41 (describing "operation and management" test).  It argues that the scope of the Court's scrutiny under Rule 9(b) should differ depending on the predicate act in question, notwithstanding that with a similar scenario in *Resolute*, the court readily found that the entire scheme alleged by the plaintiff sounded in fraud.  2017 WL 4618676, at *10.  At most, Plaintiff points only to the tables to the Complaint setting forth the author, date and other information for each publication it claims constituted violations of the mail and wire fraud act, Opp. 37, confirming that it cannot provide such specificity for any other claim.  Moreover, it remains unable to identify any ***fraud*** in those publications – alleging falsity does not equal fraud. *See infra* 15-17; GP Br. 44-45.  Further, it attempts to lump together all of the Greenpeace enti-ties without specifying their particular roles in operating and managing the supposed enterprise, other than alleging that they signed letters to various banks (also signed by hundreds of other ENGOs).  *See* Compl. ¶¶ 38(q); 237-38; 245-47; 251-52; 255; 261-62; 275.[13]  Merely signing on in support does not a criminal enterprise make nor explain why Greenpeace is singled out.

### 2.      Plaintiff Has Not Plausibly Pled a "Pattern" of Racketeering Activity

Energy Transfer does not dispute that it cannot demonstrate an enterprise with "closed-

---

[12] *See* https://www.greenpeace.org/usa/campaign-updates/supply-drive-for-dakota-red-warrior-camp/.
[13] Plaintiff's attempt to convert non-party Earthjustice's DAPL court challenges into "'operation or management' of the enterprise" (Opp. 43), is nearly farcical.  It never explains ***how*** seeking relief in federal court could possibly constitute operation of a criminal enterprise.  And it does not allege that any named Defendant oversaw or was involved in any legal efforts (which, standing alone, also could not form the basis of either a defamation claim or a predicate civil RICO act).

ended continuity" based on DAPL activities; rather, it takes the astonishing position that it has sufficiently pled closed-ended continuity through its vague narrative allegations about a "decades-long" pattern of prior "criminal schemes" purportedly perpetrated by some version of an environmental-group "enterprise" against other companies, wholly unrelated to DAPL. Opp. 45-46 (citing Compl. ¶¶ 41-59). Putting aside the breathtaking audacity and absurdity of this claim, Plaintiff has not plausibly pled the existence of such an enterprise.

First, the allegations it cites in the Complaint are nothing more than an airing of industry grievances against environmental groups, not a serious effort to proffer factual pleadings supporting prior RICO schemes – precisely the sort of *ad hominem* attack that a court recently struck in a case brought by Resolute Forest Products against Greenpeace Canada. GP Br. 43 n.39. Second, Plaintiff never even identifies the members of this alleged decades-long enterprise, other than saying they were "numerous," Compl. ¶ 41, a problem it brushes aside because, it says, an enterprise need not have "precisely identical participants," pointing only to a case in which a single participant (a general contractor) differed between schemes while every other enterprise member was the same throughout. Opp. 45-46 (citing *Atlas Pile Driving*, 886 F.2d at 994-95). Third, it never alleges any purported "common purpose" or "relationships" between members other than in the context of the alleged DAPL activities. Fourth, Plaintiff has not come close to pleading cognizable predicate criminal acts for the purported prior schemes.

### 3.    Energy Transfer Has Not Plausibly Pled Any Predicate Criminal Acts

Energy Transfer's Complaint is full of allegations about extortion, money laundering, cyber-attacks, death threats, drug trafficking, and tax fraud by shadowy figures it claims are "enterprise" members. The Greenpeace Defendants demonstrated why these claims are not just implausible under any pleading standard, but wholly untethered from reality, GP Br. 30 n.33, 39-40, 48, and Plaintiff has now all but abandoned them. Opp. 47 n.24. Energy Transfer thus

15

commences its defense of the "predicate acts" element by focusing on its allegations that the "enterprise" violated the Patriot Act. Opp. 47-49.  However, no Greenpeace entities are alleged to have actually committed any such violations, nor are there any plausible ties between the unnamed parties who allegedly committed such acts and any "enterprise" of which the Greenpeace Defendants were members.  *See supra* 11-14; GP Br. 48.

With respect to mail and wire fraud, Energy Transfer does not anywhere deny that these claims are repackaged defamation claims; rather, it argues that such claims are not mutually exclusive.  Opp. 51 n.26.  But even if true, this is primarily because the fraud claims require ***more*** than just misrepresentations of fact.[14]  GP Br. 44-46.  At a bare minimum, even Energy Transfer must concede that fraud requires a showing of intent to deceive or cheat another out of money or property.  Opp. 54; GP Br. 44-45.  Here, it fails even to meet that minimal showing.

