**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| Energy Transfer Equity, L.P., and Energy Transfer Partners, L.P., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:17-cv-00173 |
| | ) ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| Greenpeace International (aka "Stichting Greenpeace Council"); Greenpeace, Inc.; Greenpeace Fund, Inc.; Banktrack (aka "Stichting Banktrack"); Earth First!; Cody Hall; Krystal Two Bulls; Jessica Reznicek; Ruby Montoya; Charles Brown; and John and Jane Does 1-20, | ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMAND** |
| Defendants. | | |

Plaintiffs Energy Transfer Equity, L.P., Energy Transfer Partners, L.P. (collectively "Energy Transfer" or "Plaintiffs"), as and for their amended complaint against Greenpeace International (aka "Stichting Greenpeace Council"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund") (collectively, the "Greenpeace Defendants"), Earth First!, Cody Hall, Krystal Two Bull, Ruby Montoya, Jessica Reznicek, Charles Brown, and John and Jane Does 1-20, allege as follows:

**PRELIMINARY STATEMENT**

1.      This action arises from an illegal scheme targeting Energy Transfer and its project, the Dakota Access Pipeline ("DAPL" or the "Project") -- a 1,172 mile underground pipeline -- which extends from the Bakken region of North Dakota to Patoka, Illinois. The scheme involved a campaign of misinformation that was intended to, and did, incite violence, property destruction, and criminal sabotage designed to stop the construction and operation of DAPL.

2.      The scheme was perpetrated by a network of putative not-for-profits and rogue eco-terrorists who have organized around common interests, goals, objectives and stated purposes, chief among them, the commitment to further an anti-development, no fossil fuel agenda through anarchist political philosophy and criminal sabotage.

3.      Between August 2016 and May 2017, thousands of protestors descended upon North Dakota, in an effort to prevent the construction of the final segment of DAPL.   During that time period hundreds of people were arrested, when protests turned into violent clashes that placed the lives of construction workers, security personnel, and the local authorities in danger.

4.      The myth is that these protests were organic, spontaneous and peaceful.  The reality is that the opposition to DAPL was a highly organized and orchestrated scheme perpetrated by out-of-state protestors who have political interests in the pipeline protest and hidden agendas vastly different and far removed from the SRST.

5.      The Enterprise, or perpetrators of the scheme, followed a well-honed playbook developed by Greenpeace International consisting of four central components: (1) ubiquitous and aggressive dissemination of false and alarmist claims regarding phony but emotionally charged hot-button issues to manufacture a sense of crisis; (2) use of the manufactured claims to attract on-the-ground protestors to rally for the cause, who the Enterprise then trained in property destruction and criminal sabotage; (3) planting of radical, violent eco-terrorists on the ground amongst the protestors to incite violent action; and (4) use of the manufactured claims and ensuing violent and destructive protests to fraudulently induce donations to fund further racketeering activity.

6.      With respect to DAPL, the plan proceeded precisely as designed.

7.      As the project neared its end point, after two years of construction, Greenpeace Inc. and Greenpeace Fund (together, "Greenpeace USA") embarked on a misinformation campaign designed to generate an international media spectacle based on the false claims that DAPL would traverse the SRST reservation, desecrate cultural resources, and poison its water supply.  Greenpeace USA worked in concert with a core group of environmental non-governmental organizations ("ENGOs") to aggressively disseminate false and sensational claims about DAPL, each publishing their coordinated claims under its own banner to create an "echo chamber" cloaking their misrepresentations with a veneer of legitimacy.

8.      Led by Greenpeace, the Enterprise used these lies to recruit protesters and dispense monies which directly supported the proliferation of protest camps.  The camps began with a handful of Native Americans gathered on tribal land, but evolved to several camps, which collected hundreds of thousands of dollars from GoFundMe websites and attracted thousands of protestors from around the country to create semi-permanent groups of men, women, and children in the surrounding areas between August 2016 and May 2017.  Greenpeace and the other ENGOs understood and intended that a certain percentage of such protestors could be coopted to engage in acts of violence and eco-terrorism.  The protestors they incited were trained by Greenpeace USA on-the-ground in North Dakota in direct action, blockade techniques, and criminal sabotage.

9.      Moreover, the Greenpeace Defendants used these materially false and misleading publications and claims to fraudulently induce donations used, in part, to fund illegal activities against DAPL and other Energy Transfer infrastructure projects, including the provision of funds for travel to protests, materials for attacks, and legal representation and bail when the protestors,

who intentionally perpetrated criminal acts at the behest of Greenpeace Defendants, were arrested.

10.     At the same time, Earth First!, an associated-in-fact group of individuals, comprised of persons known and unknown, including Grayson Bauer Flory and Earth First! Journal which published manuals used to teach the racketeering activity engaged in, provided $500,000 of seed money to a core group of violent eco-terrorists and training in property destruction, who then formed what became known as Red Warrior Camp.  The funding and training of eco-terrorists to engage in racketeering activity was approved and directed by John and Jane Does, members of the organizational structure which Earth First! publicly acknowledges exists, but the members of which have never been publicly disclosed.

11.     Greenpeace, working in concert with John and Jane Does operating as Earth First!, organized donation drives to fund, feed, and house members of Red Warrior Camp, and held trainings in its warehouses and at protest camps in North Dakota to train protesters in property destruction, monkeywrenching, and tactics to get arrested -- all of which were intentionally designed to delay construction and operation of DAPL.  Greenpeace USA employees participated in the violent and destructive protests, a practice that is condoned by Greenpeace USA which provided its employees with unlimited paid time to travel to DAPL camps in North Dakota.

12.     Likewise, John and Jane Does, operating as members of Earth First!, trained Defendants Ruby Montoya, Jessica Reznicek, and other members of Mississippi Stand, a radical eco-terrorist group, on the ground near DAPL construction sites in Iowa.  These Earth First! associates trained Montoya and Reznicek in monkeywrenching and other eco-terrorist techniques to torch holes and otherwise destroy the pipeline and construction equipment, including

4

acetylene cutting torch tactic.  These tactics are set forth in *Earth First! Direct Action Manual*

("Direct Action Manual") and *Ecodefense: A Field Guide to Monkeywrenching* (the "Ecodefense

Guide"), authored by associates of Earth First! and published by Grayson Bauer Flory under the

auspices of Earth First! Journal.  As the associates of Earth First! intended, Montoya and

Reznicek used the acetylene cutting torch tactic to destroy several segments of DAPL, resulting

in millions of dollars in property damage and significant delay of construction activities.

13.     Greenpeace, John and Jane Does operating as members of Earth First!, and

others advertised Red Warrior Camp's and Mississippi Stand's violent activities to secure

additional funding and recruit additional protesters, and used other illegal means, including

selling drugs, purchased with donated money, to other protestors at the camps to finance their

operations, line their own pockets, and fund the eco-terrorists they incited to North Dakota.

14.     The violence at the camps escalated in tandem with the Enterprise's

misinformation campaign and the establishment of Red Warrior Camp and Mississippi Stand.

The Enterprise maliciously disseminated misinformation and prompted on-site violence not

because it was in the SRST's interest, but rather to further its anti-fossil fuel and anarchist

agendas.  Ultimately, the SRST evicted Red Warrior Camp from the protest site in November

2016 because Red Warrior Camp was advancing the Enterprise's sensational and violent agenda

irrespective and contrary to the interests of the Tribe that they claimed to be supporting.

15.     The Enterprise, through Greenpeace and John and Jane Does operating as

associates of Earth First!, knowingly funded, controlled, directed, and incited acts of terrorism in

violation of the U.S. Patriot Act, including attempted and actual destruction of an energy facility

and equipment and arson on government property and aimed at interstate commerce.  These acts

of physical sabotage of the pipeline were serious terrorist threats that -- had oil been flowing in

the pipeline when the attacks were perpetrated -- would have caused the pipeline to explode, endangering human lives and resulting in environmental disaster.   The attacks further undermine the authenticity of the Enterprise's "environmental" cause.

16.    Ultimately, the pipeline was completed and is operational.  The Enterprise's campaign against Energy Transfer, however, is ongoing.  The Greenpeace Defendants and John and Jane Does operating as Earth First! continue to target Energy Transfer's infrastructure projects with patterns of criminal activity, including most recently, the Bayou Bridge pipeline. In furtherance of this objective, John and Jane Does, members of the organizational structure of Earth First, held an Organizers Conference earlier this year to plot direct action and criminal sabotage against the Bayou Bridge.  Earth First!'s activities are coordinated closely with Greenpeace USA, which has escalated interference with Energy Transfer's infrastructure projects to its "priority project of 2018" and has recruited and hired Defendant Charles Brown for the express purpose of organizing and executing racketeering activity designed to interfere with Energy Transfer's infrastructure projects.  Under Defendant Brown's direction, Greenpeace USA sent agents to Louisiana to train on-the ground protesters in similar militant and illegal actions employed against DAPL, and fund direct actions against the Bayou Bridge pipeline.

17.    The coordinated attack against Energy Transfer's infrastructure projects has inflicted enormous damages on Energy Transfer's business operations.  The company has suffered direct monetary damages including costs associated with damaged equipment, construction sites, and the pipeline itself; increased security costs; and costs associated with the delays in construction of DAPL, all of which were the direct, and intended, consequence that naturally flowed from the the Enterprise's predicate acts.  The campaign has also resulted in damage to Plaintiffs' reputation and access to capital markets, including impaired access to

financing and increased costs of capital, impairing the company's ability to finance future infrastructure projects at economical rates.  Finally, Plaintiffs incurred substantial expenditures to mitigate the direct impact of the slander campaign and other violent protests.

18.    These damages were intentionally and maliciously inflicted based upon a relentless campaign of its brand and illegal predicate acts.  Defendants must be held accountable for these damages, and for substantial punitive damages to deter this illegal means of doing business.

### JURISDICTION AND VENUE

19.    This action arises under The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968, and state statutes and common law.

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

21.    This Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. § 1965 because each defendant resides in the United States, transacts business on a systematic and continuous basis in the United States, and/or has engaged in tortious misconduct here in violation of United States law.

22.    This Court also has personal jurisdiction pursuant to North Dakota's long-arm statute, N.D.R. Civ. P. 4, because each defendant directly and through agents transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in a persistent course of conduct, and derives substantial revenue within the state; or is registered to do business in and has consented to personal jurisdiction in this state.

23.     Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this forum and defendants are subject to personal jurisdiction in this judicial district.

## THE PARTIES

24.     Plaintiff Energy Transfer Equity, L.P., is a master limited partnership organized under the laws of Delaware and headquartered in Dallas, Texas.  Energy Transfer Equity is the parent company of the other Plaintiff entities herein.  Together with its subsidiaries, Energy Transfer owns and operates a diverse portfolio of natural gas midstream, intrastate, and interstate transportation and storage assets, as well as crude oil, natural gas liquids, and refined product transportation and terminalling assets.  Energy Transfer owns the largest liquid petroleum and natural gas pipeline system by volume in the United States, spanning nearly 72,000 miles, including a 38.25% interest in the Dakota Access Pipeline ("DAPL").

25.     Plaintiff Energy Transfer Partners, L.P. ("Energy Transfer Partners") is a master limited partnership organized under the laws of Delaware with its headquarters and principal place of business in Dallas, Texas.  Energy Transfer Partners is a wholly owned subsidiary of Energy Transfer Equity.  It holds a 51% interest in Dakota Access, LLC ("Dakota Access"), a limited liability company organized under the laws of Delaware with its headquarters and principal place of business in Dallas, Texas, which owns and operates DAPL.

26.     Defendant Greenpeace International, aka Stichting Greenpeace Council ("GP-International" or "GPI"), is a putative Dutch not-for-profit foundation based in Amsterdam, the Netherlands.

27.     Defendant Greenpeace, Inc. ("GP-Inc.") is a putative nonprofit corporation organized under the laws of California and headquartered in Washington, D.C. and is licensed to do business in many states throughout the United States, including North Dakota.

28.     Defendant Greenpeace Fund, Inc. ("GP-Fund") is a putative nonprofit charitable corporation organized under the laws of California and headquartered in Washington, D.C. and is licensed to do business in many states throughout the United States, including North Dakota.

29.     Defendant Earth First! is an associated-in-fact group of individuals comprised of persons known and unknown, including Grayson Bauer Flory and his publication Earth First! Journal, which publishes manuals used to teach the racketeering activity engaged in.  John and Jane Does, holding themselves out as associates of Earth First! conducted those activities, provided training in those activities, and provided $500,000 in seed money to fund those activities.  All of these activities were approved and directed by John and Jane Does, members of the organizational structure of Earth First! which Earth First! publicly acknowledges exists, but the members of which have never been publicly disclosed.

30.     Defendant Cody Hall is a resident of South Dakota.  Hall served as a leader, organizer, and media spokesperson for Red Warrior Camp, an encampment of militant eco-terrorists formed in North Dakota adjacent to DAPL construction sites, and recruited, funded and trained by Greenpeace USA and Earth First! to lead and coordinate violent attacks against DAPL.

31.     Defendant Krystal Two Bulls is a resident of Montana.  Two Bulls was an organizer and media coordinator for Red Warrior Camp.

32.     Defendant Jessica Reznicek is a resident of Iowa.  Reznicek is the founder of Mississippi Stand.

33.     Defendant Ruby Montoya is a resident of Iowa.  Montoya was a press representative for Mississippi Stand.

34.     Defendant Charles Brown is a resident of Virginia.  Brown is a pipeline campaigner for Greenpeace USA focused on Greenpeace's "priority project of 2018" -- interfering with Energy Transfer's infrastructure projects.

35.     John and Jane Does 1 through 20, whose identities are presently unknown to Plaintiffs, including men and women operating and holding themselves out as members of Earth First!, unknown members and affiliates of Red Warrior Camp and other participants in the network of environmental groups targeting Energy Transfer and other legitimate organizations, as well as co-conspirators and/or aiders and abettors of the named Defendants in the scheme, enterprise, and misconduct alleged in this complaint, including, among others, cyber-hacktivists, environmental activists, and certain foundations directing funds to the Defendants.

