# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### WESTERN DIVISION

| | | |
|---|---|---|
| Energy Transfer Equity, L.P., and Energy Transfer Partners, L.P., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 1:17-cv-00173 |
| Greenpeace International (aka "Stichting Greenpeace Council"); Greenpeace, Inc.; Greenpeace Fund, Inc.; Banktrack (aka "Stichting Banktrack"); Earth First!; Cody Hall; Krystal Two Bulls; Jessica Reznicek; Ruby Montoya; Charles Brown; and John and Jane Does 1-20, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTIONS OF DEFENDANTS GREENPEACE INTERNATIONAL,
GREENPEACE, INC., GREENPEACE FUND, INC., AND
<u>CHARLES BROWN TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

    A.    DAPL -- The Enterprise's First Target .................................................. 4

    B.    The Enterprise ........................................................................................ 5

        1.    The Greenpeace Defendants ................................................. 5

        2.    Earth First! and Earth First! Doe Defendants ..................... 6

        3.    Red Warrior Camp, Cody Hall, and Krystal Two Bulls ..... 7

    C.    Defendants' Operations Against Energy Transfer .............................. 8

        1.    The Enterprise Disseminated Falsehoods About DAPL to Fund and Facilitate Its Racketeering Activity .................................. 8

            a.    The Enterprise Misrepresented That DAPL Traverses SRST Lands ................................................... 8

            b.    The Enterprise Misrepresented That DAPL Will "Poison" SRST Water Supplies ...................................... 9

            c.    The Enterprise Misrepresented That DAPL Will Catastrophically Alter Climate ...................................... 9

            d.    The Enterprise Misrepresented That Energy Transfer  Used Excessive Force Against Peaceful Protests .................... 9

            e.    The Enterprise Misrepresents that DAPL was Routed and Approved Without Adequate Environmental Review or Consultation ............................................................ 10

            f.    The Enterprise Misrepresented That Energy Transfer Desecrated Cultural Resources ..................................... 10

        2.    The Enterprise Organized, Supported, and Funded Violence Against DAPL ...................................................................... 11

        3.    Enterprise Members Target Energy Transfer's Lenders, Investors, and Business Partners .......................................... 12

    D.    The Enterprise's Continuing Conduct .............................................. 13

E.       Damages.........................................................................................................14

LEGAL STANDARD.....................................................................................................14

ARGUMENT..................................................................................................................15

I.       PLAINTIFFS' EDERAL RICO CLAIMS ARE PROPERLY PLED...........................15

       A.       The Amended Complaint Adequately Pleads a RICO Enterprise
              and Each Defendant's Participation in the Enterprise..........................16

       B.       The Amended Complaint Adequately Pleads a Pattern of
              Racketeering Activity..........................................................................18

              1.       The Enterprise's Racketeering Activity...................................20

                     a.       Greenpeace USA Violated the Patriot Act by Providing
                            Material Support to Red Warrior Camp to Aid Attacks on
                              Law Enforcement and DAPL.......................................20

                     b.       GPI and Greenpeace USA Committed Mail Fraud and Wire
                              Fraud by Disseminating Misinformation Via the Internet,
                              E-mail, and U.S. Mail.................................................22

              2.       Energy Transfer Has Standing to Bring Its RICO Claims........................24

       C.       Each Defendant Is Liable for the Full Conduct of the RICO Enterprise.............27

II.      PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY PLED..................................28

       A.       The Amended Complaint States a Claim for Defamation....................................28

              1.       Greenpeace's Defamatory Statements Are Not Protected
                   Speech Under the First Amendment.........................................29

               2.       Greenpeace's Defamatory Statements Are Not "Protected Opinion"......30

       B.       Defendants' Statements Are Not Protected By Statutory Privilege.....................32

       C.       The Amended Complaint Alleges Actual Malice.................................................33

       D.       GP-Fund Is Liable For Defamatory Statements Published by
               Greenpeace USA..................................................................................34

       E.       The Complaint States a Claim for Trespass........................................................36

       F.       The Complaint States a Claim for Tortious Interference......................................37

III.     THE COURT HAS PERSONAL JURISDICTION OVER GPI AND BROWN...........38

A.      This Court Has Jurisdiction Over GPI and Brown Under RICO .......................... 38

B.      This Court Has Jurisdiction Over GPI and Brown Under North
        Dakota Law .................................................................................................... 39

C.      This Court Has Jurisdiction Over GPI Under Rule 4(k)(2) ................................. 40

CONCLUSION.................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abels v. Farmers Commodities Corp.*,
259 F.3d 910 (8th Cir. 2001) .........................................................................18, 22

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)..................................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................14, 20, 21

*Atkinson v. McLaughlin*,
343 F. Supp. 2d 868 (D.N.D. 2004)........................................................................39

*Atkinson v. McLaughlin*,
462 F. Supp. 2d 1038 (D.N.D. 2006).......................................................................37

*Atlas Pile Driving Co. v. DiCon Fin. Co.*,
886 F.2d 986 (8th Cir. 1989) ...................................................................................19

*Bladow v. Bladow*,
249 N.W.2d 917 (N.D. 1977) ...................................................................................37

*Boyle v. United States*,
556 U.S. 944 (2009).....................................................................................16, 18, 20

*Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*,
607 F. Supp. 1187 (S.D.N.Y. 1985).........................................................................36

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)...................................................................................... *passim*

*Browning v. Flexsteel Indus., Inc.*,
955 F. Supp. 2d 900 (N.D. Ind. 2013) ....................................................................17

*Burr v. Kulus*,
564 N.W.2d 631 (N.D. 1997) ...................................................................................16

*Buttons v. Nat'l Broad. Co.*,
858 F. Supp. 1025 (C.D. Cal. 1994) ........................................................................35

*Chastain v. Hodgdon*,
202 F. Supp. 3d 1216 (D. Kan. 2016) ......................................................................33

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................................35

*Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley*,
  454 U.S. 290 (1981) ............................................................................................30

*Crest Const. II, Inc. v. Doe*,
  660 F.3d 346 (8th Cir. 2011) ..............................................................................16

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130 ........................................................................................................34

*D. Offutt Co. v. Lexington Ins. Co.*,
  342 F. Supp. 2d 838 (D.N.D. 2004) ....................................................................38

*DakColl, Inc. v. Grand Cent. Graphics, Inc.*,
  352 F. Supp. 2d 990 (D.N.D. 2005) ....................................................................38

*Dakota Access, LLC v. Archambault*,
  No. 1:16-cv-296, 2016 WL 5107005 (Sept. 16, 2016) ...................................2, 10

*Dundon v. Kirchmeier*,
  No. 1:16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017), *aff'd by* 701 F.
  App'x 538 (8th Cir. 2017) .................................................................................2, 31

*Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
  873 F. Supp. 2d 288 (D.D.C. 2012) .........................................................23, 24, 25

*Fiber Sys. Int'l, Inc. v. Roehrs*,
  470 F.3d 1150 (5th Cir. 2006) ............................................................................34

*First Nat. Bank and Trust Co. v. Hollingsworth*,
  931 F.2d 1295 (8th Cir. 1991) ............................................................................20

*Garrett v. Cassity*,
  2010 WL 5392767 (E.D. Mo. Dec. 21, 2010) ....................................................22

*Geraci v. Women's Alliance, Inc.*,
  436 F. Supp. 2d 1022 (D.N.D. 2006) ..................................................................16

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ............................................................................................30

*Ginardi v. Frontier Gas Servs., LLC*,
  2011 WL 3493125 (E.D. Ark. Aug. 10, 2011) ....................................................15

*H.J. Inc. v. Northwestern*,
    492 U.S. 229 (1989)................................................................................................19, 20

*Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*,
    187 F.3d 941 (8th Cir. 1999) ...........................................................................26

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) ...............................................................15, 18, 28

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..........................................................................................33

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ...........................................................................31

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)..............................................................................................21

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992)..........................................................................................26

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.*,
    434 F. Supp. 2d 598 (N.D. Iowa 2006)............................................................31

*Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*,
    61 F.3d 1250 (7th Cir. 1995) ...........................................................................27

*Janklow v. Newsweek, Inc.*,
    788 F.2d 1300 (8th Cir. 1986) .........................................................................30

*Johnson v. City of Shelby, Miss.*,
    135 S. Ct. 346 (Nov. 10, 2014) .......................................................................20

*Kahn v. iBiquity Digital Corp.*,
    2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006) ...................................................35

*Kimberlin v. Nat'l Bloggers Club*,
    2015 WL 1242763 (D. Md. Mar. 17, 2015)................................................23, 24

*Kimm v. Lee*,
    2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ......................................................23

*McCurdy v. Hughes*,
    248 N.W. 512 (N.D. 1933) ..............................................................................35

*McDermott v. Sway*,
    50 N.W.2d 235 (N.D. 1951) ............................................................................36

*Merial Ltd. v. Cipla Ltd.*,
   681 F.3d 1283 (Fed. Cir. 2012)................................................................................40

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).....................................................................................................30

*Minto Grain, LLC v. Tibert*,
   776 N.W.2d 549 (N.D. 2009) ..................................................................................36

*Murphy v. Aurora Loan Servs., LLC*,
   699 F.3d 1027 (8th Cir. 2012) .................................................................................14

*In re N. Dakota Pers. Injury Asbestos Litig. No. 1*,
   737 F. Supp. 1087 (D.N.D. 1990)......................................................................37, 39

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982).................................................................................................30

*Nero v. Mosby*,
   233 F. Supp. 3d 463 (D. Md. 2017), *rev'd on other grounds*, 890 F.3d 106
   (4th Cir. 2018)..........................................................................................................34

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964).................................................................................................33

*Newton v. Tyson Foods, Inc.*,
   207 F.3d 444 (8th Cir. 2000) ...................................................................................25

*Pacquiao v. Mayweather*,
   803 F. Supp. 2d 1208 (D. Nev. 2011)......................................................................34

*Peoples Bank & Tr. Co. of Mountain Home v. Globe Int'l Pub., Inc.*,
   978 F.2d 1065 (8th Cir. 1992) .................................................................................29

*Phoenix Bond & Indemnity Co. v. Bridge*,
   477 F.3d 928 (7th Cir. 2007) ...................................................................................27

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426 (8th Cir. 1989) .................................................................................30

*Procter & Gamble v. Amway Corp.*,
   242 F.3d 539 (5th Cir. 2001) ...................................................................................26

*Raineri Const., LLC v. Taylor*,
   2014 WL 348632 (E.D. Mo. Jan. 31, 2014) ...........................................................17

*Restis v. Am. Coal. Against Nuclear Iran*,
   53 F. Supp. 3d 705 (S.D.N.Y. 2014)........................................................................31

*S.E.C. v. Carrillo*,
   115 F.3d 1540 (11th Cir. 1997) ..................................................................40

*Sagebrush Resources, LLC v. Peterson*,
   841 N.W.2d 705 (N.D. 2014) ....................................................................36

*Salinas v. United States*,
   522 U.S. 52 (1997)......................................................................................27

*Sebrite Agency Inc. v. Platt*,
   884 F. Supp. 2d 912 (D. Minn. 2012)........................................................20

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)..............................................................................15, 27

*Sheppard v. Freeman*,
   67 Cal. App. 4th 339 (1998) ......................................................................36

