**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| Energy Transfer Equity, L.P., and Energy Transfer Partners, L.P., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 1:17-cv-00173 |
| Greenpeace International (aka "Stichting Greenpeace Council"); Greenpeace, Inc.; Greenpeace Fund, Inc.; Banktrack (aka "Stichting Banktrack"); Earth First!; Cody Hall; Krystal Two Bulls; Jessica Reznicek; Ruby Montoya; Charles Brown; and John and Jane Does 1-20, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO KRYSTAL TWO BULLS' MOTION TO DISMISS UNDER RULE 12(b)(6)
AND MOTION TO QUASH IMPROPER SERVICE UNDER RULE 12(b)(5)**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    DAPL -- The Enterprise's First Target .................................................. 3

    B.    The Enterprise .......................................................................... 4

        1.    The Greenpeace Defendants .................................................. 4

        2.    Earth First! and Earth First! Doe Defendants ............................. 5

        3.    Red Warrior Camp, Cody Hall, and Krystal Two Bulls ........................... 5

    C.    Defendants' Operations Against Energy Transfer ................................. 7

        1.    The Enterprise Disseminated Falsehoods About DAPL to Fund
            and Facilitate Its Racketeering Activity ....................................... 7

        2.    The Enterprise Organized, Supported, and Funded Violence
            Against DAPL .......................................................................... 8

            a.    Red Warrior Camp Infiltrates Protest Camps in North
                Dakota ........................................................................ 8

            b.    Red Warrior Camp's Violent Attacks on DAPL and Energy
                Transfer ..................................................................... 9

            c.    The Greenpeace Defendants, Ms. Two Bulls, and Mr. Hall
                Raise Funds to Support Red Warrior Camp's Violent
                Mission ...................................................................... 9

        3.    Enterprise Members Target Energy Transfer's Lenders, Investors, and
            Business Partners ................................................................ 12

    D.    The Enterprise's Continuing Conduct .............................................. 12

LEGAL STANDARD ........................................................................................ 13

ARGUMENT ................................................................................................. 13

I.    PLAINTIFFS' FEDERAL RICO CLAIMS AGAINST MS. TWO BULLS ARE
    ADEQUATELY PLED ................................................................................. 13

A.      The Amended Complaint Adequately Pleads a RICO Enterprise and Ms. Two Bulls' Participation in the Enterprise............................................................. 14

B.      The Amended Complaint Adequately Pleads a Pattern of Racketeering Activity ........................................................................................................... 16

C.      Energy Transfer Has Standing to Bring Its RICO Claims .................................. 19

D.      Ms. Two Bulls Is Liable for the Conduct of the RICO Enterprise And All Damage Flowing Therefrom.............................................................................. 20

II.      THE FIRST AMENDMENT DOES NOT PROTECT MS. TWO BULLS' ILLEGAL CONDUCT ....................................................................................... 21

III.     PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY PLED ................................ 24

A.      The Complaint States a Claim for Trespass.......................................................... 24

B.      The Complaint States a Claim for Conspiracy .................................................... 25

IV.      MS. TWO BULLS WAS PROPERLY SERVED .......................................................... 25

CONCLUSION.................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson Windows, Inc. v. Delmarva Sash & Door Co. of Md.*,
    2002 WL 1424570 (D. Minn. June 28, 2002) ........................................................27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................13, 17, 18

*Atlas Pile Driving Co. v. DiCon Fin. Co.*,
    886 F.2d 986 (8th Cir. 1989) ...........................................................17

*Bates v. Hadden*,
    2013 WL 12086760 (S.D. Iowa Sept. 6, 2013) .......................................27

*Bladow v. Bladow*,
    249 N.W.2d 917 (N.D. 1977) ...........................................................25

*Boyle v. United States*,
    556 U.S. 944 (2009) ......................................................................14, 16, 17

*Bradenburg v. Ohio*,
    395 U.S. 444 (1969) .......................................................................23

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ......................................................................14, 19, 20

*Burr v. Kulus*,
    564 N.W.2d 631 (N.D. 1997) ...........................................................14

*Dakota Access, LLC v. Archambault*,
    No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sept. 16, 2016) ...........................2, 22

*Dundon v. Kirchmeier*,
    No. 1:16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017), *aff'd by* 701 F.
    App'x 538 (8th Cir. 2017) ...............................................................2, 22

*First Nat'l. Bank and Trust Co. v. Hollingsworth*,
    931 F.2d 1295 (8th Cir. 1991) ...........................................................17

*Geraci v. Women's Alliance, Inc.*,
    436 F. Supp. 2d 1022 (D.N.D. 2006) ...................................................14

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) .......................................................................22

*Ginardi v. Frontier Gas Servs., LLC*,
  No. 4:11-cv-420 (BRW), 2011 WL 3493125 (E.D. Ark. Aug. 10, 2011) ..............................13

*Goodwin v. United States*,
  869 F.3d 636 (8th Cir. 2017), *reh'g denied* (Sept. 28, 2017) ...................................22

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989)...............................................................................16, 17

*Handeen v. Lemaire*,
  112 F.3d 1339 (8th Cir. 1997) ........................................................13, 16, 21

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..................................................................................19

*Johnson v. City of Shelby, Miss.*,
  135 S. Ct. 346 (Nov. 10, 2014) ..................................................................18

*McDermott v. Sway*,
  50 N.W.2d 235 (N.D. 1951) .......................................................................24

*Minto Grain, LLC v. Tibert*,
  776 N.W.2d 549 (N.D. 2009) ......................................................................25

*Murphy v. Aurora Loan Servs., LLC*,
  699 F.3d 1027 (8th Cir. 2012) ....................................................................13

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)................................................................................23

*In re N. Dakota Pers. Injury Asbestos Litig. No. 1*,
  737 F. Supp. 1087 (D.N.D. 1990).................................................................25

*Qwest Comm'ns Co. v. Aventure Comm'ns Tech., LLC*,
  86 F. Supp. 3d 933 (S.D. Iowa 2015) ...........................................................26

*Raineri Const., LLC v. Taylor*,
  2014 WL 2348632 (E.D. Mo. Jan. 31, 2014) ...................................................19

*Rice v. Paladin Enterprises, Inc.*,
  128 F.3d 233 (4th Cir. 1997) .....................................................................22

*Sagebrush Resources, LLC v. Peterson*,
  841 N.W.2d 705 (N.D. 2014) .....................................................................24

*Salinas v. United States*,
  522 U.S. 52 (1997)..................................................................................20

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ..................................................................................................14

*Two Palms Software, Inc. v. Worldwide Freight Mgmt., LLC*,
    No. 4:10-CV-1045 CEJ, 2011 WL 1004861 (E.D. Mo. Mar. 18, 2011) ..................................10

*United States v. Arnaout*,
    236 F. Supp. 2d 916 (N.D. Ill. 2003) ....................................................................18

*United States v. Darden*,
    70 F.3d 1507 (8th Cir. 1995) .............................................................................16

*United States v. Henley*,
    766 F.3d 893 (8th Cir. 2014) .................................................................14, 20, 21

*United States v. Hively*,
    437 F.3d 752 (8th Cir. 2006) .............................................................................17

*United States v. Kragness*,
    830 F.2d 842 (8th Cir. 1987) .............................................................................17

*United States v. Larson*,
    807 F. Supp. 2d 142 (W.D.N.Y. 2011) .................................................................22

*United States v. McCarthy*,
    97 F.3d 1562 (8th Cir. 1962) .............................................................................20

*Zimprich v. N. Dakota Harvestore Sys., Inc.*,
    419 N.W.2d 912 (N.D. 1988) .............................................................................18

## Statutes and Rules

18 U.S.C. 1964(c) ..................................................................................................19

18 U.S.C. § 844 ................................................................................................17-18

18 U.S.C. § 1361 ..................................................................................................17

18 U.S.C. § 1961(4) .........................................................................................14, 16

18 U.S.C. § 1962 ....................................................................................13, 14, 19

18 U.S.C. § 1964(c) .............................................................................................13

18 U.S.C. § 2339A .......................................................................................17, 18, 19

Fed. R. Civ. P. 4 ..................................................................................................26

Fed. R. Civ. P. 4(m) .............................................................................................26

Fed. R. Civ. P. 12 ............................................................................................................1, 13

N.D.C.C. § 12.1-06.1-03(2) ...............................................................................................14

N.D. R. Civ. P. 4(d)(2)(A)(iv) ...........................................................................................26

**Other Authorities**

Model Penal Code § 2.07 ...................................................................................................18

Restatement (Second) of Agency § 212 (1958) .................................................................18

Restatement (Second) of Torts § 877 (1979) .....................................................................18

Plaintiffs Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. (together "Energy Transfer" or the "Company") respectfully submit this memorandum of law in opposition to Krystal Two Bulls' Motion to Dismiss Under Rule 12(b)(6) and Motion to Quash Improper Service Under Rule 12(b)(5).