Revealingly, Energy Transfer phrases its claim in a manner that omits both the victim and the object of the fraud: "Defendants devised a scheme to defraud to further their own environmental and political agendas."  Opp. 50.  In other words, one might ask, defraud ***who***, and of ***what***?  Answers to those questions are precisely what are missing in the Complaint (and in Energy Transfer's Response).  First, of course, Energy Transfer cannot and does not claim that ***it*** was the victim of any fraud.  Rather, its laundry list of seven purported categories of mail and wire fraud in its Response allege false statements made to the general public.  Opp. 50.  Yet even if the "blog posts, articles, and press releases" and other communications to the public somehow contained misrepresentations, of what was the public deprived?  Energy Transfer's only answer to that question is that donors were defrauded of their funds, but it has not pled a single example

---

[14] Energy Transfer argues at length about what the statute does ***not*** require when pleading fraud.  Opp. 52-54.  Putting aside that, in typical cases of mail or wire fraud, a plaintiff can show many if not most of these elements, and that none of the cases Energy Transfer cites lacked ***all*** of these elements, what Energy Transfer fails to explain to the Court is what fraud ***does*** require beyond mere falsity.

of this, and in any event it has no standing to pursue a claim on behalf of donors.  *Resolute*, 2017
WL 4618676, at *10; GP Br. 50.

The only other categories of alleged fraud are "disseminating false and misleading
allegations" and "harassing" Plaintiff's investors to "terminate their business relationship with
Energy Transfer."  Opp. 50-51. As to the latter, even employing "hard bargaining" to urge
someone to do something is not the equivalent of deceiving or cheating someone out of money or
property; at best this would describe extortion, not fraud, and as previously explained Plaintiff
has failed to plausibly plead extortion.  GP Br. 46-48.  As to spreading false information to
Energy Transfer's own "stakeholders," Plaintiff again wholly fails to identify what money or
property the Defendants sought to defraud these stakeholders of, because it cannot.

### 4.      ETP Has Not Plausibly Pled Proximate Cause and Direct Harm

Plaintiff argues it has satisfied proximate cause by alleging it was the "intended victim[]"
of Defendants' "scheme to defraud" and alleging economic harm through impairment of business
relationships, access to financing, and costs to mitigate the impact of Defendants' campaign.
Opp. 55-61.  These arguments are unavailing.  Greenpeace does not deny that the risk that DAPL
posed was the focus of their advocacy, but that alone does not make Energy Transfer the "target"
of a fraudulent scheme.  Nowhere does Energy Transfer explain how statements to supporters of
environmental causes (that is, Greenpeace's supporters), or even the general public, could lead to
the types of losses Energy Transfer says it suffered.  And any harm from such statements would
be reputational damage, which is not cognizable under a RICO claim.  GP Br. 49-50.

Thus, in its Response, Energy Transfer argues primarily that Defendants committed fraud
by "disseminat[ing] false and misleading allegations about Energy Transfer to the banks
financing DAPL, investors, and the market generally with the specific intent that these critical
market constituents would rely on these false representations and terminate their business

relationships with Plaintiffs."[15]  Opp. 56.  In particular, Plaintiff's entire case on proximate cause

appears to depend on the public calls to stop DAPL investments.  Compl. ¶¶ 237-78.  Notably,

the alleged "false representations" in those statements are the same public messages at issue in

Plaintiffs' defamation claims and none of the public letters to banks are alleged to have been

uniquely formulated to "defraud" them of their money or property.  More importantly, on their

face these letters set forth positions taken by the signatories (in many cases, hundreds of them),

cite to contemporaneous reports as the basis for their concerns, and spell out actions the

signatories ask the banks to take.  As Energy Transfer concedes, the banks and other investors

then took a variety of responsive actions.  Some did nothing.  Some affirmatively rejected the

claims.  Some hired consultants to examine them. Some responded with public statements.

Some divested a portion of their DAPL-related investments.  A few divested completely.  ***None***

diverted money intended for Energy Transfer to any Defendant.  *See id*. ¶ 252.

        Even in the few instances where the Complaint alleges actual loss of investors, it does not

explain how such losses flowed from any deceptive or false statement, as opposed to investors'

own independent decisions, or the general condemnation of the DAPL project in the market.  GP

Br. 51-52.  Although Plaintiff points to divestments by banks Nordea and DNB, and pension

funds Storebrand and KLP, those entities all have publicly stated that they did ***not*** divest because

of pressure from environmental groups.  *See* "Nordic investors reject Dakota pipeline operator's

allegations," Reuters, Aug. 29, 2017.[16]  For example, KLP said it "did not divest from ETP as the

result of pressure from Greenpeace, and would have gladly communicated this to the company if

---

[15] With respect to public statements to "the market generally," Plaintiff says the enterprise sought
to "galvanize the public" to boycott banks, sign petitions, and participate in demonstrations.
Compl. ¶ 232; *see also id.* ¶¶ 235, 242, 250, 254, 262.  Plaintiff's attempt to convert these classic
forms of advocacy and protest into a supposed vehicle for fraud hardly merits a response, but any
alleged harm from such statements would be remote and, at most, constitute reputational injury.
[16] https://www.reuters.com/article/us-energy-transf-lawsuit-nordics/nordic-investors-reject-dakota-
pipeline-operators-allegations-idUSKCN1B928V.

they had returned our messages" and its decision was based on "'an unacceptable risk of contribution to serious or systemic human rights violations.'"  *Id.*  Nordea said there is "no way that any NGO in the world could make Nordea to 'cave in'" as Energy Transfer now claims.  *Id.*