## STATEMENT OF FACTS

36.     Since no later than July 2016, Energy Transfer has been the target of a malicious and hostile campaign arising from its development, construction, and operation of DAPL -- a 1,172 mile underground pipeline -- which extends from the Bakken region of North Dakota to Patoka, Illinois, passing through South Dakota and Iowa, the specifics of which are as follows:

### A.     The Criminal Enterprise

37.     The campaign against Energy Transfer was conducted by an illegal Enterprise comprised of various legally distinct but associated-in-fact environmental organizations, individuals, and others who worked in concert with one another for the purpose of carrying out the pattern of racketeering activity directed at stopping DAPL and funding themselves and other enterprise members executing the predicate acts.  The Enterprise was comprised of the following members:

## 1. <u>Red Warrior Camp, Cody Hall, and Krystal Two Bull</u>

38.    Red Warrior Camp,[1] founded by Defendant Cody Hall and represented by media liaison Krystal Two Bull, falsely portrays itself as a coalition of "water protectors" representing 27 tribal nations dedicated to direct action to interfere with the construction of DAPL.  In truth, Red Warrior Camp is a front for eco-terrorists recruited, directed, and funded by Greenpeace USA and individuals operating as Earth First!.  Using seed money and training from Earth First!, through John and Jane Does operating under that name, and funds and supplies from Greenpeace USA, beginning in August 2016 and continuing until they were evicted by order of the SRST Tribal council in November 2016, Red Warrior Camp infiltrated and radicalized the DAPL protest movement by coopting a percentage of otherwise peaceful protestors drawn to territory adjacent to the DAPL crossing at Lake Oahe.  Red Warrior Camp successfully recruited, coopted, and directed protestors to employ militant, illegal predicate acts to disrupt DAPL construction during that time period and other protesters to engage in various activities designed to distract from, and provide cover for, these racketeering activities.

39.    Red Warrior Camp widely disseminated recruitment and fundraising videos of militant and illegal acts through its official media team, the Women Warriors Media Cooperative.  The videos encourage the public to travel to protest camps, where Greenpeace USA, individuals operating as Earth First!, and existing Red Warrior Camp members trained new members on how to conduct illegal attacks on DAPL construction sites and personnel.  Members of Red Warrior Camp were trained, in part, by Greenpeace USA, including in the coordination of large-scale attacks on DAPL construction sites that culminated with

---

[1]    At this time, Plaintiffs do not believe that the SRST members named in the August 15, 2016 complaint in *Dakota Access, LLC v. Archambault*, Case No. 16-CV-00296-DLH-CSM, in the District of North Dakota, are members of Red Warrior Camp, since those individuals were members of SRST which subsequently ousted Red Warrior Camp.

bombing and arson of federal and state lands, property destruction, and arrests. Moreover, members of Red Warrior Camp buried illegal weapons and munitions, illegally trafficked over state lines, near the river bed to use in clashes with law enforcement.

40.    To raise funds, Red Warrior Camp recorded attacks, announced arrests, and set up funds for bail and legal representation. Red Warrior Camp also established GoFundMe and other crowdfunding accounts and Amazon wish lists to provide financial support to others who wanted to travel to North Dakota. A critical source of funding and supplies for Red Warrior Camp's operations were supply drives held by Greenpeace USA to fund, feed, and house members of Red Warrior Camp at its Lake Oahe campsite. The funds and supplies generated by these drives were directed to Defendant Hall and enabled Red Warrior Camp to carry out further violent and destructive attacks. Red Warrior Camp also engaged in an illegal drug trade by using donation money to buy drugs out of state and sell them throughout the camps in the area, securing enormous profits.

41.    Red Warrior Camp's illegal tactics was often associated with "calls to action" publicized by Krystal Two Bulls, through Greenpeace USA, among others, and which was designed to enlist others to engage in activities that would distract from, and provide cover for, their illegal activities. Their illegal conduct eventually resulted in Red Warrior Camp's ouster from the camps by unanimous vote of the SRST Tribal council. However, rather than leave as asked, Red Warrior Camp continued to engage in and incite violent and terrorist actions definitively demonstrating that their agenda had nothing to do with support and protecting SRST.

42.    In executing these acts of terrorism, Red Warrior Camp adopted intense security protocols which prevented information about their planned protests and the identity of their members from disclosure to law enforcement and Energy Transfer's security personnel. Even

today, members of the Red Warrior Camp fiercely guard their identities, to avoid accountability for their acts of terrorism. They recently pressured a documentary film maker not to distribute a film including footage of their conduct between August and November 2016 so that their identities would remain a secret.

### 2. <u>Mississippi Stand, Jessica Reznicek, and Ruby Montoya</u>

43. Mississippi Stand is a radical eco-terrorist group led by Jessica Reznicek near DAPL construction sites in Iowa. Marketing itself as the "shutdown caravan," Mississippi Stand stated that its purpose was to "lock down" DAPL construction whenever, wherever, and by whatever means possible.

44. In September and October 2016, Defendants John and Jane Does, operating as members of Earth First!, held in-person direct action trainings for Mississippi Stand in Iowa to execute the techniques laid out in Earth First Journal's Direct Action Manual and Ecodefense Guides. Following this training, members of Mississippi Stand unlawfully "locked down" DAPL construction in Iowa on an almost daily basis, using "steel or sleeping dragons" to attach themselves to construction sites and equipment. Moreover, based on Earth First!'s Direct Action Manual and Ecodefense Guide and training, Reznicek and Montoya perpetrated illegal terrorist attacks against DAPL, burning heavy construction equipment and using oxy-acetylene cutting torches to cut holes into segments of the interstate pipeline.

45. Its "lockdowns" and other criminal activities were frequently recorded on video and disseminated through its website and social media, and were featured on Earth First! Journal's website. Mississippi Stand also established GoFundMe accounts and other crowdfunding accounts with materially false and misleading claims about DAPL, which Mississippi Stand intended to fraudulently induce financial support from others. Mississippi Stand has publicly endorsed Red Warrior Camp's illegal tactics, stating that "it fights the black

13

snake in solidarity with Red Warrior Camp." Additionally, it has prominently featured Reznicek's and Montoya's statements on its homepage and continues to openly advocate for property destruction and terrorism, while fundraising for legal support for such action.

### 3. Greenpeace International

46.    Greenpeace International ("GP-International" or "GPI") holds the Greenpeace trademark and serves as the international coordinating body for a network of more than twenty-six legally distinct national and regional associations operating under the common Greenpeace name, including defendants Greenpeace Inc. and Greenpeace Fund.

47.    Major public campaigns by associated entities operating under the Greenpeace name must be presented to, and approved by, GPI, whose leadership is comprised of "families council" of all of its associated members.

48.    The various Greenpeace associations operating under GPI have a history of engaging in property destruction and criminal sabotage in pursuit of its manufactured causes. For example, in a 2011 campaign against genetically modified organisms, Greenpeace activists -- under the direction and control of GP-International -- broke into an experimental farm in Australia and destroyed a plot of genetically-modified wheat engineered to benefit diabetics, causing $400,000 in damage and setting back the research by a year. Similarly, in a December 2014 campaign to influence a major international climate change conference in Peru, Greenpeace activists defaced a several thousand-year-old UNESCO Heritage site miles away. That site, called the Nazca Lines, is a precious moon-like landscape that has preserved large, extremely fragile geoglyphic figures ancient peoples formed over 2,500 years. Walking in the Nazca Lines is illegal because doing so necessarily and permanently alters the landscape and, thus, the geoglyphics. Greenpeace activists disregarded this prohibition and substantiated risk of irreparable environmental harm to climb and walk on this site, to unfurl a large banner, causing

substantial and irreparable harm.  Although Greenpeace purported to apologize for this damage, it refused to identify the members responsible for the illegal destruction and to this day is harboring and protecting those eco-terrorists from justice.

49.    Most recently, the association of Greenpeace entities, under the direction and approval of GPI, has targeted Exxon with a fraudulent and illegal campaign, which in Greenpeace's own words, is intended to "delegitimize [Exxon]," "force officials to disassociate themselves from Exxon," and "drive divestment from Exxon."  Pursuant to the operational memorandum for campaign, the campaign, would be executed by, among other things, use of fraudulent lawsuits to obtain internal documents from Exxon through discovery.[2]

50.    GP-International operated, managed, and controlled the Enterprise's campaign against Energy Transfer by, among other things, authorizing, approving, and underwriting the campaign executed under the Greenpeace banner.  GP-International also provided grants and disbursements back to GP-Fund and GP-Inc. to support the international campaign against Energy Transfer and DAPL, and disseminated the false, misleading, and manufactured claims about Energy Transfer and DAPL through publication on its website and direct communications with Energy Transfer's critical market constituents for the purpose of fraudulently inducing donations to fund these activities and harm Energy Transfer.

51.    GP-International also recruited other international Greenpeace organizations operating under its direction and control -- including GP-Switzerland, GP-Japan, and GP-Netherlands -- to participate in the campaign against Energy Transfer.  At GP-International's direction, these international Greenpeace associations aggressively disseminated the false claims

---

[2]    https://freebeacon.com/issues/memo-shows-secret-coordination-effort-exxonmobil-climate-activists-rockefeller-fund/

that DAPL would desecrate historical and cultural resources and poison SRST's water supply to Energy Transfer's critical market constituents in Europe and Asia, generating international media attention for the campaign and fraudulently inducing contributions used to fund the illegal acts.

### 4.  Greenpeace USA and Defendant Charles Brown

52.      Greenpeace USA is comprised of defendants Greenpeace Fund ("GP-Fund") and Greenpeace Inc. ("GP-Inc").

53.      Defendant GP-Fund is a section 501(c)(3) non-profit foundation which falsely purports to be exclusively operated for a charitable purpose.  GP-Fund authorized, underwrote, and facilitated GP-Inc.'s campaign against Energy Transfer, and, along with GPI, was actively involved in the operation, control, and planning of the campaign with GP-Inc. and other enterprise members.

54.      Defendant GP-Inc. is a nonprofit corporation organized pursuant to the laws of California and headquartered in Washington, D.C.  GP-Inc. receives substantial support from both GP-International and GP-Fund, including the use of the Greenpeace name and the funding necessary to pay its substantial operating expenses and salaries and fund its execution of the disinformation campaign.

55.      Although GP-Fund and GP-Inc. are separate and distinct legal entities (as required by their respective tax statuses), GP-Fund and GP-Inc. associate in fact by publicly identifying themselves and doing business as "Greenpeace USA."  Greenpeace USA controls all Greenpeace operations in the United States and "pursuant to a 'protocol' between [ ] all other Greenpeace entities worldwide, including Greenpeace International, no Greenpeace operations are to occur in the United States without GP-Inc.'s and GP-Fund's consent."  GP-Fund and GP-Inc. share an executive director, Annie Leonard, who directs and controls Greenpeace USA's operations.

56.     Employees of GP-Fund and GP-Inc., respectively, are held out publicly as campaigners for Greenpeace USA.  For example, Annie Leonard, the director of GP-Fund and GP-Inc. is described on Greenpeace's website as the Executive Director of Greenpeace USA.

57.     Greenpeace USA directed, controlled, and operated the Enterprise's campaign against Energy Transfer and DAPL by coordinating closely, supporting and funding the illegal direct against taken against DAPL and manufacturing and ubiquitously disseminating sensational and materially false propaganda designed to radicalize and incite activists with sincerely held environmental beliefs to North Dakota which provides funds, cover, and direct support for these illegal activities.  While Greenpeace represented that these claims were based on "facts," "science" and "research," the Greenpeace Defendants did not employ or consult any scientists, environmentalists, engineers, or other industry experts in developing the campaign's narrative. Greenpeace disseminated these false claims on Greenpeace USA's website and in direct communications with Plaintiffs' critical market constituents.   A full recitation of the false and misleading claims about Energy Transfer and DAPL manufactured and disseminated by Greenpeace USA are set forth in **Appendix A**.  Greenpeace USA used these materially false and misleading statements to fraudulently induce donations used, in part, to fund illegal activities against DAPL and other Energy Transfer infrastructure projects.

58.     In manufacturing and disseminating this false narrative, Greenpeace coordinated closely with a network of other putative legitimate environmental groups, including RAN, Sierra Club, Bold Alliance, and 350.org.   These organizations disseminated the same false and phony claims in tandem with Greenpeace USA to create an "echo chamber" and lend putative legitimacy to the unsupported assertions that DAPL would cause environmental and cultural harm.  A full recitation of the false and misleading claims about Energy Transfer and DAPL

disseminated by these Enterprise members in coordination with Greenpeace are set forth in **Appendix B**.

59.     Once activists were recruited to North Dakota, Greenpeace USA trained thousands of protestors to engage in direct actions and criminal sabotage directed at Energy Transfer construction equipment and the pipeline itself.  Beginning no later than August 2016, Greenpeace USA direct action trainers organized and led training sessions at the camps in North Dakota where they trained protesters in the techniques set forth in Earth First! Direct Action Manual and Ecodefense Guide to unlawfully stop DAPL construction.

60.     Greenpeace USA also coordinated closely with Defendant John and Jane Does, Earth First! representatives, to plant radical eco-terrorists at the camp sites to radicalize the protest movement and coordinate large scale attacks and sow chaos.  Greenpeace USA held drives to raise funds and supplies for Red Warrior Camp's operations between September 12 and 19, 2016, and organized trainings on-the-ground in North Dakota to train members of Red Warrior Camp in tactics designed to unlawfully interfere with construction of DAPL.

61.     Greenpeace USA employees regularly participated in the direct actions and other criminal activities executed by radical eco-terrorists, a practice which is widely known to and condoned by Greenpeace.  In fact, Greenpeace USA provided its employees with unlimited paid personal days, beyond their stated policy limits, so long as the employees are engaged in direct action campaigns.