*Soentgen v. Quain & Ramstad Clinic, P.C.*,
   467 N.W.2d 73 (N.D. 1991) ......................................................................32

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)...................................................................................33

*Streeter v. Emmons Cty. Farmers Press*,
   222 N.W. 455 (N.D. 1928) ........................................................................30

*Thornhill v. State of Ala.*,
   310 U.S. 88 (1940).....................................................................................30

*Time Inc. v. Hill*,
   385 U.S. 374 (1967)...................................................................................29

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*,
   85 F.3d 383 (8th Cir. 1996) .......................................................................30

*Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*,
   2001 ND 116 (2001)..................................................................................37

*United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.*,
   88 F.3d 563 (8th Cir. 1996) .......................................................................22

*United States v. Arnaout*,
   236 F. Supp. 2d 916 (N.D. Ill. 2003) .........................................................21

*United States v. Darden*,
   70 F.3d 1507 (8th Cir. 1995) .....................................................................18

*United States v. Heater*,
    689 F.2d 783 (8th Cir. 1982) ....................................................................28, 39

*United States v. Henley*,
    766 F.3d 893 (8th Cir. 2014) ....................................................................15, 28

*United States v. Hively*,
    437 F.3d 752 (8th Cir. 2006) ............................................................................20

*United States v. Kragness*,
    830 F.2d 842 (8th Cir. 1987) ............................................................................20

*United States v. McCarthy*,
    97 F.3d 1562 (8th Cir. 1962) ............................................................................27

*United States v. Nabors*,
    45 F.3d 238 (8th Cir. 1995) ..............................................................................20

*United States v. Welch*,
    327 F.3d 1081 (10th Cir. 2003) ........................................................................23

*Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*,
    168 F. App'x 893 (11th Cir. 2006) ...................................................................34

*Varriano v. Bang*,
    541 N.W.2d 707 (N.D. 1996) ...........................................................................35

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ...........................................................................................30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liability Litig.*,
    2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ....................................................6

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) .........................................................................32

*Zidon v. Pickrell*,
    344 F. Supp. 2d 624 (D.N.D. 2004) ............................................................38, 39

**Statutes**

18 U.S.C. § 1964(c) ...............................................................................................24

18 U.S.C. § 844 ......................................................................................................21

18 U.S.C. § 1341 .........................................................................................20, 22, 27

18 U.S.C. § 1343 ............................................................................................20, 22

18 U.S.C. § 1361 ................................................................................................................21

18 U.S.C. § 1957 ................................................................................................................20

18 U.S.C. § 1961 ..................................................................................................16, 19, 20

18 U.S.C. § 1962 ........................................................................................................15, 24

18 U.S.C. § 1965 ................................................................................................................38

18 U.S.C. § 2339A ..................................................................................................20, 21, 22

28 U.S.C. § 1404 ................................................................................................................38

N.D.C.C. § 12.1-06.1-03 ....................................................................................................16

N.D.C.C. § 14-02-03 ..........................................................................................................28

N.D.C.C. § 14-02-04 ..........................................................................................................28

N.D.C.C. § 14-02-05 ..........................................................................................................32

**Other Authorities**

50 Am. Jur. 2d Libel and Slander § 334 ............................................................................34

Fed. R. Civ. P. 4(k)(1)(A) ......................................................................................38, 39, 40

Fed. R. Civ. P. 12 ..............................................................................................................14

Fed. R. Civ. P. 9(b) ............................................................................................................22

N.D. R. Civ. P. 4(b)(2) ........................................................................................................39

Plaintiffs Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. (together "Energy Transfer" or the "Company") respectfully submit this memorandum of law in opposition to defendants Greenpeace International, Greenpeace, Inc., and Charles Brown's Memorandum in Support of Motion to Dismiss Amended Complaint (ECF No. 103-1) ("GP Mem.") and defendant Greenpeace Fund, Inc.'s Memorandum in Support of Motion to Dismiss (ECF No. 102) ("GP-Fund Mem.").

## PRELIMINARY STATEMENT

In its Amended Complaint, Energy Transfer sufficiently pleads its RICO and other claims, including, in particular, RICO predicate acts under the Patriot Act, mail fraud, and wire fraud statutes.  Moreover, by this action, Energy Transfer in no way seeks, as Greenpeace International ("GPI"), Greenpeace Fund, Inc. ("GP-Fund"), and Greenpeace, Inc. ("GP-Inc.," collectively, the "Greenpeace Defendants") argue, to limit anyone's exercise of any legally protected conduct.  Rather, Energy Transfer seeks to vindicate its own legal rights in the face of the Greenpeace Defendants' malicious criminal conduct.  As alleged in detail in the Amended Complaint, the Greenpeace Defendants engaged in a criminal enterprise with defendants Red Warrior Camp, Cody Hall, Krystal Two Bulls, Earth First!, Jessica Reznicek, and Ruby Montoya (collectively, "Defendants") to finance and perpetrate violence, vandalism, and other illegal activity to obstruct construction and operation of Energy Transfer's government-approved Dakota Access Pipeline ("DAPL").

Indeed, the conduct alleged here already has been described by the District Court for the District of North Dakota as "mindless and senseless criminal mayhem" that is not protected by the rights of free speech and assembly:

> With respect to the assertion the movement has been a peaceful protest, one need only turn on a television set or read any newspaper in North Dakota.  There the viewer will find countless videos and photographs of the "peaceful" protestors

1

> attaching themselves to construction equipment operated by Dakota Access;
> vandalizing and defacing construction equipment; trespassing on privately-owned
> property; obstructing work on the pipeline; and verbally taunting, harassing, and
> showing disrespect to members of the law enforcement community . . . To suggest
> that all of the protest activities to date have been "peaceful" and law-abiding
> defies commonsense and reality.

*Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005, at *2 (Sept. 16,

2016); *see also Dundon v. Kirchmeier*, No. 1:16-cv-406, 2017 WL 5894552, at *4 (D.N.D. Feb.

7, 2017), *aff'd by* 701 F. App'x 538 (8th Cir. 2017).

Defendants' RICO enterprise comprised three related components.  First, the Greenpeace

Defendants disseminated knowingly false statements regarding the nature and impact of the

pipelines to vast numbers of supporters through "Greenpeace" websites, social media, and email

blasts to induce protestors to donate money to their anti-DAPL cause and to incite and enable

radical environmental groups such as defendant Earth First! and defendant Red Warrior Camp to

descend on DAPL construction sites in North Dakota to "stop the pipeline."  Second, the

Greenpeace Defendants and the John and Jane Doe defendants operating as Earth First! ("Earth

First! Doe Defendants") organized, funded, and supported Red Warrior Camp's operations to

organize and lead violent protests in North Dakota.  The Greenpeace Defendants held donation

drives for Red Warrior, dispatched Greenpeace employees to participate in DAPL protests under

the "Red Warrior Camp" banner, and provided training in "direct action" techniques*, i.e.,*

vandalism and violence, to members of Red Warrior Camp.  With material support from the

Greenpeace Defendants, Red Warrior Camp executed violent attacks through the fall of 2016

involving trespass, property destruction, and arson and bombing of federal lands and DAPL

equipment in violation of the Patriot Act.  Third, the Greenpeace Defendants disseminated false

information concerning Energy Transfer and DAPL directly to Energy Transfer's lenders,

investors, and other business constituents in an effort to cut off Energy Transfer's financial resources.

But the attacks on DAPL in North Dakota were not the end of the Greenpeace Defendants' "direct action" against Energy Transfer.  The Greenpeace Defendants, in concert with Earth First! Doe Defendants, continue to employ similar tactics against Energy Transfer's Mariner East 2 pipeline in Pennsylvania and the Bayou Bridge pipeline in Louisiana -- funding and supporting front groups' direct-action campaigns at those locations, training protestors in blockade and sabotage techniques, spreading misinformation about those pipelines to incite further protest and raise funds, and causing daily interruption and delay to the construction of these projects.

Energy Transfer thus states claims not only for RICO violations, but also for violations of North Dakota racketeering law, defamation, criminal trespass, tortious interference with business relationships, and conspiracy.  With respect to defamation, the Amended Complaint appended dozens upon dozens of specific examples, with dates, times, speakers, and other information, each of which constitutes defamation under North Dakota law.  The Greenpeace Defendants ignore the majority of the statements pleaded (and for that reason alone, the Court should deny their motion to dismiss this claim).

Moreover, contrary to the Greenpeace Defendants' contentions, their conduct -- including their knowing and intentional misrepresentations, fraud, and other tortious and illegal acts -- is not protected by the First Amendment.  The Greenpeace Defendants' argument that their conduct and statements -- including that DAPL traversed Standing Rock Sioux Tribe ("SRST") land and that Energy Transfer "deliberately desecrated" SRST sacred sites -- are protected "opinion" or "political advocacy" is specious.  No law protects parties who knowingly and maliciously

publish false statements, no matter how those statements are labeled, let alone parties that engage in violent conduct.

Defendants' venue and jurisdiction challenges fare no better.  There is a strong presumption in favor of a plaintiff's choice of forum.  This is especially true here, where Defendants intentionally directed their racketeering and other illegal activity toward disrupting lawful activity in North Dakota and thereby inflicted substantial injuries on Energy Transfer there.  Finally, because it is undisputed that Greenpeace International and Charles Brown were validly served with process in the United States, these defendants are subject to jurisdiction in this state under RICO's nationwide jurisdiction provision, or alternatively, under North Dakota law by virtue of their role in the conspiracy alleged in the Amended Complaint and, as to GPI, the tortious acts it committed in, and targeting, this State.

Accordingly, Defendants' motions should be denied in their entirety.

## STATEMENT OF FACTS

### A.     DAPL -- The Enterprise's First Target

On June 25, 2014, Energy Transfer announced the development and construction of DAPL -- a 1,172 mile underground pipeline -- to transport daily, across four states, nearly a half-million barrels of domestically produced crude oil from the Bakken region of North Dakota.  For the next 25 months, the Company, working closely with the United States Army Corps of Engineers ("USACE"), conducted extensive planning to identify a route that would have the least impact on the maximum group of stakeholders and resources.  (¶¶ 104, 109-11.)[1]

DAPL traverses private land for 99% of its route.  One exception is where DAPL crosses *federally* owned and regulated waters at the Missouri River under the man-made Lake Oahe.

---

[1] References to "¶ __" are to paragraphs of the Amended Complaint (ECF No. 95).

DAPL follows the route of an existing pipeline -- the Northern Border Pipeline -- under Lake

Oahe.  Energy Transfer selected this route because it would traverse a path that was already

disturbed by other infrastructure.  (¶ 109.)  Lake Oahe is federally owned and regulated, as is the

land surrounding it, and the pipeline "crosses" 90 to 115 feet below the lake.  (¶¶ 85-87.)  The

crossing is located 0.5 miles above the northern boundary of the SRST reservation.  (*Id.*)  DAPL

does not cross SRST-owned land or water.  (*Id.*)  On July 25, 2016, USACE issued its Final

Environmental Assessment for DAPL with a Mitigated Finding of No Significant Impact,

concluding that the risk of spill was low and authorizing the pipeline's route under Lake Oahe.