## PRELIMINARY STATEMENT

In its Amended Complaint, Energy Transfer details Ms. Two Bulls' participation in an unlawful, violent scheme to cause financial harm to Energy Transfer, physically harm Energy Transfer's employees and infrastructure, and disrupt and prevent Energy Transfer's construction of the Dakota Access Pipeline ("DAPL").  As alleged in the Amended Complaint, Ms. Two Bulls participated in a criminal enterprise with Greenpeace International ("GPI"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund") (collectively, the "Greenpeace Defendants"), Red Warrior Camp, Cody Hall, and Earth First! to finance, organize, and perpetrate violence, vandalism, and other illegal activity to obstruct construction and operation of Energy Transfer's government-approved DAPL.

Defendants, including Ms. Two Bulls, advanced their extremist agenda -- to attack and disrupt Energy Transfer's business and its construction of DAPL -- through means far outside the bounds of democratic political action, protest, and peaceful, legally protected expression of dissent.  Instead, defendants pursued -- in the words of Ms. Two Bulls -- "militant direct action" that called for trespass onto Energy Transfer's private property; violent and destructive attacks on the pipeline, Energy Transfer construction equipment, and other private property; arson; and intimidation, harassment, and assault of Energy Transfer employees.  Indeed, the conduct alleged here already has been described by the U.S. District Court for the District of North Dakota as "mindless and senseless criminal mayhem" that is not protected by the rights of free speech and assembly:

> With respect to the assertion the movement has been a peaceful protest, one need only turn on a television set or read any newspaper in North Dakota.  There the viewer will find countless videos and photographs of the "peaceful" protestors attaching themselves to construction equipment operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on privately-owned property; obstructing work on the pipeline; and verbally taunting, harassing, and showing disrespect to members of the law enforcement community. . . . The estimated damage to construction equipment and loss of work on the project is far in excess of several million dollars. . . . To suggest that all of the protest activities to date have been "peaceful" and law-abiding defies commonsense and reality.

*Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005, at *2 (D.N.D. Sept. 16, 2016); *see also Dundon v. Kirchmeier*, No. 1:16-cv-406, 2017 WL 5894552, at *2 (D.N.D. Feb. 7, 2017), *aff'd by* 701 F. App'x 538 (8th Cir. 2017).

Unlawful conduct is precisely what Ms. Two Bulls intentionally instigated and enabled as a leader and organizer of Red Warrior Camp.  In fact, on October 12, 2016, in the midst of the violent attacks on DAPL and Energy Transfer, Ms. Two Bulls published an article regarding the DAPL protests that called for "militant direct action" against DAPL and Energy Transfer:

> **Make militant direct action the organizing strategy, not just a tool in the toolbox**. . . . Movements around the world use confrontational action as a strategy, not just as a tactic.  Militant movements in Serbia ousted Milosevic . . . . Militant direct action is a strategy we use to build real movements, change power dynamics, shift societies and even remove governments.[1]

Energy Transfer is not alone in taking issue with the violence instigated and perpetrated by Ms. Two Bulls and Red Warrior Camp.  In fact, in the midst of the anti-DAPL protests, the tribal council of the Standing Rock Sioux Tribe -- the indigenous people on whose behalf she and Red Warrior Camp purported to act -- voted unanimously to expel Ms. Two Bulls' organization from the protests, as a result of her calls for, and its perpetration of, violence against Energy Transfer.

---

[1] Krystal Two Bulls, Scott Parkin, Patrick Young, "The Financial Powers Behind the Dakota Access Pipeline Must Be Confronted," Common Dreams, Oct. 12, 2016, *available at* Center for Constitutional Rights, https://ccrjustice.org/krystal-two-bulls.

Energy Transfer does not seek to limit Ms. Two Bulls', or anyone's, exercise of legally protected rights.  This action is not an effort to use corporate power to bully or suppress dissent, and it is certainly not an effort to interfere with the rights of indigenous peoples or to dissuade them from expressing their views.  Energy Transfer supports the rights of indigenous people and has gone to extraordinary lengths to engage local tribal nations -- including the Standing Rock Sioux -- in a spirit of cooperation and respect.

But the law does not protect parties -- like Ms. Two Bulls -- who engage in or facilitate violence.  As a "leader," "organizer," "media coordinator," and fundraiser for Red Warrior Camp, Ms. Two Bulls is directly, and vicariously, responsible for Red Warrior's violent attacks on Energy Transfer property and personnel in North Dakota.  Ms. Two Bulls' unlawful actions were intended to -- and did -- cause enormous financial harm and physical damage to Energy Transfer.  It is for this unlawful conduct and financial harm that Energy Transfer seeks to vindicate its own legal rights.  Energy Transfer thus states claims not only for RICO violations, but also for violations of North Dakota racketeering law, criminal trespass, and conspiracy.

Accordingly, Ms. Two Bulls' motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    DAPL -- The Enterprise's First Target

On June 25, 2014, Energy Transfer announced the development and construction of DAPL -- a 1,172 mile underground pipeline -- to transport nearly a half-million barrels of domestically produced crude oil daily across four states, from the Bakken region in North Dakota, across South Dakota and Iowa, to Patoka, Illinois.  For the next 25 months, the Company, working closely with the United States Army Corps of Engineers ("USACE"),

conducted extensive planning to identify a route that would have the least impact on the maximum group of stakeholders and resources.  (¶¶ 104, 109-11.)[2]

DAPL traverses private land for 99% of its route.  One exception is where DAPL crosses *federally* owned and regulated waters at the Missouri River under the man-made Lake Oahe. DAPL follows the route of an existing pipeline -- the Northern Border Pipeline -- under Lake Oahe.  Energy Transfer selected this route because it would traverse a path that was already disturbed by other infrastructure.  (¶ 109.)  Lake Oahe is federally owned and regulated, as is the land surrounding it, and the pipeline "crosses" 90 to 115 feet below the lake.  (¶¶ 85-87.)  The crossing is located 0.5 miles above the northern boundary of the Standing Rock Sioux Tribe ("SRST") reservation.  (*Id*.)  DAPL does not cross SRST-owned land or water.  (*Id*.)  On July 25, 2016, USACE issued its Final Environmental Assessment for DAPL with a Mitigated Finding of No Significant Impact, concluding that the risk of spill was low and authorizing the pipeline's route under Lake Oahe.  (*Id.* at ¶ 107)

**B.    The Enterprise**

The Amended Complaint alleges a RICO enterprise consisting of the following:

**1.    The Greenpeace Defendants**

The Greenpeace Defendants are parts of the international "Greenpeace" organization, a network of legally distinct, but centrally coordinated, international, national, and regional associations.  (¶¶ 46-47.)  GPI reviews, approves, and underwrites the activities of national and regional "Greenpeace" entities -- here, GP-Inc. and GP-Fund's operations against Energy Transfer.  (¶¶ 46-47, 58.)  GP-Inc. and GP-Fund collectively hold themselves out as "Greenpeace USA," and act together as "Greenpeace USA."  (¶¶ 52, 55-56.)