Energy Transfer argues that RICO injury does not have to be solely attributable to the alleged fraud, Opp. 58, but that is not the point:  On the face of the pleadings, the ***primary*** reasons for investors divesting their interests in DAPL had nothing to do with alleged false statements.  Energy Transfer also argues that the "presence of intermediaries does not break the chain of causation," *id.*, but the banks and investors were not "intermediaries" in a chain of causation – they were independent actors considering many different inputs, thus making any ultimate losses to Plaintiff far too attenuated to recover under RICO (or otherwise).  And yet again, in the absence of specific allegations about deceptive statements which were intended to and did deprive the recipient of their money or property, any purported harm here would merely be a generalized reputational harm, redressable only by a claim of defamation.  GP Br. 50.

## II.  THE COURT SHOULD TRANSFER VENUE

The Greenpeace Defendants have previously shown that the Court may exercise its discretion to transfer venue under 28 U.S.C. § 1404(a), as each factor in the relevant analysis supports transfer to either the District of Columbia or the Northern District of California.  In response, Energy Transfer – which has no corporate presence in North Dakota – does not demonstrate to the contrary, for at least the following reasons.  First, the location of witnesses in this case – the factor generally afforded the greatest weight by courts, *Zidon v. Pickrell*, 344 F. Supp. 2d 624, 634 (D.N.D. 2004) – weighs in favor of transfer to the District of Columbia. While Greenpeace identifies by name at least seven witnesses located there, GP Br. 57, Energy Transfer offers a self-serving and speculative list of potential categories of witnesses in North Dakota, Opp. 81, but cannot demonstrate the materiality and importance of those witnesses given

that none would be able to comment on the core allegations relating to purported defamatory or fraudulent statements. *Zidon*, 344 F. Supp. 2d at 634; Compl. ¶¶ 3, 13. Second, judicial economy favors Defendants given the parallel litigation pending in the U.S. District Court for the District of Columbia, which Plaintiff can only weakly claim is "tangential," Opp. 82 n.46, despite the fact that Plaintiff itself claims that the filing of that case was the triggering event for the entire alleged "enterprise." *See, e.g.*, Compl. ¶¶ 10-11, 87-89, 95, 107-111. Third, North Dakota law does not apply, as Plaintiff suggests, because the locus of the Greenpeace Defendants' speech activities at issue is their offices, not North Dakota. GP Br. 60.[17]

## **CONCLUSION**

Efforts by large corporations to chill speech critical of their business practices are nothing new. Even here, where Energy Transfer attempts to wrap its defamation claims against non-profit advocacy groups in the mantle of an alleged criminal conspiracy, the First Amendment demands scrutiny of those claims in order to secure the rights of speech and association that are necessary and vital to a robust marketplace of ideas. Careful examination of Plaintiff's claims here reveals that not only do they constitute a transparent attempt to subvert critical speech, but despite its 442-paragraph Complaint, those claims each fail to state a claim under the law.

---

[17] GPI also has shown that Plaintiff has failed to establish this Court's personal jurisdiction over it. Plaintiff did not, as it now claims, validly serve GPI in the U.S. under RICO, because its attempted service on a board member was improper. Fed. R. Civ. P. 4(h); Cal. Civ. Proc. Code § 416.10; N.D.R.Civ.P. 4(D). GPI objected to this attempt, and the parties then stipulated to service through counsel. *See* ECF No. 13. Plaintiff also has not shown that GPI has sufficient "national contacts" with the U.S. as required for RICO service and under Federal Rule of Civil Procedure 4(k)(2), given the negligible contacts cited in the Complaint. *See* ¶¶ 38(a), 212, n.8. Nor has Plaintiff shown jurisdiction under North Dakota's long arm statute, as other than a letter directed to banks (none of which are in this state) concerning DAPL construction across several states, Plaintiff offers no evidence that GPI directed any statements intended to cause injury in North Dakota, or conspired with the other Defendants to do so; and any alleged reputational harm to Plaintiff would not primarily accrue in North Dakota, because Energy Transfer is not based there. Plaintiff offers no evidence that GPI directed any statements intended to cause injury in North Dakota (indeed, not a single one of the 47 statements listed by ETP is attributed to GPI).

This 30th day of March, 2018.

Respectfully submitted,

/s/   Derrick Braaten
Derrick Braaten, ND Bar #06394
BAUMSTARK BRAATEN LAW PARTNERS
109 North 4th Street, Suite 100
Bismark, ND  58501
(701) 221-2911
derrick@baumstarkbraaten.com

Laura Handman (admitted *pro hac vice*)
Lisa Zycherman (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006-2401
(202) 973-4200
laurahandman@dwt.com
lisazycherman@dwt.com

Lacy H. Koonce, III (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 603-6467
lancekoonce@dwt.com

Thomas Burke (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street; Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
thomasburke@dwt.com

*Attorneys for Defendants Greenpeace International and Greenpeace, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 30th day of March, 2018, I have served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing.

_____/s/ Lisa B. Zycherman_____

LISA B. ZYCHERMAN (Admitted *Pro Hac Vice*)

22