62.     Greenpeace USA's fraudulent and illegal scheme against Energy Transfer and its infrastructure projects is ongoing.  In 2018, Greenpeace USA recruited and hired Charles Brown for the sole purpose of illegally interfering with construction and operation of Energy Transfer's infrastructure projects.  Under Defendant Brown's direction and control, Defendant Brown and

other employees and agents of Greenpeace USA traveled to Louisiana to train on-the-ground protesters, incite, and fund direct actions against the Bayou Bridge Pipeline.

### 5.  <u>Earth First!</u>

63.     Earth First! is an associated-in-fact group of individuals comprised of persons known and unknown, that funds, trains and engages in property destruction and other illegal activity.  The association-in-fact includes Grayson Bauer Flory and his publication Earth First! Journal, which publishes manuals used to teach the racketeering activity engaged in, and John and Jane Does, holding themselves out as associates of Earth First! who conducted those activities, provided training in those activities, and funded those activities. All of this was approved and directed by John and Jane Does, members of the organizational structure which Earth First! publicly acknowledges exists, but the members of which have never been publicly disclosed.

64.     Founded in 1980 by Mike Roselle and Dave Foreman, the organization's stated purpose is to further its anti-development agenda through anarchist political philosophy, property destruction, and criminal sabotage, which it calls "monkeywrenching" or "ecotage."

65.     Earth First! has deep ties to Greenpeace, which Earth First!'s founder Roselle formally joined in 1986.  At Greenpeace, Roselle employed Earth First!'s militant tactics to organize Greenpeace's first "action teams" and trained and prepared these teams to execute unlawful acts.  As a result of his role in implementing these tactics, Roselle was subsequently appointed to Greenpeace's Board of Directors.  The two organizations have a history and practice of coordinating closely on campaigns and together have executed dozens of joint environmental actions.

66.     While Earth First! self-servingly characterizes itself as a "philosophy," it possesses all the indicia of a legal entity: it has members, leaders, and decision-making process;

19

solicits funds; and has commenced three separate legal actions. John and Jane Does, operating as leaders of Earth First!, hold annual leadership conferences, known as "Organizers Conferences," where they set strategic and tactical goals for the year, fundraise to achieve those goals, and use those funds to, among other things, fund direct actions throughout the year.

67.     John and Jane Does operating as Earth First! directed, controlled, and operated the Enterprise's campaign against Energy Transfer and DAPL by providing $500,000 in seed money to a group of eco-terrorists – who became known as Red Warrior Camp -- to establish an encampment near Lake Oahe in North Dakota. Representatives of Earth First!, along with the Greenpeace Defendants, trained members of Red Warrior Camp in tactics to unlawfully interfere with construction of DAPL and criminal sabotage of DAPL itself.

68.     Moreover, John and Jane Does operating as Earth First! recruited and incited radical eco-terrorists to form Mississippi Stand, an encampment near the DAPL construction site in Iowa to likewise act to illegally "lock down" construction of DAPL whenever, wherever, and however possible. Throughout September and October 2017, John and Jane Does operating as Earth First! organized and led direct action training sessions for members of Mississippi Stand in in Lee County, Iowa, where they trained protesters to execute attacks on Energy Transfer personnel and equipment using the tactics set forth in Earth First!'*s* Direct Action Manual and Ecodefense Guide. Members of Mississippi Stand subsequently employed these same tactics on November 8, 2016, March 2017, and May 2017, to cut holes in DAPL and set fire to DAPL construction equipment, resulting in millions of dollars of damage to Energy Transfer.

69.     Earth First! Journal, the publication arm of Earth First!, raises funds the organization uses for its criminal activities through the Earth First! Direct Action Fund, which

"assist[ed] in planning, coordinating, and funding the frontline activists" who engage in property destruction and monkeywrenching.

70.    Earth First! Journal and Flory also controlled and directed the Enterprise's campaign against Energy Transfer through the publication and distribution of "action resources" for Earth First! members, including the Earth First! Direct Action Manual and Ecodefense Guide. Proceeds from sales of these publications fund further direct actions.

71.    The Direct Action Manual is a playbook for unlawful interference with infrastructure development.  A chapter titled "Ground Blockades" describes a number of techniques to "lock down" construction.  These techniques include using U-locks, steel cables, case-hardened or cobalt chains to attach to other people or construction equipment.  The manual also includes instructions and diagrams for more "heavy duty" lock down tools, such as "lockboxes," which are steel pipes designed for protesters to insert their arms and connect their wrists to a concealed metal pins attached to the inside of the pipe.  This prevents law enforcement from easily cutting U-locks or other less heavy duty lock down devices concealed inside the steel pipe, enabling protesters to further delay construction.  An even more heavy duty lockbox is a "super box" or "sleeping dragon," which is a lockbox reinforced by a sheath of concrete and coiled bailing wire, and takes hours for law enforcement to cut through (and thus resulting in more lost construction time).  The manual also provides instructions on a "very difficult to dismantle" lockbox using 55 gallon drum barrels fitted with lockboxes and filled with solid concrete.

72.    In addition to the Direct Action Manual, Earth First! Journal, through Flory, publishes the Ecodefense Guide, Earth First!'s playbook for "monkeywrenching," i.e. property destruction and criminal sabotage.  A chapter titled "Vehicles and Heavy Equipment" includes

21

detailed instructions and illustrations of tools, parts, and steps for various methods of disabling heavy construction equipment, a "classic act of monkeywrenching."  These methods include: pouring sand in the crankcase; jamming door and ignition locks with wood, cement, or silicone rubber sealant; pouring water, dirt, sand, or other abrasives into an oil filter hole; slashing tire sidewalls; smashing fuel pumps, water pumps, valve covers, or other parts; pouring water or dirt into air intakes; putting battery acid or corrosives or a box of quick rice in the radiator; pouring gasoline or other fuel into the fuel reservoir; and using bolt cutters on various cables.

73.     In addition to these methods of sabotage, the Ecodefense Guide contains a primer on "burning machinery," which has the advantage of "utterly destroy[ing] the bulldozer, yarder or whatever."  To destroy heavy machinery by arson, the manual recommends soaking cotton rags in diesel fuel and stuffing the rags "in the engine if it is accessible, under exposed wiring, hoses, and gauges, in treads or around tires, and in the cab under the dash."  The primer also provides various methods for delayed ignition so as to leave time to escape before the arson is discovered.

74.     Ecodefense also instructs on sabotage by cutting torch.  An alternative to explosives, the cutting torch is able to cut through steel infrastructure (such as a pipeline) and is "the optimum tool for converting an expensive machine into a pile of scrap safely, quickly, and quietly."  The manual recommends the use of an oxy-acetylene cutting torch, because an acetylene torch, which can also be used for welding, looks less suspicious in the field.

75.     John and Jane Does operating as members of Earth First! disseminated these manuals on property destruction to protesters at DAPL construction sites in North Dakota and Iowa.  Earth First! representatives also worked with Greenpeace USA, members of Red Warrior Camp, and Mississippi Stand to train thousands of protestors on the ground, and funded and

provided supplies and manuals to the camps' most violent constituents to ensure that these groups orchestrated, directed, and engaged in violence, sabotage, and property destruction.

76.    The Enterprise achieved its intended result.  Red Warrior Camp led numerous attacks involving arson and bombing of Energy Transfer's personnel and property.  Moreover, the "acetylene cutting torch" tactics detailed in Ecodefense was employed by Earth First!-trained Mississippi Stand members Jessica Reznicek and Ruby Montoya to burn several segments of the pipeline, resulting in millions of dollars in property damage and significant delays of construction activities.  Protesters used lockdown and blockade techniques to shut down construction of DAPL on an almost daily basis.  Recognizing its imprint on these activities, Earth First! Journal through Flory has glorified and reinforced this eco-terrorism on its website, calling for further sabotage and a proliferation of attacks on Energy Transfer's infrastructure projects.

77.    The Enterprise's racketeering activities include: (i) funding, directing, controlling, and intentionally inciting acts of terrorism that violate the U.S. Patriot Act, including damaging or attempting to damage an energy facility and committing arson on federal property and on private property used for interstate commerce; (ii) using the mails and wires as part of a scheme to defraud the public inciting violence; (iii) interstate drug trafficking to support these illegal terrorist activities; (iv) transporting and transmitting misappropriated funds and property through interstate commerce; (v) use of mail and wires to disseminate false and misleading allegations to Energy Transfer's critical market constituents; and (vi) conspiracies to do the same.

78.    The common purpose of the Enterprise was to manufacture and disseminate false and sensational claims about DAPL to fund and facilitate its racketeering activity.

79.    For approximately fourteen months this group and the others comprising the Enterprise have been pursuing the Enterprise's purposes, and they continue to do so today, targeting Energy Transfer's latest infrastructure projects.

**B.    The Illegal Campaign Against The Dakota Access Pipeline**

80.    Consistent with the Enterprise's well-honed playbook, the illegal campaign against Energy Transfer and DAPL was comprised of three critical components. First, GPI and GP-USA, working in concert with other putative ENGOs, manufactured and disseminated six categories of misinformation which were intentionally and expressly marketed to the public as "facts" based on "research" and "science." These statements were designed to fraudulently mislead and incite members of the public to criminal trespass, violence, and property destruction. GPI and GP-USA also used its funds to directly and indirectly support these criminal activities.

81.    Second, the Enterprise -- through John and Jane Does holding themselves our as representatives of Earth First! -- planted and funded eco-terrorists on-the-ground in North Dakota to radicalize the protest movement and incite acts of criminal sabotage. Enterprise members Greenpeace and John and Jane Does holding themselves out as representatives of Earth First! organized direct action trainings to train recruited protesters in acts of vandalism and violence. Greenpeace also provided funds and supplies for these criminal activities, including funds for travel, housing, and supplies for the attacks, and funds for legal representation and bail for those arrested during the attacks.

82.    Third, after recruiting and funding the violent elements from out-of-state to descend on North Dakota, the Enterprise exploited the proliferation of protest camps to secure additional funding through illegal means including, among others, drug trafficking to protesters at the camp. The Enterprise used the funds from these activities to finance their continued operations and line the pockets of their executives.

### 1. The Enterprise Disseminates False Claims About DAPL to Fund And Facilitate Its Racketeering Activity

83.     Beginning in July 2016, and continuing up until the operation of DAPL, GPI and Greenpeace USA ubiquitously disseminated false and sensational claims about DAPL, which were untethered to any facts, to manufacture misinformed outrage that could be used to induce donations used to facilitate the Enterprise's racketeering activity and recruit individuals to engage in these activities, or other activities that would provide cover for such illegal activity. GPI and GP-USA disseminated these claims on their respective websites, and in direct communications with Energy Transfer's critical market constituents.  These intentionally inflammatory claims, which were continuously disseminated in high-profile reports, websites, blog posts, and on social media, including Facebook and Twitter, were deliberately false and misleading for the reasons set forth below.  For a full recitation of the date, author, and content of these false statements, see Appendices A and B.

### a. The Enterprise Misrepresents That DAPL Traverses SRST Tribal Treaty Lands

84.     First, Greenpeace, in coordination with other similarly situated purported not-for-profits, created the widespread misperception that DAPL would be built across SRST land or that there still exists a legal dispute about whether the SRST holds title to some of the land at issue.  None of this is true.

85.     In fact, the pipeline is located a half-mile north of the legal boundary of the SRST reservation, and proceeds beneath Lake Oahe.

86.     The 1.4 miles of land beneath and adjacent to Lake Oahe is not part of the SRST reservation, nor is it the sovereign land of any other Native American tribe.  It is indisputably federally-owned property.   Moreover, the land on either side of the federally-owned Lake Oahe parcel is privately owned.

87.     Any claim that portions of the public or private land is "unceded" tribal land ignores that the question of ownership has been conclusively resolved by the United States Supreme Court, which held in 1980 that the federal government exercised its Constitutional power of eminent domain and "effected a taking of tribal property."  That Constitutional taking encompassed land north of the current legal boundary of the SRST reservation, including the privately owned parcel of land used for staging and construction.

88.     While SRST does maintain certain fishing and recreational rights to the waters of Lake Oahe, the United States District Court for the District of Columbia held that construction of DAPL will not impair the Tribe's rights to hunt and fish on that body of water.  The Court further upheld the Corp's conclusion that operation of the pipeline will not have an adverse impact on Lake Oahe.

89.     Highlighting the disingenuous nature of Greenpeace's claims of cataclysmic risks posed by the pipeline, at the same time people were being incited to physical violence and terrorism to prevent fictional risks and impingement on tribal sovereignty, not far away crude oil was being transported right through SRST's reservation by rail -- a vastly more dangerous mode of transportation -- as it has been for decades without objection.

### b.    The Enterprise Misrepresents DAPL Will Poison Tribal Water

90.     Greenpeace also falsely alleged that Energy Transfer is "poisoning the water of thousands of people."  The purported basis for these false statements is that operation of DAPL will inevitably result in a catastrophic oil spill.

91.     These claims misrepresent, distort, and omit the relevant science and facts which unequivocally demonstrate pipelines are the safest method to transport energy products and the

risks of pipeline rupture are generally minimal, with an oil spill a highly unlikely occurrence, actually happening less than 0.001% of the time.

92.    Moreover, the risk of pipeline rupture and oil spill are even more remote with respect to DAPL, which was designed and constructed using the latest safety and environmentally protective technologies, and in strict compliance with federal safety requirements, safety codes, and industry best practices, including high-performance external coating over the entire pipeline to reduce the risk of external corrosion, horizontal directional drilling ("HDD") to install the pipeline deep below bodies of water without disturbing them, thicker walled pipe in certain areas, and advanced monitoring leak detection and remotely controlled isolation valves to prevent spills in the remote case of rupture.