(*Id.* at ¶ 107)

### B.     The Enterprise

The Amended Complaint alleges a RICO enterprise consisting of the following:

### 1.     The Greenpeace Defendants

The Greenpeace Defendants are parts of the international "Greenpeace" organization, a

network of legally distinct international, national, and regional associations.  (¶ 46.)  GPI

reviews, approves, and underwrites the activities of national and regional "Greenpeace" entities,

here, GP-Inc. and GP-Fund's operations against Energy Transfer.  (¶¶ 46-47, 58.)  GPI also

recruited and directed "Greenpeace" organizations in the Netherlands, Japan, and Switzerland,

and under GPI's direction, they disseminated false claims about Energy Transfer and DAPL to

its international business constituents.  (¶¶ 51, 165, 170.)

GP-Inc. and GP-Fund collectively hold themselves out as "Greenpeace USA" and share

an Executive Director.  (¶¶ 52, 55.)  Employees of GP-Inc. and GP-Fund are publicly identified

as representatives of "Greenpeace USA."  (¶ 56; ECF No. 104 at Tabs 3, 20, 25.)  GP-Inc. and

GP-Fund publish reports as "Greenpeace USA," and act together as "Greenpeace USA."  (*Id.*)

GP-Inc. and GP-Fund admit in public filings that they jointly "control all Greenpeace operations

in the United States" and "pursuant to a 'protocol' between [ ] all other Greenpeace entities worldwide, including…Greenpeace International, no Greenpeace operations are to occur in the United States without [their] consent." [2]  (¶ 55.)

Greenpeace USA and GPI directed and operated the campaign against Energy Transfer including by:  publishing and disseminating false statements about Energy Transfer and DAPL to deceive the public, foment protests, and raise funds for attacks on DAPL (¶¶ 80, 83-112); training protestors in North Dakota to engage in "direct action" (¶¶ 59, 75, 117, 130); coordinating with Earth First! Doe Defendants and Red Warrior Camp to train members of Red Warrior Camp to execute violent attacks on construction sites in North Dakota (¶¶ 39, 60); seconding Greenpeace USA employees to Red Warrior Camp to perpetrate attacks (¶¶ 11, 61, 118); providing supplies to Red Warrior Camp to sustain its encampment at Lake Oahe (¶ 126).

### 2.    Earth First! and Earth First! Doe Defendants

Earth First! is a radical environmentalist activist group.  (¶¶ 63, 66.)  In connection with the DAPL protests, Earth First! Doe Defendants provided $500,000 to extremist protestors, including Cody Hall and Krystal Two Bulls, to form and fund the violent Red Warrior Camp at the DAPL crossing near Lake Oahe (¶ 118); coordinated with Greenpeace USA to provide training in "direct action" and criminal sabotage to Red Warrior Camp (¶¶ 39, 60); and distributed copies of its Direct Action Manual and Ecodefense Guide -- which provide instruction on "direct action" techniques -- at protest camps in North Dakota.  (¶¶ 71-75.)

---

[2] Treating GP-Inc. and GP-Fund "as a collective unit does not prejudice" them because they hold themselves out as one entity.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liability Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *11 (N.D. Cal. Oct. 30, 2017).

### 3.     Red Warrior Camp, Cody Hall, and Krystal Two Bulls

"Red Warrior Camp" is the name of a sub-group of the most radical anti-DAPL activists. Red Warrior Camp distinguishes itself from other activists by its willingness to cross the line from non-violent protest to "direct action" against Energy Transfer and DAPL.  (¶ 38.)  "Direct action," as the term is used by activists, included destruction of Energy Transfer construction equipment, attacks on and intimidation of Energy Transfer employees, and operations to damage or destroy DAPL.  Red Warrior Camp infiltrated and radicalized the DAPL protest movement by inciting peaceful protestors at camps near the DAPL Lake Oahe crossing to engage in illegal "direct action."  (*Id.*)

Red Warrior Camp amounts to a front organization for Greenpeace USA intended to provide cover for Greenpeace USA's support of and engagement in illegal "direct action" against Energy Transfer and DAPL.  (¶ 38.)  Defendant Cody Hall formed Red Warrior Camp in the fall of 2016 with the financial support and direction of Greenpeace USA and Earth First! Doe Defendants in connection with anti-DAPL protests in North Dakota.  (¶ 38.)  Krystal Two Bulls serves as the group's media liaison and organizer.  (¶¶ 31, 38.)  Greenpeace USA and the Earth First! Doe Defendants trained members of Red Warrior Camp to conduct attacks on DAPL construction sites.  (¶¶ 75, 117, 130.)  With this training, Red Warrior Camp and defendant Hall led violent attacks on Energy Transfer's construction sites on August 11 and 12, 2016, and September 3, 6, and 9, 2016 (¶¶ 120-25.)  After these initial attacks, Greenpeace USA directly provided to Hall supplies to fund, feed, and house Red Warrior at its Lake Oahe campsite. (¶ 126.)  Red Warrior Camp also liaised with Greenpeace USA through defendant Two Bulls. (¶ 127.)  These supplies enabled the camp to carry out further violent and destructive attacks, culminating in arson and bombing of federal lands and Energy Transfer's construction

equipment in attacks led by Red Warrior Camp on October 27, 2016 and November 20, 2016. (¶¶ 120-25, 133-42.)

### C.    Defendants' Operations Against Energy Transfer

The Enterprise's operations against Energy Transfer consisted of three related components.  First, the Greenpeace Defendants disseminated false statements about Energy Transfer and DAPL via their websites, e-mail, and U.S. mail for the purpose of deceiving the public into funding the Enterprise's racketeering activity and recruiting individuals and inciting the radical protestors to descend on Lake Oahe to halt construction of DAPL.  (¶¶ 83-112.) Second, the Greenpeace USA and Earth First! Doe Defendants organized, funded, and supported Red Warrior Camp.  (¶¶ 113-52.)  Third, the Greenpeace Defendants disseminated false statements about Energy Transfer and DAPL directly to Energy Transfer's lenders and investors to fraudulently induce the termination or impairment of these relationships.  (¶¶ 158-77.)

### 1.    The Enterprise Disseminated Falsehoods About DAPL to Fund and Facilitate Its Racketeering Activity

Beginning in July 2016 and continuing up until the operation of DAPL, the Greenpeace Defendants disseminated false claims about the impacts of the development, construction, and operation of DAPL.  (¶¶ 83-112.)  The misstatements are set forth in detail in Appendices A and B to the Amended Complaint.  (ECF Nos. 95-1, 95-2.)

### a.    The Enterprise Misrepresented That DAPL Traverses SRST Lands

The Greenpeace Defendants falsely claimed that the pipeline would be built across SRST land and that there exists a legal dispute about whether the SRST holds title to land crossed by DAPL.  (¶ 84; ECF No. 95-1.)  In fact, the pipeline does not traverse SRST property.  (¶¶ 85-89.)

**b.      The Enterprise Misrepresented That DAPL Will "Poison" SRST Water Supplies**

The Greenpeace Defendants also falsely alleged DAPL would result in "[m]illions of people los[ing] access to a clean water supply, including the Standing Rock Sioux Tribe." (¶ 90; ECF No. 95-1.) This is false. (¶¶ 91-94.) There is consensus among the scientific community that pipelines are the safest method to transport energy products and the risks of pipeline rupture are minimal. (¶ 91.) DAPL was designed and constructed in strict compliance with federal safety requirements and industry best practices, and utilized the latest safety and protective technologies. (¶ 92)

**c.      The Enterprise Misrepresented That DAPL Will Catastrophically Alter Climate**

The Greenpeace Defendants falsely claimed that DAPL is a "climate destroying project" that will result in increased greenhouse emissions. (¶ 95; ECF No. 95-1.) In fact, DAPL has a net positive climate impact as it provides infrastructure to transport oil that would otherwise be carried by fossil fuel-intensive means such as rail, truck, and barge, all of which have a higher likelihood of causing environmental damage via spills or leaks. (¶¶ 96-97.)

**d.      The Enterprise Misrepresented That Energy Transfer Used Excessive Force Against Peaceful Protests**

The Greenpeace Defendants also publicly misrepresented that Energy Transfer "commit[ted] grievous human rights violations" against "peaceful" and "non-violent" protestors. (¶ 98; ECF No. 95-1.) This is false. The protests at Lake Oahe were not peaceful. The State of North Dakota has publicly concluded that: "[t]he real brutality [was] committed by violent protesters who use[d] improvised explosive devices to attack police, use[d] hacked information to threaten officers and their families, and use[d] weapons to kill livestock, harming farmers and ranchers." (¶ 100.) This Court has likewise described the protests as "mindless and senseless

criminal mayhem," with "protestors attaching themselves to construction equipment operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on privately owned property; obstructing work on the pipeline." *Archambault,* 2016 WL 5107005, at *2. Moreover, Energy Transfer did not utilize "excessive force" against anyone.  Construction workers and private security officers exercised restraint in response to violence, responding with force only when necessary to protect themselves or unarmed workers from harm.  (¶ 102.)

### e. The Enterprise Misrepresented that DAPL was Routed and Approved Without Adequate Environmental Review or Consultation

The Greenpeace Defendants also misrepresented that DAPL's approval "was rushed, lacked proper government-to-government consultation with [SRST]," was "rubber-stamp[ed]," and "approved without adequate environmental reviews."  (¶ 103; ECF No. 95-1.)  This is false; plans for DAPL were subject to extensive review, study, and communications with local stakeholders to address environmental and cultural considerations.  (¶¶ 104-07, 109-11.)

### f. The Enterprise Misrepresented That Energy Transfer Desecrated Cultural Resources

The Greenpeace Defendants falsely claimed that Energy Transfer "deliberately desecrated documented burial grounds and other culturally important sites" and "destroyed sacred Native Lands" and "religious and other historical sites."  (¶ 108; ECF No. 95-1.) Contrary to these claims, the DAPL route was planned to, and does, avoid historic sites, and Energy Transfer went to extraordinary lengths to ensure cultural resources were not disturbed or destroyed, including consulting with SRST prior to construction.  (¶¶ 108-11.)  Furthermore, the North Dakota State Historical Society has rejected the Greenpeace Defendants' claim and, after conducting cultural resource surveys of the Lake Oahe corridor, concluded that there was "no

evidence of infractions [by Energy Transfer] . . . with respect to disturbance of human remains or significant sites." (¶ 112.)

### 2. The Enterprise Organized, Supported, and Funded Violence Against DAPL

Beginning in August 2016, in response to the Enterprise's misinformation campaign, thousands of protestors traveled to North Dakota to form encampments near the Lake Oahe crossing. (¶ 117.) Greenpeace USA sent direct action trainers to the camps to lead "daily direct action trainings" in "hard lockdown blockades" and "technical blockades," as well as sessions on destroying the pipeline. (*Id.*) Using these tactics, protestors unlawfully stopped construction at DAPL construction sites in North Dakota on an almost daily basis between August and November 2016. (*Id.*) At the same time, Earth First! Doe defendants gave $500,000 in seed money to violent infiltrators to form Red Warrior Camp. (¶ 118.) Greenpeace USA trained members of Red Warrior Camp directly and also sent its own employees to the newly-formed Red Warrior Camp to participate in the DAPL protests under the Red Warrior Camp umbrella. (¶¶ 11, 61, 118.) On August 11, 2016, roughly 200 protestors led by Red Warrior Camp and Hall entered DAPL property near Lake Oahe. (¶ 120.) Red Warrior Camp members jumped fences and threatened DAPL employees and law enforcement with knives. (*Id.*) Attacks continued on August 12, when 50 members of Red Warrior Camp entered DAPL property, intimidating Energy Transfer employees. (¶ 121.) Due to these threats of violence, Dakota Access personnel were evacuated by police escort, stopping construction. (*Id.*)

On September 3, 2016, Red Warrior Camp and Hall led hundreds of protestors in an attack on construction crews working on DAPL. (¶ 122.) Red Warrior Camp members stampeded horses, dogs, and motor vehicles onto federal and private land where DAPL construction was ongoing. (*Id.*) Protesters attacked security personnel with knives, fence posts

11

and flagpoles, resulting in numerous hospitalizations.  (*Id.*)  Red Warrior Camp mounted a similar attack on September 6.  (¶ 124.)  Red Warrior Camp attacked again on September 9, with masked members carrying knives and hatchets swarming and damaging a DAPL construction site two miles east of Highway 1806.  (¶ 125.)