---

[2] References to "¶ __" are to paragraphs of the Amended Complaint (ECF No. 95).

Greenpeace USA and GPI directed and operated the campaign against Energy Transfer including by:  publishing and disseminating false statements about Energy Transfer and DAPL to deceive the public, foment protests, and raise funds for attacks on DAPL (¶¶ 80, 83-112); training protestors in North Dakota to engage in "direct action" (¶¶ 59, 75, 117, 130); coordinating with Earth First! Doe Defendants and Red Warrior Camp to train members of Red Warrior Camp to execute violent attacks on construction sites in North Dakota (¶¶ 39, 60); seconding Greenpeace USA employees to Red Warrior Camp to perpetrate attacks (¶¶ 11, 61, 118); and providing supplies to Red Warrior Camp to sustain its encampment at Lake Oahe (¶ 126).

### 2.      Earth First! and Earth First! Doe Defendants

Earth First! is a radical environmentalist activist group.  (¶¶ 63, 66.)  In connection with the DAPL protests, Earth First! Doe Defendants provided $500,000 to extremist protestors, including Mr. Hall and Ms. Two Bulls, to form and fund the violent Red Warrior Camp at the DAPL crossing near Lake Oahe (¶ 118); coordinated with Greenpeace USA to provide training in "direct action" and criminal sabotage to Red Warrior Camp (¶¶ 39, 60); and distributed copies of its Direct Action Manual and Ecodefense Guide -- which provide instruction on "direct action" techniques -- at protest camps in North Dakota.  (¶¶ 71-75.)

### 3.      Red Warrior Camp, Cody Hall, and Krystal Two Bulls

"Red Warrior Camp" is the name of a sub-group of the most radical anti-DAPL activists based in camps near Lake Oahe in North Dakota.  Mr. Hall formed Red Warrior Camp in the fall of 2016 with the financial support and direction of Greenpeace USA and Earth First! Doe Defendants in connection with anti-DAPL protests in North Dakota.  (¶ 38.)  Red Warrior Camp distinguishes itself from other activists by its willingness to cross the line from non-violent protest to "direct action" against Energy Transfer and DAPL.  (*Id.*)  "Direct action," as the term

is used by activists, included destruction of Energy Transfer construction equipment, attacks on and intimidation of Energy Transfer employees, and operations to damage or destroy DAPL. Red Warrior Camp infiltrated and radicalized the DAPL protest movement by inciting peaceful protestors at camps near the DAPL Lake Oahe crossing to engage in illegal "direct action."  (*Id.*)

Ms. Two Bulls was a "leader," "media coordinator," "organizer," and fundraiser for Red Warrior Camp.  (¶¶ 31, 38, 126-27, 130-32; Recine Decl., Exs. 1-5[3].)  In this role, she urged supporters to take "militant direct action" against the pipeline (Recine Decl., Ex. 1), and recruited individuals, raised funds and supplies, and organized Red Warrior Camp's attacks on DAPL construction sites.  (¶¶ 31, 38-41, 120-27, 130-33, 135, 141.)  She managed the group's e-mail, Facebook, Twitter, and Instagram accounts.  (*See* Recine Decl., Ex. 4.)  She also served as Red Warrior Camp's liaison with Greenpeace USA.  (¶¶ 126-27.)

Red Warrior Camp amounts to a front organization for Greenpeace USA intended to provide cover for Greenpeace USA's support of and engagement in illegal "direct action" against Energy Transfer and DAPL.  (¶ 38.)  Under the direction of Mr. Hall and Ms. Two Bulls, Red Warrior Camp repeatedly trespassed on federal and private land, attacked Energy Transfer's property and personnel, and destroyed Energy Transfer's property and federal lands by arson.

---

[3] On this motion, it is inappropriate for the Court to consider Ms. Two Bulls' factual arguments seeking to distance herself from Red Warrior Camp's violent actions.  (*See* ECF No. 121 at 1 (asserting that Ms. Two Bulls is a "longtime activist for . . . anti-militarism"); 5 (asserting that Ms. Two Bulls did not author a communique calling for "like-minded warriors" to "kill this Black Snake")).  The Amended Complaint adequately pleads that Ms. Two Bulls was part of the leadership of Red Warrior Camp in her role as organizer, media coordinator, and fundraiser for the group.  (¶¶ 31, 38, 130-32.)  In any event, her assertions are demonstrably false, as demonstrated by articles and posts in which Ms. Two Bulls herself uses the titles "leader," "organizer" and "media coordinator," and in which she solicits "monetary support" for Red Warrior Camp and urges "militant direct action" against DAPL.  (Recine Exs. 1-5.)

### C.      Defendants' Operations Against Energy Transfer

The Enterprise's operations against Energy Transfer consisted of three related components.  First, the Greenpeace Defendants disseminated false statements about Energy Transfer and DAPL via their websites, e-mail, and U.S. mail for the purpose of deceiving the public into funding the Enterprise's racketeering activity, recruiting individuals, and inciting the radical protestors to descend on Lake Oahe to halt construction of DAPL.  (¶¶ 83-112.)  Second, the Greenpeace USA, Earth First! Doe Defendants, Ms. Two Bulls, and Mr. Hall organized, funded, and supported Red Warrior Camp.  (¶¶ 113-52.)  Third, the Greenpeace Defendants disseminated false statements about Energy Transfer and DAPL directly to Energy Transfer's lenders and investors to fraudulently induce the termination or impairment of these relationships. (¶¶ 158-77.)

### 1.      The Enterprise Disseminated Falsehoods About DAPL to Fund and Facilitate Its Racketeering Activity

Beginning in July 2016 and continuing up until the operation of DAPL, the Greenpeace Defendants disseminated false claims about the impacts of the development, construction, and operation of DAPL.  (¶¶ 83-112.)  These misrepresentations regarding DAPL and Energy Transfer fall into six broad categories:  false statements regarding DAPL's path, false statements alleging Energy Transfer "desecrated" cultural resources, false statements regarding the environmental impact of DAPL on water supplies, false statements regarding the impact of DAPL on climate change, false statements regarding Energy Transfer's pre-construction environmental assessments of DAPL project, and false statements regarding Energy Transfer's treatment of anti-DAPL protestors.  (*Id.*)  Specific misrepresentations are set forth in detail in Appendix A to the Amended Complaint.  (ECF No. 95-1.)

### 2. The Enterprise Organized, Supported, and Funded Violence Against DAPL

#### a. Red Warrior Camp Infiltrates Protest Camps in North Dakota

Beginning in August 2016, in response to the Enterprise's misinformation campaign, thousands of protestors traveled to North Dakota to form encampments near the Lake Oahe crossing.  (¶ 117.)  Earth First! Doe defendants gave $500,000 in seed money to violent infiltrators to form Red Warrior Camp.  (¶ 118.)  Greenpeace USA trained members of Red Warrior Camp directly and also sent its own employees to the newly-formed Red Warrior Camp to participate in the DAPL protests under the Red Warrior Camp umbrella.  (¶¶ 11, 61, 118.)