93.    Allegations that DAPL would poison SRST's water supply are further undermined by the facts that SRST's existing water intake near Fort Yates is 20 miles away. Sufficient time exists to close the nearest intake valve to avoid human impact in the unlikely event of a spill.  Moreover, the remote risk of contamination of SRST water-supply was further mitigated when SRST's water intake structure was moved 50 miles further downstream in August 2017.  Indeed, USACE publicly noted during the permitting process, that SRST is constructing the Indian Memorial Intake, a new reservation-wide system intended to provide for all of the SRST reservation's water needs.  Once in operation, the intake at Fort Yates was taken out of service.  The location of the new water intake 70 miles downstream from the Lake Oahe crossing allows for increased response time to prevent hydrocarbons from a pipeline spill at the Lake Oahe crossing from reaching the Indian Memorial Intake in the highly unlikely event of a spill.

94.     Finally, Energy Transfer and its partners have developed site-specific geographical response plans to limit any impact from a release, including measures for the deployment of containment or diversionary booms at predetermined locations and oil collection and recovery activities to prevent migration of oil.  Emergency response notifications will be made to federal, state, and local agencies and tribal officials.

### c.     The Enterprise Misrepresents DAPL Will Catastrophically Alter Climate

95.     Defendants GPI and GP-USA also exploited the mass interest and concern about climate change with the false charge DAPL is a "climate destroying project" that will result in increased greenhouse emissions.

96.      In fact, DAPL actually has a net positive impact on climate change by providing much-needed infrastructure for domestic oil production that would otherwise be transported by means that are less safe for the environment, such as rail, truck, and barge.  Since DAPL became operational, oil-train traffic within North Dakota has decreased from daily traffic of 12 trains, or 1,200 cars, at similar oil production volumes, to 2 trains, or 200 cars with DAPL, thus decreasing greenhouse emissions.

97.     Without DAPL, more infrastructure for rail and trucking would be built to transport oil in production, increasing both carbon emissions and the risk of spill.  Thus, analyzing a rail alternative to the Keystone XL Pipeline, the Keystone XL Environmental Impact Analysis calculated a 27.8% to 41.8% increase in greenhouse gases compared to the proposed pipeline.

### d.     The Enterprise Misrepresents Energy Transfer Used Excessive

**Force to Combat Peaceful Protests**

98.      Greenpeace also falsely alleged that Energy Transfer "commit[ted] grievous human rights violations" against "peaceful" and "non-violent" protestors through "[i]ndiscriminate use of attack dogs, rubber bullets, concussion grenades, tazers and mace."

99.      However, the so-called "peaceful protests" were anything but peaceful, and as set forth below, Greenpeace, John and Jane Does holding themselves out as representatives of Earth First!, and others deliberately incited, trained and funded radicals to infiltrate the protest campaigns to ensure that end.

100.      As the State of North Dakota has publicly acknowledged: "[t]he real brutality [was] committed by violent protesters who use[d] improvised explosive devices to attack police, use[d] hacked information to threaten officers and their families, and use[d] weapons to kill livestock, harming farmers and ranchers."

101.      This Court has likewise noted:

> With respect to the assertion the movement has been a peaceful protest; one need only turn on a television set or read any newspaper in North Dakota.  There the viewer will find countless videos and photographs of the "peaceful" protestors attaching themselves to construction equipment operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on privately owned property; obstructing work on the pipeline; and verbally taunting, harassing, and showing disrespect to the law enforcement community.  The State of North Dakota has estimated the cost of law enforcement to date at $2 million dollars.  The estimated damage to construction equipment and loss of work on the project is far in excess of several million dollars.  The Morton County sheriff reported that 22 protestors were arrested on September 13, 2016, just a few days ago.  To suggest that all of the protests to date have been "peaceful" and law-abiding defies common sense and reality.  Nearly every day the citizens of North Dakota are inundated with images of "peaceful" protestors engaging in mindless and senseless criminal mayhem.

*Dakota Access, LLC v. Archambault*, Case No. 1:16-cv-00296, ECF No. 45, at 3-4 (D.N.D. Sept. 16, 2016).

102.    Construction workers, private security officers, and law enforcement at DAPL

worksites exercised extraordinary restraint in response to the violence, responding with force

only when necessary to protect themselves or unarmed construction workers from harm.

> **e.    The Enterprise Misrepresents DAPL was Routed and Approved Without Adequate Environmental Review or Consultation**

103.    Greenpeace and those ENGOs working in concert with them misrepresented that

DAPL's approval "was rushed, lacked proper government-to-government consultation with

[SRST]," was "rubber-stamp[ed]," and "approved without adequate environmental reviews."

These claims have been rejected twice by the U.S. District Court of the District of Columbia.

104.    On September 9, 2016, the U.S. District Court for the District of Columbia

explained the facts "tell a different story" and in reality, "the Corps exceeded its [National

Historic Preservation Act] obligations."   The court detailed Energy Transfer's careful

consideration of historic artifacts, noting the Company "prominently considered" the "potential

presence of historic properties" in choosing the route for the pipeline, consulted past cultural

surveys, and hired professionally licensed archaeologists to conduct "extensive new cultural

surveys of its own."   The court further noted Energy Transfer rerouted when the survey revealed

previously unidentified historic or cultural resources, including "140 times in North Dakota

alone to avoid potential cultural resources . . . ."

105.    The court also detailed efforts to consult with SRST, noting that despite "dozens

of attempts to engage Standing Rock" the "Tribe largely refused to engage in consultations."

Nonetheless, the court concluded USACE exceeded its consultation requirements because when

it met with SRST, they "engaged in meaningful exchanges that in some cases resulted in

concrete changes to the pipeline's route."   The court emphasized "the Corps took numerous trips

to Lake Oahe with members of the Tribe to identify sites of cultural significance," "met with the

Tribe no fewer than four times…to discuss their concerns with the pipeline," and re-routed the pipeline "in response to the Tribe's concern about burial sites."

106.     Likewise, by decision dated June 14, 2017, the same court rejected the false claims of inadequate environmental review, finding that USACE adequately considered viable alternatives to the route, the risks of spill, and impacts of a potential spill.  The court held Energy Transfer properly rejected alternate routes, including the Bismarck route because the route would cross through or close to wellhead source water protection areas, and, unlike the selected route, would have been co-located with existing utility or pipeline routes for only 3 percent of the route increasing the impact on cultural resources.

107.     The court also found the analysis of the risks of an oil spill was sufficient, noting that the Environmental Assessment "devotes several pages to discussing DAPL's 'reliability and safety,'" providing "the necessary content" to support its conclusion that the risk of a spill is low.

### f.    The Enterprise Misrepresents That Energy Transfer Intentionally Desecrated Cultural Resources

108.     The most damaging, and wholly false, statements disseminated by the Greenpeace Defendants and other ENGOs were the claims that DAPL employees and personnel "deliberately desecrated documented burial grounds and other culturally important sites," "destroyed sacred Native Lands . . . ," and "religious and other historical sites."

109.     Contrary to these claims, the DAPL route was planned to avoid sites that had been listed on or were eligible for the National Register of Historic Places.  The Company specifically selected a route that crosses "brownfield" locations, or tracts of land already disturbed by previous infrastructure projects.

110.     Where DAPL crosses Lake Oahe the pipeline is co-located in parallel (but much deeper than) the Northern Border Pipeline, a 1,408-mile natural gas pipeline, as well as overhead

power lines.  HDD drilling at 90 to 115 feet below Lake Oahe makes construction extraordinarily unlikely to impact cultural or tribal resources, as geologic soils at those depths predate human occupation.

111.    In North and South Dakota, Energy Transfer retained archeologists from three different, firms to conduct a cultural survey of a 400-foot corridor along the entire planned route – 200 feet on each side of the route.  Energy Transfer surveyed nearly twice as many miles in North Dakota than the 357 miles that would eventually be used for the pipeline.  When the surveys identified potential cultural resources, Energy Transfer modified the route to avoid those resources.  The Company also had a comprehensive Unanticipated Discovery Plan in the event construction encountered a cultural resource not detected by cultural surveys.

112.    The Enterprise's claim that Energy Transfer deliberately desecrated documented historical resources has been disproven by the State Historical Society of North Dakota, which conducted cultural resource surveys of the 1.36-mile-long-corridor following the Enterprise's putative identification of cultural resources prior to Labor Day weekend.  The State Historical Society concluded the "inventory and inspection conducted . . . yielded no evidence of infractions . . . with respect to disturbance of human remains or significant sites."

**2.  The Enterprise Organizes, Supports And Funds Acts Of Violence**

113.    Having recruited and incited hundreds of thousands of protesters to North Dakota based on fabricated and unsubstantiated claims about the putative environmental and cultural impacts of DAPL, beginning no later than August 2016, John and Jane Does holding themselves out as members of Earth First! used funds raised through the campaign to plant radical, violent eco-terrorists on the ground who would establish "resistance camps" near DAPL construction sites and begin coopting and inducing protestors to engage in illegal interference and detruction of the pipeline.

114.    The first camp formed in North Dakota was the Sacred Stone Camp, formed by members of the SRST.  Originally, the Sacred Stone Camp was formed entirely on the SRST reservation, but eventually expanded to USACE property.  At its largest, the Sacred Stone Camp contained approximately 3,000 to 4,000 people.  The camp had its own fundraising, legal, and media platforms and collectives to support their direct actions against the pipeline.

115.    The next camp that was formed was Oceti Sakowin, originally created in August 2016 as an overflow camp after DAPL opponents began arriving in North Dakota en masse. Oceti Sakowin Camp is the largest of the camps, with approximately 10,000 to 15,000 people.  It was formed on land belonging to the Corps.  Due to its proximity to DAPL, this camp has been the primary launching point for the Enterprise's direct actions against DAPL, and its organizers describes it as "the main starting place for participation to stop the Dakota Access Pipeline." Like the Sacred Stone Camp, the Oceti Sakowin camp had its own fundraising, legal, and media platforms and collectives to support their direct actions against the pipeline.

116.    The Red Warrior Camp was initially formed as a sect within Oceti Sakowin Camp.  Its members are the primary perpetrators of violence and disorder and are known for coordinating and employing militant tactics to disrupt DAPL construction.  The Red Warrior Camp openly coordinates and endorses illegal behavior on social media.  Red Warrior Camp established a sophisticated security team to prevent protestors who did not share their commitment to militant tactics from entering the camp – thus preventing detection for its illegal and violent actions against the pipeline.   Members of Red Warrior Camp had access to tactical tools and weapons such as machetes, glocks, AR -15s, shotguns, body armor, .30/30 Rifle, two-way radios, and night vision capabilities.  As with the other two camps, Red Warrior Camp had its own fundraising, legal, and media platforms and organizations.

33

117.    Beginning in August 2016, Greenpeace USA, using funds it had fraudulently procured from its misinformation campaign, sent trainers to North Dakota to lead direct action training at protest camps for the protesters it recruited.  Using methods developed and published by Earth First! through Earth First! associate Flory, and set forth in the Earth First! Direct Action Manual and EcoDefense Guide, Greenpeace USA conducted intensive "daily direct action trainings," for thousands of protestors at protest camps in North Dakota.  The sessions included training in "hard lockdown blockades," "technical blockades," and illegal destruction of pipeline and associated properties.  Greenpeace USA taught protesters how to construct and use body blockades, U-locks and chains, lockboxes, and barrels to secure lockboxes.  Armed with Greenpeace training in Earth First! tactics, protestors unlawfully locked down the DAPL construction sites and equipment and harassed Energy Transfer personnel on an almost daily basis, between August and November 2016.  These daily protests and associated illegal activities were, in part, intended to distract and occupy security and law enforcement personnel, as as to facilitate extreme and illegal activities, including drug distribution and pipeline destruction.

118.    Defendant John and Jane Does, holding themselves out as Earth First! associates, provided $500,000 of funding to a group of violent eco-terrorists to establish an encampment near the juncture of the DAPL pipeline construction and the Lake Oahe crossing and to infiltrate and coopt the movement assembled there.  This group identified itself as Red Warrior Camp. Red Warrior Camp attracted the most militant elements from surrounding camps, absorbing certain of the protestors recruited and trained by the Greenpeace Defendants, as well as certain individuals Greenpeace sent to the camps.

119.    Defendant Cody Hall was one of the founders and leaders of Red Warrior Camp. He and those operating at his direction infiltrated more peaceful groups in late August and early

September 2016 and instigated criminal behavior, including damage to and destruction of the pipeline facility.

120.    On August 11, 2016, roughly 200 protestors led by Red Warrior Camp members and Cody Hall entered onto Dakota Access property near Lake Oahe without permission and obstructed and delayed pipeline construction.  Protestors, including Cody Hall and other members of Red Warrior Camp, destroyed Dakota Access's property to gain access to construction sites and disrupt construction activities.  They also jumped a fence, threatening DAPL employees and law enforcement personnel with knives.

121.    On August 12, 2016, roughly 350 protestors, led by members of Red Warrior Camp, entered onto Dakota Access property, again without permission.  Due to threats of violence, Dakota Access personnel had to be evacuated from Dakota Access's property by police escort.  Protestors swarmed departing company vehicles and threw rocks and bottles at them.

122.    On September 3, 2016, hundreds of protestors, again led by Red Warrior Camp and Defendant Cody Hall, attacked construction crews working on Dakota Access property near Highway 1806.  The protesters illegally blocked traffic, and quickly became violent, destroying facility property, and stampeding with hundreds of protesters, horses, dogs, and vehicles onto land where construction was ongoing.  Protesters threatened security personnel with knives, hit them with fence posts and flagpoles, and otherwise physically attacked private security personnel retained by Energy Transfer, resulting in multiple security guards and dogs being hospitalized. One officer reported being cornered by 40-50 protesters who hit him with a fence post, kicked him in the knees so he fell to the ground, and then call[ed] to other protestors to "stomp him, kick him."

123.    Referring to violence and disorder caused by the Enterprise on September 3, 2016, Morton County Sherriff Kyle Kirchmeier stated:

> Any suggestion that today's event was a peaceful protest, is false. This was more like a riot than a protest. Individuals crossed onto private property and accosted private security officers with wooden posts and flag poles. The aggression and violence displayed here today is unlawful and should not be repeated. While no arrests were made at the scene, we are actively investigating the incident and individuals who organized and participated in this unlawful event.