Simultaneous with the attacks and after, the Greenpeace Defendants mounted a misinformation campaign to raise money and supplies to support Red Warrior Camp's ongoing activities.  (¶ 126.)  Between September 12 and 19, Greenpeace USA organized donation drives in ten cities across the country to collect supplies to fund, feed, and house Red Warrior Camp members at Lake Oahe.  (*Id.*)  Greenpeace USA sent the funds and supplies directly to Hall, notwithstanding knowledge of his recent arrest.  (¶¶ 126-27.)  Greenpeace USA also published Red Warrior Camp's public "call to action" by defendant Two Bulls, who urged the public to "take escalated action to stop the pipeline."  (¶ 127.)

Supplies from Greenpeace USA enabled Red Warrior Camp to continue its violent attacks on DAPL through October and November 2016.  On October 27, 2016, protestors led by Red Warrior Camp trespassed on federal land DAPL traversed, setting fire to the land and appurtenant structures, numerous Energy Transfer vehicles, and heavy construction machinery. (¶ 133.)  On November 20, 2016, Red Warrior Camp members gathered at Backwater Bridge in North Dakota and attempted to cross the bridge to establish an encampment on DAPL property. (¶ 141.)  Armed Red Warrior Camp members attacked police, ignited fires on and near the bridge, and threw grenades and flares at officers.  (*Id.*)

### 3.   Enterprise Members Target Energy Transfer's Lenders, Investors, and Business Partners

The Greenpeace Defendants disseminated falsehoods concerning Energy Transfer and DAPL directly to Energy Transfer's business constituents in an effort to induce the termination

or impairment of these relationships. (¶¶ 158-77.) On November 8, 2016, Greenpeace USA joined in sending a letter to the Equator Principles Association, a consortium of global banks that includes Energy Transfer lenders DNB, ING, Nordea, and BNP Paribas. (¶ 159.) The letter falsely alleged that Energy Transfer "deliberately desecrated documented burial grounds and other culturally important sites" and violated human rights. (*Id.*) In reliance on these misrepresentations, DNB, one of the banks funding DAPL, sold its equity interest in Energy Transfer. (¶ 160.) Greenpeace USA took credit for DNB's divestment. (¶ 161.)

Between November 28-30, 2016, Greenpeace USA and GPI joined in sending letters to 17 banks involved in the $2.5 billion lending facility DAPL, including DNB, Citigroup, and ING, urging these banks to exit the DAPL loan facility based on false claims about the impact of DAPL on the environment and cultural and historical resources. (¶¶ 163-64.) Greenpeace USA and GPI continued to disseminate misrepresentations to the banks through 2017. (¶¶ 167-75.) In January 2017, ING divested its shares in the Company. (¶ 169.) On February 2, 2017, ABN AMRO threatened to stop financing Energy Transfer if the project was to "be constructed without the consent of the [SRST] or if further violence will be used." (¶ 170.) On February 8, 2017, following in-person meetings where Greenpeace falsely represented that DAPL "go[es] through the [SRST]'s reservation land," Nordea announced it would exclude Energy Transfer from all investments. (¶¶ 168, 172.) In March 2017, ING sold its share of the $2.5 billion credit facility, totaling $120 million, and DNB sold its estimated $340 million share. (¶ 177.) On April 5, 2017, BNP Paribas likewise sold its $120 million share of the loan. (*Id.*) Such divestment directly harmed Energy Transfer by driving up its borrowing costs.

### D.     The Enterprise's Continuing Conduct

Greenpeace and Earth First! Doe Defendants continue to jointly target Energy Transfer's infrastructure projects. Greenpeace USA and Earth First! Doe Defendants have funded and

directed protestors to establish encampments to protest the Mariner East 2 pipeline in

Pennsylvania and the Bayou Bridge Pipeline in Louisiana.  (¶ 154.)  In 2018, Greenpeace USA

hired defendant Charles Brown as a pipeline organizer solely to interfere with Energy Transfer's

projects.  (¶¶ 62, 154.)  Greenpeace USA sent Brown and other employees to train hundreds of

protestors at both campsites.  (¶ 154.)  Using Greenpeace/Earth First! blockade techniques,

protestors have stopped construction on an almost daily basis for both projects.  (*Id.*)

Additionally, unknown individuals have used Ecodefense Guide techniques to vandalize

bulldozers and other construction equipment at both sites.  (¶¶ 155-56.)  The Earth First! Doe

Defendants, through Earth First! Journal, have called for "further sabotage" and a "proliferation

of more actions like these."  (¶ 157.)

> **E.     Damages**

As they have publicly acknowledged, the Enterprise's scheme inflicted enormous damage

on Energy Transfer.  (¶ 184.)  Energy Transfer suffered direct injuries including costs arising

from damaged equipment, construction sites, and the pipeline itself; increased security costs; and

costs associated with the delays in construction of DAPL.  (*Id.*)  Energy Transfer also has

suffered impaired access to financing and increased costs of capital. (*Id.*)  Finally, Energy

Transfer incurred substantial expenditures to rebut and respond to the misinformation campaign.

(*Id.*)

**LEGAL STANDARD**

A complaint should be dismissed only where the facts alleged fail to state a plausible

claim for relief.  Fed. R. Civ. P. 12; *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  On a Rule 12

motion, the Court must "assume all factual allegations in the pleadings are true and interpret

them in the light most favorable to the nonmoving party."  *Murphy v. Aurora Loan Servs., LLC*,

699 F.3d 1027, 1033 (8th Cir. 2012) (quotation omitted).  A complaint need only set forth

14

allegations that "clear[ ] the relatively low hurdle of presenting plausible facts to create a reasonable inference that [a defendant] is involved in activities that may have harmed [p]laintiffs." *Ginardi v. Frontier Gas Servs., LLC*, No. 4:11-cv-420 (BRW), 2011 WL 3493125, at *1 (E.D. Ark. Aug. 10, 2011) (Wilson, J.).  Applying these standards, Defendants' motions should be denied in their entirety.

## ARGUMENT

## I.   PLAINTIFFS' FEDERAL RICO CLAIMS ARE PROPERLY PLED

The Racketeering Influenced and Corrupt Organization Act ("RICO") bars "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly in the conduct of such an enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  RICO also provides a private right of action to "[a]ny person injured in his business or property by reason of RICO's substantive provisions."  *Id.* § 1964(c).  To plead a RICO violation, a plaintiff must allege a defendant: (1) conducted, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) resulting in damages to business or property.  *See Handeen v. Lemaire*, 112 F.3d 1339, 1347-54 (8th Cir. 1997).[3]

The U.S. Supreme Court mandates that RICO "'be liberally construed to effectuate its remedial purposes,'" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985), and has repeatedly "refused to adopt narrowing constructions of RICO in order to make it conform to a

_____

[3] The RICO statutory scheme also makes it unlawful for any person to conspire to violate § 1962(a).  To plead a violation of 18 U.S.C. § 1962(d), a plaintiff must establish that either "a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise."  *United States v. Henley*, 766 F.3d 893, 908 (8th Cir. 2014) (internal citations omitted).

preconceived notion of what Congress intended to proscribe," *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008).  Under this precedent, the Amended Complaint adequately pleads each element of a RICO violation.[4]

### A.  The Amended Complaint Adequately Pleads a RICO Enterprise and Each Defendant's Participation in the Enterprise

A RICO "enterprise" is "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The "very concept of an association in fact is expansive" and encompasses any "continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 944, 945, 948 (2009).  To plead a RICO enterprise, a plaintiff must allege:  (1) a common purpose among members of engaging in a course of conduct; (2) relationships among those associated with the enterprise; and (3) sufficient longevity to permit the associates of the enterprise to pursue its purpose.  *Id.*[5]  The Amended Complaint alleges an enterprise consisting of defendants GPI, Greenpeace USA, Charles Brown, Earth First!, the Earth First! Doe Defendants, Cody Hall, Krystal Two Bulls, and Red Warrior Camp, Mississippi Stand, Jessica Reznicek, and Ruby Montoya.  (¶¶ 37-76.)  The Enterprise's alleged common purpose is to

---

[4] Since Energy Transfer has sufficiently pleaded its federal RICO claims, it has likewise pleaded its claims under the North Dakota counterpart, N.D.C.C. § 12.1-06.1-03(2).  *See Burr v. Kulus*, 564 N.W.2d 631, 636 (N.D. 1997) (North Dakota RICO statute modeled after federal RICO statute and contains similar language for similar purpose).  Moreover, Plaintiffs have adequately alleged probable cause that Defendants committed the predicate acts.  *See Geraci v. Women's Alliance, Inc.*, 436 F. Supp. 2d 1022, 1043 (D.N.D. 2006) (probable cause requires only "fair probability").

[5] *Crest Const. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011), relied on by GP-Fund to argue that a court must "determine if the enterprise would still exist were the predicate acts removed from the equation" (GP-Fund Mem. 7-8), does not impose a higher burden.  As the Supreme Court has made clear, "it is incorrect" that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering," for evidence establishing both elements may "coalesce."  *Boyle*, 556 U.S. at 947.

further an anti-development, anti-fossil fuel agenda and to impede or prevent the construction of oil pipelines DAPL, Mariner East 2, and Bayou Bridge. (¶¶ 2, 14, 80-82.)

Sufficient relations between Enterprise members are also alleged. GPI collaborated with, sanctioned, and funded Greenpeace USA's participation in the campaign against Energy Transfer. (¶¶ 46-47, 51, 58, 165, 170.) Further, GPI serves as international director of all "Greenpeace" activity throughout the world. (¶¶ 46-47.) Greenpeace USA, in turn, acted in concert with Earth First! Doe Defendants to jointly train members of Red Warrior Camp in "direct action" techniques to attack construction sites in North Dakota (¶¶ 39, 60), and sustained Red Warrior Camp by seconding Greenpeace USA employees to Red Warrior Camp for the duration of the protests, with pay, to execute attacks on Energy Transfer's construction sites. (¶¶ 126-27.) Greenpeace USA coordinated with Hall and Two Bulls of Red Warrior Camp to divert funds fraudulently raised through Greenpeace USA's misinformation campaign against DAPL, and its normal fundraising channels, to Red Warrior Camp to sustain Red Warrior Camp's operations against Energy Transfer. (*Id.*) Greenpeace USA also ran donation drives for the express purpose of sustaining Red Warrior Camp's operations at Lake Oahe. (*Id.*) Greenpeace USA sent the supplies and funds raised through these drives directly to Hall. (*Id.*) Greenpeace USA also used its immense web presence to provide a media conduit for Red Warrior Camp, publishing a "call to action" written by Two Bulls on its website.[6] (¶ 127.) The

---

[6] These allegations of coordinated activity also distinguish this case from those involving entirely "parallel conduct." *Raineri Const., LLC v. Taylor*, No. 4:12-cv-2297 (CEJ), 2014 WL 348632, at *4 (E.D. Mo. Jan. 31, 2014) (enterprise element satisfied where plaintiffs alleged that the individual defendants were participants in committing acts of racketeering, including property damage, to coerce plaintiff into signing a collective bargaining agreement); *Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 912 (N.D. Ind. 2013) (enterprise element not sufficiently plead because complaint lacked even "a single allegation regarding the manner in which the various associates of the enterprise (defendants or otherwise) collaborated in any of the predicate acts").

foregoing allegations sufficiently plead a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948.