Red Warrior Camp openly announced and disseminated its violent intentions on social media via a series of recruitment videos featuring themes of guerilla warfare and insurgency.  (¶¶ 131-32.)  One video featured masked or hooded members of Red Warrior Camp and anarchist riots and arson across the world, urging viewers to "take railroads. Take bridges. Do it! They cannot stop us all!"  (¶ 131.)  Another video, titled "Mask up and Donate," called for "likeminded warriors" to "join [Red Warrior] in [their] fight for water by any means necessary."  (¶ 132.)  The video refers to Red Warrior Camp members as "Black Snake Killaz" who eat "rubber bullets for breakfast."  (*Id.*)  The same videos solicited donations for Red Warrior Camp.  (*Id.*)  Ms. Two Bulls, in her role as Red Warrior Camp's media coordinator, leader, and organizer, produced or authorized the publication of these videos.  (¶¶ 31, 41.)  Ms. Two Bulls also published Red Warrior Camp's periodic "calls to action," on Greenpeace USA's website and elsewhere, to recruit individuals to join Red Warrior Camp in North Dakota or "send monetary support."  (¶¶ 127, 130; Recine Decl., Ex. 3.)

    **b.**  **Red Warrior Camp's Violent Attacks on DAPL and Energy Transfer**

On August 11, 2016, roughly 200 protestors led by Red Warrior Camp and Mr. Hall entered DAPL property near Lake Oahe.  (¶ 120.)  Red Warrior Camp members jumped fences and threatened DAPL employees and law enforcement with knives.  (*Id.*)  Attacks continued on August 12, when hundreds of members of Red Warrior Camp entered DAPL property, threatening Energy Transfer employees with violence.  (¶ 121.)  Due to these threats of violence, Dakota Access personnel were evacuated by police escort, stopping construction.  (*Id.*)

On September 3, 2016, Red Warrior Camp and Mr. Hall led hundreds of protestors in an attack on construction crews working on DAPL.  (¶ 122.)  Red Warrior Camp members stampeded horses, dogs, and motor vehicles onto federal and private land where DAPL construction was ongoing.  (*Id.*)  Protesters attacked security personnel with knives, fence posts and flagpoles, resulting in numerous hospitalizations.  (*Id.*)  Protesters also destroyed Energy Transfer's property.  (*Id.*)  Red Warrior Camp mounted a similar attack on September 6.  (¶ 124.)  Days later, Mr. Hall was arrested for his role in the September 3 and September 6 attacks.  (*Id.*)

Red Warrior Camp attacked again on September 9, with masked members carrying knives and hatchets swarming and damaging a DAPL construction site two miles east of Highway 1806.  (¶ 125.)

    **c.**  **The Greenpeace Defendants, Ms. Two Bulls, and Mr. Hall Raise Funds to Support Red Warrior Camp's Violent Mission**

After Red Warrior Camp led these initial attacks on DAPL property and construction crews, Red Warrior Camp, through Ms. Two Bulls and Mr. Hall, and the Greenpeace Defendants agreed that Greenpeace USA would use its fraudulent misinformation campaign to raise money for continued illegal activities at Red Warrior Camp, including directing fraudulently induced funds to Mr. Hall and using its campaign to solicit direct donations and supplies to Mr. Hall.

(¶ 126.)  Between September 12 and 19, 2016, in coordination with Ms. Two Bulls and Mr. Hall, Greenpeace USA organized donation drives in ten cities across the country to collect supplies to fund, feed, and house Red Warrior Camp members at Lake Oahe.  (*Id.*)  Greenpeace USA sent the funds and supplies directly to Mr. Hall, notwithstanding knowledge of his recent arrest. (¶¶ 126-27.)

Around this time, Ms. Two Bulls published a series of posts and videos seeking support for Red Warrior Camp.  Ms. Two Bulls published Red Warrior Camp's public "call to action" on Greenpeace USA's website, urging the public to "take escalated action to stop the pipeline." (¶ 127.)  She published similar "calls to action" on Red Warrior Camp and her own Facebook page, asking supporters to "send monetary support" to Red Warrior Camp.  (Recine Decl., Exs. 3-4.)  She urged "militant direct action" against the pipeline.  (Recine Decl., Ex. 1.)  Ms. Two Bulls further issued a "communique" seeking "reinforcements from skilled and trained Warriors prepared to evict the Dakota Access Pipeline" to join Red Warrior Camp in Standing Rock to "kill this Black Snake once and for all."  (¶ 130.)[4]  Ms. Two Bulls also published a series of videos recruiting protestors to join Red Warrior Camp in North Dakota and soliciting donations. (¶ 132.)

---

[4]     Ms. Two Bulls' contention that she did not author this "communique" (ECF No. 121 at 5) raises a question of fact not appropriate for resolution on a motion to dismiss.  *Two Palms Software, Inc. v. Worldwide Freight Mgmt., LLC*, No. 4:10-CV-1045 CEJ, 2011 WL 1004861, at *2 (E.D. Mo. Mar. 18, 2011) ("The authorship of the document, and the extent of Defendant's participation on the drafting, are [] questions of fact and not appropriate for determination on a motion to dismiss.").  In any event, it is inaccurate to say that the writing style of the "communique" is "entirely distinct" from Ms. Two Bulls' other statements.  (*Id.*)  In a February 2017 post, Ms. Two Bulls use near-identical language, calling for an "attack [on] this Black Snake from every front with a diversity of tactics."  (Recine Decl., Ex. 5.)  "Diversity of tactics," according to Red Warrior Camp, includes the very "direct action" and "measures to put a stop to the work on DAPL" that the SRST rejected and caused it to evict Red Warrior Camp.  (Recine Decl., Ex. 6.)  Such language is entirely consistent with Ms. Two Bulls' call for "militant direct action" against DAPL.  (Recine Decl., Ex. 1.)

Money and supplies raised through the media campaign led by Ms. Two Bulls, in coordination with Greenpeace USA, enabled Red Warrior Camp to continue its violent attacks on DAPL through October and November 2016.  On October 27, 2016, protestors led by Red Warrior Camp trespassed on Energy Transfer property near Highway 1806, set up roadblocks to prevent access to the area, and erected an encampment on Energy Transfer property.  (¶ 133.)  When law enforcement requested that Red Warrior Camp members remove the barricade and leave Energy Transfer's property, Red Warrior Camp members responded with violence.  (*Id.*)  On this night, Red Warrior Camp members built makeshift barriers between themselves and the police and lit them on fire to prevent law enforcement from evicting them from the site.  (*Id.*)  Red Warrior Camp members threw Molotov cocktails at law enforcement, setting fire to DAPL land and appurtenant structures.  (*Id.*)  Red Warrior Camp members also deliberately set fire to numerous Energy Transfer vehicles and its heavy construction equipment, destroying the property in the process.  (*Id.*)  Red Warrior Camp, through Two Bulls, published documentary-style videos glorifying its unlawful acts of arson and destruction.  (¶¶ 31, 135.)

As a result of Red Warrior Camp's violent tactics, on November 1, 2016, the SRST Tribal Council unanimously voted to ask Red Warrior Camp to leave the Lake Oahe area out of concern for the safety of non-violent protestors opposing DAPL and because SRST rejected Red Warrior Camp's violent tactics.  (¶ 136.)  Red Warrior Camp ignored SRST's request, and not only did not leave the area, but continued to perpetrate violent operations against Energy Transfer and DAPL, rather than adopt non-violent means of protest that SRST preferred and supported.  (¶ 141.)

On November 20, 2016, Red Warrior Camp members gathered at Backwater Bridge in North Dakota and attempted to cross the bridge to establish an encampment on DAPL property.

(¶ 141.)  Armed Red Warrior Camp members attacked police, ignited fires on and near the

bridge, and threw grenades and flares at law enforcement officers.  (*Id.*)  Red Warrior Camp

members tore down barbed wire fencing and illegally entered Energy Transfer property.  (*Id.*)

### 3.   Enterprise Members Target Energy Transfer's Lenders, Investors, and Business Partners

The Greenpeace Defendants disseminated falsehoods concerning Energy Transfer and

DAPL directly to Energy Transfer's business constituents in an effort to induce the termination

or impairment of these relationships.  (¶¶ 158-77.)  In reliance on these misrepresentations,

numerous banks funding DAPL sold their equity interest in Energy Transfer and exited the $2.5

billion lending facility for DAPL.  (*Id.*)  Such divestment directly harmed Energy Transfer by

driving up its borrowing costs.