124.    Days later, Red Warrior Camp leader Cody Hall was arrested for his role in the September 3 and September 6 attacks.

125.    On September 9, 2016, 150-200 protesters, again led by Red Warrior, swarmed and damaged a DAPL construction site on private property two miles east of Highway 1806. Again, law enforcement observed protesters carrying knives and hatchets, protesters on horseback, and protesters wearing masks and goggles.

126.    After Red Warrior Camp led these initial attacks on DAPL property and construction crews, Red Warrior Camp, through Defendant Cody Hall and Krystal Two Bulls, and the Greenpeace Defendants agreed that Greenpeace USA would use its fraudulent campaign to raise money for the continued illegal activities at Red Warrior Camp, including directing fraudulently induced funds to Mr. Hall and using its campaign to solicit direct donations and supplies to Mr. Hall.  As part of this effort, between September 12 and 19, Greenpeace USA organized donation drives at its offices in ten cities across the country to collect supplies to fund, feed, and house the militant group at the camp.

127.    Notwithstanding Red Warrior Camp's violent protests leading to its leader's arrest, Greenpeace published a public "call to action" from Red Warrior Camp representative Krystal Two Bulls on their website, stating the Red Warrior Camp "calls on all people from around the world to take action" and "come stand with us" against DAPL.  Two Bulls urged, "If

you cannot be physically present, you can still take escalated action to stop the pipeline and support our struggle." Even today, Ms. Two Bulls' biography is available on Greenpeace's website. During this period, Greenpeace also sent supplies generated by the donation drives directly to Red Warrior Camp's leader and organizer, Cody Hall, enabling Red Warrior to continue its violent attacks against Energy Transfer.

128. At the same time, in September 2016, Defendant John and Jane Does, operating as members of Earth First!, trained Jessica Reznicek and Ruby Montoya, to plot, incite, and execute direct action and criminal sabotage against DAPL. Reznicek and Montoya formed Mississippi Stand, established an encampment near construction sites in Iowa, and recruited other members to join them. Defendant John and Jane Does, representatives of Earth First!, held training sessions for Reznicek, Montoya, and other Mississippi Stand members in September and October 2016 in Lee County, Iowa. At the trainings, Defendant John and Jane Does, representatives of Earth First!, provided instructions on blockades and sabotage, as well as the threats of "security culture," in order to avoid arrest and accountability for criminal sabotage. By late October, members of Mississippi Stand had also formed protest camps in North Dakota.

129. Throughout September and October, Mississippi Stand stopped DAPL construction in Iowa on an almost daily basis. Mississippi Stand members regularly used the "steel or sleep dragon" techniques, detailed in the Earth First! Direct Action Manual to lock themselves to construction sites and equipment. Its "lockdowns" were frequently recorded on video and disseminated through its website and social media, each accompanied with a call for funding for to support more direct actions. Mississippi Stand's direct actions resulted in numerous arrests, and the eco-terrorist group used crowdfunding to raise legal funds specifically

to bail out arrestees and keep its operation going. Mississippi Stand's efforts were routinely promoted on Earth First! Journal's website.

130. Also in October 2016, seeking to up the ante in North Dakota, through Krystal Two Bulls, Red Warrior Camp issued a "communique" seeking "reinforcements from skilled and trained Warriors prepared to evict the Dakota Access Pipeline" to join them in Standing Rock immediately to "kill this Black Snake once and for all." Earth First! Journal published the communique on its website. Throughout October, as protestors continued to arrive at the camps in North Dakota, Greenpeace USA's direct action trainers conducted additional technical lockdown blockade trainings.

131. Red Warrior Camp also disseminated a series of recruitment and fundraising videos through its official media team, the Women Warriors Media Cooperative, led by Defendant Manuel. Manuel's videos regularly used themes of guerrilla warfare and insurgency, and featured masked or hooded members of Red Warrior Camp clad in military-style camouflage jackets, ski goggles, and bandanas. The videos claim to bring a "message from the active front line resistance" and request "skilled and trained warriors who are prepared to evict the Dakota Access Pipeline." For example, a video styled as an "Official Warrior Communique From the Front Lines" and produced with digital effects imitating a coded military transmission, opens with a masked member of Red Warrior Camp issuing a call to action. This video repeatedly cuts to footage of violent anarchic riots arson across the world and urges the viewer to "take railroads. Take bridges. Do it! They cannot stop us all!"

132. Another Red Warrior Camp video titled "Mask Up and Donate" seeks financial support. The video states that the Red Warrior Camp is "looking for likeminded warriors" who will "join [them] in [their] fight for water by any means necessary." The video brags that

members of Red Warrior Camp are "Black Snake Killaz [sic]" who have "rubber bullets for breakfast." The video includes instructions for donating to Red Warrior.

133. Answering Red Warrior's call to action, on October 27, 2016, a large group of people directed, incited, and led by Red Warrior Camp entered Dakota Access property near Highway 1806, set up roadblocks, and established an encampment. After law enforcement "requested them to remove the barricade and have protestors vacate the private property." Nevertheless, protestors returned, and further requests that they leave the Dakota Access property were met with violence. Protestors set up makeshift barriers and lit them on fire to prevent the officers from accessing the site and threw Molotov cocktails, logs, rocks, debris, and even urine at the officers. Protestors even attempted to stampede a nearby group of buffalo at law enforcement. They also set fire to numerous vehicles, three pieces of Dakota Access construction equipment, and two bridges. During the course of the attack, Red Fawn Fallis, a radical eco-terrorist, fired three shots from a pistol at a police officer, narrowly missing a police deputy. Fallis has since been arrested and charged with attempted murder.

134. At the same time, spurred by the Red Warrior's messages of violence and disorder, members of another radical eco-terrorist group called Akicita Group attacked a Dakota Access security guard who went to investigate equipment that was on fire. Upon the security guard's arrival in his work vehicle, Israel Hernandez and Michael Fasig, both Akicita members, repeatedly and intentionally rammed the security guard's vehicle to force him off the road. Once the security guard's vehicle was in a ditch, a group of protesters approached the security guard, some of whom were brandishing knives. Protesters, armed with knives, encircled the security guard and seized a rifle that was in his possession and then, holding him against his will, eventually released him to the Bureau of Indian Affairs. The security guard's vehicle was later

set on fire.  Hernandez and Fasig were charged with reckless endangerment and criminal mischief as a result of this attack.

135.    Immediately after the attack, Red Warrior Camp published a documentary-style recruitment video glorifying their unlawful acts.  The video displayed images of burning barricades, burning cars, and violent confrontations between masked Red Warriors and law enforcement.

136.    Red Warrior Camp's militant actions were taken without the approval of the SRST, or other ad hoc governing bodies at the protest camps.  As a result of their aggressive and violent tactics, on November 1, 2016, the SRST Tribal Council voted 10-0 to ask Red Warrior Camp to leave the protest camps out of concern for the safety of the peaceful protesters opposing DAPL.

137.    Because of the degree of their violent tactics, Red Warrior Camp's members, other than Cody Hall, have gone to extreme lengths to hide their identity.  Among other things, they requested that documentary film makers, with footage of their conduct desist from distributing the film in order to ensure that their identities remain unknown.

138.    After the vote, Mississippi Stand endorsed Red Warrior's tactics on Facebook, stating that it "fights the black snake in solidarity with Red Warrior Camp," and that it was "continuously inspired" by Red Warrior's "direct efforts to halt the black snake."  Mississippi Stand stated that "the only thing that is going to kill this snake is warriors showing up on DAPL easement and refusing to leave until construction is shut down in all four states permanently," and that it would not stop fighting "until we cut off this black snake indefinitely."

139.    Mississippi Stand's methods in Iowa escalated in tandem with Red Warrior's.  In a direct action on November 10, 2016, Mississippi Stand activists, armed with screwdrivers,

climbed into a section of pipe to occupy it and prevent construction.  After the activists were

removed and arrested, construction workers were forced to rip out the plastic section of the pipe

to ensure that the activists did not drill any holes in the pipeline with their screwdrivers.

140.    Immediately after the event, Mississippi Stand posted a video of the pipeline

occupation on Facebook, touting the "successful action of over 16 hours of interfering with the

Dakota Access pullback under the waters" and implored the public to "Please donate, every little

bit helps."  Donations to Mississippi Stand were sent directly to Ruby Montoya, Mississippi

Stand's press representative, in Iowa.  Foreshadowing more destructive and dangerous measures

to come, Montoya told press that she and Mississippi Stand were "willing to risk everything."

Earth First! Journal immediately publicized Mississippi Stand's pipeline occupation on its

website.

141.    In North Dakota, despite SRST's formal effort to evict them, Red Warrior Camp

did not leave, and instead incited even more violent action.  On November 20, 2016,

approximately 650 protesters, incited and led by Red Warrior Camp, gathered at Backwater

Bridge in Mandan, North Dakota, which had been closed since October due to concerns about its

structural integrity.  At around 6:00 pm, in what the police described as an organized tactical

movement, Red Warrior Camp attempted to flank and attack police officers in a very aggressive

manner.  Members of Red Warrior Camp, some of whom claimed to be carrying firearms,

attempted to move several trucks that had been burned by rioters on October 27 in order to

facilitate crossing the bridge and entering Dakota Access property.  Mississippi Stand members

who were in North Dakota participated in the attack.  Protesters started numerous fires on and

around the bridge and camps and threw objects and homemade weapons, including grenades and

flares, at law enforcement officers.  They also threw flares into the sky and aimed strobes and

41

high-output spotlights at Dakota Access security helicopters. Red Warrior Camp also employed at least three drones in the vicinity of the bridge and were seen crossing barbed wire to enter onto Dakota Access property without permission, with one member laying across the wire to allow others to enter.

142.    Additionally, Red Warrior Camp and those incited by the lies disseminated by the Enterprise, have taken other extreme measures promoted by the Earth First! Direct Action Manual and Eco Defense Manual to sabotage the pipeline, including repeated acts of arson on construction equipment and pipeline destruction. In August 2016, three fires were reported in Jasper Country, Reasnor, and Mahaska County, Iowa. In each instance, heavy equipment, including bulldozers and backhoes, were intentionally burned. In total, the fires caused millions in damages. The Earth First! Journal publicized the arson on its website and Facebook, proclaiming, "Resistance is growing!".

143.    In October 2016, unknown individuals set fire to construction equipment along the pipeline route near the town of Reasnor, Iowa, causing more than $2 million in damages to construction equipment. The arson method was taken directly from Earth First!'s Ecodefense manual.

144.    On November 8, 2016, Defendants Reznicek and Montoya traveled to a Dakota Access construction site in Mahaska County, Iowa, where, following instructions in the *Ecodefense* manual, they added motor oil and rags to six coffee canisters and placed them on the seats of six pieces of machinery, piercing the coffee canisters once they were in place and striking several matches, anticipating that the seats "would maintain a fire long enough to make the machines obsolete." They were correct. Their arson damaged two excavators, a bulldozer, and a side boom, causing more than $1 million in damages. Thereafter Reznicek and Montoya,

42

recognizing the success of the method, set fire to equipment on several other occasions, using gasoline and rags along with tires.  In May 2017, a contractor-owned skid loader and pipeline equipment in Newell, Iowa were set on fire.  The fire caused nearly $150,000 in damages.

145.    Finally, on at least three occasions, Reznicek and Montoya, again following the Ecodefense manual, used oxy-acetylene cutting torches to cut holes into the pipeline.  While Reznicek and Montoya had previously used arson on construction equipment, stopping construction for at least a day, they sought to up the ante.

146.    Leading up to March 2017, Reznicek and Montoya "began to research the tools necessary to pierce through 5/8 inch steel pipe."  They purchased equipment used to affect the destruction outside their city "in efforts to maintain anonymity," as their goal was to "push this corporation beyond their means to eventually abandon the project."  Having practiced with their equipment, they "were able to get the job down to 7 minutes."  On approximately March 13, 2017, Reznicek and Montoya used oxy-acetylene cutting torches to pierce a hole through an above-ground safety valve in Mahaska County, Iowa.

147.    Recognizing the effectiveness of the pipeline destruction which they claimed "successfully delay[ed] completion of the pipeline for weeks," Reznicek and Montoya "began to use this tactic up and down the pipeline, throughout Iowa (and a part of South Dakota), moving from valve to valve until running out of supplies, and continuing to stop the completion" of DAPL.  On approximately March 17, 2017, in Sioux County, South Dakota, Reznicek and Montoya used the cutting torch to cut holes at two valve sites near Sioux Falls.  On both occasions, oil had not yet been flowing through the pipeline.  Earth First! Journal publicized images and news of the sabotage on Facebook and its website, calling on the public to "Stand up fight back."

148.    On May 3, 2017, in Wapello County, Iowa, Reznicek and Montoya cut through a chain link fence protecting a section of DAPL and attempted to use the cutting torch to cut into the aboveground section of the pipe in which crude oil was already flowing.  Fortunately, the Reznicek and Montoya failed to cut through the thick steel but left visible burn marks.  Reznicek and Montoya claim their tactics of arson and pipeline destruction were "peaceful," but they are the exact opposite.  Had the torch successfully cut through the pipeline as in the prior two attempts to destroy the pipeline, the torch would have ignited the oil inside and caused an explosion.  These acts of sabotage not only damaged the pipeline, but endangered the public at-large and the very lands and waters the Enterprise claims it seeks to protect.