The same allegations establish GPI's and Greenpeace USA's roles in directing "*some part*" of the Enterprise's affairs. *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995) (RICO liability is "not limited to the kingpin" but extends to all "operators or managers"). To direct some part of the Enterprise's affairs, a party need not yield control of the enterprise; rather, liability extends to those who participated in the management or operation of the enterprise -- whether upper management or lower-rung participants acting at their direction, as GPI and Greenpeace are alleged to have done. *Id.*; *see also Handeen*, 112 F.3d at 1350-51 (defendants participated in "operation or management" of the enterprise by overseeing enterprise's navigation of the legal system).

The Greenpeace Defendants' contention that the Amended Complaint does not adequately plead "communications" among Enterprise members is wrong. (GP Mem. 11.) Specific allegations of communications are not required at the pleading stage where, as here, "a plaintiff is not a party to a communication" and the "facts that would have to be alleged are known to the defendants, but the plaintiffs have not yet had a chance to find them out." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 921 (8th Cir. 2001). Further, communications between Enterprise members for the purpose of advancing the anti-DAPL agenda can be inferred from the conduct alleged. It is inconceivable that GPI and Greenpeace USA engaged in the alleged conduct described herein *without* communicating with Enterprise members.

## B. The Amended Complaint Adequately Pleads a Pattern of Racketeering Activity

A pattern of racketeering activity is sufficiently pleaded with allegations showing either: (i) "a series of related predicates extending over a substantial period of time," *i.e.,* closed-end

continuity; or (ii) "that the predicate acts or offenses are part of an ongoing entity's regular way of doing business," *i.e.,* open-end continuity. *H.J. Inc. v. Northwestern,* 492 U.S. 229, 242 (1989). A "pattern of racketeering activity" requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Such "predicate acts" are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). Predicate acts may be "related" even where the racketeering conduct targeted different victims, *i.e.,* an enterprise's "racketeering activity" need not be directed solely at the RICO plaintiff and a RICO plaintiff need not have been harmed by each alleged predicate act. *See Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 994-95 (8th Cir. 1989) (pattern element satisfied where complaint alleged two separate criminal schemes involving different victims and participants but common purposes, methodology, and results). Here, Energy Transfer has pled both open- and closed-end continuity.

The Amended Complaint alleges that Enterprise members have targeted Energy Transfer pipeline projects since at least August 2016, when Energy Transfer established camps at Lake Oahe and commenced "direct action" training. Enterprise members trained Mississippi Stand members in Iowa in 2017 and engaged in attacks on the Mariner East 2 pipeline in Pennsylvania and the Bayou Bridge pipeline in Louisiana throughout 2018. As recently as July 2018, Enterprise members called for "further sabotage" of the pipelines and identified "unguarded" Energy Transfer pipelines for attack.[7] (¶ 157.) These allegations establish that the Enterprise engaged in predicate acts over a period of two years and are sufficient to plead "closed-end"

---

[7] The Enterprise funded, trained, and directed protestors on-the-ground at both Mariner East 2 and Bayou Bridge, destroying construction equipment at both sites (¶ 155-57), and stopping construction on nearly a daily basis (¶ 154).

continuity.  *See, e.g.*, *United States v. Nabors*, 45 F.3d 238, 241 (8th Cir. 1995); *see also First Nat. Bank and Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir. 1991).[8]  These allegations also establish that the Enterprise's RICO activity is ongoing, establishing "open-end" continuity.  *See H.J. Inc.*, 492 U.S. at 241-43; *United States v. Hively*, 437 F.3d 752, 762 (8th Cir. 2006).[9]

### 1.    The Enterprise's Racketeering Activity

The Amended Complaint alleges the Enterprise engaged in dozens of acts constituting "racketeering activity" for purposes of RICO, as defined by 18 U.S.C. § 1961, including violations of the U.S. Patriot Act; providing material support for violations of the Patriot Act (18 U.S.C. § 2339A); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and money laundering (18 U.S.C. § 1957).

### a.    Greenpeace USA Violated the Patriot Act by Providing Material Support to Red Warrior Camp to Aid Attacks on Law Enforcement and DAPL

The Amended Complaint alleges that Greenpeace USA committed RICO predicate acts by providing material support for violations of the Patriot Act, in violation of 18 U.S.C. § 2339A.[10]  The Patriot Act prohibits:  (i) arson and bombing of property used in interstate

---

[8] Defendants' reliance on *Sebrite Agency Inc. v. Platt*, 884 F. Supp. 2d 912 (D. Minn. 2012), to argue the Amended Complaint fails to allege open-ended continuity is unavailing.  (GP Mem. 16.) The *Sebrite* court explicitly explained that "all criminal activity ceased following [plaintiff's] discovery of the fraudulent scheme."  *Id.* at 921.  Here, Defendants' conduct is ongoing.

[9] Defendants argue, wrongly, that because "[t]here is no allegation that North Dakota protestors were involved in Louisiana and Pennsylvania protests," there is "no continuing enterprise with same enterprise members."  (GP Mem. 16.)  Specific actors and members may change without "loss of the enterprise's identity as an enterprise."  *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987); *see Boyle*, 556 U.S. at 941 (sustaining enterprise where "participants . . . included a core group, along with others . . . recruited from time to time").

[10]  While the original Complaint did not specifically cite 18 U.S.C. § 2339A as a predicate act, the facts alleged in the Amended Complaint sufficiently state a violation.  *Johnson v. City of*

commerce in violation of 18 U.S.C. § 844(i); (ii) arson and bombing of government property in violation of 18 U.S.C. § 844(f)(2)-(3); (iii) depredation of federal property in violation of 18 U.S.C. § 1361; and (iv) providing material support or resources to anyone to anyone "knowing or intending that [the resources] are to be used in preparation for, or in carrying out, a violation" of 18 U.S.C. § 2339A(a).  "Material support or resources" includes, *inter alia*, "any property, tangible or intangible, or service, including currency . . . lodging, training, expert advice or assistance . . . [or] personnel."  *Id.* at 2339(b).

Red Warrior Camp violated the Patriot Act by executing acts of arson and bombings of federal lands and property used in interstate commerce, as detailed above, *supra at* § C.2.  Red Warrior Camp's arson, bombing, and destruction of federal lands and pipeline equipment violate 18 U.S.C. §§ 844(i), 844(f)(2), and 1361.  Greenpeace USA violated 18 U.S.C. § 2339A by knowingly and intentionally providing training, supplies, personnel and other "material support" to Red Warrior Camp -- a party it knew was engaged in conduct violating the Patriot Act -- in furtherance of the foregoing attacks.  *See supra at* § C.2.  This conduct by Greenpeace USA constitutes illegal provision of material support for Patriot Act violations.  *See United States v. Arnaout*, 236 F. Supp. 2d 916, 916, 918 (N.D. Ill. 2003) (diverting charitable donations to terrorist organizations constituted provision of material support under Patriot Act where indictment alleged defendant knew and intended that donations would be used to perpetrate Patriot Act violations); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (providing

---

*Shelby, Miss.*, 135 S. Ct. 346, 347 (Nov. 10, 2014) (although complaint did not cite statute under which it was seeking to recover, *Twombly* and *Iqbal* require only that plaintiff "plead facts sufficient to show that her claim has substantive plausibility," which is established by setting forth factual basis for the complaint).

funds and other support to known terrorist organization constitutes intentionally providing

"material support" under 18 U.S.C. § 2339A.

> **b.** **GPI and Greenpeace USA Committed Mail Fraud and Wire Fraud by Disseminating Misinformation Via the Internet, E-mail, and U.S. Mail**

18 U.S.C. §§ 1341 and 1343 proscribe the use of mails or wires, respectively, in

furtherance of "any scheme or artifice to defraud." To plead a violation of the mail or wire fraud

statute, the plaintiff must allege: "(1) a scheme to defraud; (2) intent to defraud; (3) reasonable

foreseeability that the mails (or wires) would be used; and (4) use of the mails (or wires) in

furtherance of the scheme." *United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.*, 88 F.3d 563,

571 (8th Cir. 1996). Mail and wire fraud allegations are subject to Federal Rule of Civil

Procedure ("FRCP") 9(b)'s particularity requirement. *Abels*, 259 F.3d at 920. To satisfy this

requirement, a plaintiff need only plead the "who, what, where, when, and how of the alleged

fraud." *Garrett v. Cassity*, No. 4:09-cv-01252 (ERW), 2010 WL 5392767, at *17 (E.D. Mo.

Dec. 21, 2010) (citation omitted). "Malice, intent, knowledge, and other conditions of a person's

mind may be alleged generally." FRCP 9(b). "Where a plaintiff is not a party to a

communication" between a defendant and a third party, the plaintiff is not required to "plead

facts that remain within the defendants' private knowledge" or "highly specific allegations

before allowing at least a brief discovery period." *Abels*, 259 F.3d at 921.

Energy Transfer alleges GPI and Greenpeace USA perpetrated two related "schemes to

defraud" by which they disseminated false statements concerning Energy Transfer and DAPL

through the mails and wires, one that solicited support for itself and Red Warrior Camp through

donations and incited protestors to travel to Lake Oahe, *see supra at* § C.1, and one that targeted

Energy Transfer's investors, *see supra at* § C.3. Both schemes were successful; protests at Lake

Oahe multiplied, funds were raised, and Energy Transfer business constituents abandoned the

Company or only agreed to continue doing business on more onerous terms, all in reliance on GPI and Greenpeace USA's misrepresentations.  (¶¶ 80, 83, 113, 126, 160, 168-70, 172, 174, 176-77.)  These allegations sufficiently plead mail and wire fraud.