### D.   The Enterprise's Continuing Conduct

Greenpeace and Earth First! Doe Defendants continue to jointly target Energy Transfer's

infrastructure projects.  Greenpeace USA and Earth First! Doe Defendants have funded and

directed protestors to establish encampments to protest the Mariner East 2 pipeline in

Pennsylvania and the Bayou Bridge Pipeline in Louisiana.  (¶ 154.)  In 2018, Greenpeace USA

hired defendant Charles Brown as a pipeline organizer solely to interfere with Energy Transfer's

projects.  (¶¶ 62, 154.)  Greenpeace USA sent Brown and other employees to train hundreds of

protestors at both campsites.  (¶ 154.)  Using Greenpeace/Earth First! blockade techniques,

protestors have stopped construction on an almost daily basis for both projects.  (*Id.*)

Additionally, unknown individuals have used Ecodefense Guide techniques to vandalize

bulldozers and other construction equipment at both sites.  (¶¶ 155-56.)  The Earth First! Doe

Defendants, through Earth First! Journal, have called for "further sabotage" and a "proliferation

of more actions like these."  (¶ 157.)

## LEGAL STANDARD

A complaint should be dismissed only where the facts alleged fail to state a plausible claim for relief.  Fed. R. Civ. P. 12; *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  On a Rule 12 motion, the Court must "assume all factual allegations in the pleadings are true and interpret them in the light most favorable to the nonmoving party."  *Murphy v. Aurora Loan Servs., LLC*, 699 F.3d 1027, 1033 (8th Cir. 2012) (quotation omitted).  A complaint need only set forth allegations that "clear[ ] the relatively low hurdle of presenting plausible facts to create a reasonable inference that [a defendant] is involved in activities that may have harmed [p]laintiffs."  *Ginardi v. Frontier Gas Servs., LLC*, No. 4:11-cv-420 (BRW), 2011 WL 3493125, at *2 (E.D. Ark. Aug. 10, 2011) (Wilson, J.).  Applying these standards, Defendants' motions should be denied in their entirety.

## ARGUMENT

### I.    PLAINTIFFS' FEDERAL RICO CLAIMS AGAINST MS. TWO BULLS ARE ADEQUATELY PLED

The Racketeering Influenced and Corrupt Organization Act ("RICO") bars "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly in the conduct of such an enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c). RICO also provides a private right of action to "[a]ny person injured in his business or property by reason of RICO's substantive provisions."  18 U.S.C. § 1964(c).  To plead a RICO violation, a plaintiff must allege that a defendant: (1) conducted, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) resulting in damages to business or property. *See Handeen v. Lemaire*, 112 F.3d 1339, 1347-54 (8th Cir. 1997).

13

The RICO statute also makes it unlawful for any person to conspire to conduct or participate in the conduct of a RICO enterprise.  18 U.S.C. § 1962(d).  To plead a violation of 18 U.S.C. § 1962(d), a plaintiff must establish that either "a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise."  *United States v. Henley*, 766 F.3d 893, 908 (8th Cir. 2014) (internal citations omitted).

The U.S. Supreme Court mandates that RICO "'be liberally construed to effectuate its remedial purposes,'" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985), and has repeatedly "refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe," *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008).  Under this precedent, the Amended Complaint adequately pleads each element of a RICO violation.[5]

### A.    The Amended Complaint Adequately Pleads a RICO Enterprise and Ms. Two Bulls' Participation in the Enterprise

A RICO "enterprise" is "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The "very concept of an association in fact is expansive" and encompasses any "continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 944, 945, 948 (2009).  To plead a RICO enterprise, a plaintiff must allege:  (1) a

---

[5] Since Energy Transfer has sufficiently pleaded its federal RICO claims, it has likewise pleaded its claims under the North Dakota counterpart, N.D.C.C. § 12.1-06.1-03(2).  *See Burr v. Kulus*, 564 N.W.2d 631, 636 (N.D. 1997) (North Dakota RICO statute modeled after federal RICO statute and contains similar language for a similar purpose).  Moreover, Plaintiffs have adequately alleged probable cause that Defendants committed the predicate acts.  *See Geraci v. Women's Alliance, Inc.*, 436 F. Supp. 2d 1022, 1043 (D.N.D. 2006) (probable cause requires only "fair probability").

common purpose among members of engaging in a course of conduct; (2) relationships among those associated with the enterprise; and (3) sufficient longevity to permit the associates of the enterprise to pursue its purpose. *Id*. The Amended Complaint alleges an enterprise consisting of Greenpeace Defendants, Earth First!, the Earth First! Doe Defendants, Mr. Hall, Ms. Two Bulls, and Red Warrior Camp. (¶¶ 37-76.) The Enterprise's alleged common purpose is to further an anti-development, anti-fossil fuel agenda and to impede or prevent the construction of DAPL and harm Energy Transfer through the publication and dissemination of false statements concerning Energy Transfer and DAPL; obstruction of DAPL construction by means of trespass, vandalism, violence, property destruction, and other unlawful activity; and interference with Energy Transfer's critical business relationships. (¶¶ 2, 80-82.)

Sufficient relations between Enterprise members, including Ms. Two Bulls, are also alleged. Red Warrior Camp was formed with the financial support and direction of Greenpeace USA and Earth First! Doe Defendants in connection with anti-DAPL protests in North Dakota, and these defendants trained members of Red Warrior Camp in "direct action" techniques to attack construction sites in North Dakota. (¶¶ 38-39, 60.) Ms. Two Bulls' coordination with Greenpeace USA to advance Red Warrior Camp's agenda is unquestionable. On October 28, 2016, Greenpeace USA and Ms. Two Bulls -- taking advantage of Greenpeace USA's immense web presence -- published a "call to action" written by Ms. Two Bulls on Greenpeace USA's website. (¶ 127.) Ms. Two Bulls also coordinated with Greenpeace USA in its donation drives for the express purpose of sustaining Red Warrior Camp's operations at Lake Oahe. (¶¶ 126-27.) Greenpeace USA sent the supplies and funds raised through these drives directly to Ms. Two Bulls' co-head of Red Warrior Camp, Mr. Hall. (*Id.*) That Ms. Two Bulls acted with Greenpeace USA to sustain Red Warrior Camp's anti-DAPL activities is plain, and the foregoing

allegations sufficiently plead relations between Ms. Two Bulls and other enterprise members and the existence of a "continuing unit that functions with a common purpose."[6] *Boyle*, 556 U.S. at 948.

The same allegations establish Ms. Two Bulls' role in directing "*some* part" of the Enterprise's affairs. *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995) (RICO liability is "not limited to the kingpin" but extends to all "operators or managers"). To direct some part of the Enterprise's affairs, a party need not yield control of the enterprise; rather, liability extends to those who participated in the management or operation of the enterprise -- whether upper management or lower-rung participants acting at their direction. Ms. Two Bulls' role as "leader," "organizer," "media coordinator," and fundraiser for key enterprise member Red Warrior Camp satisfies this standard. *Id.*; *see also Handeen*, 112 F.3d at 1350-51 (defendants participated in "operation or management" of the enterprise by overseeing enterprise's navigation of the legal system).