149.    These terrorist acts of arson and pipeline destruction were intended and directly incited by the Enterprise's misinformation campaign, and John and Jane Does holding themselves out as representatives of Earth First! gave Reznicek and Montoya the training and the means to execute their eco-terrorism.  In a July 24, 2017 statement, Reznicek and Montoya publicly claimed responsibility for the arson and pipeline destruction, citing to the Enterprise's misrepresentations regarding violations of "rule of law, indigenous sovereignty, land seizures, state sanctioned brutality."  Their statement is a direct response to the Enterprise's call to action, and Reznicek and Montoya acknowledge they acted after participating in other aspects of the Enterprise's campaign, including "Civil Disobedience" and "boycotts and encampments."  Evidence of the Enterprise's direction and control is likewise reflected in Reznicek and Montoya's echoes of the Enterprise's false claims that DAPL "brutalize[s] the land, water, and people," "wishes to poison literally millions of us irreparably by putting us all at risk of another major catastrophe with yet another oil spill," and will leak "until the oil is shut off and the pipes are removed from the ground."

150.     Reznicek and Montoya concluded with a call for others to follow in their

path:  "We are speaking publicly to empower others to act boldly, with purity of heart, to

dismantle the infrastructures which deny us our rights to water, land and liberty. . . . [I]t is our

duty to act with responsibility and integrity, risking our own liberty for the sovereignty of us

all."  To "inspire others to act boldly," Reznicek and Montoya provide a roadmap for arson and

pipeline destruction," outlining details of their "peaceful direct action" including by informing

the public of materials that can be used to commit arson and pipeline destruction, where and how

they should be purchased, the hindrance of scouting and the importance of "trust[ing] your spirit,

trust[ing] the signs," and even how to interact with federal agents.  Reznicek and Montoya's

statement even included a link to an image of the damaged pipeline published on the Earth First!

Journal's website.

151.     The Enterprise glorified Reznicek's and Montoya's violent actions.  Earth First!

Journal re-published Reznicek and Montoya's confession and call to action, and featured an

exclusive interview with the women that promoted their actions.  Mississippi Stand!, the radical

eco-terrorist group with which the women are affiliated, has likewise provided Reznicek and

Montoya with a platform for their call to action.  The group now seeks to "legitimise and

humanise these land defence methods in our current climate chaos."   The group's website

launched a page titled "Peaceful Property Destruction," calling on the public to engage in

destruction of "machines and infrastructure," claiming among other things that "Jess and Ruby's

actions were peaceful" and that such property destruction may be justified under the "necessity

defense," while prominently featuring Reznicek and Montoya's statement—complete with

instructions—on its website.   Consistent with their past campaigns, the group launched a new

45

contribution page, requesting the public to "Contribute to Defense Fund," as the "legal battle ahead will set many precedents, including the necessity defence."

152.    Already, Reznicek and Montoya's call to action has had effect.  On August 7, Mississippi Stand! shared on Facebook a statement of anonymous individuals who blockaded an oil train in Vancouver.  The individuals stated that their action "is in solidarity with Ruby Montoya and Jessica Reznicek – who successfully taught themselves how to sabotage the Dakota Access pipeline (DAPL), delayed construction of DAPL for weeks, and never got caught until they turned themselves in recently. . . . We feel Ruby and Jessica showed inspirational leadership in getting us to step outside of our privileges and comfort zones and ask ourselves, 'What are we willing to sacrifice and how far are we willing to go in our resistance?'"

### 3.    The Enterprise's Continued Activities Targeting Energy Transfer

153.    The Enterprise's orchestration of property destruction and acts of violence targeting Energy Transfer's infrastructure projects is ongoing.  Greenpeace Defendants have made interfering with Energy Transfer's projects their "priority project of 2018" and, working in concert with Defendant John and Jane Does, representative of Earth First!, and Earth First! Journal, have focused on halting two projects:  the Mariner East 2 pipeline in Pennsylvania and the Bayou Bridge Pipeline in Louisiana.

154.    Consistent with their campaign against DAPL, Greenpeace, under the direction and control of defendant Charles Brown, and working in concert with Earth First! have funded, trained, directed, and incited protestors to establish encampments in Pennsylvania and Louisiana to protest the pipeline.  Using the Earth First! Direct Action Manual and the Earth First Eco Defense Guide's direct action techniques, Greenpeace, under the direction and control of Defendant Brown, and John and Jane Does Defendants, representatives of Earth First!, have trained hundreds of protestors at both campsites.  Greenpeace has offered free legal

representation to those arrested for their direct actions.  Using these techniques, protestors have stopped construction on almost a daily basis at the Mariner East 2 and Bayou Bridge construction sites.

155.    As the Enterprise intended, eco-terrorists have also resorted to more extreme tactics outlined in Earth First!'s Ecodefense manual.  In April 2018, following techniques outlined in Ecodefense, eco-terrorists "made the two tractors that Energy Transfer Partners was going to use to construct the Mariner East 2 pipeline near Exton, PA inoperative by cutting their hoses and electrical wires, cutting off valve stems to deflate the tires, introducing sand into their systems, putting potatoes in the exhaust pipes, using contact cement to close off the machines' panels and fuel tanks, and a variety of other mischievous improvised sabotage techniques."  As recommended in Ecodefense, the sabotage was executed "in a way that would not be noticeable until operating the machine afterwards had ruined it completely."  The saboteurs proudly proclaimed that "ETP has had to acknowledge the damage," and called for "a proliferation of more actions like these" so that the project would "be seriously compromised."  Earth First! Journal publicized the "anonymous" communique on its website.

156.    Likewise, in April 2018, eco-terrorists cut hydraulic hoses and electrical lines and broke window, and spray-painted messages on backhoes and bulldozers at Bayou Bridge construction sites.  The vandalism resulted in at least $50,000 in damages.

157.    The Enterprise continues to call for "further sabotage" of the Energy Transfer's projects.  In July 2018, Earth First! Journal published another "communique" from the eco-terrorists responsible for the April attacks on Energy Transfer's construction equipment.  The eco-terrorists announced that they had found other suitable targets by "visit[ing] the pipeline route," where "machines and other infrastructure are everywhere, and many are still unguarded."

Noting that the ETP projects are "struggling" due to other vandalism, the eco-terrorists

proclaimed that "ETP [is] a prime target for further sabotage" and "encourage[d] people to safely

do their own research and join the fun."

### 4. The Enterprise's Interference With The Banks Financing DAPL

158.    Another central component of the Enterprise's scheme against Energy Transfer

and DAPL was its efforts to aggressively interfere with Energy Transfer's critical business

constituents through a campaign of misinformation designed to fraudulently induce the

termination of these relationships.  Most aggressively targeted were the consortium of banks

financing DAPL and Energy Transfer's other existing and prospective infrastructure projects.

For a full recitation of the false and misleading statements sent to the banks financing DAPL

and other Energy Transfer infrastructure projects see **Appendix A**.

159.    On November 8, 2016, the Enterprise, including Greenpeace USA, sent a joint

letter to the Equator Principles Association ("EPA"), a consortium of global banks committed to

responsible environmental and social practices, which includes, among others, Energy Transfer

financers DNB, ING, Nordea, and BNP Paribas.  The letter falsely alleged that Energy Transfer

"deliberately desecrated documented burial grounds and other culturally important sites" and

violated human rights.

160.    Immediately following receipt of the November 8 letter, Norwegian bank DNB,

one of the 17 banks funding DAPL, announced that it "looks with worry at how the situation

around the pipeline in North Dakota has developed," and will therefore "use its position to bring

about a more constructive process to find a solution to the conflict."  DNB further threatened that

"[i]f these initiatives do not give appeasing answers and results, DNB will consider its further

involvement in the financing of the project."  In response to continued misinformation, two

weeks later, on November 17, 2016, DNB announced that it had sold off all assets in Energy

Transfer, totaling approximately $3 million.  While DNB continued to finance approximately 10% of DAPL, it vowed to reconsider its loan.

161.    Greenpeace USA immediately touted its role in DNB's decision to divest its $3 million interest in Energy Transfer.  On November 18, 2016, Perry Wheeler of Greenpeace USA published "Largest Bank In Norway Sells Its Assets In Dakota Access," claiming credit for DNB's divestment of Energy Transfer shares.  Nevertheless, Greenpeace USA continued to call on DNB to exit the DAPL loan.

162.    Days later, Greenpeace's Perry Wheeler published "Another Major Norwegian Investor Divests From Companies Behind Dakota Access Pipeline," which reported the decision by the Norwegian firm Odin Fund Management to sell off $23.8 million in investments in DAPL-related companies.  The article applauded Odin but continued to call on DNB to halt funding for the project as soon as possible.  Greenpeace USA also called on other Norwegian funds, such as KLP and Storebrand, to divest, and implored Citibank to "divest and halt its loan disbursements immediately."

163.    On November 28, 2016, the Enterprise, including Greenpeace USA, wrote a letter to BBVA, urging BBVA to exit the DAPL loan facility based on false claims about the putative impact of DAPL on the environmental and cultural and historical resources.

164.    On November 30, 2016, the Enterprise, including Greenpeace USA, sent identical letters to the other sixteen banks involved in the $2.5 billion loan for DAPL, including the Bank of Tokyo Mitsubishi UFJ, BayernLB, BNP Paribas, Citigroup, Wells Fargo, TD Bank Group, SMBC, Societe Generale, Natixis, Mizuho Bank, Intesa Sanpaolo, ING, ICBC, DNB Norway, and Credit Agricole, imploring each of these banks to divest and rescind their loans in DAPL

based on false claims about the putative impact of DAPL on the environment and cultural and historical resources.

165.    Also on November 30, 2016, Greenpeace Japan and 350.org Japan, at the direction of GPI, sent a separate letter to Japanese banks, Mizuho Bank, Sumitomo Mitsui, and Bank of Tokyo-Mitsubishi UFJ, "strongly demand[ing] that you immediately divest from the [DAPL]."  The letter requested in-person meetings to address the banks' "loan[s] and lending policies in the energy sector to safeguard against the risk of investing in projects that contribute to climate change."

166.    In response to the Enterprise's misinformation campaign, on November 30, 2016, Citibank affirmed its commitment to fund DAPL, but announced the retention of Foley Hoag LLP, an independent human rights expert, on behalf of the consortium of banks financing DAPL. The consortium retained Foley Hoag to review various matters related to the permitting process including compliance with applicable laws related to consultation with Native Americans and the policies and procedures employed by Energy Transfer.  Over the course of the following four months, Energy Transfer was called upon to respond to countless requests for information and in-person interviews in connection with the Foley Hoag investigations, resulting in significant legal fees and diversion of company resources.

167.    Greenpeace USA immediately condemned Citibank for its statement that it would continue to fund the project in an article by Perry Wheeler, "Activists Worldwide Close Accounts, Demand Citibank Halt and Rescind Dakota Access Pipeline Loans."  Throughout December, Greenpeace USA continued to disseminate misinformation designed to interfere with Energy Transfer's financing relationships, including in December 5 and December 8 articles by

Mary Sweeters, "3 Things You Need To Know About The Dakota Access Pipeline Win" and "How Global Solidarity Can Help Ensure The Dakota Access Pipeline Is Never Built."

168.    On December 13, 2016, Greenpeace USA's Perry Wheeler published "After Visiting Standing Rock, Swedish Bank Nordea Puts Companies Behind DAPL on Watch," which reported that Greenpeace had met with Nordea regarding DAPL, and in response to Greenpeace's demands Nordea announced that it will "demand guarantees from the companies building the Dakota Access Pipeline that it will not go through the Standing Rock Sioux Tribe's reservation land."

169.    The Enterprise, including Greenpeace USA, continued to target the banks with misinformation through January 2017.  In response to this misinformation, during the last week of January, ING sold $2.2 million of its holdings in Energy Transfer companies.

170.    On February 2, 2017, in response to the Enterprise's misinformation and in person meetings with Greenpeace Netherlands, ABN AMRO threatened to stop financing Energy Transfer if the project will "be constructed without the consent of the Standing Rock Sioux Tribe or if further violence will be used."   The Enterprise called on other banks, including ING in the Netherlands, to follow this example, and cancel their loans.

171.    On February 7, 2017, Greenpeace USA posted an article, "It's Time for DAPL Funders to Decide Which Side of History They Want to Be On," which purported to put "banks on notice for their role in supporting a project that violates Indigenous rights and threatens our climate."

172.    The banks caved in response to the Enterprise's misinformation.  On February 8, 2017, following in-person meetings with Greenpeace, Nordea announced that it would exclude ETP, Sunoco Logistics, and Phillips 66 from all investments.

173.    On February 16, 2017, Greenpeace Switzerland, at the direction of Greenpeace USA, wrote directly to Credit Suisse's Chief Risk Officer and Global Head of Public Policy referencing a meeting with the Credit Suisse Sustainability team on December 8, 2016 and "numerous calls with the team," whereby Greenpeace "demand[ed] [ ] for Credit Suisse to immediately stop banking relationship with [companies related to DAPL]." The letter admonished Credit Suisse for "actively engag[ing] in new deals with the above mentioned clients," including a February 3, 2017 $2.2 billion senior secured term loan agreement led by Credit Suisse in participation with other banks. The letter demanded a response from Credit Suisse on or before February 24, 2017.

174.    In reliance on the Enterprise's misinformation, on March 1, 2017, Storebrand, a Norwegian private investment manager, announced that it had sold $34.8 million worth of shares in Phillips 66, Marathon Petroleum Corporation, and Enbridge.

175.    Greenpeace's ubiquitous attack on DAPL and the banks financing the project continued throughout March.   On March 7, 2017 Greenpeace published "Greenpeace Responds To Court's Ruling Against Standing Rock," representing that DAPL was "criminal."  On March 10, 2017, Greenpeace published "In Solidarity, Greenpeace Supports Native Nations March in D.C.," which alleged that DAPL will result in "catastrophically altered climate, unbreathable air, and undrinkable water."

176.    Days later, on March 17, 2017, KLP, a Norwegian pension fund, announced its decision to divest an estimated $68 million from ETP, Phillips 66, Enbridge, and Marathon Petroleum Corporation.

177.    On March 21, 2017, ING sold its $120 million share of the $2.5 billion credit facility, becoming the first bank to do so.

On March 26, 2017, in response to the Enterprise's misinformation campaign, DNB sold its estimated $340 million loan to DAPL.  Shortly after, on April 5, 2017, BNP Paribas announced that it likewise had sold its $120 million loan.