Disseminating false statements about a RICO plaintiff to third parties via the mail or wires may constitute mail and wire fraud, even if the plaintiff was not the defrauded party. *Bridge*, 553 U.S. at 645 (sustaining RICO claims where defendants' mail and wire fraud was targeted at third parties, not at plaintiff, when plaintiff suffered harm as a result of the fraud); *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012) (disseminating fraudulent fundraising materials relied on by third parties, not plaintiff, constituted mail fraud).[11]  Energy Transfer was harmed when, as alleged, specific investors and lenders abandoned the company based on misrepresentations disseminated by Greenpeace USA, when thousands of protestors descended on Lake Oahe to obstruct, by any means, construction of DAPL, and by the financial and material support Greenpeace USA solicited via fraud and directed to Red Warrior Camp.  Defendants' argument that mail and wire fraud violations require that a defendant obtain property from the hands of the plaintiff is an incorrect statement of the law.  "[N]either the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute."  *United States v. Welch*, 327 F.3d 1081,

---

[11] Defendants' contention that these allegations describe only defamation, which defendants allege does not constitute a predicate act under RICO, is wrong.  False claims made to support a scheme to defraud may equally support a defamation claim as a RICO claim.  Moreover, the harm allegedly suffered by the plaintiffs in cases cited by defendants was solely "reputational" – not physical damage to property and specific harm to business like increased capital costs.  *See Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763, at *9 (D. Md. Mar. 17, 2015) (dissemination of calculated falsehoods for the purpose of causing reputational harm); *Kimm v. Lee*, No. 04-cv-5724 (HB), 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005) ("Though [plaintiff] may well have suffered reputational injury as a result of the defendants' alleged acts, no one was 'induced to part with anything of value as a result.'").

1108 n.27 (10th Cir. 2003); *Feld*, 873 F. Supp. 2d at 318 ("Mail fraud lies whether or not the

perpetrator ends up with the victim's money or property.").  Finally, contrary to the Greenpeace

Defendants' assertions, the Amended Complaint pleads mail and wire fraud with the requisite

specificity.  Energy Transfer pleads the dates, times, authors, and recipients of false

communications wherever possible (ECF No. 95-1), and articulates why the statements are false

(¶¶ 84-112).

### 2.      Energy Transfer Has Standing to Bring Its RICO Claims

Energy Transfer has established standing to bring its RICO claims.  "Any person injured

in his business or property by reason of a violation" of 18 U.S.C. § 1962 may bring a civil cause

of action.  18 U.S.C. 1964(c).  "[I]n order to show injury 'by reason of' a RICO violation," a

plaintiff must establish that its alleged injury was proximately caused by defendants.  *Bridge*,

553 U.S. at 654.  A plaintiff needs merely to demonstrate that there is "some direct relation

between the injury asserted and the injurious conduct alleged."  *Id*. (quoting *Holmes v. Sec.*

*Investor Prot. Corp.*, 503 U.S. 528 at 268 (1992)).  The Amended Complaint alleges that Energy

Transfer suffered extensive injury to its business and property as a result of the Enterprise's

conduct.  *See supra at* § E.  These alleged injuries are cognizable RICO injuries to "business or

property." [12]

The Amended Complaint also pleads that Energy Transfer's injuries were proximately

caused by the Enterprise's RICO violations.  First, Energy Transfer alleges that Red Warrior

Camp members, with the material support of GPI and Greenpeace USA, physically damaged or

destroyed Energy Transfer property.  (¶¶ 117-27, 130, 133, 141.)  The Amended Complaint

---

[12] Defendants' reliance on *Kimberlin* to argue Energy Transfer lacks standing is misplaced.  (GP Mem. 20.)  In *Kimberlin,* plaintiff lacked standing because it only alleged harm to its reputation - - which is not a cognizable RICO injury.  2015 WL 1242763, at \*11-14.

alleges that Energy Transfer incurred increased security costs at DAPL and costs associated with construction delays.  (¶ 184.)  This establishes the "direct relation between the injury asserted and the injurious conduct alleged"; thus, Energy Transfer has adequately established proximate cause with respect to the alleged physical injuries to Energy Transfer property and business costs incurred in connection with Red Warrior Camp's attacks.  *See Bridge*, 553 U.S. at 654.

Second, the Amended Complaint alleges that Energy Transfer suffered injuries to its business that were proximately caused by misrepresentations disseminated by the Enterprise to the public regarding the development, construction, and impacts of DAPL.  (¶ 197.)  The Enterprise's misrepresentations were intended to and did incite thousands of people to travel to North Dakota to trespass on construction sites and stop construction of DAPL, causing delays in Energy Transfer's construction of DAPL (among all other injuries suffered by Energy Transfer during the protests).  (¶ 117.)  The Enterprise's misrepresentations were also intended to and did raise funds to support the Enterprise's operations, including for Red Warrior Camp's violent attacks.  *Feld*, 873 F. Supp. 2d at 321 (allegations that defendant used donations induced by fraudulent marketing materials misrepresenting plaintiff's practices to fund racketeering activity against plaintiff sufficiently alleged proximate causation).

Third, the Amended Complaint alleges that GPI and Greenpeace USA disseminated false statements to Energy Transfer's lenders and investors intending that that they would rely on them and impair or terminate the relationship.  (¶¶ 158-77.)  As set forth above, numerous Energy Transfer investors divested from the Company as a result of these misrepresentations.  *See supra at* ¶ C.3.[13]  The foregoing allegations establish a sufficiently "direct relation" between Energy

---

[13] In *Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000), relied upon by defendants, plaintiff was the "incidental" victim of defendants' racketeering scheme, and thus any injury to plaintiff was an unintended "passed-through" consequence of the defendants' racketeering

Transfer's injuries and the alleged misconduct for pleading purposes. *Bridge*, 553 U.S. at 649-50.

Defendants' contention that Energy Transfer has not pled proximate cause with respect to its fraud allegations because Energy Transfer did not rely on the Enterprise's misrepresentations is wrong. A RICO plaintiff may suffer an injury that is proximately caused by wire or mail fraud, even if the plaintiff did not rely on the misrepresentations forming the gravamen of the fraud claims. *Bridge*, 553 US at 657 (reliance by RICO plaintiff is not "necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in Supreme Court decisions in [*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)]"). The Supreme Court in *Bridge* was crystal clear:

> Reliance … whether characterized as an element of [a mail fraud] claim or as a prerequisite to establishing proximate causation, simply ***has no place*** in a remedial scheme keyed to the commission of mail fraud, a statutory offense that is distinct from common-law fraud and that does not require proof of reliance.

*Id.* at 656 (emphasis added). Thus, there is no requirement that Energy Transfer plead reliance in connection with wire and/or mail fraud to establish proximate cause, and, its alleged injuries are squarely within the scope of injuries the Supreme Court has held may be "proximately caused" by wire or mail fraud. *Id.*; *see also Procter & Gamble v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (proximate causation adequately alleged where defendants directed misinformation campaign about plaintiff to plaintiff's customers -- thereby causing boycott of plaintiff's products -- because such misrepresentations were intended to, and did contemporaneously, injure

---

activity. The Eighth Circuit recognizes that where, as here, a plaintiff intentionally targeted by a disinformation campaign are injured by reason of racketeering conduct. *See Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 952 (8th Cir. 1999).

plaintiff's reputation and business relationships).  Based on *Bridge*, injuries "proximately

caused" by mail and wire fraud extend beyond those of the defrauded party, and Energy

Transfer's injuries are sufficiently "direct" for pleading purposes.[14]

### C.   Each Defendant Is Liable for the Full Conduct of the RICO Enterprise

All RICO defendants are liable for all the acts of their co-conspirators reasonably linked

to the Enterprise's goals, irrespective of whether they participated in the commission of the

predicate act or had knowledge thereof.  *See Salinas v. United States*, 522 U.S. 52, 63 (1997)

(RICO "conspiracy may exist even if a conspirator does not agree to commit or facilitate each

and every part of the substantive offense"); *see also id.* at 63, 64 ("[if] conspirators have a plan

which calls for some conspirators to perpetrate the crime and others to provide support, the

supporters are as guilty as the perpetrators" and "[e]ach is responsible for the acts of each

other").  Moreover, "[o]ne does not have to have contact with all of the other members of a

conspiracy to be held accountable as a conspirator."  *United States v. McCarthy*, 97 F.3d 1562,

1570 (8th Cir. 1962).  "Notwithstanding a defendant's lack of knowledge of the identity of all of

the other co-conspirators or his failure to appreciate the extent of the enterprise, a defendant can

be held liable as a co-conspirator if he shares the same common purpose or goal of the other

conspirators."  *Id.* at 1570-71.  The focus is "not on the agreement to commit the individual

---

[14] There is no statutory or other basis on which to impose a "zone-of-interests" test to determine
whether plaintiff adequately pleaded its mail and wire fraud claims.  Indeed, after holding in
*Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.
1995) (Easterbrook, J.), that the plaintiff was not in the "zone of interest" of the mail fraud
statute as required to bring a RICO claim, the Seventh Circuit clarified, in *Phoenix Bond &
Indemnity Co. v. Bridge*, 477 F.3d 928 , 932-33 (7th Cir. 2007) (Easterbrook, J.), which was
affirmed by the Supreme Court, that when an injury is direct, "it cannot be knocked out by a
zone-of-interests requirement that has no purchase in the text of either § 1341 or RICO."  *Cf.
Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 493-95 (1985) (RICO does not require
plaintiff to allege injury "caused by an activity which RICO was designed to deter").

predicate acts," but on "the agreement to participate in the enterprise through a pattern of racketeering activity." *Henley*, 766 F.3d at 908. An agreement to participate in an enterprise through a pattern of racketeering "may be shown wholly through the circumstantial evidence of [each defendant's] actions." *Handeen*, 112 F.3d at 1355.

Here, GPI and Greenpeace USA agreed with their co-defendants and enterprise members to engage in the illegal scheme targeting Energy Transfer, *supra* § I.A, and performed numerous overt acts in furtherance of that scheme *supra* § I.B.1, causing injury to Energy Transfer. Thus, each defendant is legally responsible for the acts of its co-conspirators that are reasonably foreseeable within the scope of the conspiracy. *See, e.g., Henley*, 766 F.3d at 909 (imputing liability to defendant for acts of co-conspirators where circumstantial evidence demonstrated agreement to participate in enterprise). Finally, "[o]ne who joins a conspiracy after its inception, knowing its unlawful purpose, is charged with the same responsibility as if he had been one of its instigators." *United States v. Heater*, 689 F.2d 783, 788 (8th Cir. 1982). Thus, defendant Brown, who was hired to lead, and has led, interference operations against Energy Transfer's infrastructure projects, is also liable for the full scope of harm caused by the Enterprise.

## II.   PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY PLED

### A.   The Amended Complaint States a Claim for Defamation

The Amended Complaint also properly asserts a claim for defamation. To plead defamation under North Dakota law, a plaintiff must allege a "false and unprivileged publication" that "[t]ends directly to injure the person in respect to the person's office, profession, trade, or business, . . . by imputing something with reference to the person's office, profession, trade, or business that has a natural tendency to lessen its profits" or "by natural consequence causes actual damage." N.D.C.C. §§ 14-02-03, 04. The Amended Complaint and annexed appendices allege dozens of false statements published by GP-Fund (together with GP-

Inc.) under the name Greenpeace USA, as well as the dates and authors of those statements.  The alleged defamatory statements fall into six general categories:  (1) statements that DAPL traverses SRST tribal land; (2) statements that DAPL will poison SRST's water supply; (3) statements that DAPL will catastrophically alter the climate; (4) statements that DAPL was routed and approved without adequate environmental review or consultation with SRST; (5) statements that Energy Transfer used excessive force against protestors; and (6) statements that Energy Transfer intentionally desecrated SRST's cultural resources.  (¶¶ 83-112.)  As set forth above, all of those statements are false.  Thus, contrary to Greenpeace's assertion, Energy Transfer's defamation claim is not an attack on Greenpeace's "beliefs" or "viewpoints."  Rather, by their defamation claim, Energy Transfer seeks to recover the damages suffered as a result of Greenpeace's broad dissemination of demonstrably false, malicious statements regarding Energy Transfer's business.  As set forth below, the Greenpeace Defendants' contention that these false, malicious statements are somehow exempt from defamation laws is baseless.