**B.    The Amended Complaint Adequately Pleads a Pattern of Racketeering Activity**

A pattern of racketeering activity also requires a showing of either (i) "a series of related predicates extending over a substantial period of time," *i.e.*, closed-ended continuity; or (ii) "that the predicate acts or offenses are part of an ongoing entity's regular way of doing business," *i.e.*, open-ended continuity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). A pattern also requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). While Ms. Two Bulls does not challenge the Amended Complaint on continuity grounds (*see* ECF No.

---

[6] Ms. Two Bulls wrongly states that a "hierarchical or consensual decision making structure" is necessary for a RICO enterprise. (*See* ECF No. 121 at 13.) In *Boyle*, the Supreme Court expressly rejected any requirement of such "extratextual" formal structural attributes. 556 U.S. at 945, 948.

121 at 10), Plaintiffs have sufficiently alleged both open-ended and closed-ended continuity. The Amended Complaint alleges that Enterprise members have targeted Energy Transfer's pipeline projects since at least August 2016 when, with the support of Greenpeace USA and Earth First! Doe Defendants, Red Warrior established camps at Lake Oahe and commenced attacks on DAPL construction sites (¶¶ 38, 118-21), and Enterprise members continue attacks on Energy Transfer's infrastructure projects to this day (¶¶ 154-57).  These allegations establish that the Enterprise engaged in predicate acts over a period of two years and are sufficient to plead "closed-ended" continuity.  *See, e.g.*, *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 994-95 (8th Cir. 1989) (pattern element satisfied where complaint alleged two separate criminal schemes involving different victims and participants but common purposes, methodology, and results); *see also First Nat'l. Bank and Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir. 1991).  These allegations also establish that the Enterprise's RICO activity is ongoing, establishing "open-ended" continuity.  *See H.J. Inc.*, 492 U.S. at 241-43; *United States v. Hively*, 437 F.3d 752, 762 (8th Cir. 2006).[7]

The Amended Complaint alleges that Ms. Two Bulls committed violations of the Patriot Act.  The Patriot Act prohibits:  (i) arson and bombing of property used in interstate commerce in violation of 18 U.S.C. § 844(i); (ii) arson and bombing of government property in violation of 18 U.S.C. § 844(f)(2)-(3); (iii) depredation of federal property in violation of 18 U.S.C. § 1361; and (iv) providing material support or resources to anyone to anyone "knowing or intending that [the resources] are to be used in preparation for, or in carrying out, a violation" of 18 U.S.C. §

---

[7] Specific actors and members may change without "loss of the enterprise's identity as an enterprise."  *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987); *see Boyle*, 556 U.S. at 941 (sustaining enterprise where "participants . . . included a core group, along with others . . . recruited from time to time").

2339A(a). [8]  "Material support or resources" includes, *inter alia*, "any property, tangible or intangible, or service, including currency . . . lodging, training, expert advice or assistance . . . [or] personnel." *Id.* at 2339A(b).

Red Warrior Camp violated the Patriot Act by executing acts of arson and bombings of federal lands and property used in interstate commerce, as detailed above, *supra at* § C.2.  Red Warrior Camp's arson, bombing, and destruction of federal lands and pipeline equipment violate 18 U.S.C. §§ 844(i), 844(f)(2), and 1361.  As a "leader" and "organizer" who directed Red Warrior Camp's actions, Ms. Two Bulls is directly responsible for Red Warrior Camp's Patriot Act violations. *Zimprich v. N. Dakota Harvestore Sys., Inc.*, 419 N.W.2d 912, 914 (N.D. 1988) ("For directing another to commit wrongful conduct [defendant] can be held directly liable apart from any theory of vicarious liability which may apply.").[9]

Moreover, Ms. Two Bulls violated 18 U.S.C. § 2339A by knowingly and intentionally providing funds, supplies, personnel, leadership, media services, and other "material support" to Red Warrior Camp in furtherance of the foregoing attacks.  *See supra at* § C.2.  *See United States v. Arnaout*, 236 F. Supp. 2d 916, 916, 918 (N.D. Ill. 2003) (diverting charitable donations

---

[8] While the Amended Complaint does not specifically cite 18 U.S.C. § 2339A as a predicate act, the facts alleged in the Amended Complaint sufficiently state a violation. *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (Nov. 10, 2014) (although complaint did not cite statute under which it was seeking to recover, *Twombly* and *Iqbal* require only that plaintiff "plead facts sufficient to show that her claim has substantive plausibility," which is established by setting forth factual basis for the complaint).

[9] *See also* Restatement (Second) of Agency § 212 (1958) ("A person is subject to liability for consequences of another's conduct which results from his directions as he would be for his own personal conduct"); Restatement (Second) of Torts § 877 (1979) ("One who orders an act to be done is liable for its consequences as he would be for his own personal conduct if he has or should have knowledge of the conditions under which it is to be done."); Model Penal Code § 2.07 ("A person is legally accountable for any conduct he performs or causes to be performed in the name of . . . an unincorporated association or in its behalf to the same extent as if it were performed in his own name or behalf.").

to terrorist organizations constituted provision of material support under Patriot Act where indictment alleged defendant knew and intended that donations would be used to perpetrate Patriot Act violations); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (providing funds and other support to known terrorist organization constitutes intentionally providing "material support" under 18 U.S.C. § 2339A).

### C. Energy Transfer Has Standing to Bring Its RICO Claims

Energy Transfer has established standing to bring its RICO claims. "Any person injured in his business or property by reason of a violation" of 18 U.S.C. § 1962 may bring a civil cause of action. 18 U.S.C. 1964(c). "[I]n order to show injury 'by reason of' a RICO violation," a plaintiff must establish that its alleged injury was proximately caused by defendants. *Bridge*, 553 U.S. at 654. A plaintiff needs merely to demonstrate that there is "some direct relation between the injury asserted and the injurious conduct alleged." *Id*. (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 528, 268 (1992)). The Amended Complaint alleges that Energy Transfer suffered extensive injury to its business and property as a result of the Enterprise's conduct. (¶ 184.) These alleged injuries are cognizable RICO injuries to "business or property." *Raineri Const., LLC v. Taylor*, 2014 WL 2348632, at *2 (E.D. Mo. Jan. 31, 2014) (interference with customer relationships, business operations, and causing property damage are injuries to business or property).

The Amended Complaint pleads that Energy Transfer's injuries were proximately caused by the Enterprise's RICO violations. First, Energy Transfer alleges that Red Warrior Camp members, under Ms. Two Bulls' direction and control, physically damaged or destroyed Energy Transfer property. (¶¶ 31, 38-41, 120-27, 130-33, 135, 141.) Moreover, Energy Transfer alleges that Ms. Two Bulls provided material support to Red Warrior Camp by offering her own services as an organizer and media coordinator, recruiting individuals to join Red Warrior Camp, and

19

raising funds and supplies for Red Warrior Camp to sustain its illegal activities.  (*Id.*)  The
Amended Complaint alleges that Energy Transfer incurred increased security costs at DAPL and
costs associated with construction delays.  (¶ 184.)  This establishes the "direct relation between
the injury asserted and the injurious conduct alleged"; thus, Energy Transfer has adequately
established proximate cause with respect to the alleged physical injuries to Energy Transfer
property and business costs incurred in connection with Red Warrior Camp's attacks.  *See
Bridge*, 553 U.S. at 654.