### C.    The Scheme's Connections To North Dakota

178.    The Enterprise's campaign against Energy Transfer has had significant contact with, and effects in, North Dakota where Energy Transfer has been actively involved in the construction of 357 miles of DAPL, causing nearly $33 million in damages to North Dakota taxpayers to pay for state and local responses to the protests and related illegal activities.

179.    On federal land alone, it took USACE approximately 3 weeks in March and April 2017, and $1.1 million of taxpayers' money to pick up after the protesters, who left 835 dumpsters worth of trash and debris in their wake (not including recyclable materials such as lumber and propane tanks that were also left behind), showing once again that any former grassroots opposition to DAPL was hijacked by the Enterprise and professional protesters with no concern for tribal rights or the environment.  Indeed, SRST had to begin a major cleanup and restoration project in January 2017, which required the help of outside sanitation services, just to prevent snowmelt from washing tens of thousands of pounds of garbage into the Cannonball and Missouri Rivers, contaminating the very waters the Enterprise falsely claimed it sought to protect.  Along with their garbage, protesters also abandoned at least 12 dogs at the protester camps, which were later rescued by a Bismarck-Mandan rescue organizations.

180.    Enterprise members, including Greenpeace Fund, Inc. and Greenpeace, Inc., are foreign nonprofit corporations registered to do business in North Dakota as charitable organizations.

181.    A large portion of the Enterprise's campaign of disinformation has been directed at disrupting lawful activity on a specific strip of land on the western bank of the Missouri River

just north of the SRST reservation.  Indeed, many of the Enterprise's false statements concerning

DAPL and Energy Transfer are designed, or explicitly followed by pleas, to "stand with Standing

Rock," and a variety of more specific conduct that falls within that slogan, including sending

money and supplies to protester camps and traveling to Standing Rock to occupy the protester

camps and harass DAPL construction workers and law enforcement, among other illegal anti-

DAPL, anti-Energy Transfer activity.

182.    Thousands of Energy Transfer employees, contractors, and subcontractors have

worked on the construction of DAPL in North Dakota, and DAPL's operations in North Dakota

alone are projected to produce upwards of $110 million in annual tax revenue, not to mention the

hundreds of millions of dollars spent in secondary markets in local economies near DAPL

worksites.

183.    As a result of the Enterprise's wrongful acts, Energy Transfer has suffered

substantial damage in North Dakota, including costs of delayed construction, unanticipated costs

of professional security services to ward off violent protesters, and costs associated with

combatting the Enterprise's campaign of disinformation within North Dakota.

**D.    <u>Plaintiffs' Damages</u>**

184.    The Enterprise's scheme has inflicted enormous damage on Energy Transfer's

reputation and business operations.  The company has suffered direct monetary damages

including costs arising from damaged equipment, construction sites, and the pipeline itself;

increased security costs; and costs associated with the delays in construction of DAPL, all of

which were the direct and intended consequence of the Enterprise's campaign.  The campaign

has also resulted in damage to Plaintiffs' reputation and access to capital markets, including

impaired access to financing and increased costs of capital, impairing the company's ability to

finance future infrastructure projects at economical rates.  Finally, Plaintiffs incurred substantial

expenditures to mitigate the direct impact of the slander campaign and other violent protests.

## CAUSES OF ACTION

### COUNT I

**RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(c)**
**(AGAINST ALL DEFENDANTS)**

185.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully

set forth herein.

186.    Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

187.    Beginning no later than July 2016 and continuing through the present (the

"Scheme Period"), Defendants and Enterprise members were associated in fact and comprised an

"enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual

knowledge of the illegality of their actions and those of the enterprise.  The Enterprise is engaged

in, and its activities affect, interstate and foreign commerce.

188.    The Enterprise has an existence beyond that which is merely necessary to

commit predicate acts and oversaw and coordinated the commission of numerous predicate acts

on an on-going basis in furtherance of the scheme, each of which caused direct harm to

Plaintiffs.

189.    During the Scheme Period, each of the Defendants agreed to and did conduct and

participate in the affairs of the Enterprise through a pattern of racketeering activity within the

meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

190.    The Enterprise's conduct and acts in furtherance of the fraudulent scheme

included, but were not limited to, the predicate racketeering acts of: (i) mail fraud in violation of

18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) drug trafficking in

violation of 18 U.S.C. § 1961(1)(D); (iv) money laundering in violation of 18 U.S.C. §§ 1956-57; (v) interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952; (vi) interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314-15; (vii) destruction of an energy facility in violation of 18 U.S.C. § 1366(a); (viii) destruction of a hazardous liquid pipeline facility in violation of 18 U.S.C. § 60123(b); (ix) arson and bombing of government property risking death in violation of 18 U.S.C. § 844(f)(2); (x) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (xi) injuring and committing depredation to federal property in violation of 18 USC § 1361; and which constitute a pattern of racketeering activity pursuant to § 1961(5).

### a) Patriot Act Violations

191.    The Enterprise directly incited, directed, funded, trained, and provided supplies for acts of terrorism in violation of the U.S. Patriot Act, including (i) attempted and actual destruction of the pipeline; (ii) arson of property used in interstate commerce, including the pipeline, vehicles, and construction equipment; (iii) arson and bombing of federal property during violent attacks against law enforcement near DAPL construction sites; and (iv) damaging federal property, including by burning federal lands and leaving 835 dumpsters of trash and debris at protest camps.

192.    John and Jane Does operating as Earth First! provided training and funding for Red Warrior Camp to infiltrate camps in North Dakota, train protestors in violent tactics, and lead violent attacks against Energy Transfer personnel and property.

193.    The Greenpeace Defendants provided training and supplies to members of Red Warrior Camp and other on-the-ground protesters in North Dakota.

194.    As intended, on October 27, 2016, a large group of protestors led by Red Warrior Camp trespassed on federal lands and Dakota Access property, threw Molotov cocktails and

homemade grenades at law enforcement, and set fire to Energy Transfer's construction equipment, two bridges and federal land.

195.    On November 20, 2016, protestors led by Red Warrior Camp attempted to cross Backwater Bridge in North Dakota to establish an encampment on Dakota Access property. Armed with weapons, Red Warrior Camp attempted to flank and attack police officers, started numerous fires on and around the bridge, and threw grenades and flares at law enforcement.

196.    John and Jane Does operating as Earth First! provided training and manuals to Mississippi Stand members Jessica Reznicek and Ruby Montoya, who were present at training events hosted by Earth First!.  Following instructions in the Ecodefense manual, Reznicek and Montoya set fire to construction equipment in November 2016 and May 2017.  Between March 2017 and May 2017, Reznicek and Montoya, again following the Ecodefense manual, used an oxy-acetylene cutting torch to cut holes into the interstate pipeline.

### b)  Mail and Wire Fraud

197.    As set forth herein, beginning no later than July 2016, Greenpeace USA, along with John and Jane Does operating as Earth First! and other Enterprise members, developed a scheme to fraudulently and intentionally target Energy Transfer by widely disseminating misinformation regarding the development, construction, and impacts of DAPL.  The purpose of this scheme was to recruit and incite protestors to travel to North Dakota to establish encampments, where Greenpeace USA would train thousands of protestors to engage in unlawful conduct and racketeering activity to halt construction.  The Enterprise also disseminated these claims in furtherance of a scheme to fraudulently interfere with Energy Tranfer's business constituencies.  Enterprise members, including Greenpeace USA used these materially false and misleading statements to fraudulently induce donations used, in part, to fund illegal activities against DAPL and other Energy Transfer infrastructure projects.

198. At the same time, Greenpeace USA widely and aggressively disseminated these false and misleading statements directly to Energy Transfer's creditors, investors, and other critical market constituencies for the purpose of interfering with Energy Transfer's contracts. Greenpeace USA also used the misrepresentations widely disseminated to the public to fraudulently induce Energy Transfer's business constituencies to terminate their relationships with Energy Transfer.

199. Defendants used the mails and wires to execute the scheme to defraud. In furtherance and for the purpose of executing and attempting to execute this scheme and artifice to harm Energy Transfer through deception of the public, on numerous occasions Defendants used and caused to be used U.S. mails and wire communications in interstate and foreign commerce.

200. These mail and wire communications were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Energy Transfer and DAPL; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace USA's Greenpeace International's, and other Enterprise members' website and other internet platforms such as Twitter and Facebook; (iii) communicating and coordinating with one another to create and disseminate the false and misleading information necessary to perpetrate the scheme against Energy Transfer; (iv) disseminating false and misleading allegations directly to Energy Transfer's creditors, investors, and other critical market constituencies through email, U.S. mail, and phone; (v) wiring funds to eco-terrorist groups and individuals to execute attacks against Energy Transfer equipment and personnel, (vi) perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and

bombing of property used in interstate commerce, and depredation of government property; and (vii) wiring funds for drug-trafficking, (viii) wiring fraudulently obtained funds to sustain the Enterprise's campaign and fund further racketeering activity against ETE.

201.    Defendants committed and participated in these acts willfully and with knowledge of their illegality.

202.    Each such use of a mail or wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to Energy Transfer's business and reputation.  While Energy Transfer does not have the full knowledge of the extent of the use of the wires and mails by the Enterprise in furtherance of the scheme, Appendices A and B show some, but not all, of those violations.

203.    In addition, the Defendants have transmitted funds from inside the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States with the intent that the funds promote the carrying on of the Enterprise's unlawful racketeering activity.  Each such transfer constitutes a predicate act.

### c)  Drug Trafficking

204.    In furtherance of the campaign, Red Warrior Camp engaged in an illegal drug trade by using funds to buy drugs out of state and sell them at the camps at enormous profits, which funds were used to finance the scheme's continued operations and line the pockets of its organizers.

### d)  Money Laundering

205.    In furtherance of the campaign, the Enterprise knowingly engaged in monetary transactions involving illicit proceeds derived from the illegal campaign against Energy Transfer.

The Enterprise deposited, withdrew, transferred, or exchanged funds in or affecting interstate or foreign commerce to a financial institution. These funds were derived from the Enterprise's racketeering activity, including mail and wire fraud, violations of the Patriot Act, and drug trafficking.

### e) Interstate and Foreign Travel In Aid of Racketeering

206.    Defendants also travelled in interstate and foreign commerce and used interstate and foreign commerce facilities with intent to commit or otherwise promote or facilitate the commission of the predicate acts alleged herein, and the Defendants did commit and promote the commission of the predicate acts. Each such use of the interstate or foreign commerce facilities constitutes a predicate act.

### f) Interstate Transportation of Stolen Property

207.    Defendants also travelled in interstate and foreign commerce with stolen property and donations with the intent to commit or otherwise promote or facilitate the commission of the predicate acts alleged herein, and the Defendants did commit and promote the commission of the predicate acts. Each such use of the interstate or foreign commerce facilities constitutes a predicate act.

208.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and Defendants and Enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its falsity. Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

209.    The conduct and actions set forth herein were related to each other by virtue of: (i) common participants; (ii) a common victim; and (iii) the common purpose and common result

of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize donations and cause harm to Energy Transfer's business and reputation.

210.    The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conceal and promote fraudulent activity.  The Enterprise has existed with the current members (and others as yet unknown) since at least April 2016, the conduct and activities have continued as of the date of this Complaint, and the Enterprise's racketeering activities threaten to continue in the future, as evidenced by Greenpeace Defendants hiring of an employee dedicated to interfering with Energy Transfer's infrastructure projects and Earth First! and Greenpeace Defendants' continued training of protesters to halt construction of the Mariner East 2 and Bayou Bridge pipelines.

211.    The Defendants' direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of 18 U.S.C. § 1962(c).

212.    As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended as an objective of the predicate acts.  Plaintiffs' damages include, but are not limited to:  business disruption losses and expenses; mitigation costs, substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

213.     As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million. Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT II

### CONSPIRACY IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (AGAINST ALL DEFENDANTS)

214.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

215.     During the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired to, and did further the efforts of the Enterprise to perpetrate the scheme against Energy Transfer through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(a).

216.     In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) drug trafficking in violation of 18 U.S.C. § 1961(1)(D); (iv) money laundering in violation of 18 U.S.C. §§ 1956-57; (v) interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952; (vi) interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314-15; (vii) destruction of an energy facility in violation of 18 U.S.C. § 1366(a); (viii) destruction of a hazardous liquid pipeline facility in violation of 18 U.S.C. § 60123(b); (ix) arson and bombing of government property risking death

in violation of 18 U.S.C. § 844(f)(2); (x) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (xi) injuring and committing depredation to federal property in violation of 18 USC § 1361; and which constitute a pattern of racketeering activity pursuant to § 1961(5).

217.    Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Defendants, for the purpose of executing the scheme to solicit fraudulent donations and harm Energy Transfer's business: (i) preparing false and misleading reports concerning Energy Transfer and DAPL; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace USA's Greenpeace International's, and other Enterprise members' website and other internet platforms such as Twitter and Facebook; (iii) communicating and coordinating with one another to create and disseminate the false and misleading information necessary to perpetrate the scheme against Energy Transfer; (iv) wiring funds to eco-terrorist groups and individuals to execute attacks against Energy Transfer equipment and personnel, (v) perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property; and (vi) drug-trafficking.

218.    It was specifically intended and foreseen by Defendants that the Enterprise would engage in, and conduct activities which affected interstate commerce.  Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

219.    The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  These activities in furtherance of the unlawful campaign against Energy Transfer have extended for at least fourteen months, have continued up to the commencement of this action, and threaten to continue in the future. The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), in violation of 18 U.S.C. § 1962(d).