### 1.   Greenpeace's Defamatory Statements Are Not Protected Speech Under the First Amendment

The Greenpeace Defendants contend that all of their alleged defamatory statements constitute "political advocacy criticizing ETP's practices" and thus fall "within core First Amendment protection."  (GP Mem. 21.)  Greenpeace is wrong:  knowing, deliberate misstatements of fact find no protection, ever under the First Amendment.  *See, e.g.*, *Time Inc. v. Hill*, 385 U.S. 374, 390 (1967) ("Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published should enjoy a like immunity").  No one, Greenpeace included, is allowed to intentionally spread lies for the purpose of harming another person, as Greenpeace did here. *See, e.g.*, *Peoples Bank & Tr. Co. of Mountain Home v. Globe Int'l Pub., Inc.*, 978 F.2d 1065,

1070 (8th Cir. 1992) (First Amendment tolerates sanctions against calculated falsehoods);

*Streeter v. Emmons Cty. Farmers Press*, 222 N.W. 455, 457 (N.D. 1928) ("The right to freely

write, speak, and publish . . . opinions . . . does not mean unrestrained license to publish false and

libelous matter.") (quotation and citation omitted).

It is no answer to claim, as Greenpeace does, that defamatory statements made while

engaged in "political advocacy" are protected speech.  False statements of fact are actionable

even in the context of public debate.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)

("[T]here is no constitutional value in false statements of fact.).[15]

### 2.    Greenpeace's Defamatory Statements Are Not "Protected Opinion"

The Greenpeace Defendants' contention that the defamatory statements alleged in the

Amended Complaint are protected "opinions" is similarly unavailing.  Merely labeling a

statement "opinion" does not defeat a defamation allegation.  *Milkovich v. Lorain Journal Co.*,

497 U.S. 1, 18 (1990) (rejecting "wholesale defamation exemption for anything that might be

labeled 'opinion'").[16]  The relevant question is whether a fact finder could conclude that the

published statement -- whether couched as "opinion" or not -- declares or implies a provably

---

[15] While Defendants attempt to analogize their conduct to lawful "association," the cases cited involve *truthful* statements clearly distinguishable from the calculated falsehoods and unlawful conduct alleged in the Amended Complaint.  *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902-03, 915 (1982) (no allegations that boycotts were based on intentionally false statements); *Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley*, 454 U.S. 290, 309-10 (1981) (involving political campaign contributions; no allegation of false statements); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (involving charitable contributions; no allegation of false statements); *Thornhill v. State of Ala.*, 310 U.S. 88, 104-05 (1940) (overturning loitering and picketing conviction; no allegation of false statements).

[16] Notably, the Eighth Circuit has expressly noted that the case law on which Defendants purport to rely is no longer viable after *Milkovich*.  *See Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 393-94 (8th Cir. 1996) (recognizing that *Milkovich* undermined continuing viability of *Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) and *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986); (GP Mem. 28 (relying exclusively on pre-*Milkovich* case law including *Price* and *Janklow*)).

false assertion of fact.  *See Ideal Instruments, Inc. v. Rivard Instruments, Inc*., 434 F. Supp. 2d

598, 624 (N.D. Iowa 2006) ("[I]f a reasonable trier of fact could find that the so-called opinion

could be interpreted as a false assertion of fact, the statement is actionable for defamation.").[17]

The Greenpeace Defendants' statements are actionable because they state and/or imply verifiably

false statements of fact.  By way of example, the Court has acknowledged that Defendants'

statements that Energy Transfer used excessive force on protesters -- which the Greenpeace

Defendants claim are opinion -- are readily verifiable (and false) statements of fact.  *See*

*Kirchmeir*, 2017 WL 5894552, at *4.  Similarly, the Greenpeace Defendants stated that DAPL

"is cutting through . . . unceded Treaty lands" and violating "Native land titles" -- statements that

are not "opinion," but verifiably false statements, (*see, e.g.*, ¶¶ 84-86; ECF No. 95-1; ECF No.

104, Tab 11), as are statements that Energy Transfer "deliberately desecrated documented burial

grounds and other culturally important sites," (¶ 108).[18]

     The Greenpeace Defendants further argue that the alleged defamatory statements fall into

categories of media that are wholesale exempt from defamation law, including news editorials

and "tweets" or other social media communications.  (GP Mem. 28, 29.)  These contentions are

baseless:  the First Amendment provides no generalized protection from defamation claims based

on the medium of publication.  *See, e.g.*, *Hatfill v. New York Times Co.*, 416 F.3d 320, 333 (4th

Cir. 2005) (op-ed contained defamatory statement); *Restis v. Am. Coal. Against Nuclear Iran*, 53

F. Supp. 3d 705, 724 (S.D.N.Y. 2014) ("defamatory statements published on Facebook and

---

[17] Defendants' argument in this regard is not only legally erroneous, but disingenuous as well.
While contending that the alleged defamatory statements are not factual, but mere "opinion,"
Defendants also contend that these purported non-factual statements are true.  (*See* GP Mem. 24
("[a]ll of Greenpeace's [ ] statements are not only true . . .").)

[18] In September 2016, the State Historical Society of North Dakota issued a report conclusively
that its "inventory and inspection . . . yielded no evidence of infractions . . . with respect to
disturbance of human remains or significant sites."  (¶ 112.)

Twitter, as well as statements made in press releases, could indeed be actionable in defamation suits").

### B. Defendants' Statements Are Not Protected By Statutory Privilege

The Greenpeace Defendants contend dismissal is warranted because certain alleged defamatory statements constitute privileged "fair reports" of "judicial, legislative, or other public official proceeding" protected by North Dakota statute.  (GP Mem. 35-36).  They are wrong.  The relevant statute protects only "a fair and true report, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof."  N.D.C.C. § 14-02-05(4).  The Greenpeace Defendants' false statements about DAPL were made contemporaneously with Energy Transfer's construction of DAPL; they did not arise out of any litigation or other proceedings and were, facially, not "reports" of such proceedings.  Moreover, the "fair report" privilege is a factual defense not appropriately considered on a motion to dismiss.  *See, e.g.*, *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 79 (N.D. 1991) ("[A]ctual malice and abuse of a qualified privilege are questions of fact" inappropriate for disposition on motion for summary judgment).

Further, in order to fall within the scope of the privilege, it must be clear that the statements at issue "were intended as a summary of an official document" or proceeding, and a failure to attribute the reported facts to such official proceedings is fatal.  *White v. Fraternal Order of Police*, 909 F.2d 512, 528 (D.C. Cir. 1990).  The Greenpeace Defendants identify only a few statements that reference governmental action at all (*see, e.g.*, Tab 3 (referencing USACE announcement); Tab 28 (same)), but mere reference to governmental action is not sufficient to render a statement a report on "official proceedings," and passing references are insufficient to insulate statements from defamation claims.  *See White*, 909 F.2d at 527-28.

C.      **The Amended Complaint Alleges Actual Malice**

A complaint pleads actual malice where it alleges that the defendant made the defamatory publication with "a reckless disregard for the truth," that is, "with a high degree of awareness of probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal quotation omitted); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (defining actual malice as the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not").  Direct evidence of actual malice is not required.  Rather, a "plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668.  A complaint need only raise "a reasonable inference" that defendant knowingly made a false statement or recklessly disregarded the truth of that statement. *Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1221 (D. Kan. 2016).

The Greenpeace Defendants knew that their statements regarding Energy Transfer and DAPL were false.  For example, they knew their statements regarding Energy Transfer's purported desecration of cultural resources and that DAPL traversed SRST land were false because on September 9, 2016, the U.S. District Court for the District of Columbia found that Energy Transfer "prominently considered" historic and cultural resources in choosing the pipeline route and that the pipeline was approved after "meaningful exchanges" with Standing Rock.  (¶¶ 104-05.)  Even after these findings, the Greenpeace Defendants continued to make contrary statements, including publicly stating in February 2017 that DAPL constituted a "blatant disregard of tribal sovereignty," and, in November 2016, that "[i]t is abundantly clear that the tribe was not adequately consulted." (*See, e.g.*, ECF No. 95-1; ECF No. 104 at Tabs 12, 29).  Calculated publication of knowingly false information, such as Defendants' repetition of false statements regarding DAPL, is the hallmark of actual malice.  *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove

33

persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination"); *see generally Nero v. Mosby*, 233 F. Supp. 3d 463, 478, 493-95 (D. Md. 2017) (allegations that defendants knew truth because they were involved in underlying events were "adequate to present a plausible claim that at least some of [defendant's] defamatory . . . statements were made with knowledge that they were false or . . . with reckless disregard" of their falsity), *rev'd on other grounds*, 890 F.3d 106, 125 (4th Cir. 2018).

Finally, actual malice may also be inferred by virtue of the fact that each of the defamatory statements was made in furtherance of the illegal campaign against Plaintiffs and DAPL. (*See* ¶ 80); *see, e.g.*, *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 158 ("policy of 'sophisticated muckraking,'" was evidence of malice) (plurality opinion); *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1170 (5th Cir. 2006) (holding that "smear campaign . . . illustrated the circumstances in which the defamatory statements were made . . . and [was] thus relevant evidence from which actual malice could be inferred" (quotation omitted)); *Pacquiao v. Mayweather*, 803 F. Supp. 2d 1208, 1214 (D. Nev. 2011) (actual malice adequately alleged where defendants "set out on a course designed to destroy [plaintiff]").

### D.    GP-Fund Is Liable For Defamatory Statements Published by Greenpeace USA

GP-Fund seeks to escape liability by arguing that the Amended Complaint does not allege which statements it authored. (GP-Fund Mem. 15-16.) It is well-settled that "every person who takes a responsible part in a defamatory publication -- that is, every person who, either directly or indirectly, publishes or assists in the publication of an actionable defamatory statement -- is liable for the resultant injury."[19] 50 Am. Jur. 2d Libel and Slander § 334;

---

[19] The cases cited by GP-Fund are inapposite because, unlike here, those defendants were not alleged to have participated in the creation or distribution of the defamatory materials. *See. e.g.*, *Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*, 168 F. App'x 893 (11th Cir. 2006)

*McCurdy v. Hughes*, 248 N.W. 512, 513 (N.D. 1933) ("All persons who cause or participate in or aid or abet another in the publication of defamatory matter are liable in a civil action for damages."). Allegations that "[defendants], 'working together and in concert, wrote, printed, and caused [the defamatory material] to be published'" are sufficient at the pleading stage. *Varriano v. Bang*, 541 N.W.2d 707, 712 (N.D. 1996).