> **D.    Ms. Two Bulls Is Liable for the Conduct of the RICO Enterprise And All
> Damage Flowing Therefrom**

All RICO defendants are liable for all the acts of their co-conspirators reasonably linked
to the Enterprise's goals, irrespective of whether they participated in the commission of the
predicate act or had knowledge thereof.  *See Salinas v. United States*, 522 U.S. 52, 63 (1997)
(RICO "conspiracy may exist even if a conspirator does not agree to commit or facilitate each
and every part of the substantive offense"); *see also id.* at 63, 64 ("[if] conspirators have a plan
which calls for some conspirators to perpetrate the crime and others to provide support, the
supporters are as guilty as the perpetrators" and "[e]ach is responsible for the acts of each
other").  Moreover, "[o]ne does not have to have contact with all of the other members of a
conspiracy to be held accountable as a conspirator."  *United States v. McCarthy*, 97 F.3d 1562,
1570 (8th Cir. 1962).  "Notwithstanding a defendant's lack of knowledge of the identity of all of
the other co-conspirators or his failure to appreciate the extent of the enterprise, a defendant can
be held liable as a co-conspirator if he shares the same common purpose or goal of the other
conspirators."  *Id.* at 1570-71.  The focus is "not on the agreement to commit the individual
predicate acts," but on "the agreement to participate in the enterprise through a pattern of
racketeering activity."  *Henley*, 766 F.3d at 908.  An agreement to participate in an enterprise

through a pattern of racketeering "may be shown wholly through the circumstantial evidence of [each defendant's] actions." *Handeen*, 112 F.3d at 1355.

Here, Ms. Two Bulls' relationships with Greenpeace Defendants and Red Warrior Camp, and the actions she took in her role as a leader of Red Warrior Camp, are adequate to allege that Ms. Two Bulls is a part of the alleged RICO enterprise.  Further, the Amended Complaint alleges that Ms. Two Bulls agreed with her co-defendants and enterprise members to engage in the illegal scheme targeting Energy Transfer, *supra* § I.A, and performed numerous overt acts in furtherance of that scheme, *supra* § I.B, causing injury to Energy Transfer.  Thus, Ms. Two Bulls is legally responsible for the acts of her co-conspirators that are reasonably foreseeable to be within the scope of the conspiracy.  *See, e.g., Henley*, 766 F.3d at 909 (imputing liability to defendant for acts of co-conspirators where circumstantial evidence demonstrated agreement to participate in enterprise).  This includes Greenpeace Defendants' violations of the mail and wire fraud statutes by their widespread dissemination of false statements concerning Energy Transfer and DAPL to the public, and to Energy Transfer's business constituents, for the purpose of raising funds for Red Warrior's continued attacks against Energy Transfer.  (*See* ECF No. 111 at § I.B.1.b.)  Likewise, Ms. Two Bulls is liable for Red Warrior Camp's violations of the Patriot Act.  *See supra* § I.B.

## II.    THE FIRST AMENDMENT DOES NOT PROTECT MS. TWO BULLS' ILLEGAL CONDUCT

Ms. Two Bulls' attempts to recast racketeering, Patriot Act violations, trespass, conspiracy, and other unlawful activity as protected speech and association should be rejected.  The U.S. District Court for the District of North Dakota has twice held that acts of trespass, violence, and destruction of public and private property are not protected by the First Amendment:

> The rights of free speech and assembly do not mean the Dakota Access pipeline
> protestors can trespass on public or private property, or protest on public bridges,
> streets, and highways without permission, whenever they choose to do so under
> the guise of such activity being a "peaceful and prayerful protest." . . . As
> previously noted, the rights of free speech and assembly do not mean, and have
> never meant, that everyone who chooses to protest against the Dakota Access
> pipeline may do so at any time, any place, and under any set of conditions they
> choose in total disregard of the law.  To allow that to occur would result in
> anarchy and an end to the rule of law in civilized society.

*Kirchmeier*, No. 1:16-cv-00406, 2017 WL 5894552, at *20; *see also Archambault*, 2016 WL

51070005, at *2-3 ("[W]hile the pipeline demonstrators have the right to protest, ***they certainly***

***have no right to violate the law or commit illegal and unlawful acts while exercising their***

***First Amendment rights***.") (emphasis added).

Moreover, the Supreme Court has long held that misconduct like Ms. Two Bulls' may

give rise to liability even if it involves speech:

> [I]t has never been deemed an abridgment of freedom of speech or press to make
> a course of conduct illegal merely because the conduct was in part initiated,
> evidenced, or carried out by means of language, either spoken, written, or printed.
> Such an expansive interpretation of the constitutional guaranties of speech and
> press would make it practically impossible ever to enforce laws against
> agreements and conspiracies deemed injurious to society.

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see also Goodwin v. United*

*States*, 869 F.3d 636, 639 (8th Cir. 2017), *reh'g denied* (Sept. 28, 2017) ("Specific criminal acts

are not protected speech even if speech is the means for their commission.") (citations omitted).

This principle applies to activity that violates valid conduct-regulating statutes, such as RICO.

*See United States v. Larson*, 807 F. Supp. 2d 142, 165 (W.D.N.Y. 2011) ("[T]he RICO

conspiracy provision punishes conduct rather than mere association or speech – namely, the

intentional conduct of agreeing to further the criminal enterprise by committing predicate

crimes" and thus does not implicate the First Amendment); *Rice v. Paladin Enterprises, Inc.*, 128

F.3d 233, 242-43 (4th Cir. 1997) ("speech . . . that constitutes criminal aiding and abetting does

not enjoy the protection of the First Amendment" including "where, as here, the defendant has the specific purpose of assisting and encouraging commission of such conduct").

Contrary to Ms. Two Bulls' assertions, the conduct alleged here is actionable under both *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) and *Bradenburg v. Ohio*, 395 U.S. 444 (1969). *Claiborne Hardware* recognizes that "[t]he First Amendment does not protect violence" or violent conduct "masquerad[ing] under the guise of 'advocacy.'" 458 U.S. at 916. First Amendment protection does not extend to one who "specifically intend[ed] to accomplish [the aims of the organization] by resort to violence"; "authorized, directed, or ratified specific tortious activity"; or "incit[ed] lawless action." *Id.* at 916, 919, 927; *see also Brandenburg*, 395 U.S. at 448 (the First Amendment does not protect "preparing a group for violent action and steeling it to such action" or "advocacy [ ] directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Additionally, otherwise protected speech "might be taken as evidence that [a defendant] gave other specific instructions to carry out violent acts or threats." *Claiborne Hardware*, 458 U.S. at 927.

As the foregoing cases make clear, Ms. Two Bulls' alleged conduct far exceeds the bounds of protected speech and association. As alleged in the complaint, Ms. Two Bulls is, and was during the anti-DAPL protests, a leader, media coordinator, and fundraiser for Red Warrior Camp. In her leadership role, Ms. Two Bulls authorized, directed, and ratified Red Warrior Camp's activities, including its violent trespass on public and private lands, destruction of construction equipment, and harassment of Energy Transfer personnel. (¶¶ 31, 126-27, 131-33, 135, 141.) As Red Warrior Camp's "media coordinator," Ms. Two Bulls published calls for violent action against Energy Transfer and DAPL. (¶ 31.) She urged "militant direct action" to "evict the Dakota Access Pipeline" and "kill th[e] Black Snake." (¶ 130; Recine Decl., Ex. 1.)

23

She recruited "likeminded warriors" to "join [Red Warrior Camp] in [their] fight for water by any means necessary" through videos featuring anarchist riots, arson, and violent confrontation, which were intended to -- and did -- incite unlawful and violent action by members of an organization she admittedly lead.  (¶¶ 131-33, 135, 141.)  As the group's fundraiser, Ms. Two Bulls raised funds and supplies for the purpose of sustaining these operations, resulting in Red Warrior Camp's arson and destruction of Energy Transfer's property and federal lands and causing enormous financial harm to Energy Transfer.  (¶¶ 126-27; Recine Decl., Ex. 3.)  Indeed, Red Warrior Camp has proclaimed that their "measures to put a stop to the work on DAPL . . . has cost ETP millions," and that their direct action has "struck . . . a deadly blow."  (Recine Decl., Ex. 6.)  Ms. Two Bulls' and her group's organization, incitement, support, and perpetration of violence are not afforded Constitutional protection, and her contentions that the conduct alleged is protected speech should be rejected by the Court.