220.    Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), and the overt acts taken in furtherance of that conspiracy, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended as an objective of the predicate acts.  Plaintiffs' damages include, but are not limited to:  business disruption losses and expenses; mitigation costs, substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

221.    As a result of the violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million. Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(d), together with interest, costs, and

attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT III

### RACKETEERING IN VIOLATION OF N.D.C.C. § 12.1-06.1-03(2)
### (AGAINST ALL DEFENDANTS)

222.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

223.    Throughout the Scheme Period, Defendants and enterprise members were associated in fact and comprised an "enterprise" within the meaning of N.D.C.C. §§ 12.1-06.1-01(2)(b) and 12.1-06.1-03(2), which was engaged in, or the activities of which affected, interstate or foreign commerce.

224.    During the Scheme Period, each of the Defendants willfully, knowingly, and unlawfully conduct and participate in the efforts of the Enterprise to perpetrate the scheme against Plaintiffs through a pattern of racketeering activity within the meaning of N.D.C.C. §§ 12.1-06.1-01(2)(e) and (f) in violation of N.D.C.C. § 12.1-06.1-03(2).

225.    The Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to, the following predicate racketeering acts and attempts to commit such racketeering acts: (i) fraud in violation of N.D.C.C. § 12.1-06.1-01(2)(f)(15); (ii) unlawful threats to public servants in violation of N.D.C.C. § 12.1-12-06(2); (iii) willfully tampering with and damaging Plaintiffs' property in violation of N.D.C.C. §§ 12.1-21-05(a) and (b); (iv) terrorizing in violation of N.D.C.C. § 12.1-17-04; (v) inciting riot in violation of N.D.C.C. § 12.1-25.01; (vi) leading a criminal association in violation of N.D.C.C. § 12.1-06.1-02; and (vii) conspiring to violate each of the above predicate acts in violation of N.D.C.C. § 12.1-06-04.

226.    Specifically, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of:  (i) preparing false and misleading reports concerning Energy Transfer and DAPL; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace USA's Greenpeace International's, and other Enterprise members' website and other internet platforms such as Twitter and Facebook; (iii) communicating and coordinating with one another to create and disseminate the false and misleading information necessary to perpetrate the scheme against Energy Transfer; (iv) disseminating false and misleading allegations directly to Energy Transfer's creditors, investors, and other critical market constituencies through email, U.S. mail, and phone; (v) wiring funds to eco-terrorist groups and individuals to execute attacks against Energy Transfer equipment and personnel, (vi) perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property; and (vi) drug-trafficking.

227.    These predicate acts were committed for financial gain in furtherance of the Enterprise's common purpose, which was to generate increased donations to the Enterprise members.

228.    Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct predicate racketeering act within the

meaning of N.D.C.C. § 12.1-06.1-01(2)(f), as they were each committed in furtherance of a the Enterprise's fraudulent scheme to profit from their unlawful "campaign" against Energy Transfer and each caused direct injury to Energy Transfer's business, property, and reputation.

229.    The Enterprise also disseminated falsehoods about Energy Transfer in numerous reports and other Energy Transfer-related updates and blog posts on their websites, and by phone, through electronic mail, U.S. mail, and posts on social media platforms, such as Twitter, which resulted in direct injury to Plaintiffs.  While Energy Transfer does not have the full knowledge of the extent of the use of the wires and mails by the Enterprise in furtherance of the scheme, Appendices A and B shows some, but not all, of those violations.

230.    The Enterprise directly incited and perpetrated acts of violence, including (i) attempted and actual destruction of the pipeline; (ii) arson of property used in interstate commerce, including the pipeline, construction equipment, and private and public property; (iii) arson and bombing of federal property including during attacks on law enforcement; and (iv) damaging federal property, including by burning federal lands and leaving 835 dumpsters of trash and debris at protest camps.

231.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and Defendants and enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its falsity.  Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

232.    The conduct and actions set forth herein were related to each other by virtue of: (i) common participants; (ii) a common victim; and (iii) the common purpose and common result

of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize donations and cause harm to Energy Transfer's business and reputation.

233.    The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conceal and promote fraudulent activity.  The Enterprise has existed with the current members and others as yet unknown since at least April 2016, and the conduct and activities have continued as of the date of this Complaint, and the Enterprise's racketeering activities threaten to continue in the future.

234.    The Defendants' direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of N.D.C.C. § 12.1-06.1-03(2).

235.    As a direct and proximate cause of the Defendants' violations of N.D.C.C. § 12.1-06.1-03(2), Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended and an objective of the predicate acts. Plaintiffs' damages include, but are not limited to:  damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended as an objective of the predicate acts.  Plaintiffs' damages include, but are not limited to:  business disruption losses and expenses; mitigation costs, substantial damages to Plaintiffs' property, brand, goodwill, business reputation, and standing in the global marketplaces; and the expenditure of substantial resources and management time to mitigate the damage caused by the Enterprise's illegal campaign, including legal fees.

236.    As a result of the violations of N.D.C.C. § 12.1-06.1-03(2), Plaintiffs have suffered damages in an amount to be proven at trial, but which constitute no less than $300 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with N.D.C.C. § 12.1-06.1-05(1), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of N.D.C.C. § 12.1-06.1-03(2), and disgorgement of Defendants' illicit proceeds.

237.    Pursuant to N.D.C.C. § 12.1-06.1-05(2), Plaintiffs are also entitled to injunctive relief to prevent, restrain and remedy the Enterprise's pattern of racketeering activity and violations of N.D.C.C. § 12.1-06.1-03(2).

<u>COUNT IV</u>

**DEFAMATION**
**(AGAINST DEFENDANTS GREENPEACE INTERNATIONAL, GREENPEACE INC.,**
**GREENPEACE FUND)**

238.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

239.    As set forth herein, Greenpeace Defendants knowingly and intentionally published false and injurious statements about Energy Transfer, including, among other things, that:

(a)  DAPL traverses SRST tribal treaty lands;

(b)  DAPL will poison SRST's water supply;

(c)  DAPL will catastrophically alter the climate;

(d)  DAPL was routed and approved without adequate environmental review or consultation with SRST;

(e)  Energy Transfer used excessive and illegal force against peaceful protestors; and

(f)  Energy Transfer intentionally desecrated SRST's cultural resources.

240.    Greenpeace Defendants published these false and misleading statements in many publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to the public, government regulators and officials, and Energy Transfer's creditors, investors, and other critical market constituents.

241.    The false and defamatory statements set forth herein concerning Energy Transfer were made and published with actual malice, as such statements were made by Greenpeace Defendants with knowledge of their falsity or reckless disregard for their truth.

242.    Greenpeace Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of injuring Energy Transfer's reputation, preventing others from doing business with Energy Transfer, and interfering with Energy Transfer's existing business relationships.  Those third-parties include, among others, Energy Transfer's creditors, investors, and other critical market constituents, as well as the general public, government agencies and officials, and other critical market constituents.

243.    Greenpeace Defendants' false statements directly harmed Energy Transfer's business, property, and reputation in numerous specific ways, including, but not limited to: lost financing; lost profits; increased expenses; legal fees; and costs expended to mitigate the impact of Defendants' malicious campaign.

244.    Greenpeace Defendants' publication of the false and defamatory statements cited herein have proximately caused Energy Transfer to suffer monetary damages in an amount to be determined at trial, but which constitute no less than $300 million.

## COUNT V

## TORTIOUS INTERFERENCE WITH BUSINESS

## (AGAINST DEFENDANTS GREENPEACE INTERNATIONAL, GREENPEACE INC., GREENPEACE FUND)

245.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

246.     Energy Transfer had many existing and prospective valid business relationships with third-parties, including, but not limited to: (i) existing and prospective creditors; (ii) existing and prospective investors; and (iii) existing and prospective long-term capacity transportation shippers.

247.     Each of the Defendants knew of Energy Transfer's existing and prospective business relationships with these third-parties.

248.     Defendants intentionally maliciously interfered with Energy Transfer's existing and prospective business relationships with these third-parties by employing wrongful, tortious and unlawful means, including, but not limited to, the dissemination of false, misleading and defamatory statements concerning Energy Transfer's business and DAPL.  This interference was committed intentionally and without justification or excuse and was carried out by, among other things:

   (a) The publication of false, misleading and defamatory statements in numerous publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to Energy Transfer's creditors, investors, and other critical market constituents, government agencies and regulators and the public at-large.

   (b) Organizing and carrying out "brand-damaging campaigns" against Energy Transfer's creditors.

   (c) Organizing and carrying out hundreds of protests at Energy Transfer's headquarters, at banks financing Energy Transfer's business and its construction

71

of the DAPL, and at the headquarters of the United States Army Corps of Engineers;

(d) Issuing Energy Transfer's critical business constituencies extortive public demands and threats to sever their ties with Energy Transfer or face crippling boycotts and other illegal attacks;

(e) Inciting and perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property

(f) Organizing and carrying out cyber-attacks against Energy Transfer; and

(g) Other overt acts to harm Energy Transfer's business and reputation.

249. Energy Transfer had a reasonable expectation of obtaining the benefits of these existing and prospective business relationships. Defendants' wrongful actions directly caused Energy Transfer to lose the business relationships described herein, thereby causing Energy Transfer to suffer significant economic damages. Each of the Defendants was aware of, and intended to cause, this detrimental impact on Energy Transfer's existing and prospective business relationships.

250. As a direct and proximate result of Defendants' intentional interference with Energy Transfer's existing and prospective business relationships with third-parties, Energy Transfer's business relationships were damaged, including but not limited to: (i) existing and prospective creditors; (ii) existing and prospective investors; and (iii) existing and prospective long-term capacity transportation shippers.

251. The Defendants' wrongful, tortious, and unlawful interference with Energy Transfer's existing and prospective business relationships caused Energy Transfer to suffer monetary damages, stemming from, among other things, lost financing, increased cost of capital,

increased operating costs, lost revenue, injury to reputation, mitigation costs and attorney's fees in an amount to be determined at trial, but which constitute no less than $300 million.

## COUNT VII

### CRIMINAL TRESPASS
### (AGAINST ALL DEFENDANTS)

252.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

253.    As set forth above, Defendants willfully entered Energy Transfer's property without consent or other privilege.

254.    Defendants caused and aided and abetted others in willfully entered Energy Transfer's property without consent or other privilege.

255.    Upon willfully entering Energy Transfer's property without consent or other privilege, Defendants maliciously and wantonly destroyed property and caused violence and disorder aimed at harassing and harming Energy Transfer personnel and property, and disrupting Energy Transfer's operations.

256.    Energy Transfer suffered harm and damages in an amount to be proven at trial due to numerous construction delays as a result of Defendants willfully entering Energy Transfer's land without consent or other privilege and maliciously and wantonly causing violence and disorder aimed at harassing and harming Energy Transfer personnel and property, and disrupting Energy Transfer's operations.

257.    Energy Transfer also suffered harm and damages in an amount to be proven at trial as a result of Defendants willfully entering Energy Transfer's land without consent or other privilege and maliciously and wantonly destroying of property, including but not limited to construction equipment and materials, fencing and other barrier systems, structures, and the land.

73

## COUNT VIII

### COMMON LAW CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

258.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

259.    As set forth herein, each of the Defendants, together with others, conspired with respect to Counts V through VII, and acted in concert to commit unlawful acts.  Each of the Defendants shared the same conspiratorial objective, which was to harm Energy Transfer and interfere with Energy Transfer's existing and prospective business relationships in order to induce fraudulent donations.

260.    Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including:

> (a) The publication of false, misleading and defamatory statements in numerous publications on the internet, on social media platforms such as Twitter, and in direct emails, letters, and telephone communications and in-person meetings to Energy Transfers' creditors, investors, and other critical market constituents, government agencies and regulators and the public at-large;

> (b) Inciting and perpetrating acts of terrorism under the U.S. Patriot Act, including destruction of an energy facility, destruction of hazardous liquid pipeline facility, arson and bombing of government property risking or causing injury or death, arson and bombing of property used in interstate commerce, and depredation of government property;

> (c) Other overt acts to harm Energy Transfer's business and reputation;

> (d) Criminal trespass on Energy Transfer's property with the intent of harming Energy Transfer personnel and property and disrupting construction.

261.    The false and injurious statements about Energy Transfer created and disseminated by the defendants included, among others, that:

> (a) DAPL traverses SRST tribal treaty lands;

> (b) DAPL will poison SRST's water supply;

(c)  DAPL will catastrophically alter the climate;

(d)  DAPL was routed and approved without consultation with SRST;

(e)  Energy Transfer used excessive and illegal force against peaceful protestors; and

(f)  Energy Transfer intentionally desecrated SRST's cultural resources.

262.    At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

263.    As a direct, proximate result of the operation and execution of the conspiracy, Energy Transfer has been injured and suffered damages in an amount to be proven at trial.

## **DEMAND FOR JURY TRIAL**

Demand is hereby made for a trial by jury for all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment:

(a)    Awarding Plaintiffs compensatory damages in amounts to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

(b)    Awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial;

(c)    Awarding Plaintiffs treble damages, costs of suit, attorney's fees and costs of litigation under 18 U.S.C. § 1964(c) and N.D.C.C. § 12.1-06.1-05(1), in amounts to be determined at trial;

(d)    Awarding Plaintiffs injunctive relief preventing Defendants from engaging in continued wrongful activity and disgorgement, as set forth herein, in the form that the Court may determine is just and proper, and requiring them to disgorge all monies they have improperly secured;

(e)    Prejudgment and post-judgment interest; and

(f)     Such other and further relief as this Court deems may be just and proper.

**FREDRIKSON BYRON P.A**          **KASOWITZ BENSON TORRES LLP**

By:     Lawrence Bender, ND Bar# 03908        By:     Michael J. Bowe (admitted *pro hac vice*)
                                                      Jenifer S. Recine (admitted *pro hac vice*)
                                                      Lauren Tabaksblat (admitted *pro hac vice*)
        1133 College Drive, Suite 1000                1633 Broadway
        Bismarck, ND 58501                            New York, NY 10019
        Telephone: 701.221.8700                       Telephone: 212.506.1700
        Fax: 701.221.8750

                                                      *Attorneys for Plaintiffs Energy Transfer*
                                                      *Equity, L.P., and Energy Transfer*
                                                      *Partners, L.P.*

76