As set forth above, GP-Fund and GP-Inc. "control all Greenpeace operations in the United States," and consistent with this structure, worked in concert with one another to develop and publish the false and defamatory allegations about Energy Transfer under the collective banner "Greenpeace USA." GP-Inc. and GP-Fund collectively hold themselves out as "Greenpeace USA" and share an Executive Director. (¶¶ 52, 55.) Greenpeace USA is alleged to have made more than 70 of the defamatory statements at issue. (*See* ECF No. 95-1.) Thus, at minimum, GP-Fund is liable for its part in the publication of these statements. *Varriano*, 541 N.W.2d at 712. Further, GP-Fund and GP-Inc., not Energy Transfer, attribute the published statements to Greenpeace USA, including by publishing them under the name "Greenpeace USA" and on the "Greenpeace USA" website. (*See, e.g.*, ECF No. 104 at Tabs 3, 20, 25.) "[I]f there has been lumping together of [d]efendants in the [complaint], that is a direct result of how [they] have chosen to operate." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 977 (N.D. Cal. 2018).

---

(plaintiff failed to allege defendant's participation in defamation); *Kahn v. iBiquity Digital Corp.*, No. 06-cv-1536 (NRB), 2006 WL 3592366 at *5 n.23 (S.D.N.Y. Dec. 7, 2006) (finding no liability for "a non-party's alleged defamation, without a link between that party and defendants"); *Buttons v. Nat'l Broad. Co.*, 858 F. Supp. 1025, 1027 (C.D. Cal. 1994) (denying joinder where parties not alleged to have any responsibility for production or publication of defamatory statements).

Moreover, as a member of the alleged conspiracy, GP-Fund is liable for the defamatory statements of its co-conspirators, regardless of whether GP-Fund itself published the statements. *See, e.g.*, *Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 607 F. Supp. 1187, 1191 (S.D.N.Y. 1985) (finding defendant "liable for the acts of other members of the claimed conspiracy as if they were his own" where he allegedly "was a member of a conspiracy, and acted in concert with the other [ ] defendants, in an attempt to smear the reputation of [plaintiff]" through "dissemination of allegedly libelous statements to the public and customers"); *Sheppard v. Freeman*, 67 Cal. App. 4th 339, 349 (1998) ("[L]iability for libel may be imposed on a conspiracy theory" where plaintiff alleges defendants engaged in a conspiracy to defame him.).

### E.    The Complaint States a Claim for Trespass

The Amended Complaint also states a claim for trespass.  To plead a claim for trespass on real property under North Dakota law, the complaint must allege that a person "intentionally and without a consensual or other privilege . . . enters land in possession of another or any part thereof or causes a thing or third person to do so."  *McDermott v. Sway*, 50 N.W.2d 235, 240 (N.D. 1951).  Thus, "[i]f, by any act of his, the actor intentionally causes a third person to enter land, he is as fully liable as though he himself enters."  *Id.*  To state a claim for trespass to chattel, the complaint must allege a loss of use of the property.  *Sagebrush Resources, LLC v. Peterson*, 841 N.W.2d 705, 712 (N.D. 2014).  The Amended Complaint alleges that Greenpeace USA and Charles Brown trained thousands of protestors to trespass on Energy Transfer's construction sites and disrupt construction by using chains, U-locks, steel pipes, wires, and drum barrels to attach themselves to each other and construction equipment.  (¶ 117.)  The trespass by hundreds of protestors stopped construction on an almost daily basis in North Dakota, and this continues in Pennsylvania and Louisiana.  (*Id.*)  These allegations sufficiently state a claim for trespass on real property and chattel.  *Minto Grain, LLC v. Tibert*, 776 N.W.2d 549, 566 (N.D.

2009) (awarding damages for loss of financing as a result of trespass); *Bladow v. Bladow*, 249

N.W.2d 917, 919 (N.D. 1977) (awarding value of loss of use of land for certain time period).

### F.   The Complaint States a Claim for Tortious Interference

To plead a claim for tortious interference under North Dakota law, the complaint must

allege: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the

interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful

act of interference by the interferer; (4) proof that the interference caused the harm sustained; and

(5) actual damages to the party whose relationship or expectancy was disrupted." *Trade 'N Post,*

*L.L.C. v. World Duty Free Americas, Inc.*, 2001 ND 116, ¶ 36 (2001).  To prevail on such

claims, a "plaintiff need not prove an independent tort to establish an independently tortious act.

Rather, the plaintiff must prove that the defendant's conduct would be actionable under a

recognized tort." *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1058 (D.N.D. 2006) (quotation

omitted).  Energy Transfer alleges Defendants directed knowingly false statements to Energy

Transfer's investors, lenders, and other business constituencies for the purpose of destroying

these relationships, and was successful in this effort.  (¶¶ 158-77.)  Further, Energy Transfer has

adequately pleaded defamation claims against each of the defendants, as well trespass and

unlawful racketeering conduct, and each of these claims alleges the harm to Energy Transfer's

business resulting from Defendants' tortious actions.  Drawing all inferences in Energy

Transfer's favor, as the Court must at this stage, the Amended Complaint states a claim for

tortious interference. [20]

---

[20] The Amended Complaint also alleges a claim for civil conspiracy under North Dakota law, the
element of which are: "(1) [t]wo or more persons, and for this purpose a corporation is a person;
(2) [a]n object to be accomplished; (3) [a] meeting of minds on the object or course of action; (4)
[o]ne or more unlawful or overt acts; and (5) [d]amages as the proximate result thereof."  *In re N.*
*Dakota Pers. Injury Asbestos Litig. No. 1*, 737 F. Supp. 1087, 1096 (D.N.D. 1990).  As set forth

## III.     THE COURT HAS PERSONAL JURISDICTION OVER GPI AND BROWN

Finally, GPI and Brown's contentions that they are not subject to personal jurisdiction in this Court are unavailing.  (*See* GP Mem. 39-40.)  The Amended Complaint alleges facts sufficient to show that both GPI and Brown are subject to this Court's jurisdiction under the RICO statute and North Dakota state law and that GPI is subject to this jurisdiction under FRCP 4(k)(2).[21]

### A.     This Court Has Jurisdiction Over GPI and Brown Under RICO

Where a plaintiff has established personal jurisdiction over at least one RICO defendant under 18 U.S.C. § 1965(a), a court may exercise jurisdiction over additional RICO defendants who do not reside within the district, so long as they are served within "any judicial district of the United States."  *Id.* § 1965(b).  RICO defendants GP-Inc. and GP-Fund do not dispute this Court's jurisdiction.  Energy Transfer effected service on GPI and Brown in the United States. (*See* ECF Nos. 17, 20.)  Thus, GPI and Brown are subject to the jurisdiction of this Court under section 1965(b).

---

above, the Amended Complaint plausibly alleges Defendants' common plan, concerted action, and unlawful acts, including violations of state and federal law.

[21] Because venue is indisputably proper in this District, plaintiffs' choice of forum is entitled to substantial deference.  *See, e.g.*, *DakColl, Inc. v. Grand Cent. Graphics, Inc.*, 352 F. Supp. 2d 990, 1003 (D.N.D. 2005) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *Zidon v. Pickrell*, 344 F. Supp. 2d 624, 633 (D.N.D. 2004) ("Courts are in the business of deciding cases, not playing procedural hockey among available districts at the whim of dissatisfied parties").  Defendants have not made any attempt to carry their "heavy burden of showing why a change of forum is warranted."  *D. Offutt Co. v. Lexington Ins. Co.*, 342 F. Supp. 2d 838, 841 (D.N.D. 2004); (*see* GP Mem. 39 n.34).  Nor could they, for the reasons previously detailed by Plaintiffs.  (ECF No. 65 at 79-81).  Their request for a transfer pursuant to 28 U.S.C. § 1404(a) must therefore be denied.

**B.     This Court Has Jurisdiction Over GPI and Brown Under North Dakota Law**

GPI is subject to this Court's jurisdiction under North Dakota's long-arm statute, which provides for jurisdiction over a person who, "directly or by an agent," "commit[s] a tort within or outside this state causing injury to another person or property within this state; [or] commit[s] a tort within this state, causing injury to another person or property within or outside this state." N.D. R. Civ. P. 4(b)(2); *see* Fed. R. Civ. P. 4(k)(1)(A).  The Amended Complaint alleges GPI committed torts within the state when it directed, funded, and supported, among other things, violations of the Patriot Act in North Dakota.  The Amended Complaint alleges that GPI disseminated false statements outside the state with the expectation and intention to cause injury in North Dakota.  The Court can find jurisdiction on that basis.  *See Atkinson v. McLaughlin*, 343 F. Supp. 2d 868, 877-878 (D.N.D. 2004) (exercising jurisdiction over foreign nationals whose defamatory statements "directly targeted" North Dakota concerning subjects "relate[d] to North Dakota"); *Zidon v. Pickrell*, 344 F. Supp. 2d 624, 632 (D.N.D. 2004) (exercising jurisdiction over defendant who targeted defamatory statements to North Dakota and "brunt of the injury" was in North Dakota").

Finally, North Dakota law permits the exercise of this Court's jurisdiction over GPI and Brown based on the contacts of their co-conspirators in this state, which contacts are not disputed on this motion.  *See In re N. Dakota Pers. Injury Asbestos Litig.*, 737 F. Supp. 1087, 1098-99 (D.N.D. 1990) (finding jurisdiction over Canadian defendant based on co-conspirators' North Dakota activities).  Jurisdiction lies here because GPI and Brown participated in a conspiracy that engaged in tortious conduct in North Dakota.  (¶¶ 62, 154.)  While Brown did not join the conspiracy until spring 2018, he is liable for the full scope of his co-conspirator's conduct.  *Heater*, 689 F.2d at 788 ("One who joins a conspiracy after its inception, knowing its unlawful purpose, is charged with the same responsibility as if he had been one of its instigators.").

### C.    This Court Has Jurisdiction Over GPI Under Rule 4(k)(2)

Further, even if the Court were to conclude that GPI is not subject to long-arm jurisdiction in this state, the Court should nevertheless exercise jurisdiction over it pursuant to Fed. R. Civ. P. 4(k)(2), which confers jurisdiction over foreign defendants who have sufficient contacts with the United States as a whole to satisfy due process standards, but lack substantial contacts with any single state.  *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1293-94 (Fed. Cir. 2012)  Because the Amended Complaint alleges minimum contacts with the United States and GPI does not identify any other state in which it would be subject to personal jurisdiction, this Court's exercise of jurisdiction is proper pursuant to Rule 4(k)(2).  *See S.E.C. v. Carrillo*, 115 F.3d 1540, 1545-46 (11th Cir. 1997).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss and transfer venue should be denied in their entirety.  To the extent the Court grants Defendants' motions in whole or in part, Energy Transfer requests that such dismissal be without prejudice and that leave to amend the complaint be granted.

DATED this 18th day of September, 2018.

**FREDRIKSON BYRON P.A**                    **KASOWITZ BENSON TORRES LLP**

                                            /s/ Jennifer S. Recine

By:   Lawrence Bender, ND Bar# 03908   By:   Michael J. Bowe (admitted *pro hac vice*)
                                            Jenifer S. Recine (admitted *pro hac vice*)
                                            Lauren Tabaksblat (admitted *pro hac vice*)

      1133 College Drive, Suite 1000         1633 Broadway
      Bismarck, ND 58501                     New York, NY 10019
      Telephone: 701.221.8700               Telephone: 212.506.1700
      Fax: 701.221.8750

                                            *Attorneys for Plaintiffs Energy Transfer*
                                            *Equity, L.P., and Energy Transfer*
                                            *Partners, L.P.*