## III.    PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY PLED

### A.    The Complaint States a Claim for Trespass

The Amended Complaint also states a claim for trespass.  To state a claim for trespass on real property under North Dakota law, the complaint must allege that a person "intentionally and without a consensual or other privilege . . . enters land in possession of another or any part thereof or causes a thing or third person to do so."  *McDermott v. Sway*, 50 N.W.2d 235, 240 (N.D. 1951).  Thus, "[i]f, by any act of his, the actor intentionally causes a third person to enter land, he is as fully liable as though he himself enters."  *Id.*  To state a claim for trespass to chattel, the complaint must allege a loss of use of the property.  *Sagebrush Resources, LLC v. Peterson*, 841 N.W.2d 705, 712 (N.D. 2014).  The Amended Complaint alleges that Ms. Two Bulls recruited individuals, raised funds and supplies, organized, and otherwise aided and abetted Red Warrior Camp's trespass on Energy Transfer's construction sites to obstruct construction.

(¶¶ 31, 38-41, 120-27, 130-33, 135, 141.)  The trespass by Red Warrior Camp members stopped construction on numerous occasions.  (¶¶ 120-22, 125, 133, 141.)  These allegations sufficiently state a claim for trespass on both real property and chattel.  *See Minto Grain, LLC v. Tibert*, 776 N.W.2d 549, 566 (N.D. 2009) (awarding damages for loss of financing as a result of trespass); *Bladow v. Bladow*, 249 N.W.2d 917, 919 (N.D. 1977) (awarding value of loss of use of land for certain time period).

### B.  The Complaint States a Claim for Conspiracy

The Amended Complaint also alleges a claim for civil conspiracy under North Dakota law, the elements of which are:  "(1) [t]wo or more persons, and for this purpose a corporation is a person; (2) [a]n object to be accomplished; (3) [a] meeting of minds on the object or course of action; (4) [o]ne or more unlawful or overt acts; and (5) [d]amages as the proximate result thereof."  *In re N. Dakota Pers. Injury Asbestos Litig. No. 1*, 737 F. Supp. 1087, 1096 (D.N.D. 1990).  As set forth above, the Amended Complaint plausibly alleges Defendants' common plan, concerted action, and unlawful and overt acts, including violations of state and federal law.  *See supra* §§ I.A and I.B.

## IV.  MS. TWO BULLS WAS PROPERLY SERVED

On December 5, 2018, Ms. Two Bulls was properly served with the summons and complaint.  (ECF No. 116).  The declarations of Plaintiffs' counsel submitted in support of Plaintiffs' motions to extend time for service (ECF Nos. 115 and 120) are true and accurate statements of the efforts of Plaintiffs' investigators to locate and serve Plaintiffs, and accurately reflect the facts conveyed by these investigators to Plaintiffs' counsel.  And, even if Ms. Two Bulls' arguments regarding service were valid -- and they are not -- the issue is moot.  In her motion, Ms. Two Bulls states that she can be served by certified mail at P.O. Box 1138, Lame Deer, Montana 59043 (ECF No. 121 at 21).  Thus, to avoid any argument that service was not

properly effected, on January 7, 2019, Plaintiffs sent a copy of the summons and complaint by certified mail to that address, a method which Ms. Two Bulls represents is sufficient to effect service.[10]  (*See* Recine Decl., Ex. 8.)

Even if service were somehow untimely or otherwise deficient -- and it is not -- dismissal under Fed. R. Civ. P. 4 is inappropriate where defendant has notice of the complaint and cannot demonstrate any prejudice as a result of a deficiency.  *See Qwest Comm'ns Co. v. Aventure Comm'ns Tech., LLC*, 86 F. Supp. 3d 933, 994 (S.D. Iowa 2015) (Rule 4 "should be liberally construed to uphold service so long as a party receives sufficient notice of the complaint").  Ms. Two Bulls was personally served (ECF No. 116); admits that even before being served, she "had been aware of this lawsuit and the fact that [she] was named as a defendant in the amended complaint" (ECF No. 122-1 ¶ 3); and has now responded to this suit (ECF No. 122).

Ms. Two Bulls should not be dismissed for failure to properly effect service.  Such a dismissal is unwarranted and would only serve to delay -- not discontinue -- claims against her.  Fed. R. Civ. P. 4(m) (dismissal for untimely service must be made "without prejudice").  Because any dismissal for failure to serve must be without prejudice, any purported service issues can be cured upon re-filing the Amended Complaint against Ms. Two Bulls and re-serving her pursuant to the method she concedes is proper.[11]  Based on the foregoing, Ms. Two Bulls'

---

[10] It is not the case, as Ms. Two Bulls contends, that an "address search website" indicates that P.O. Box 1138 is her current address.  (ECF No. 121 at 21.)  Instead, the website Ms. Two Bulls point to shows that the P.O. Box address has not been associated with Ms. Two Bulls since July 2006.  (Recine Decl., Ex. 7.)  Further, neither Ms. Two Bulls recent Lame Deer, Montana address nor her current Billings, Montana address are publicly disclosed (to the best of Plaintiffs' knowledge).  (*Id.*)  The most recent publicly available address for Ms. Two Bulls is 5244 Wyoming NE Blvd, Apt E4, Albuquerque, NM 87111 (*id.*).  Plaintiffs attempted to serve Ms. Two Bulls at this address immediately after filing the Amended Complaint.  (ECF No. 108 ¶ 12.)

[11] While Plaintiffs now have effected service via this method as represented is proper in Ms. Two Bulls' submission to the Court, under North Dakota law, which applies here, sending a summons and complaint via certified mail, without more, is insufficient to effect service.  N.D. R. Civ. P.

motion to quash service should be denied.  *See Anderson Windows, Inc. v. Delmarva Sash & Door Co. of Md.*, 2002 WL 1424570, *3 (D. Minn. June 28, 2002) (denying motion to dismiss for insufficient process where defendant "was aware of the litigation" and responded to the complaint); *Bates v. Hadden*, 2013 WL 12086760, at *4-5 (S.D. Iowa Sept. 6, 2013) (defendant was not prejudiced where defendant "had notice of . . . the lawsuit from the outset" and had since "been properly served").

## <u>CONCLUSION</u>

For the foregoing reasons, Ms. Two Bulls' motion to dismiss and to quash service should be denied in its entirety.  To the extent the Court grants Ms. Two Bulls' motions in whole or in part, Energy Transfer requests that such dismissal be without prejudice and that leave to amend the complaint be granted.

---

4(d)(2)(A)(iv).  Rather, North Dakota law requires "a signed receipt and resulting [ ] delivery" to Ms. Two Bulls.  As discussed, public sources indicated that the P.O. Box has not been associated with Ms. Two Bulls since July 2006.  (Recine Decl., Ex. 7.)  Thus, Ms. Two Bulls' contention that Plaintiffs somehow failed to take obvious steps are baseless, as the very method she suggests would be appropriate is not authorized by North Dakota law.

DATED this 11th day of January, 2019.

**FREDRIKSON BYRON P.A**             **KASOWITZ BENSON TORRES LLP**

                                     /s/ Jennifer S. Recine

By:   Lawrence Bender, ND Bar# 03908   By:   Michael J. Bowe (admitted *pro hac vice*)
                                             Jennifer S. Recine (admitted *pro hac vice*)
                                             Lauren Tabaksblat (admitted *pro hac vice*)

     1133 College Drive, Suite 1000          1633 Broadway
     Bismarck, ND 58501                      New York, NY 10019
     Telephone: 701.221.8700                 Telephone: 212.506.1700
     Fax: 701.221.8750

                                             *Attorneys for Plaintiffs Energy Transfer*
                                             *Equity, L.P., and Energy Transfer*
                                             *Partners, L.P.*